# 23-365-cv

## United States Court of Appeals
### for the
### Second Circuit

JASON FREY, BRIANNA FREY, JACK CHENG, WLLIAM SAPPE,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK,KEECHANT SEWELL, in her Official Capacity, STEVEN NIGRELLI, in his Official Capacity,

*Defendants - Appellees,*

KEVIN BRUEN, Acting Superintendent of the New York State Police, in his official capacity, DERMOT SHEA, in his Official Capacity as NYPD Police Commissioner,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (White Plains)

## BRIEF FOR PLAINTIFFS-APPELLANTS

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... i

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUE PRESENTED FOR REVIEW ...................................................... 1

STATEMENT OF THE CASE.................................................................. 1

SUMMARY OF THE ARGUMENTS ..................................................... 8

STANDARD OF REVIEW ...................................................................... 9

LEGAL ARGUMENT.............................................................................. 9

I. POST-1791 REGULATIONS MUST BE REJECTED ....................................... 9

    A.  The Bruen Test – Step One ................................................................ 10

    B.  The Bruen Test – Step Two ............................................................... 11

II. SUPREME COURT JURISPRUDENCE LOOKS TO THE
    FOUNDING ERA TO DEFINE THE SCOPE OF RIGHTS, NOT 1868........ 12

III.  NO SUPREME COURT CASES RELY SOLELY ON 1868
    TO INTERPRET THE BILL OF RIGHTS .................................................... 14

IV. MODERN FIREARM REGULATIONS CANNOT BE JUSTIFIED BY
    POST-RATIFICATION ANALOGUES........................................................ 16

    A. The District Court Erred By Not Enjoining 400.00(15) ................... 17

    B. The District Court Erred By Not Enjoining 400.00(6) .................... 18

V. PENAL LAW 265.01-e – PUBLIC TRANSPORTATION AND TIMES
    SQUARE HAVE NO HISTORICAL ANALOGUE ....................................... 20

A. The CCIA is Heightened Version of the Rejected
   Proper-Cause Factor............................................................................ 20

B. Times Square Ban Has No Historical Analogue............................... 22

C. Transportation Ban Has No Historical Analogue ............................ 25

VI.  NO TRADITION OF REGULATING OPEN CARRY EXISTS.................. 27

   A.  Sappe and Frey Have Standing to Challenge Open Carry Ban ...... 27

   B.  Likelihood of Success on Open Carry Claims is Substantial ........ 30

   C. No Tradition of Criminal Penalties for Open Carry ........................ 33

VII. RELYING ON A PASSING REFERENCE TO A 'SCHOLARLY
   DEBATE' WAS AN ABUSE OF DISCRETION.......................................... 34

VIII.  APPELLANTS DEMONSTRATED IRREPARABLE HARM ................. 38

IX. INJUNCTION FAVORS THE PUBLIC INTEREST AND THERE IS NO
   HARDSHIP FOR THE GOVERNMENT ........................................................ 39

X. A PERMANENT INJUNCTION SHOULD ISSUE FROM
   THIS COURT ..................................................................................... 41

CONCLUSION ................................................................................... 42

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Antonyuk v. Bruen*,
⸺ F.Supp.3d ⸺, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ................. 40

*Antonyuk v. Hochul*,
2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ...................................................... 27

*Barker v. Wingo*,
407 U.S. 514 (1972) ........................................................................................... 24

*Benton v. Maryland*,
395 U.S. 784 (1969) ........................................................................................... 13

*Brenntag Int'l Chem., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) .............................................................................. 38

*Cath. Diocese of Brooklyn v. Cuomo*,
⸺ U.S. ⸺, 141 S.Ct. 63 (2020) ..................................................................... 39

*Cayuga Nation v. Tanner*,
824 F.3d 321 (2d Cir. 2016) .............................................................................. 28

*Christian v. Nigrelli*,
2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ................................................ 39

*Crawford v. Washington*,
541 U.S. 36 (2004) ............................................................................................. 12

*D.C. v. Heller*,
554 U.S. 570 (2008) ..................................................................................... 11, 32

*Davis v. Federal Election Comm'n*,
554 U.S. 724 (2008) ........................................................................................... 27

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) .................................................................. 11, 14, 15

i

*Dred Scott v. Sandford*,
   19 How. 393 (1857) ................................................................. 15, 37, 38

*Duncan v. Becerra*,
   265 F. Supp. 3d 1106 (S.D. Cal. 2017) .................................... 40

*Duncan v. Louisiana*,
   391 U.S. 145 (1968) ................................................................. 13

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................. 39

*Fulton v. City of Philadelphia*,
   141 S.Ct. 1868 (2021) .............................................................. 13

*Gamble v. United States*,
   139 S.Ct. 1960 (2019) .............................................................. 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................................. 41

*Gross v. United States*,
   390 U.S. 62 (1968) ................................................................... 41

*Hardaway v. Nigrelli*,
   2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ........................ 28

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ............................................... 40

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
   565 U.S. 171 (2012) ................................................................. 13

*Hudson v. Michigan*,
   547 U.S. 586 (2006) ................................................................. 24

*In re Oliver*,
   333 U.S. 257 (1948) ................................................................. 13

ii

*Indep. Bankers Ass'n of Am. v. Heimann*,
    613 F.2d 1164 (D.C. Cir. 1979) ........................................................... 41

*Klopfer v. North Carolina*,
    386 U.S. 213 (1967) ........................................................................... 13

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ........................................................................... 13

*Malloy v. Hogan*,
    378 U.S. 1 (1964) ............................................................................... 15

*McDonald v. Chicago*,
    561 U.S. 742 (2010) .................................................................... Passim

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ........................................................................... 24

*Muscarello v. United States*,
    524 U.S. 125 (1998) ........................................................................... 31

*Near v. Minnesota*,
    283 U.S. 697 (1931) ........................................................................... 13

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ........................................................................... 12

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) .................................................................. 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 .......................................................................... Passim

*Nunn v. State*,
    1 Ga. 243 (1846) ............................................................................... 31

*Powell v. Alabama*,
    287 U.S. 45 (1932) ........................................................................... 13

iii

*Ramos v. Louisiana*,
  140 S.Ct. 1390 (2020) ................................................................... 13, 15

*Reynolds v. United States*,
  98 U.S. 145 (1878) ............................................................................ 13

*Rhode Island v. Massachusetts*,
  37 U.S. (12 Pet.) 657(1838) .............................................................. 12

*South Carolina v. United States*,
  199 U.S. 437 (1905) .......................................................................... 12

*Sprint Communications Co. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) .......................................................................... 36

*Timbs v. Indiana*,
  586 U.S. ——, 139 S.Ct. 682 (2019) ................................................. 15

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .......................................................................... 28

*Virginia v. Moore*,
  553 U.S. 164 (2008) .......................................................................... 12

*Washington v. Texas*,
  388 U.S. 14 (1967) ...................................................................... 13, 14

*Wilson v. Arkansas*,
  514 U.S. 927 (1995) .......................................................................... 13

*Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*,
  339 F.3d 101 (2d Cir. 2003).............................................................. 38

*Wrenn v. D.C.*,
  864 F.3d 650 (D.C. Cir. 2017) ...................................................... 9, 41

*Wyoming v. Houghton*,
  526 U.S. 295 (1999) .......................................................................... 13

iv

**Statutes**

28 U.S.C. §1292 ................................................................................. 1
28 U.S.C. § 1331 ................................................................................ 1
28 U.S.C. § 2106 ......................................................................... 41, 42

**Other Authorities**

The "Sensitive Places" Doctrine,
  13 Charleston L. Rev. 205 (2018) ..................................................... 23

Smith, Mark W.,
  "Not All History Is Created Equal," October 1, 2022 ................................. Passim

**JURISDICTIONAL STATEMENT**

Subject matter jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1331, as the causes of action arose from violations of the U.S. Constitution. The Opinion and Order appealed from denying Appellants' application for a preliminary injunction, was entered by the Clerk of the Court on March 13, 2023. Appellants timely filed a Notice of Interlocutory Appeal on March 16, 2023. Jurisdiction in this court is proper pursuant to 28 U.S.C. §1292.

**ISSUE PRESENTED FOR REVIEW**

Whether the district court's denial of Appellants' motion for a preliminary injunction was an abuse of discretion.

**STATEMENT OF THE CASE**

This interlocutory appeal challenges a district court decision denying Appellants' motion to enjoin New York State firearm regulations that conflict with the text, history, and tradition of the right to possess and carry firearms in this Nation as codified in the Second and Fourteenth Amendments to the United States Constitution.

Each Appellant holds a New York State pistol license to possess and carry a handgun concealed on their person in public.

1

But submitting to the State's licensing scheme and obtaining a concealed carry handgun license still does not allow Appellants to lawfully exercise presumptively protected conduct.

Appellants' full carry licenses are invalid in New York City (the "City"). If they travel into the City armed with a handgun for self-protection concealed on their person, they will be arrested and incarcerated by the NYPD.[1]

To intentionally frustrate the *Bruen* opinion, New York passed the Concealed Carry Improvement Act ("CCIA"); in September 2022 it became a felony in New York State to merely possess a handgun, rifle, or shotgun on, among other locations, every public mode of transportation, in the geographical area encompassing Times Square – and there is no exemption for licensed handgun owners.[2]

And, while open carry was historically the traditional means of carrying a weapon in this Nation, Appellants cannot lawfully carry a handgun open and holstered on their person. Open carry is banned in New York.[3]

---

[1] Penal Law §§ 400.00 (6), (15).
[2] Penal Law §§ 265.01-e (2)(n), (t).
[3] Penal Law §§ 400.00(2); (15).

2

In New York State, handgun licenses are issued by statutorily defined licensing officers.[4] All licensing officers in the counties outside of New York City (the "City"), Nassau County, and Suffolk County are Judges. For the residents of the City, Nassau, and Suffolk, the licensing officer is the police commissioner.[5]

New York State concealed carry handgun licenses issued by a licensing officer outside of New York City ("upstate")[6] are valid everywhere throughout the state, but are <u>invalid</u> in the City.

By statute, upstate concealed carry licenses lose their validity once a licensee crosses the border into any of the 5 boroughs of the City.[7] An armed Westchester licensee who makes a wrong turn into the Bronx is now a criminal; traveling from Westchester to Long Island also subjects the licensee to arrest and incarceration.

Carrying a handgun open and holstered is outright banned in New York, even for licensed individuals.

As of September 2023, locations where people are the most vulnerable to a violent attack have been declared "gun free" – a neon sign to violent attackers, predators, and evil doers that the victims are absolutely defenseless – and a felony

---

[4] Penal Law § 265.00(17).
[5] Penal Law 265.00(17). In the easternmost portion of Suffolk County, the sheriff is the licensing officer.
[6] While Nassau, Suffolk, Westchester, and surrounding counties are not technically 'upstate New York', the term 'upstate' is used herein to delineate between NYPD-issued licenses and those issued anywhere else in New York State.
[7] Penal Law § 400.00(6).

conviction for law-abiding people just exercising constitutionally protected rights.[8]

There is no exemption from felony arrest and prosecution for licensed firearm owners.[9]

<u>New York Law Enforcement's Disdain for the Second Amendment</u>

NYPD will arrest any upstate licensee who possesses a handgun in the City because an upstate license "is invalid to cross the county." [A22].

An August 2022 NYPD memorandum instructs all officers that:

"Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise."

"[o]fficers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm [ ] and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous."

[Memo; Sappe ¶ 14].

According to the NYPD policy, exercising one's Second Amendment rights *de facto* waives one's Fourth Amendment rights. Constitutionally protected conduct now gives the NYPD reasonable suspicion to believe an individual is 'dangerous.' [Memo; Sappe ¶ 15].

At a press conference celebrating Governor Hochul's enactment of the CCIA on August 31, 2022, Acting Superintendent of the New York State Police ("NYSP")

---

[8] Penal Law §§ 265.01-d, 265.01-e
[9] Penal Law §§ 265.01-d, 265.01-e, 265.20.

Steven Nigrelli publicly declared that the NYSP has "zero tolerance" for violations of the state's firearm laws, anyone who violates the firearm laws will be arrested, and NYS "troopers are standing ready to do so."[10]

William Sappe

William Sappe ("Sappe") has held an unrestricted CCW issued by a County Court Judge in Orange County, New York for 8 years. [¶ 2] Sappe's CCW license authorizes him to carry a handgun concealed on his person everywhere in the State - except the 5 boroughs of New York City (the "City'). [¶3].

A CCW issued by a licensing officer outside of the City is <u>invalid</u> in the City[11]; a separate license must be applied for and obtained by the City licensing officer, to wit, the NYPD Police Commissioner.[12] [¶ 8]. Sappe applied for a City license and was denied. [¶ 9].

When Sappe is not in New York City, he carries his handgun concealed in public on a regular basis for self-defense. [¶ 3]. Sappe holds an open carry firearms permit issued by the State of California, and CCW licenses issued by the states of Connecticut, Florida[13], and Arizona. [¶ 5-6].      Sappe holds an Armed Guard license in New York and California. [¶ 5]

---

[10] https://www.youtube.com/watch?v=gC1L2rrztQs
[11] Penal Law § 400.00(6).
[12] Penal Law § 400.00(6).
[13] Sappe's FL license authorizes him to carry a handgun concealed in approximately 30 other reciprocating states. A25. https://www.fdacs.gov/Consumer-Resources/Concealed-Weapon-License/Concealed-Weapon-License-Reciprocity

Sappe works in the area known as the 'Diamond District' in New York City transporting substantial amounts of cash, diamonds, and jewelry for high-end jewelers to various locations in the City, throughout the State, and to other states, including California and Nevada. [¶7].

On his way to work, Sappe travels through the area designated as "Times Square", which is now a "gun free" zone under the CCIA.[14]

Sappe expressed concrete plans to carry a handgun concealed in the City for self-defense on a daily basis.[¶10]. Sappe is concerned for his personal safety because the number of random incidents of violent criminal attacks in the City have risen sharply. [¶10]. Because Sappe regularly travels in and out of high-end jewelry stores in the Diamond District, he is a high-level target for a violent attack and avowed below his intention to carry in the City "on a regular basis from now on." [¶ 10].

By carrying a handgun for self-defense in the City, Sappe faces a credible risk of arrest and incarceration conduct under Penal Law § 400.00(15), a Class A misdemeanor, and traveling through the Times Square area also makes him a felon.[15]

---

[14] Penal Law 265.01-e.
[15] Penal Law 265.01-e.

When Sappe is in California, where he travels on a regular basis, he carries his handgun open and exposed in a holster everywhere he goes. [¶ 17]. Sappe intends to open carry in New York as well, but open carry is banned throughout the State. [¶19]. No open carry license is available to apply for or be issued under New York's licensing scheme. [Penal Law § 400.00; ¶ 18]. Sappe intends to carry his handgun open and exposed in New York and the City whenever he is not otherwise carrying concealed [¶19] but cannot open carry is illegal.

Sappe faces a credible and imminent threat of arrest and incarceration by the NYPD for carrying a handgun in the City – whether open or concealed - because his intentions have been made public and the NYPD has informed at least one other plaintiff that carrying a handgun in New York City without a NYC license will result in arrest. [¶ 20]. Sappe's open carriage of a handgun is enough for NYPD officers to approach, frisk, and ask to see a license according to the August 2022 Memorandum, which does not have.

Jason Frey

Jason Frey ("Frey") holds a New York State concealed carry license issued by a judicial licensing officer in Westchester County, New York. [A18-19]. Frey's license is not valid in the City. [Penal Law § 400.00(6)]. Frey regularly travels to the City where he carries his handgun concealed, on the MetroNorth Train, into

Grand Central, on the number 4 subway train, into Times Square visit various shops therein; he also takes the L train to visit friends in Williamsburg. [A22].

The NYPD will arrest anyone who open carries, which is banned in New York State; and anyone who carries concealed with an upstate handgun license, which is invalid in the City. [A22].

## SUMMARY OF THE ARGUMENTS

The district court abused its discretion by denying Appellants' application to enjoin Penal Law sections 265.01-d, 265.01-e, 400.00(6), and 400.00(15).

Each of the State's regulations conflicts with the plain text of the Second Amendment. Every example of a purported 'historical analogue' proffered by the State and City not only falls outside of the Founding Era, they also conflict with the plain text of the Second Amendment, which required the district court to summarily reject them as 'justified.' See, *NYSRPA V. Bruen*, 142.s.Ct. 2111, 2137 (2022) (where later history contradicts what the text says, the text controls).

There is no Founding Era tradition of requiring government permission to possess and carry arms when traveling intrastate, as Penal Law § 400.00(6) requires; nor were there criminal sanctions for open carry or for not seeking the government's to peaceably carry a handgun in another part of the state as imposed under § 400.00(15).

8

Penal Law §§ 265.01-d and 265.01-e conflict with the plain text of the Second Amendment, and upend conduct that has **never** been criminalized – turning everyone including licensed individuals, into felons for merely possessing a firearm on private property, in Times Square, and on public transportation.

Because the challenged regulations are inconsistent with the text, history, and tradition of firearm regulation, this Court should, respectfully, issue a permanent injunction and avoid the unnecessary waste of judicial resources. See, *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017).

## STANDARD OF REVIEW

The district court's denial of a preliminary injunction is reviewed for abuse of discretion. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Such an abuse occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts. *Id.* A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* (citation omitted).

## LEGAL ARGUMENT

## I. POST-1791 REGULATIONS MUST BE REJECTED

The district court abused its discretion by accepting the government's post-ratification firearm regulations as a justification for the challenged statutes.

9

The *Bruen* test for Second Amendment challenges is clear and unwavering:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.
>
> Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command.

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126; 2129-30 (2022).

## A. The *Bruen* Test – Step One

The conduct being regulated by each of the regulations challenged by Appellants is the public carriage of handguns for self-defense.

The *Bruen* Court had "little difficulty concluding" that "the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct - carrying handguns publicly for self-defense" – a conclusion that the New York State defendants did not dispute. *Bruen*, at 2134.

The plain text of the Second Amendment protects carrying handguns publicly for self-defense; therefore, the Constitution *presumptively protects* Appellants' conduct. *Bruen*, at 2126; 2129-30.

10

### B.  The *Bruen* Test – Step Two

"When it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, at 2136 quoting, *D.C. v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis supplied); see also, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 245 (5th Cir. 2022) (Ho, J. concurring) ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the *same standards* that protect those personal rights against federal encroachment.") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied); *Bruen*, 142 S.Ct. 2111 (same).

"To the extent later history contradicts what the text says, the text controls. Liquidating indeterminacies in written laws is far removed from expanding or altering them." *Bruen*, at 2137.

> "Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."

*Id.* (citation omitted).

11

## II. SUPREME COURT JURISPRUDENCE LOOKS TO THE FOUNDING ERA TO DEFINE THE SCOPE OF RIGHTS, NOT 1868

Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868. The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the *meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838)." [16]

Recognizing that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*," *Bruen* pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564

---

[16] See, A76 (Smith, Mark W., "Not All History Is Created Equal," October 1, 2022 at p. 9) (emphasis supplied). Professor Mark W. Smith is a Presidential Scholar and a Senior Fellow in Law and Public Policy at The King's College, a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology at the University of Oxford, an attorney, and a former adjunct professor of law at the University of Kansas School of Law, where he researched and taught a course on constitutional law, the Second Amendment, and related topics. https://www.tkc.edu/people/mark-w-smith/

U.S. 117, 122–125 (2011) (First Amendment). *Bruen*, at 2137–38 (emphasis added). Justice Thomas may have acknowledged an "ongoing scholarly debate" concerning 1868, but the *Bruen* Court adhered to Supreme Court jurisprudence, which "looks to the Founding era as the period of sole or primary relevance." [A89-93].

Professor Smith points to just a few of the "numerous cases involving all of the amendments in the Bill of Rights that have been incorporated" [17] in which the Founding Period was the temporal focal point, *not* when the amendments were incorporated into the Fourteenth Amendment in 1868:

First Amendment: *Near v. Minnesota*, 283 U.S. 697 (1931)*, Reynolds v. United States*, 98 U.S. 145 (1878), *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), *Lynch v. Donnelly*, 465 U.S. 668 (1984); Fourth Amendment: *Wyoming v. Houghton*, 526 U.S. 295 (1999), *Wilson v. Arkansas*, 514 U.S. 927 (1995): Fifth Amendment: *Benton v. Maryland*, 395 U.S. 784 (1969), *Gamble v. United States*, 139 S.Ct. 1960 (2019); Sixth Amendment: *Ramos v. Louisiana*,140 S.Ct. 1390 (2020), *Powell v. Alabama*, 287 U.S. 45 (1932), *Klopfer v. North Carolina*, 386 U.S. 213 (1967), *In re Oliver*, 333 U.S. 257 (1948), *Duncan v. Louisiana*, 391 U.S. 145 (1968), *Washington v. Texas*, 388 U.S. 14 (1967); Eighth Amendment: *Timbs v. Indiana*, supra.

---

[17] A95-108.

13

"[I]n the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states. Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866." [A120-123, discussing the debates leading to the Freedmen's Bureau Act and the Civil Rights Act of 1866].

## III. NO SUPREME COURT CASES RELY SOLELY ON 1868 TO INTERPRET THE BILL OF RIGHTS

Post-*Bruen* litigation and historical research so far fails to identify "a single Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or meaning of a provision of the Bill of Rights." [A105].

The Supreme Court has held on numerous occasions that, whether we define the right as it existed in 1791 or in 1868, the right is the same against the federal government and the states alike. *Douglass v. Nippon*, at 245. "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the *same scope* as against the Federal Government." *Ibid.* (emphasis supplied) quoting *Bruen*, at 2137 citing,

14

*Ramos v. Louisiana*, 590 U.S. ——, ——, 140 S.Ct. 1390 (2020) ("This Court has long explained ... that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government.") (emphasis added); *Timbs v. Indiana*, 586 U.S. ——, ——, 139 S.Ct. 682, 203 L.Ed.2d 11 (2019) ("[I]f a Bill of Rights protection is incorporated, there is *no daylight* between the federal and state conduct it prohibits or requires.") (emphasis supplied); *Malloy v. Hogan*, 378 U.S. 1, 10–11 (1964) ("The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.") (quotations omitted). *Douglass*, at 245.

As the *Bruen* Court observed, "Even before the Civil War commenced in 1861, this Court indirectly affirmed the importance of the right to keep and bear arms in public. Writing for the Court in *Dred Scott v. Sandford*, 19 How. 393, 15 L.Ed. 691 (1857), Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right 'to keep and carry arms *wherever they went*.' *Id.* at 417 (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of

the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, at 2150–51.

## IV.  MODERN FIREARM REGULATIONS CANNOT BE JUSTIFIED BY POST-RATIFICATION ANALOGUES

Post-ratification history can be used to provide constitutional context, "but to the extent that later history contradicts what the text says, the text controls." *Bruen*, at 2136-37.

It was an abuse of discretion for the district court to adopt the government's post-ratification analogues to justify the challenged Penal Law statutes. [A167].

There is no tradition of regulating the public carriage of firearms in the Founding Era. It was only after the ratification of the Second Amendment in 1791 that public-carry restrictions proliferated. *Bruen*, at 2120.

Even the State's historian acknowledged below that the regulation of public carry began with *concealed* carry and, even then, not until the *19th Century*. [ECF Doc. 64 at ¶¶7-8].

And the City's authority - ADAM  WINKLER, GUN FIGHT  164 (W.W. Norton & Company, Inc. eds.) (2011) supports the fact that "the most common gun laws in the 1880s [post-ratification] were those that banned the possession of *concealed* firearms in public." [ECF Doc. 66 at 21] (emphasis added).

16

The Supreme Court has "[n]ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791." [A81].

*McDonald* made clear that the Supreme Court "decades ago abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *McDonald*, at 785–86.

Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *McDonald*, at 765 (internal quotation marks omitted). [A85-86].

### A. The District Court Erred By Not Enjoining 400.00(15)

The district court erroneously relied on Antebellum Period (1815-1861) restrictions to justify the enforcement of § 400.00(15)[18], misconstruing *Bruen*'s discussion of the Antebellum Period restrictions, which were only addressed because respondent-therein New York State 'heavily relied upon' them. *Bruen*, at 1245.

---

[18] A170.

The *Bruen* Court began its discussion pointing out, "Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate"[19] again confirming that no public-carry restrictions existed at the time of the ratification. And the explicit language "shall not be infringed" codified the prevention of any such restrictions.

*Bruen* further observed that "none of [the Antebellum] restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime." *Bruen*, at 2145. But at no time did the Court substitute the plain text of the Second Amendment with post-ratification restrictions from the Antebellum Period.

To the extent that *concealed* carry was regulated during the Antebellum Period, neither the *Bruen* Court nor the plain text of the Second Amendment approves of any such distinction.

**B. The District Court Erred By Not Enjoining 400.00(6)**

Appellees failed to identify any tradition – Founding Era or otherwise - to justify the enforcement of the intrastate geographical restrictions of Penal Law § 400.00(6), which requires a separate NYS handgun license to lawfully carry a handgun within the City.

---

[19] *Bruen*, at 2145.

The State relied on post-ratification discretionary licensing regulations from 1821 to 1910, which the district court erroneously adopted to justify the enforcement of § 400.00(6).[20] The regulations proffered by the City are likewise incomparable because they do not prohibit the peaceable carriage of firearms for self-defense.[21]

Accepting Appellees' regulations as a historical analogue for section 400.00(6) was also an abuse of discretion because they contradict the plain text of the Second Amendment, which "guarantee[s] the individual right to possess and carry weapons in case of confrontation. *Heller*, at 592. And where "later history contradicts what the text says, the text controls." *Bruen*, at 2137.

Because the government failed to identify any text, history, or tradition of requiring government permission to peaceably carry a firearm in public, intrastate or otherwise, it was an abuse of discretion for the district court to find that the enforcement of § 400.00(6) is justified. [A167-68].

---

[20] While the district court refers to an "abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century [A168], only one regulation fell within the Founding Era (1750-1791). Pennsylvania's 1750 "An Act for the more effectual preventing accidents which may happen by fire, and for suppressing idleness, drunkenness, and other debaucheries," which required a license for fireworks, setting chimneys on fire to clean them, and firing a gun or other firearm [ECF Doc. 67-3], is no analogue to the Penal Law's restrictions on peaceable carry; standing alone, it also falls woefully short of a 'national tradition.'

[21] ECF Doc. 67-3 [post-ratification statutes proscribing "unlawfully shooting" at others in the public square (VA), "improper use" of firearms and "disturbing the peace" (AZ), "shooting guns" "wantonly or in sport" (NC)].

## V. PENAL LAW 265.01-e – PUBLIC TRANSPORTATION AND TIMES SQUARE HAVE NO HISTORICAL ANALOGUE

The district court properly found that Appellants have standing to challenge the prohibition of guns in public parks [2(d)], theaters [2(p)], restaurants with on-premise alcohol consumption [2(o)], the MTA subway and train cars [2(n)], and Times Square [2(t)]. [A160].[22]

 The district court abused its discretion by relying on post-enactment regulations that conflict with the plain text of the Second Amendment to deny the injunction of firearm bans on public transportation such as the MTA, subway, and train cars [2(n)], and Times Square [2(t)].

### A. The CCIA is Heightened Version of the Rejected Proper-Cause Factor

When determining whether a regulation is "relevantly similar under the Second Amendment, Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Bruen*, at 2133.

In *Bruen*, the Court rejected New York's "attempt to characterize New York's proper-cause requirement as a "sensitive-place" law"; the Court found that, in New

---

[22] Because the injunction of Penal Law §§ 265.01-e(2)(d), (o), and (p) granted by the Northern District has been stayed by this Court, the district court also stayed its resolution of those statutes. [A173] citing, *Antonyuk et al.*, C.A. No. 22-2908 at ECF No. 76 (issued Dec. 7, 2022), affirmed, 598 U.S. ___ (issued Jan. 11, 2023) (No. 22A557).

York's view, "sensitive places" are locations "where the government may lawfully disarm law-abiding citizens, includ[ing] all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*, at 2133.

The Supreme Court rejected New York's expansive view of "sensitive places."

Stripped of the proper-cause restrictions, the State enacted the CCIA to prevent the possession of any guns just about everywhere in the state – on private and public property. Times Square, MetroNorth, the MTA, city buses, are all places where people "typically congregate and where law-enforcement and other public-safety professionals are presumptively available" – places presumptively open to the public exercise of Second Amendment rights.

Gun free zones leave innocent people at the mercy of evil and violent predators who have no regard for the law. The public interest weighs heavily in favor of enjoining criminal penalties for the "mere possession" of weapons for self-defense.

As *Heller* declared D.C.'s ban on home possession of handguns to be *de facto* unconstitutional, so is a ban on the possession of handguns, rifles, and shotguns – all weapons in common use for self-defense – in Times Square.

21

*Heller* and *Bruen* explicitly rejected the government's public safety arguments when addressing "the same alleged societal problems" that the government purports their regulations will 'cure' - "handgun violence primarily in urban areas". *Bruen*, at 2131–32 (cleaned up). The State's regulations not only prevent the ability to protect oneself at particular locations, they force disarmament, creating vulnerability while traveling to and from each location, and greatly expand the reach of the constitutional harm.

### B. Times Square Ban Has No Historical Analogue

The Times Square ban is the epitome of an arbitrarily created gun ban shrouded in the same public safety interests that the Supreme Court rejected in *Heller*[23], *McDonald*[24], and *Bruen,* where the Supreme Court declared that public safety justifications are off the table in Second Amendment challenges. Full stop.

The district court abused its discretion by relying on restrictions that predate and postdate the Founding Era, but cites no regulations that existed at the time of the ratification. Likewise, the government failed to identify any Founding Era restrictions to justify the Times Square ban.[25]

---

[23] See, *Heller*, at 624 (rejecting the premise that, "[b]ecause handgun violence is a problem, because the law is limited to an urban area, and because there were somewhat similar restrictions in the founding period (a false proposition that we have already discussed), the interest-balancing inquiry results in the constitutionality of the handgun ban).

[24] *McDonald v. Chicago*, 561 U.S. 742, 782 (2010) (Second Amendment is not the only constitutional right that has controversial public safety implications) (citing cases).

[25] A174-77 (relying on statutes as far back as 1328 and as far removed from 1791 as 1903).

As the Supreme Court stated in *Heller* and repeated in *McDonald* and *Bruen*, "individual self-defense is 'the central component' of the Second Amendment right[26], and it "shall not be infringed."

Sappe's right to armed self-defense is burdened every day. It is not enough to suggest that he should take another route to work outside of Times Square, if there were one. Sappe risks a felony conviction for violating the Times Square ban and he does not fall within any of the exemptions.

Likewise, Jason Frey travels into Times Square while armed to frequent the various stores within the "gun free zone" [A22], which now makes him a felon despite the fact that he subjected himself to the State's handgun licensing regime, was issued a license, and thus deemed an eligible, non-prohibited person by the State.

In *Bruen*, the Supreme Court referenced D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018) a "short list" of places identified as "sensitive places" during the colonial period and the Founding Era.[27] The list is short because "carrying firearms when going anywhere was normal in many parts of the United States."[28]

---

[26] *Bruen*, at 2161
[27] *Bruen*, at 2133
[28] Kopel at 234. But not until the Reconstruction Period of the 19th Century (post-Civil War 1865-1877) did states enacted laws against guns in polling places, misconduct with arms, and armed trespass; for most of the century, however, "there were few laws about arms at schools, and none of them attempted to make schools 'gun-free.' In the latter part of the century, several former slave

Apart from the absence of an analogous Founding Era tradition, the district court also abused its discretion by relying on the same public safety arguments used by New York State in *Bruen* - and affirmatively rejected - by reasoning: "These laws appear to recognize that the presence of groups of people, often in confined spaces, renders a location uniquely vulnerable to firearm violence." [A176].

Public safety, interest balancing justifications for restricting the right to possess and carry firearms have been *thrice rejected* by the Supreme Court. See, *Heller*, at 634 (rejecting the dissent's interest balancing test seeking to prevent the "problem" of "handgun violence" in "urban area"); *McDonald*, at 785-86, and 783 (comparing the exclusionary rule "which generates 'substantial social costs" and "sometimes include setting the guilty free and the dangerous at large) citing, *Hudson v. Michigan*, 547 U.S. 586, 591 (2006); *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (dismissal for speedy trial violation); *Miranda v. Arizona*, 384 U.S. 436, 517 (1966) (Harlan, J., dissenting) (White, J., dissenting) (the Court's rule "will return a killer, a rapist or other criminal to the streets ... to repeat his crime").

Neither the government below nor the district court cites any case in which the Supreme Court has "refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety

---

states enacted broad laws against guns at schools and most other public assemblies, and even in private social gatherings." Kopel, at 250-251.

implications." *McDonald*, at 783; and Bruen, at 2126-27, and 2160-61 ("Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit. That argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it proceeds to do just that.") (footnote omitted).

Continued reliance on public safety is repugnant to Supreme Court precedent and the plain text of the Second Amendment.

### C. Transportation Ban Has No Historical Analogue

In similar fashion, the transportation ban should have been enjoined because the government failed, relying again on public safety, to identify any historical analogue.

Banning firearms on public transportation negatively disparately impacts lower socioeconomic individuals – usually non-whites – who rely on public transportation to commute.

The ban not only prevents individuals from being armed for self-defense on the bus, subway, and train – it prevents them from being armed ***everywhere they go for their entire day***. People are required to leave their residence unarmed to lawfully ride the bus, subway, and train – and remain unarmed when they arrive to their destination, everywhere they travel throughout the day, when they travel back home, and walk back from the train, subway, or bus station at night.

25

The district court's discussion of the transportation ban begins, much like Justice Breyer's dissent in *Heller*, with setting the stage for denial with a description of the vast and expansive subway system and the "5.5 million" riders on an average weekday in 2019 (generous compared to the numbers post-covid-flight and due to markedly increased violence). [A178].

But the 'dangers' presented with the transportation ban do not present an issue that implicates "unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach" as the district court found. [A178]. Had the Supreme Court bought into the "population density" justifications proffered by New York State during the *Bruen* oral arguments, the Supreme Court's opinion would so reflect, which it does not.

The transportation ban, like every other aspect of the Concealed Carry Improvement Act, is cloaked with the same "public safety" mantra that Supreme Court precedent requires be summarily rejected.

The district court's preference for firearm regulations "prohibiting firearms in highly congested settings presenting a high risk of violence" conflicts with the plain text of the Second Amendment. [A182]. The very acknowledgment that the locations "present[] a high risk of violence" warrants striking the statutes. A "highly congested setting" cannot 'balance' away the individual right to self-defense.

26

Moreover, as the district court points out, public transportation in the late-1800s was privately owned, not owned by the government; thus restrictions from the late 1800s placed on private property are not analogous to government-imposed restrictions. [A180-81].

## VI.  NO TRADITION OF REGULATING OPEN CARRY EXISTS

### A.  Sappe and Frey Have Standing to Challenge Open Carry Ban

The district court erroneously held that Appellants lack standing to challenge New York's open carry ban, enforced against them by the criminal penalties under § 400.00(15).[29]

Only one plaintiff need have standing to seek each form of relief requested in the complaint.[30] Sappe and Jason Frey both satisfy the Article III standard.

Using the same declaration to find Sappe and Frey had standing to challenge the restrictions pertaining to concealed carry, the district court found they lacked standing to challenge the ban on open carry. [A163-64].

The purpose of Article III standing is to ensure that parties to an action have "skin in the game", which prevents the federal courts from becoming forums to

---

[29] A163-64.

[30] *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 5239895, at *7 (N.D.N.Y. Oct. 6, 2022), appeal withdrawn, No. 22-2379, 2022 WL 19396512 (2d Cir. Nov. 14, 2022) quoting, *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008).

27

'ventilate public grievances.' See, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).

Sappe has a stake in the outcome of this litigation sufficient to confer Article III standing. He sufficiently alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *4 (W.D.N.Y. Nov. 3, 2022) citing, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).

On the same facts upon which the district court found Sappe had standing to challenge the geographical restrictions of § 400.00(6) [A172; A25-26], the district court erred in finding Sappe lacked standing to challenge the open carry ban.

Sappe's declaration details his employment in the Diamond District, transporting substantial amounts of cash, diamonds, and jewelry for high-end jewelers between the Diamond District and various locations within the City, throughout New York State, and to other states, including California and Nevada. [A25].

Sappe describes his preference for open carry over concealed – averring that he has "held an open carry firearms permit issued by the State of California since 2015" and that when in California, where he travels on a regular basis, he carries his handgun "open and exposed in a holster everywhere [he] go[es]." [A27].

28

Sappe would open carry in New York but for the fact that open carry is banned and punished as a crime. Sappe "regularly observe[s] uniformed security personnel – like Brinks guards and other such uniformed security personnel - carrying handguns open and holstered – despite the fact that there is no such thing as an "open carry license" in New York and open carry is banned for regular people like [himself]." [A27].

When discussing his daily travels through the "Times Square" "gun free", which "only makes everyone in the 'zone' an unarmed victim and unable to defend themselves from a violent attack," Sappe avers that he will carry his "handgun in the Times Square area for self-protection" making no distinction between open carry and concealed carry. [A26]. And Sappe avers that he intends to open carry on those days that he determines he will not carry concealed. [A27]. Meaning that Sappe will be armed in the City every day and will determine whether or not to conceal his handgun as the circumstances so justify.

Either way, Sappe's intention to carry open and holstered are not "someday wishes." Open carry is a manner of self-protection that Sappe actually engages in when traveling to jurisdictions where he can open carry and not be subject to arrest, like California. Sappe intends to open carry in New York, has sufficiently demonstrated a concrete and imminent intention to violate § 400.00(15), and seeks an injunction of the statute.

29

Sappe has no obligation to subject himself to arrest, which would be assured. The district court agreed that a credible risk exists that NYPD and NYSP will enforce the challenged criminal firearm regulations.[31] And the August 2022 internal NYPD Memorandum instructing all NYPD officers that "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise", presumptively guarantees Sappe's arrest should an NYPD officer observe him carrying a handgun. [A137-41].

### B.  Likelihood of Success on Open Carry Claims is Substantial

Regulating alternative forms of carry is inconsistent with the plain text of the Second Amendment. The district incorrectly found that New York's prohibition of open carry in favor of concealed carry with a corresponding gun permit satisfies the Second Amendment. [A169]**.**

It was only after the ratification of the Second Amendment in 1791 that public-carry restrictions began to proliferate. *Bruen*, at 2120. Restrictions on how a handgun is carried – open or concealed – did not arise until the Antebellum Period which, as detailed above, falls outside of the Founding Era.

Restrictions on whether an individual may lawfully carry open or concealed are not an historical tradition and, in fact, they conflict with the plain text of the Second Amendment which makes no distinction. Rather, the plain text declares that

---

[31] A163.

the right to bear arms "shall not be infringed – which encompasses the individual choice of whether to carry concealed or open. *Bruen*'s analysis and holding also makes no distinction.

Post-ratification firearm regulations only applied to *concealed carry*, not open carry. There is no historical analogue to banning or criminalizing open carry. And, *Bruen*'s recognition of the presumptively protected right to public carry, in the context of a concealed carry case bears out that the right to public carry  - bearing arms - encompasses both concealed and open carry.

*Heller* also looked to the "natural meaning" of the phrase "bear arms" by turning to Justice Ginsburg's analysis of a federal criminal statute in *Muscarello*, where she references the Second Amendment:

> "Surely a most familiar meaning is, as the Constitution's Second Amendment ... indicate[s]: 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." [32]

The open carriage of weapons is rooted in this Nation's historical traditions. The only statute to ban open carry, *Nunn v. State*, 1 Ga. 243, 251 (1846), was stricken

---

[32] *Heller*, at 584 quoting, *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (dissenting opinion) quoting Black's Law Dictionary 214 (6th ed. 1990).

by the Georgia Supreme Court which construed the Second Amendment as protecting the "natural right of self-defence." *Heller,* at 612.

"[T]here is little evidence of an early American practice of regulating public carry by the general public." *Bruen*, at 2142. It was not until "the early to mid-19th century, [that] some States began enacting laws that proscribed the ***concealed carry*** of pistols and other small weapons. As we recognized in *Heller*, 'the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying ***concealed weapons*** were lawful under the Second Amendment or state analogues.' 554 U.S. at 626, 128 S.Ct. 2783." *Bruen*, at 2145-46 (emphasis added).

The indisputable conclusion: open carry has always been a historical traditional modality of carrying weapons – from long swords to long guns to holstered handguns. But even the post-ratification regulations on concealed carry conflict with the plain text of the Second Amendment; 'bearing' arms swathes both modalities of carrying weapons with the protections of the Second Amendment, consistent with *Bruen*'s holding that the plaintiffs' conduct (concealed carry) was ***presumptively protected*** by the Second and Fourteenth Amendments.

Carrying upon the person (open carry) or in the clothing or in a pocket (concealed carry) to be armed and ready for offensive or defensive action [*Id.*] – all protected conduct within the scope of the Second Amendment. Even if the

32

Antebellum regulations were an appropriate analogue, which they are not, only *concealed* carry was restricted.[33]

It should not be lost on this Court that New York recognizes no Second Amendment "Right." The State continues to enforce a discretionary may-issue licensing regime, that only authorizes concealed carry, with subjective factors that vests "broad discretion" in its licensing officers.[34] In a jurisdiction that bans open carry where concealed carry remains a mere governmental privilege, New York State maintains its refusal to recognize any constitutionally protected right under the Second Amendment.

### C. No Tradition of Criminal Penalties for Open Carry

The district court recognized that Appellants face criminal penalties under 400.00(15) for carrying a handgun open and holstered[35] – a Class a Misdemeanor subjecting violators to one year incarceration, $1,000 in fines, 3 years of probation, and the revocation of their discretionary handgun license, which would terminate their right to possess and/or carry handguns in New York State.

Because there is no history or tradition of criminalizing open carry, and the enforcement of criminal penalties conflicts with the plain text of the Second

---

[33] The *Bruen* Court discussed Antebellum-era firearm regulations (1836-1860) pressed by the State, but it did not rely on them to interpret the scope of the Second Amendment. New York "misunderstands" *Bruen* and *Heller*, just as the Supreme Court concluded they misunderstood English and colonial statutes. See, *Bruen*, at 2143.
[34] Penal Law § 400.00(1)(b), (1)(o).
[35] A156, n. 4; A163].

Amendment, Appellants have a substantial likelihood of success on their challenge to § 400.00(15).

## VII. RELYING ON A PASSING REFERENCE TO A 'SCHOLARLY DEBATE' WAS AN ABUSE OF DISCRETION

Rejecting decades of Supreme Court constitutional jurisprudence, the district court clung to a passing reference in *Bruen* to an "ongoing scholarly debate"[36], promptly rejected, to justify reliance on Appellees' post-enactment regulations. [A168].

It was the Supreme Court, not Appellants, who declared that the scope of the Second Amendment is "pegged" to 1791. [A168]. *Bruen,* at 2137 ("the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791") (cases cited).

The district court decision conflicts with, and ignores, constitutional jurisprudence. The Supreme Court has *never* relied on the ratification of the Fourteenth Amendment in 1868 as the *primary* source of interpretation. Neither the district court, Appellees, the State's historian, nor amicus Everytown, have identified

---

[36] "We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope…" *Bruen*, at 2138. This 'debate' is limited to the writings of two (2) individuals – one of which was pre-*Heller*.

a single Supreme Court case that looked to 1868 as the principal period for determining the scope or meaning of a provision of the Bill of Rights.

Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." Bruen, at 2136 (emphasis supplied) citing, *Heller*, at 634–635 (2008); see also, *Douglass* at 245 supra ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied); *Bruen*, 142 S.Ct. 2111 (same).

Applying different constitutional standards to the federal and state governments conflicts with common sense and constitutional jurisprudence. Constitutional rights are preexisting[37]; their scope is not dependent on the type of government offending them.

The *Bruen* Court warned that courts must "guard against giving postenactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation'…but post-ratification adoption or

---

[37] *Heller*, at 592; *Bruen*, at 2145.

acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137.

*Heller* and *Bruen* both confirmed that, because "post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, at 2137 quoting, *Heller*, at 614.[38]

And the Supreme Court "made clear in *Gamble* that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence only after surveying what it regarded as a wealth of authority for its reading— including the text of the Second Amendment and state constitutions. In other words, this 19th-century evidence was treated as *mere confirmation* of what the Court thought had already been established." *Bruen*, at 2137 (cleaned up) (emphasis added).

"[I]n the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the

---

[38] Citing, *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]").

states. Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866."[39]

Citing Chief Justice Taney's opinion in *Dred Scott*[40], the *Bruen* Court recognized that "[e]ven before the Civil War commenced in 1861, the Supreme Court indirectly affirmed the importance of the right to keep and bear arms in public.[41] Chief Justice Taney "offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States"[42] because they "would be entitled to the privileges and immunities of citizens, including the right to keep and carry arms *wherever they went*."[43]

"Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms - a right free blacks were often denied in antebellum America."[44]

As the Supreme Court observed in *Dred Scott*, the citizens of this country enjoyed "the full liberty of speech in public and in private upon all subjects upon

---

[39] A120-23.
[40] *Dred Scott v. Sandford*, 19 How. 393, 417 (1857).
[41] *Bruen*, at 2150.
[42] *Bruen*, at 2150-51.
[43] *Bruen*, at 2150-51 (emphasis supplied).
[44] *Bruen*, at 2151.

which its own citizens might speak; to hold public meetings upon political affairs, and to *keep and carry arms wherever they went*." *Dred Scott*, at 417.[45]

The broad scope of Second Amendment rights, which *shall not be infringed*, remains unchanged.

## VIII. APPELLANTS DEMONSTRATED IRREPARABLE HARM

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

---

[45] "After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted. This Court has already recounted some of the Southern abuses violating blacks' right to keep and bear arms. See *McDonald*, 561 U.S. at 771, 130 S.Ct. 3020 (noting the "systematic efforts" made to disarm blacks); id., at 845–847, 130 S.Ct. 3020 (THOMAS, J., concurring in part and concurring in judgment); see also S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics")." *Bruen*, at 2151. Even after Congress extended the 1866 Freedmen's Bureau Act, reaffirming that freedmen were entitled to the "full and equal benefit of all laws and proceedings concerning personal liberty and personal security, including the constitutional right to keep and bear arms, freedmen in Kentucky and Tennessee were still constantly under threat: No Union man or negro who attempts to take any active part in politics, or the improvement of his race, is safe a single day; and nearly all *sleep upon their arms at night, and carry concealed weapons* during the day. *Bruen*, at 2151–52 (cleaned up) (citations omitted) (emphasis added).

The Supreme Court has held that the loss of "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, —— U.S. ——, 141 S.Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here as well, there "can be no question that the challenged restrictions, if enforced, will cause irreparable harm." Absent a preliminary injunction, Appellants' constitutional rights are being violated. Because of the challenged regulations they are "forced to give up their rights to armed self-defense outside their homes, being left to the mercy of opportunistic, lawless individuals who might prey on them"[46] while they are unarmed in the City, on public transportation, and/or in Times Square.

And criminalizing the open carriage of a handgun under 400.00(15), which was the traditionally accepted means of carrying weapons in common use in the Founding Era, also causes irreparable harm.

## IX. INJUNCTION FAVORS THE PUBLIC INTEREST AND THERE IS NO HARDSHIP FOR THE GOVERNMENT

The lower court erred when finding, without analysis, that an injunction is not in the public interest, and that Appellants' failure to show a likelihood of success on the merits equated to their inability to show that the balance tips in their favor.[47]

---

[46] *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *10 (W.D.N.Y. Nov. 22, 2022).
[47] A184-45.

It is always in the public interest to prevent the violation of a person's constitutional rights. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. —— –, 134 S.Ct. 2751.

A preliminary injunction in this case would serve the public interest of fostering self-defense across the state. The public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Christian*, at *11 citing, *Antonyuk v. Bruen*, No. 22-CV-0734, —— F.Supp.3d ——, ——, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022); see also, *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1136 (S.D. Cal. 2017), aff'd, 742 F. App'x 218 (9th Cir. 2018) (the public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens.).

As for balancing the hardships, the Supreme Court has declared multiple times that the Second Amendment is not subject to balancing. [see, V(B), supra]. The government presented no evidence of any "hardship" below independent of their "public safety" claims. The government cannot use the balance of hardships prong to backdoor public safety arguments that are barred from an analysis of the merits of Appellants' Second Amendment challenges. And because the "burdens at the

40

preliminary injunction stage track the burdens at trial [*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)] public safety concerns are not properly part of the equation.

## X.  A PERMANENT INJUNCTION SHOULD ISSUE FROM THIS COURT

The record in this appeal bears out that Penal Law sections 400.00(6) and (15), and 265.01-e (2)(n), and (t) are repugnant to the plain text of the Second Amendment.

This Court has jurisdiction to issue a permanent injunction of unconstitutional firearm regulations. As the D.C. Circuit Court held in *Wrenn*, "since our holding at this stage makes a certain outcome inevitable, we have power to dispose of it as may be just under the circumstances." *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017) (cleaned up) quoting, *Gross v. United States*, 390 U.S. 62, 71 (1968); 28 U.S.C. § 2106. The *Wrenn* court went on to issue a permanent injunction of D.C.'s "good reason" factor for denying concealed carry licenses, which clearly violated the Second Amendment,  "to obviate further and entirely unnecessary proceedings below." *Id.*[48] ("Because the District's good-reason law merits invalidation under Heller I regardless of its precise benefits, we would be wasting judicial resources if we remanded for the court to develop the records in these cases.") citing, *Indep.*

---

[48] Also holding (in 2017) that the Second Amendment protects the individual right to carry common firearms beyond the home for self-defense, even in densely populated areas and for those lacking special self-defense needs.

41

*Bankers Ass'n of Am. v. Heimann*, 613 F.2d 1164, 1167 (D.C. Cir. 1979) ("Although the case could now be remanded to the District Court for a decision on the merits, we have concluded that such a course is unnecessary and indeed would be unduly wasteful of judicial resources.") (citing 28 U.S.C. § 2106).

The challenged regulations are inconsistent with the text, history, and tradition of firearm regulation and violate the Second Amendment, as applied to the states through the Fourteenth Amendment. This Court should, respectfully, issue a permanent injunction and avoid the unnecessary waste of judicial resources.

## CONCLUSION

Penal Law sections 400.00(6) and (15), and 265.01-e (2)(n), and (t) are repugnant to the text, history, and tradition of firearm regulation in this Nation and should be preliminarily and permanently enjoined.

Dated:  June 20, 2023
         Scarsdale, New York

                          THE BELLANTONI LAW FIRM, PLLC
                          *Attorneys for Plaintiffs*

                   By:  ___Amy L. Bellantoni_____
                          Amy L. Bellantoni (AB3061)
                          2 Overhill Road, Suite 400
                          Scarsdale, New York 10583
                          abell@bellantoni-law.com

42

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). It contains 9,418 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


Dated:   June 20, 2023