# 23-365-cv

## United States Court of Appeals
### for the
### Second Circuit

JASON FREY, BRIANNA FREY, JACK CHENG, WLLIAM SAPPE,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK,KEECHANT SEWELL, in her Official Capacity, STEVEN NIGRELLI, in his Official Capacity,

*Defendants - Appellees,*

KEVIN BRUEN, Acting Superintendent of the New York State Police, in his official capacity, DERMOT SHEA, in his Official Capacity as NYPD Police Commissioner,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (White Plains)

## APPENDIX

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# A1

APPEAL,ECF

## U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:21-cv-05334-NSR

Frey et al v. Bruen et al
Assigned to: Judge Nelson Stephen Roman
Cause: 42:1983 Civil Rights Act

Date Filed: 06/16/2021
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Jason Frey**

represented by **Amy L Bellantoni**
The Bellantoni Law Firm, LLP
2 Overhill Road
Suite 400
Scarsdale, NY 10583
914-367-0090
Fax: 888-763-9761
Email: abell@bellantoni-law.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brianna Frey**

represented by **Amy L Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jack Cheng**

represented by **Amy L Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**William Sappe**

represented by **Amy L Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kevin P. Bruen**
*Acting Superintendent of the New York State Police, in his official capacity*
*TERMINATED: 10/04/2022*

represented by **Ian Ramage**
NYS Office of The Attorney General
Litigation Bureau
28 Liberty Street
18th Floor
New York, NY 10005
212-416-8659
Email: ian.ramage@ag.ny.gov
*LEAD ATTORNEY*

**Neil Shevlin**

**A2**

New York State Office of the Attorney
General (28 Liberty)
28 Liberty Street, 15th Floor
New York, NY 10005
(212) 416-8561
Fax: (212) 416-6009
Email: Neil.Shevlin@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York City, New York**                    represented by **Rachel Kane Moston**
New York City Law Department
100 Church Street Room 6-188
New York, NY 10007
(212)-788-0767
Fax: (212)-791-9714
Email: rmoston@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Robert Ciappetta**
New York City Law Department
Administrative Law and Regulatory
Litigation Division
100 Church Street
New York, NY 10003
212-256-4036
Email: nciappet@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dermot Shea**                                represented by **Rachel Kane Moston**
*in his official capacity as NYPD Police*      (See above for address)
*Commissioner*                                 *LEAD ATTORNEY*
*TERMINATED: 10/04/2022*                        *ATTORNEY TO BE NOTICED*

**Nicholas Robert Ciappetta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Keechant Sewell**                            represented by **Rachel Kane Moston**
*in her Official Capacity*                      (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Robert Ciappetta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

# A3

**Kevin Bruen**
*in his official capacity*
*TERMINATED: 10/14/2022*

**Defendant**

| | | |
|---|---|---|
| **Steven Nigrelli** | represented by | **Suzanna Publicker Mettham** |
| *in his Official Capacity* | | New York State Office of the Attorney General |
| | | Litigation |
| | | 28 Liberty St. |
| | | Ste 18th Floor |
| | | New York, NY 10005 |
| | | 212-416-6295 |
| | | Email: suzanna.mettham@ag.ny.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**ADR Provider**

| | | |
|---|---|---|
| **Everytown for Gun Safety** | represented by | **William James Taylor , Jr.** |
| | | Everytown Law |
| | | NY |
| | | 450 Lexington Ave. |
| | | #4184 |
| | | 10017 |
| | | New York, NY 10271-0332 |
| | | 646-324-8215 |
| | | Email: wtaylor@everytown.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Interested Party**

| | | |
|---|---|---|
| **AAG New York Attorney General's Office** | represented by | **Ian Ramage** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 06/16/2021 | 1 | COMPLAINT against Kevin P. Bruen, New York City, New York, Dermot Shea. (Filing Fee $ 402.00, Receipt Number ANYSDC-24683931)Document filed by William Sappe, Jason Frey, Jack Cheng, Brianna Frey. (Attachments: # 1 Civil Cover Sheet).(Bellantoni, Amy) (Entered: 06/16/2021) |
| 06/16/2021 | 2 | **FILING ERROR - SUMMONS REQUEST As To -** REQUEST FOR ISSUANCE OF SUMMONS as to Kevin Bruen, New York City, New York, and Dermot Shea, re: 1 Complaint,. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe.. (Bellantoni, Amy) Modified on 6/17/2021 (jgo). (Entered: 06/16/2021) |
| 06/17/2021 | | **\*\*\*NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Amy L Bellantoni. Attorney must electronically file the Civil Cover Sheet separately. Use the event type Civil Cover Sheet found under the event list Other Documents. (jgo)** (Entered: 06/17/2021) |
| 06/17/2021 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Nelson Stephen Roman. Please download and review the Individual |

A4

| | | |
|---|---|---|
| | | Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(jgo) (Entered: 06/17/2021) |
| 06/17/2021 | | Magistrate Judge Andrew E. Krause is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (jgo) (Entered: 06/17/2021) |
| 06/17/2021 | | Case Designated ECF. (jgo) (Entered: 06/17/2021) |
| 06/17/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Amy L Bellantoni to RE-FILE Document No. 2 Request for Issuance of Summons,. The filing is deficient for the following reason(s): party name on the 'as to' docket entry must match exactly as it appears on the pleading caption (Kevin Bruen). Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (jgo) (Entered: 06/17/2021)** |
| 06/17/2021 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Kevin P. Bruen, New York City, New York, and Dermot Shea, re: 1 Complaint,. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 06/17/2021) |
| 06/21/2021 | 4 | ELECTRONIC SUMMONS ISSUED as to Kevin P. Bruen, New York City, New York, Dermot Shea..(pc) (Entered: 06/21/2021) |
| 06/22/2021 | 5 | AFFIDAVIT OF SERVICE of Summons and Complaint,. New York City, New York served on 6/22/2021, answer due 7/13/2021; Dermot Shea served on 6/22/2021, answer due 7/13/2021. Service was accepted by ServiceECF@law.nyc.gov on consent. Document filed by William Sappe; Jason Frey; Jack Cheng; Brianna Frey..(Bellantoni, Amy) (Entered: 06/22/2021) |
| 06/29/2021 | 6 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Kevin P. Bruen served on 6/25/2021, answer due 7/16/2021. Service was accepted by Jill Bertrand, Authorized Agent. Document filed by William Sappe; Jason Frey; Jack Cheng; Brianna Frey.. (Bellantoni, Amy) (Entered: 06/29/2021) |
| 07/14/2021 | 7 | LETTER MOTION for Extension of Time *for defendants to answer or move* addressed to Judge Nelson Stephen Roman. Document filed by New York Attorney General's Office. (Attachments: # 1 Affidavit Affirmation of Service).(Ramage, Ian) (Entered: 07/14/2021) |
| 07/15/2021 | 8 | LETTER addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated 7/15/2021 re: proposed schedule for the plaintiffs' motion for a preliminary injunction. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 07/15/2021) |
| 07/16/2021 | 9 | MEMO ENDORSEMENT re: 8 LETTER; granting 7 Letter Motion for Extension of Time. ENDORSEMENT: The Court reviewed Defendants' letter, dated July 14, 2021, requesting an extension of time to September 14, 2021 to respond to the Complaint. (ECF No. 7.) The Court also reviewed Plaintiffs' letter, dated July 15, 2021, requesting leave to file a motion for a preliminary injunction with a return date of September 14, 2021. (ECF No. 8.) The Court grants the parties' requests. Defendants time to respond to the Complaint is extended to September 14, 2021. Plaintiffs are granted leave to file their motion for a preliminary injunction with the following briefing schedule: Plaintiffs' moving papers shall |

**A5**

| | | |
|---|---|---|
| | | be served (not filed) on or before August 9, 2021; Defendants' opposition papers shall be served (not filed) on or before September 7, 2021; and Plaintiffs' reply papers shall be served (not filed) on or before September 14, 2021. All motion documents shall be filed on the reply date, September 14, 2021. The parties shall mail two courtesy copies and email one electronic copy of their motion documents to Chambers as the documents are served. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 7. Motions due by 9/14/2021. (Signed by Judge Nelson Stephen Roman on 7/16/2021) (nb) (Entered: 07/16/2021) |
| 07/16/2021 | | Set/Reset Deadlines: Kevin P. Bruen answer due 9/14/2021; New York City, New York answer due 9/14/2021; Dermot Shea answer due 9/14/2021. (nb) (Entered: 07/16/2021) |
| 08/04/2021 | 10 | NOTICE OF APPEARANCE by Rachel Kane Moston on behalf of New York City, New York, Dermot Shea..(Moston, Rachel) (Entered: 08/04/2021) |
| 08/10/2021 | 11 | NOTICE OF APPEARANCE by Neil Shevlin on behalf of Kevin P. Bruen..(Shevlin, Neil) (Entered: 08/10/2021) |
| 09/02/2021 | 12 | LETTER MOTION for Extension of Time *for Defendants to respond to Plaintiffs' preliminary injunction motion* addressed to Judge Nelson Stephen Roman. Document filed by Kevin P. Bruen..(Ramage, Ian) (Entered: 09/02/2021) |
| 09/02/2021 | 13 | LETTER RESPONSE in Opposition to Motion addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated September 2, 2021 re: 12 LETTER MOTION for Extension of Time *for Defendants to respond to Plaintiffs' preliminary injunction motion* addressed to Judge Nelson Stephen Roman. . Document filed by Jack Cheng, Brianna Frey, Jason Frey, New York Attorney General's Office, William Sappe..(Bellantoni, Amy) (Entered: 09/02/2021) |
| 09/03/2021 | 14 | FIRST LETTER MOTION for Extension of Time *to file opposition papers* addressed to Judge Nelson Stephen Roman from Rachel K. Moston dated September 3, 2021. Document filed by New York City, New York, Dermot Shea..(Moston, Rachel) (Entered: 09/03/2021) |
| 09/03/2021 | 15 | ORDER granting 12 Letter Motion for Extension of Time; granting 14 Letter Motion for Extension of Time. The Court has reviewed Defendants' letters, dated September 2, 2021 and September 3, 2021, requesting an extension of time to respond to the Complaint and the motion for a preliminary injunction. (ECF Nos. 12 & 14.) The Court also reviewed Plaintiffs' letter, dated September 2, 2021, consenting to the extension of time to respond to the Complaint, but opposing the extension for the opposition papers. Defendants' requests are GRANTED. Defendants' time to respond to the Complaint is extended to October 14, 2021. The briefing schedule for the motion for a preliminary injunction is amended as follows: Defendants' opposition papers shall be served (not filed) on or before September 14, 2021; and Plaintiffs' reply papers shall be served on or before September 21, 2021. All motion documents shall be filed on the reply date, September 21, 2021. The parties shall mail two courtesy copies and email one electronic copy of their motion documents to Chambers as the documents are served. The Clerk of the Court is kindly directed to terminate the motions at ECF Nos. 12 & 14. SO ORDERED. Kevin P. Bruen answer due 10/14/2021; New York City, New York answer due 10/14/2021; Dermot Shea answer due 10/14/2021. (Signed by Judge Nelson Stephen Roman on 9/3/2021) (va) Modified on 9/9/2021 (va). (Entered: 09/03/2021) |
| 09/03/2021 | | Set/Reset Deadlines: Responses due by 9/21/2021. Replies due by 9/21/2021. (va) (Entered: 09/03/2021) |
| 09/03/2021 | | Set/Reset Deadlines: Kevin P. Bruen answer due 10/14/2021; New York City, New York answer due 10/14/2021; Dermot Shea answer due 10/14/2021. (va) (Entered: 09/09/2021) |

**A6**

| 09/13/2021 | 16 | FIRST LETTER MOTION for Leave to File Excess Pages addressed to Judge Nelson Stephen Roman from Neil Shevlin dated September 13, 2021. Document filed by Kevin P. Bruen..(Shevlin, Neil) (Entered: 09/13/2021) |
|---|---|---|
| 09/13/2021 | 17 | ORDER granting 16 Letter Motion for Leave to File Excess Pages. Defendants' request is GRANTED. The page limit for responsive briefs shall be extended to forty (40) pages. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 16. SO ORDERED. (Signed by Judge Nelson Stephen Roman on 9/13/2021) (va) (Entered: 09/13/2021) |
| 09/20/2021 | 18 | CONSENT LETTER MOTION for Leave to File Excess Pages *for Plaintiffs' reply to State defendant's opposition* addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated 9/20/2021. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 09/20/2021) |
| 09/20/2021 | 19 | ORDER granting 18 Letter Motion for Leave to File Excess Pages. Plaintiffs' request is GRANTED. Plaintiffs are granted an additional five pages for their reply memorandum. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 18. (Signed by Judge Nelson Stephen Roman on 9/20/2021) (ate) (Entered: 09/20/2021) |
| 09/21/2021 | 20 | MOTION for Preliminary Injunction . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 09/21/2021) |
| 09/21/2021 | 21 | MEMORANDUM OF LAW in Support re: 20 MOTION for Preliminary Injunction . . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 09/21/2021) |
| 09/21/2021 | 22 | DECLARATION of Amy L. Bellantoni in Support re: 20 MOTION for Preliminary Injunction .. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Exhibit Plaintiffs' Declarations, # 2 Exhibit Order of the Hon. Eileen Rakower, J.S.C. and transcript of the underlying oral argument, # 3 Exhibit States' Brief Amicus Curiae in Wrenn v D.C.).(Bellantoni, Amy) (Entered: 09/21/2021) |
| 09/21/2021 | 23 | MEMORANDUM OF LAW in Opposition re: 20 MOTION for Preliminary Injunction . . Document filed by Kevin P. Bruen. (Attachments: # 1 Affidavit Affirmation of Service). (Ramage, Ian) (Entered: 09/21/2021) |
| 09/21/2021 | 24 | REPLY MEMORANDUM OF LAW in Opposition re: 20 MOTION for Preliminary Injunction . *Reply to State Defendant's Opposition*. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 09/21/2021) |
| 09/21/2021 | 25 | REPLY AFFIRMATION of Amy L. Bellantoni in Support re: 20 MOTION for Preliminary Injunction .. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Exhibit Declaration of Chuck Haggard, # 2 Exhibit Senate Bill S747 (proposed 2017), # 3 Exhibit Constitutional Carry States).(Bellantoni, Amy) (Entered: 09/21/2021) |
| 09/21/2021 | 26 | MEMORANDUM OF LAW in Opposition re: 20 MOTION for Preliminary Injunction . . Document filed by New York City, New York, Dermot Shea..(Moston, Rachel) (Entered: 09/21/2021) |
| 09/21/2021 | 27 | REPLY MEMORANDUM OF LAW in Support re: 20 MOTION for Preliminary Injunction . *Reply to New York City and Dermot Shea*. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 09/21/2021) |
| 10/14/2021 | 28 | ANSWER to 1 Complaint,. Document filed by New York City, New York, Dermot Shea.. (Moston, Rachel) (Entered: 10/14/2021) |

**A7**

| | | |
|---|---|---|
| 10/14/2021 | 29 | LETTER MOTION for Conference *to discuss Defendant Bruen's Motion to Dismiss* addressed to Judge Nelson Stephen Roman. Document filed by Kevin P. Bruen..(Ramage, Ian) (Entered: 10/14/2021) |
| 10/18/2021 | 30 | ORDER denying 29 Letter Motion for Conference re: 29 LETTER MOTION for Conference *to discuss Defendant Bruen's Motion to Dismiss* addressed to Judge Nelson Stephen Roman. The Court has reviewed Defendant Bruen's letter dated October 14, 2021. (ECF No. 29.) Defendant Bruen's request for a conference is denied and the pre-motion conference requirement is waived. Defendant is granted leave to file the proposed motion with the following briefing schedule: Defendant Bruen's moving papers shall be served (not filed) on or before November 17, 2021; Plaintiff's opposition papers shall be served (not filed) on or before December 17, 2021; Defendant Bruen's reply papers shall be served on or before January 3, 2022. All motion documents shall be filed on the reply date, January 3, 2022. The parties are directed to mail two courtesy copies of their motion documents to Chambers as they are served. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 29. So Ordered. (Signed by Judge Nelson Stephen Roman on 10/18/21) (yv) (Entered: 10/19/2021) |
| 10/18/2021 | | Set/Reset Deadlines: Motions due by 1/3/2022. Responses due by 1/3/2022. Replies due by 1/3/2022. (yv) (Entered: 10/19/2021) |
| 01/03/2022 | 31 | MOTION to Dismiss . Document filed by Kevin P. Bruen..(Ramage, Ian) (Entered: 01/03/2022) |
| 01/03/2022 | 32 | MEMORANDUM OF LAW in Support re: 31 MOTION to Dismiss . . Document filed by Kevin P. Bruen..(Ramage, Ian) (Entered: 01/03/2022) |
| 01/03/2022 | 33 | MEMORANDUM OF LAW in Opposition re: 31 MOTION to Dismiss . . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 01/03/2022) |
| 01/03/2022 | 34 | REPLY MEMORANDUM OF LAW in Support re: 31 MOTION to Dismiss . . Document filed by Kevin P. Bruen..(Ramage, Ian) (Entered: 01/03/2022) |
| 01/05/2022 | 35 | ORDER: It is hereby ORDERED that the above case is scheduled for oral argument on February 1, 2022 at 11:00 am to be held via teleconference. To access the teleconference, please follow these directions: (1) Dial the Meeting Number: (877) 336-1839; (2) Enter the Access Code: 1231334 #; (3) Press pound (#) to enter the teleconference as a guest. ( Telephone Conference set for 2/1/2022 at 11:00 AM before Judge Nelson Stephen Roman.) (Signed by Judge Nelson Stephen Roman on 1/5/2022) (ate) (Entered: 01/05/2022) |
| 02/01/2022 | | Minute Entry for proceedings held before Judge Nelson Stephen Roman: Oral Argument held via teleconference on 2/1/2022 re: 20 MOTION for Preliminary Injunction . filed by Jack Cheng, Jason Frey, William Sappe, Brianna Frey. Plaintiffs counsel Amy Bellantoni, Esq. present on the call. Defendant Bruens counsel Ian Ramage, Esq. and Neil Shevlin, Esq. present on the call. Defendants New York City, NY and Sheas counsel Rachel Moston, Esq. present on the call. Court Reporter is Angie Shaw-Crockett. Oral argument held. The Court reserves decision. (Court Reporter Angie Shaw-Crockett) (gs) (Entered: 03/07/2022) |
| 02/07/2022 | 36 | LETTER addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated February 7, 2022 re: clarification of 2 issues discussed during oral argument. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 02/07/2022) |
| 02/22/2022 | 37 | OPINION & ORDER re: 20 MOTION for Preliminary Injunction . filed by Jack Cheng, Jason Frey, William Sappe, Brianna Frey. For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is DENIED. The Clerk of Court is respectfully directed to |

**A8**

| | | |
|---|---|---|
| | | terminate the motion at ECF No. 20. (Signed by Judge Nelson Stephen Roman on 2/22/2022) (ate) (Entered: 02/22/2022) |
| 08/19/2022 | 38 | ENDORSED LETTER addressed to Your Honor from Amy L. Bellantoni dated 8/15/2022 re: Plaintiff's Motion. ENDORSEMENT: The Court is in receipt of the attached Notice of Motion and Memorandum of Law in Support of Plaintiffs Second Motion for a Preliminary Injunction, dated August 12, 2022. The Court received two courtesy copies by mail on August 17, 2022. Plaintiffs Motion is DENIED without prejudice for failure to follow the Courts Individual Rules, which require parties to file a pre-motion letter setting forth the basis for their anticipated motion. Plaintiffs are directed to file and serve their letter on or before August 23, 2022 and Defendants are directed to file and serve their response on or before August 27, 2022. (Signed by Judge Nelson Stephen Roman on 8/19/2022) (ate) (Entered: 08/19/2022) |
| 08/22/2022 | 39 | LETTER MOTION for Leave to File Motion for a Preliminary Injunction addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated August 22, 2022. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 08/22/2022) |
| 08/26/2022 | 40 | NOTICE OF APPEARANCE by Nicholas Robert Ciappetta on behalf of New York City, New York, Dermot Shea..(Ciappetta, Nicholas) (Entered: 08/26/2022) |
| 08/26/2022 | 41 | LETTER addressed to Judge Nelson Stephen Roman from Nicholas R. Ciappetta dated August 26, 2022 re: Response to Plaintiffs' Letter dated August 22, 2022 seeking permission to file a second motion for preliminary injunction. Document filed by New York City, New York, Dermot Shea..(Ciappetta, Nicholas) (Entered: 08/26/2022) |
| 08/26/2022 | 42 | LETTER addressed to Judge Nelson Stephen Roman from Ian Ramage dated August 26, 2022 re: Response to Plaintiffs' Letter dated August 22, 2022 seeking permission to file a second motion for preliminary injunction. Document filed by Kevin P. Bruen..(Ramage, Ian) (Entered: 08/26/2022) |
| 08/26/2022 | 43 | ORDER with respect to 39 Letter Motion for Leave to File Document. The Court is in receipt of the attached letter from Plaintiffs, dated August 22, 2022, where Plaintiffs requests leave to file a second preliminary injunction motion. The Court is also in receipt of the attached response letters from the Defendants, both dated August 26, 2022. The Court is reviewing Plaintiffs' request along with Defendants' letters in opposition, and will make a determination in the near term. (Signed by Judge Nelson Stephen Roman on 8/26/2022) (ate) (Entered: 08/26/2022) |
| 09/01/2022 | 44 | OPINION & ORDER re: 31 MOTION to Dismiss . filed by Kevin P. Bruen. For the foregoing reasons, Defendant Bruen's motion to dismiss is GRANTED. Counts I, III, and IV are dismissed without prejudice. Plaintiffs have until October 3, 2022 to file an Amended Complaint as to any claims that have not been dismissed with prejudice. Defendants are then directed to answer or otherwise respond by October 24, 2022. If Plaintiffs fail to file an Amended Complaint within the time allowed, and they cannot show good cause to excuse such failure, those claims dismissed without prejudice by this order will be deemed dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 31. ( Amended Pleadings due by 10/3/2022.) (Signed by Judge Nelson Stephen Roman on 9/1/2022) (ate) (Entered: 09/01/2022) |
| 10/03/2022 | 45 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR** FIRST AMENDED COMPLAINT amending 1 Complaint, against Kevin P. Bruen, New York City, New York, Keechant Sewell.Document filed by William Sappe, Jason Frey, Jack Cheng, Brianna Frey. Related document: 1 Complaint,..(Bellantoni, Amy) Modified on 10/4/2022 (jgo). (Entered: 10/03/2022) |

| | | |
|---|---|---|
| 10/04/2022 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Amy L Bellantoni to RE-FILE re: Document No. 45 Amended Complaint,. The filing is deficient for the following reason(s): all of the parties listed on the pleading were not entered on CM ECF; add party Kevin Bruen with party text ' in his official capacity'; the wrong party/parties whom the pleading is against were selected;. Docket the event type Add Party to Pleading found under the event list Complaints and Other Initiating Documents.. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (jgo) (Entered: 10/04/2022)** |
| 10/04/2022 | | ADD PARTY FOR PLEADING. Defendants/Respondents Kevin Bruen added. Party added pursuant to 45 Amended Complaint,.Document filed by William Sappe, Jason Frey, Jack Cheng, Brianna Frey. Related document: 45 Amended Complaint,..(Bellantoni, Amy) (Entered: 10/04/2022) |
| 10/04/2022 | 46 | FIRST AMENDED COMPLAINT amending 45 Amended Complaint, against Kevin Bruen, New York City, New York, Keechant Sewell.Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. Related document: 45 Amended Complaint,.. (Bellantoni, Amy) (Entered: 10/04/2022) |
| 10/14/2022 | 47 | SECOND AMENDED COMPLAINT amending 46 Amended Complaint, against New York City, New York, Keechant Sewell, Steven Nigrelli.Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. Related document: 46 Amended Complaint,. (Attachments: # 1 Supplement Stipulation of Parties to File Second Amendment Complaint).(Bellantoni, Amy) (Entered: 10/14/2022) |
| 10/20/2022 | 48 | PROPOSED ORDER TO SHOW CAUSE WITH EMERGENCY RELIEF. Document filed by Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Affidavit Declaration of Amy L. Bellantoni pursuant to Local Rule 6.1(d)).(Bellantoni, Amy) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 10/20/2022) |
| 10/20/2022 | 49 | DECLARATION of Amy L. Bellantoni in Support re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Exhibit NYC Legal Bulletin, # 2 Exhibit NYSP Email, # 3 Exhibit Second Amended Complaint).(Bellantoni, Amy) (Entered: 10/20/2022) |
| 10/20/2022 | 50 | DECLARATION of Jason Frey in Support re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Brianna Frey, Jason Frey, William Sappe.. (Bellantoni, Amy) (Entered: 10/20/2022) |
| 10/20/2022 | 51 | DECLARATION of Brianna Frey in Support re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Brianna Frey, Jason Frey, William Sappe.. (Bellantoni, Amy) (Entered: 10/20/2022) |
| 10/20/2022 | 52 | DECLARATION of William Sappe in Support re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Brianna Frey, Jason Frey, William Sappe.. (Bellantoni, Amy) (Entered: 10/20/2022) |
| 10/20/2022 | 53 | MEMORANDUM OF LAW in Support re: 48 Proposed Order to Show Cause With Emergency Relief, . Document filed by Brianna Frey, Jason Frey, William Sappe.. (Bellantoni, Amy) (Entered: 10/20/2022) |
| 10/20/2022 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER TO SHOW CAUSE WITH EMERGENCY RELIEF. Document No. 48 Proposed Order to Show Cause |

**A10**

| | | |
|---|---|---|
| | | With Emergency Relief, was reviewed and approved as to form. (laq) (Entered: 10/20/2022) |
| 10/20/2022 | 54 | MEMO ENDORSEMENT on re: 48 Proposed Order to Show Cause With Emergency Relief, filed by Jason Frey, William Sappe, Brianna Frey. ENDORSEMENT: The Court is in receipt of the proposed Order to Show Cause and accompanying declarations and memorandum of law, filed by Plaintiffs Brianna Frey, Jason Frey, and William Sappe. (See ECF Nos 48-53.) Defendants are directed to serve and file an opposition on or before November 10, 2022. Plaintiffs are directed to serve and file a reply on or before November 25, 2022. The parties are directed to provide two courtesy copies and one electronic copy of their papers to Chambers as they are served. Pursuant to the Court's Individual Rule 3.B., the opposition papers are limited to 25 pages and reply memoranda are limited to 10 pages. ( Responses due by 11/10/2022, Replies due by 11/25/2022.) (Signed by Judge Nelson Stephen Roman on 10/20/2022) (ate) (Entered: 10/20/2022) |
| 10/26/2022 | 55 | NOTICE OF APPEARANCE by Suzanna Publicker Mettham on behalf of Steven Nigrelli..(Mettham, Suzanna) (Entered: 10/26/2022) |
| 10/27/2022 | 56 | FIRST LETTER MOTION for Extension of Time to File Response/Reply as to 48 Proposed Order to Show Cause With Emergency Relief, *seeking until 11/28/22 for all Defendants to respond, and until 12/12/22 for Plaintiffs to reply,* addressed to Judge Nelson Stephen Roman from Suzanna Publicker Mettham dated 10/27/2022., FIRST LETTER MOTION for Extension of Time to File Answer re: 47 Amended Complaint, *until 30 days after resolution of 48 Proposed Order to Show Cause With Emergency Relief,* addressed to Judge Nelson Stephen Roman from Suzanna Publicker Mettham dated 10/27/2022. Document filed by Steven Nigrelli..(Mettham, Suzanna) (Entered: 10/27/2022) |
| 10/27/2022 | 57 | LETTER RESPONSE in Opposition to Motion addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated October 27, 2022 re: 56 FIRST LETTER MOTION for Extension of Time to File Response/Reply as to 48 Proposed Order to Show Cause With Emergency Relief, *seeking until 11/28/22 for all Defendants to respond, and until 12/12/22 for Plaintiffs to reply,* addressed toFIRST LETTER MOTION for Extension of Time to File Answer re: 47 Amended Complaint, *until 30 days after resolution of 48 Proposed Order to Show Cause With Emergency Relief,* addressed to Judge Nelson Stephen Roman from Suzanna Publicker . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 10/27/2022) |
| 10/28/2022 | 58 | MEMO ENDORSEMENT on re: 56 FIRST LETTER MOTION for Extension of Time to File Response/Reply as to 48 Proposed Order to Show Cause With Emergency Relief, *seeking until 11/28/22 for all Defendants to respond, and until 12/12/22 for Plaintiffs to reply,* addressed toFIRST LETTER MOTION for Extension of Time to File Answer re: 47 Amended Complaint, *until 30 days after resolution of 48 Proposed Order to Show Cause With Emergency Relief,* addressed to Judge Nelson Stephen Roman from Suzanna Publicker filed by Steven Nigrelli. ENDORSEMENT: The Court is in receipt of the attached letter from Defendants, dated October 27, 2022, and Plaintiffs' response thereto, dated October 27, 2022. Defendants requested 18 additional days (to November 28, 2022) to file an opposition to Plaintiffs' Order to Show Cause with Emergency Relief, which the court construes as a preliminary injunction motion. Plaintiffs oppose the request. The Court has reviewed the letters and GRANTS Defendant's request for an extension over the Plaintiffs' objection. Defendants are directed to serve and file opposition papers on or before November 28, 2022. Plaintiffs are directed to serve and file reply papers on or before December 13, 2022. The parties are directed to provide two courtesy copies and one electronic copy of their papers to Chambers as they are served. Pursuant to the Court's Individual Rule 3.B., the opposition papers are limited to 25 pages and reply memoranda are limited to 10 pages. In addition, the Court GRANTS Defendants' request to respond to |

**A11**

| | | |
|---|---|---|
| | | the Second Amended Complaint 30 days following the Court's resolution of the pending motion for a preliminary injunction. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 56. (Signed by Judge Nelson Stephen Roman on 10/28/2022) (ate) (Entered: 10/28/2022) |
| 10/28/2022 | | Set/Reset Deadlines: Responses due by 11/28/2022. Replies due by 12/13/2022. (ate) (Entered: 10/28/2022) |
| 11/18/2022 | 59 | JOINT LETTER MOTION for Leave to File Excess Pages *by City and State Defendants, and with Plaintiffs' Consent,* addressed to Judge Nelson Stephen Roman from Suzanna Publicker Mettham dated November 18, 2022. Document filed by Steven Nigrelli.. (Mettham, Suzanna) (Entered: 11/18/2022) |
| 11/18/2022 | 60 | ORDER granting 59 Letter Motion for Leave to File Excess Pages. The parties' consented-to request for leave to file excess pages is GRANTED. As requested, the State and City Defendants may file responsive briefs of up to 50 pages, and Plaintiffs may file a reply brief of up to 30 pages. (Signed by Judge Nelson Stephen Roman on 11/18/2022) (ate) (Entered: 11/18/2022) |
| 11/23/2022 | 61 | SECOND LETTER MOTION for Extension of Time *for all defendants to oppose plaintiffs' motion for a preliminary injunction* addressed to Judge Nelson Stephen Roman from Rachel K. Moston dated November 23, 2022. Document filed by New York City, New York, Keechant Sewell..(Moston, Rachel) (Entered: 11/23/2022) |
| 11/23/2022 | 62 | ORDER granting 61 Letter Motion for Extension of Time. Defendants' request for a two-day extension is GRANTED. Defendants' are directed to serve and file their opposition papers on or before Nov. 30, 2022. Plaintiffs are directed to serve and file their reply papers on or before Dec. 15, 2022. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 61. SO ORDERED. (Signed by Judge Nelson Stephen Roman on 11/23/2022) (vfr) (Entered: 11/23/2022) |
| 11/23/2022 | | Set/Reset Deadlines: Responses due by 11/30/2022 Replies due by 12/15/2022. (vfr) (Entered: 11/23/2022) |
| 11/30/2022 | 63 | MEMORANDUM OF LAW in Opposition re: 48 Proposed Order to Show Cause With Emergency Relief, . Document filed by Steven Nigrelli..(Mettham, Suzanna) (Entered: 11/30/2022) |
| 11/30/2022 | 64 | DECLARATION of Dr. Brennan Rivas in Opposition re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Steven Nigrelli. (Attachments: # 1 Exhibit A - Dr. Rivas Resume, # 2 Exhibit B - N.Pa.R.R. Rules).(Mettham, Suzanna) (Entered: 11/30/2022) |
| 11/30/2022 | 65 | DECLARATION of Suzanna Publicker Mettham in Opposition re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Steven Nigrelli. (Attachments: # 1 Exhibit A - Brooklyn (1880) (Licensing Ordinance), # 2 Exhibit B - Buffalo (1891) (Licensing Ordinance), # 3 Exhibit C - Elmira (1892) (Licensing Ordinance), # 4 Exhibit D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance)D - Syracuse (1892) (Licensing Ordinance), # 5 Exhibit E - Troy (1905) (Licensing Ordinance), # 6 Exhibit F - Lockport (1909) (Licensing Ordinance), # 7 Exhibit G - Albany (1905) (Licensing Ordinance), # 8 Exhibit H - Maryland (1715) (Private Property), # 9 Exhibit I - Pennsylvania (1721) (Private Property), # 10 Exhibit J - Pennsylvania (1760) (Private Property), # 11 Exhibit K - New |

Jersey (1722) (Private Property), # 12 Exhibit L - New Jersey (1771) (Private Property), # 13 Exhibit M - New York (1763) (Private Property), # 14 Exhibit N - Louisiana (1865) (Private Property), # 15 Exhibit O - Texas (1866) (Private Property), # 16 Exhibit P - Oregon (1893) (Private Property), # 17 Exhibit Q - Delaware (1874) (Private Property), # 18 Exhibit R - Colorado (1883) (Private Property), # 19 Exhibit S - Illinois (1902) (Private Property), # 20 Exhibit T - Tennessee (1869) (Sensitive Places), # 21 Exhibit U - Georgia (1870) (Sensitive Places), # 22 Exhibit V - Texas (1870) (Sensitive Places), # 23 Exhibit W - Missouri (1883) (Sensitive Places), # 24 Exhibit X - Arizona (1889) (Sensitive Places), # 25 Exhibit Y - Oklahoma (1890) (Sensitive Places), # 26 Exhibit Z - Mississippi (1878) (Sensitive Places), # 27 Exhibit AA - 2 Edw. 3, c. 3 (1328)AA - 2 Edw. 3, c. 3 (1328)AA - 2 Edw. 3, c. 3 (1328)AA - 2 Edw. 3, c. 3 (1328)AA - 2 Edw. 3, c. 3 (1328), # 28 Exhibit BB - 26 Hen. 8 c. 6 (1534), # 29 Exhibit CC - Virginia (1786) (Sensitive Places), # 30 Exhibit DD - Kansas (1867) (Sensitive Places, Alcohol), # 31 Exhibit EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol)EE - Wisconsin (1889) (Sensitive Places, Alcohol), # 32 Exhibit FF - New York, New York (1858) (Public Parks), # 33 Exhibit GG - Philadelphia, Pennsylvania (1868) (Public Parks), # 34 Exhibit HH - Hyde Park, Illinois (1876) (Public Parks), # 35 Exhibit II - Chicago, Illinois (1881) (Public Parks), # 36 Exhibit JJ - St. Louis, Missouri (1883) (Public Parks), # 37 Exhibit KK - Danville, Illinois (1883) (Public Parks), # 38 Exhibit LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks)LL - Salt Lake City, Utah (1888) (Public Parks), # 39 Exhibit MM - Saint Paul, Minnesota (1888) (Public Parks), # 40 Exhibit NN - Trenton, New Jersey (1890) (Public Parks), # 41 Exhibit OO - Springfield, Massachusetts (1891) (Public Parks), # 42 Exhibit PP - Lynn, Massachusetts (1891) (Public Parks), # 43 Exhibit QQ - Williamsport, Pennsylvania (1890) (Public Parks), # 44 Exhibit RR - Grand Rapids, Michigan (1891) (Public Parks), # 45 Exhibit SS - Spokane, Washington (1892) (Public Parks), # 46 Exhibit TT - Peoria, Illinois (1892) (Public Parks), # 47 Exhibit UU - Wilmington, Delaware (1893) (Public Parks), # 48 Exhibit VV - Pittsburgh, Pennsylvania (1893) (Public Parks), # 49 Exhibit WW - Michigan (1895) (Public Parks), # 50 Exhibit XX - Canton, Illinois (1895) (Public Parks), # 51 Exhibit YY - Indianapolis, Indiana (1896) (Public Parks), # 52 Exhibit ZZ - Reading, Pennsylvania (1897) (Public Parks), # 53 Exhibit AAA - Boulder, Colorado (1899) (Public Parks), # 54 Exhibit BBB - National Parks Regulations (Public Parks)). (Mettham, Suzanna) (Entered: 11/30/2022)

| | | |
|---|---|---|
| 11/30/2022 | 66 | MEMORANDUM OF LAW in Opposition re: 48 Proposed Order to Show Cause With Emergency Relief, . Document filed by New York City, New York, Keechant Sewell, Dermot Shea..(Moston, Rachel) (Entered: 11/30/2022) |
| 11/30/2022 | 67 | DECLARATION of Nicholas R. Ciappetta in Opposition re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by New York City, New York, Keechant Sewell. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit |

**A13**

| | | |
|---|---|---|
| | | 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15).(Ciappetta, Nicholas) (Entered: 11/30/2022) |
| 11/30/2022 | 68 | DECLARATION of Nicholas R. Ciappetta in Opposition re: 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by New York City, New York, Keechant Sewell. (Attachments: # 1 Exhibit 16, # 2 Exhibit 17, # 3 Exhibit 18, # 4 Exhibit 19, Part 1, # 5 Exhibit 19, Part 2, # 6 Exhibit 19, Part 3, # 7 Exhibit 20, # 8 Exhibit 21, # 9 Exhibit 22, # 10 Exhibit 23, # 11 Exhibit 24, # 12 Exhibit 25).(Ciappetta, Nicholas) (Entered: 11/30/2022) |
| 12/07/2022 | 69 | LETTER MOTION for Conference addressed to Judge Nelson Stephen Roman from William J. Taylor, Jr. dated December 7, 2022., LETTER MOTION to File Amicus Brief addressed to Judge Nelson Stephen Roman from William J. Taylor, Jr. dated December 7, 2022. Document filed by Everytown for Gun Safety. (Attachments: # 1 Exhibit -- Proposed Amicus Brief).(Taylor, William) (Entered: 12/07/2022) |
| 12/07/2022 | 70 | LETTER RESPONSE to Motion addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated 12/7/2022 re: 69 LETTER MOTION for Conference addressed to Judge Nelson Stephen Roman from William J. Taylor, Jr. dated December 7, 2022. LETTER MOTION to File Amicus Brief addressed to Judge Nelson Stephen Roman from William J. Taylor, Jr. dated December 7, 2022. . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/08/2022 | 71 | ORDER terminating 69 Letter Motion for Conference re: 69 LETTER MOTION for Conference addressed to Judge Nelson Stephen Roman from William J. Taylor, Jr. dated December 7, 2022. LETTER MOTION to File Amicus Brief addressed to Judge Nelson Stephen Roman from William J. Taylor, Jr. dated December 7, 2022. ; granting 69 Letter Motion to File Amicus Brief. Everytown's request for leave to file an amicus curiae brief is GRANTED. Everytown is directed to file the proposed brief it attaches along the hereto letter as soon as practicable. The Clerk of the Court is directed to terminate the motion at ECF No. 69.. (Signed by Judge Nelson Stephen Roman on 12/8/2022) (ate) (Entered: 12/08/2022) |
| 12/08/2022 | 72 | BRIEF *of Amicus Curiae*. Document filed by Everytown for Gun Safety..(Taylor, William) (Entered: 12/08/2022) |
| 12/15/2022 | 73 | REPLY MEMORANDUM OF LAW in Support re: 48 Proposed Order to Show Cause With Emergency Relief, 54 Memo Endorsement, Set Deadlines,,,,,, . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 12/15/2022) |
| 12/15/2022 | 74 | DECLARATION of Amy L. Bellantoni in Support re: 54 Memo Endorsement, Set Deadlines,,,,,, 48 Proposed Order to Show Cause With Emergency Relief,., REPLY AFFIRMATION of Amy L. Bellantoni in Support re: 54 Memo Endorsement, Set Deadlines,,,,,, 48 Proposed Order to Show Cause With Emergency Relief,. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Exhibit "Not All History is Created Equal", Smith, Mark W., # 2 Exhibit Email Communication NYSP Pistol License Bureau, # 3 Exhibit Declaration of Chuck Haggard, Baird v. Bonta, 19 Civ. 00617 (CAED)).(Bellantoni, Amy) (Entered: 12/15/2022) |
| 01/18/2023 | 75 | SCHEDULING ORDER: It is hereby: ORDERED that the above case is scheduled for In-Person Oral Argument on January 24, 2023 at 11:30 am, on the following narrow set of issues: Plaintiff's challenge to N.Y. Penal Law § 265.01-e [banning guns in sensitive places], with a focus on § 265.01-e(2)(n) which bans firearms in public transportation, including Metropolitan Transit Authority subway cars and train cars and § 265.01-e(2)(t) which bans the carrying of firearms in the Times Square area. Any interested party may listen to oral argument via teleconference. To access the teleconference, please follow |

**A14**

| | | these directions: (1) Dial the Meeting Number: (877) 336-1839; (2) Enter the Access Code: 1231334 #; (3) Press pound (#) to enter the teleconference as a guest. Oral Argument set for 1/24/2023 at 11:30 AM before Judge Nelson Stephen Roman. (Signed by Judge Nelson Stephen Roman on 1/18/2023) (ate) (Entered: 01/18/2023) |
|---|---|---|
| 01/23/2023 | 76 | CONSENT LETTER MOTION to Adjourn Conference *and Oral Argument* addressed to Judge Nelson Stephen Roman from Amy L. Bellantoni dated 1/23/23. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 01/23/2023) |
| 01/23/2023 | 77 | ORDER granting 76 Letter Motion to Adjourn Conference. Pltfs' request to adjourn the in-person Oral Argument from Jan. 24, 2023 until Feb. 22, 2023 at 10:00 am is GRANTED with Defts' consent. The Court did not have availability on any of the proposed dates. Clerk of Court is requested to terminate the motion at ECF No. 76. Oral Argument set for 2/22/2023 at 10:00 AM before Judge Nelson Stephen Roman. (Signed by Judge Nelson Stephen Roman on 1/23/2023) (ate) (Entered: 01/23/2023) |
| 02/21/2023 | 78 | FIRST LETTER MOTION to Adjourn Conference addressed to Judge Nelson Stephen Roman from Nicholas Ciappetta dated February 21, 2023. Document filed by New York City, New York, Keechant Sewell, Dermot Shea. Return Date set for 2/22/2023 at 10:00 AM..(Ciappetta, Nicholas) (Entered: 02/21/2023) |
| 02/21/2023 | 79 | ORDER granting 78 Letter Motion to Adjourn Conference. City Defts. counsel's request to adjourn the oral argument from Feb. 22, 2023 until Mar. 10, 2023 at 10 am is GRANTED. Clerk of Court is requested to terminate the motion at ECF No. 78. SO ORDERED. Oral Argument set for 3/10/2023 at 10:00 AM before Judge Nelson Stephen Roman.. (Signed by Judge Nelson Stephen Roman on 2/21/2023) (tg) (Entered: 02/21/2023) |
| 03/10/2023 | | Minute Entry for proceedings held before Judge Nelson Stephen Roman: Oral Argument held on 3/10/2023 re: 48 Proposed Order to Show Cause With Emergency Relief, filed by Jason Frey, William Sappe, Brianna Frey. Plaintiffs counsel Amy Bellantoni, Esq. present. Defendant Nigrellis counsel Suzanna Publicker Mettham, Esq. present. Defendants New York City, NY and Sewells counsel Nicholas Ciappetta, Esq. and Rachel Moston, Esq. present. Court Reporter is Angie Shaw-Crockett. Oral Argument held. The Court reserves decision. (Court Reporter Angie Shaw-Crockett) (gs) (Entered: 03/20/2023) |
| 03/13/2023 | 80 | OPINION & ORDER: For the foregoing reason, Plaintiffs' motion for preliminary injunction is DENIED in part, and STAYED in part, as follows: The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.03(3), and NYC Admin. Code § 10-315. The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of N.Y. Penal Law §§ 265.01-e(2)(n) (with regards to the MTA subway and rails) and 265.01-e(2)(t). The Court STAYS its decision on the preliminary injunction motion with respect to Plaintiffs challenge of N.Y. Penal Law §§ 265.01-d, 265.01-e(2)(d), 265.01-e(2)(p), and 265.01-e(2)(o) pending resolution by the Second Circuit in Antonyuk et al., v. Hochul, et al., C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022). The parties are DIRECTED to submit a letter to the Court once a resolution is reached in Antonyuk et al., v. Hochul, et al., C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), which may impact the Courts resolution on the preliminary injunction motion with respect to Plaintiffs challenge of N.Y. Penal Law §§ 265.01-d, 265.01-e(2)(d), 265.01-e(2)(p), and 265.01-e(2)(o). (Signed by Judge Nelson Stephen Roman on 3/13/2023) (ate) (Entered: 03/13/2023) |
| 03/16/2023 | 81 | NOTICE OF INTERLOCUTORY APPEAL from 80 Memorandum & Opinion,,,,,. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. Filing fee $ 505.00, receipt number ANYSDC-27478393. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Bellantoni, Amy) (Entered: 03/16/2023) |

| 03/16/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 81 Notice of Interlocutory Appeal,..(nd) (Entered: 03/16/2023) |
|---|---|---|
| 03/16/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 81 Notice of Interlocutory Appeal, filed by Jack Cheng, Jason Frey, William Sappe, Brianna Frey were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/16/2023) |
| 03/16/2023 | 82 | MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a) (1)*. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 03/16/2023) |
| 03/16/2023 | 83 | DECLARATION of Amy L. Bellantoni in Support re: 82 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)*.. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Exhibit NYC Legal Bulletin, # 2 Exhibit NYSP Email).(Bellantoni, Amy) (Entered: 03/16/2023) |
| 03/16/2023 | 84 | DECLARATION of Jason Frey in Support re: 82 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)*.. Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe. (Attachments: # 1 Affidavit Declaration of William Sappe, # 2 Affidavit Declaration of Brianna Frey).(Bellantoni, Amy) (Entered: 03/16/2023) |
| 03/16/2023 | 85 | MEMORANDUM OF LAW in Support re: 82 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)*. . Document filed by Jack Cheng, Brianna Frey, Jason Frey, William Sappe..(Bellantoni, Amy) (Entered: 03/16/2023) |
| 03/30/2023 | 86 | RESPONSE in Opposition to Motion re: 82 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)*. . Document filed by New York City, New York, Keechant Sewell, Dermot Shea..(Ciappetta, Nicholas) (Entered: 03/30/2023) |
| 03/30/2023 | 87 | RESPONSE in Opposition to Motion re: 82 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)*. . Document filed by Steven Nigrelli.. (Mettham, Suzanna) (Entered: 03/30/2023) |
| 04/13/2023 | 88 | OPINION & ORDER re: 82 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)*. filed by Jack Cheng, Jason Frey, William Sappe, Brianna Frey. For the reasons discussed herein, the Court DENIES Plaintiffs' motion for a stay pending appeal. The Clerk of the Court is kindly directed to terminate the motion at ECF No. 82. (Signed by Judge Nelson Stephen Roman on 4/13/2023) (ate) (Entered: 04/13/2023) |
| 04/14/2023 | 89 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion. (nb) (Entered: 04/14/2023) |
| 04/14/2023 | 90 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion. (nb) (Entered: 04/14/2023) |
| 04/14/2023 | 91 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion. (nb) (Entered: 04/14/2023) |
| 04/14/2023 | 92 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion. (nb) (Entered: 04/14/2023) |
| 04/14/2023 | 93 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion. (nb) (Entered: 04/14/2023) |
| 04/14/2023 | 94 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion.(vba) (Entered: 04/14/2023) |

## A16

| 04/14/2023 | 95 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion.(vba) (Entered: 04/14/2023) |
|---|---|---|
| 04/14/2023 | | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion.(vba) (Entered: 04/14/2023) |
| 04/17/2023 | 96 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 80 Memorandum & Opinion. (tro) (Entered: 04/17/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/21/2023 18:45:26 | | |
| **PACER Login:** | Amybellantoni | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:21-cv-05334-NSR |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

DocuSign Envelope ID: 89907370-398E-477A-9BA9-45AC6209D5C8

**A17**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JASON FREY, BRIANNA FREY,                    Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                                    Plaintiffs,

            -against-
                                             **DECLARATION OF**
NEW YORK CITY, New York, STEVEN NIGRELLI,    **JASON FREY**
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,
                                    Defendants.
-----------------------------------------------------------------x

JASON FREY, declares the following pursuant to 28 U.S.C. § 1746:

1.      I am a plaintiff in the above-captioned matter. I make this Declaration in support of

Plaintiffs' Third Motion for a Preliminary Injunction based on my own personal knowledge and,

if called as a witness, I could and would testify competently to the truth of the matters set forth

herein.

2.      I am a resident of Westchester County, New York. I am not prohibited by state or

federal law from possessing, receiving, owning, or purchasing firearms.

3.      I am a law-abiding person. I understand that New York is not a "constitutional

carry" state; I complied with the New York laws requiring that I apply to the government for a

license to exercise a preexisting right protected by the Constitution, and I obtained a New York

State handgun license. I continue to hold a valid New York State pistol license that was issued by

a Westchester County Court Judge and statutory pistol licensing officer, which I have held without

incident since its issuance.

4.      To be deemed eligible for the issuance of a handgun license, I underwent and passed

a criminal history background check through the FBI and New York State Division of Criminal

DocuSign Envelope ID: 89907370-398E-477A-9BA9-45AC6209D5C8

Justice Services, and a mental health prohibitor check through the New York State SAFE Act Office.

5.     My handgun license authorizes me to (i) only possess the handguns registered thereon; (ii) purchase additional handguns to be registered thereon; and (iii) carry my registered handguns concealed ("CCW" or "concealed carry license").

6.     My CCW does not authorize me to carry my handgun open and exposed (holstered) on my person for self-defense. Open carry is banned in New York and there is no process or procedure for lawfully openly carrying a handgun holstered in New York.

7.     My CCW is restricted by the licensing officer to "sportsman". Under the sportsman restricted license, I am restricted to carrying a handgun concealed in public to and from target shooting activities and while engaging in outdoor sporting activities such as camping, hiking, hunting, and the like. I am an avid hunter and my family and I spend a great deal of time outdoors.

8.     In 2019, I applied to one of the licensing officers for Westchester County to have the restrictions of my CCW license lifted to allow for the unrestricted full carry (concealed) of my registered handguns.

9.     My application was denied on the sole basis that I had not established "proper cause" to carry a handgun concealed "without regard to employment or place or possession."

10.     In the *Bruen* case, the Supreme Court held that the "proper cause" requirement for unrestricted concealed carry violated the Constitution.

11.     Had New York State not continued to enforce an unconstitutional handgun licensing scheme, I would have had a full carry concealed license at its initial issuance or, at the very least, my 2019 amendment to full carry concealed would have been approved.

DocuSign Envelope ID: 89907370-398F-477A-9BA9-4FAC6209D5C8

**A19**

12.     By the issuance of a pistol license, I was deemed eligible to carry a handgun concealed in public. I should not have to request more permission from the government to exercise that right and should not be subject to arrest, jail and other penalties for carrying outside of my restriction.

13.     I am simply not going to place myself, my wife, or my children in danger by going about my daily life unarmed because Defendants refuse to comply with the Constitution and continue to enforce unconstitutional statutes, like enforcing a law that makes me a criminal for carrying concealed outside of my license restriction.

14.     I regularly carry a handgun concealed on my person in public – not only to and from target shooting or when I am engaging in sportsman activities like camping and hiking, for the protection of myself and my family – but during my everyday life, like when we go shopping at the Jefferson Valley Mall and Acme in Yorktown and to Shop Rite and Walmart in the Cortlandt Town Center, which we do on a regular basis. My family and I also eat out (that are also subject to the alcohol beverage control laws), including Primavera Restaurant in Croton Falls, BLT Steakhouse in White Plains, Antonella's on Route 9 in Fishkill, La Famiglia in Carmel and other restaurants. None of those locations have "conspicuous signage" granting me permission to exercise my right to be armed for self-defense.

15.     I am armed when my wife and I take our kids to the movies at the Regal Cinemas in the Cortlandt Town Center. The last time was around May or June when we went to see Dr. Strange Multiverse of Madness and we are planning to see Halloween Ends within the next week or two. We also visit the Barnes and Noble bookstore in the same Cortlandt Town Center shopping plaza.

16.      I am not going to seek permission from any or every property owner or lessee or refrain from going about in public to all of the places that members of the general public go – on public and private property, residential and commercial – just because there is no "conspicuous signage" granting me permission to exercise my right to be armed for self-defense. I have no obligation to follow a law that is a blatant violation of the Second Amendment.

17.      The NYSP have a barracks behind the movie theater in the Cortlandt Town Center, NYSP Troop K Zone 3. It is very likely that a trooper could observe a bulge from my firearm while I am visiting any one of the stores in the Cortlandt Town Center – Walmart, Barnes and Noble, Regal Cinemas, Five Below – or just walking to my car and arrest me for carrying in a restricted location' because there are no 'conspicuous signage' at the Cortlandt Town Center granting 'permission' for people to carry firearms and I am not going to ask permission to exercise a constitutional right.

18.      My family and I are often at various parks in Yorktown including Sunnyside Park, London Woods, and Legacy Field, where I carry my firearm concealed. We also spend time at the Pound Ridge Reservation, FDR, Lake Taconic and Fahnestock Park several times per year. Bear and coyote sightings are not uncommon at these locations and I carry my handgun concealed as a last resort in the event of a confrontation.

19.      I am also armed when getting gas around town including the BP on Route 6 and 7-11 in Jefferson Valley, which also lack 'conspicuous signage' granting permission for me to carry a firearm to protect myself. I intend to continue getting gas at these and other locations.

20.      I face certain arrest and incarceration by any NYS trooper who observes me carrying a handgun concealed outside of my restriction, in a restricted area, and/or a sensitive location. If convicted, I my pistol license will be revoked, and if convicted of a felony or 'serious

offense', I will forfeit my Second Amendment rights.

21.     I intend to start carrying my handgun open and holstered at the above locations at times when I am not carrying the same handgun concealed.

22.     For sure, if I open carry at the Cortlandt Town Center, gas stations, and anywhere else in New York State, I will certainly be stopped by the NYSP, arrested, and put in jail because open carry is banned in New York. The only reason I do not exercise the right to open carry in New York State is the fear of arrest, jail and the other criminal and civil penalties that will follow.

23.     In September 2022, the NYSP Pistol Permit Bureau confirmed in writing that open carry is a crime in New York State, whether a felony or a misdemeanor is unclear, but that the licensing statute only refers to concealed carry.

24.     On August 31, 2022, Acting Superintendent Steven Nigrelli publicly stated that the NYSP has "zero tolerance" and if anyone violates the firearm laws, they will be arrested and that NYS troopers are standing ready to do so."[1]

25.     I will also immediately be arrested by NYSP troopers for carrying a handgun open and holstered because open carry is banned in New York. Whether I will be charged with a misdemeanor or a felony for carrying openly, the fact remains that I face imminent and certain arrest and incarceration.

26.     My handgun license is not valid in New York City. Under the Penal Law, I am required to apply for and obtain a separate handgun license to carry a handgun concealed in New York City. I am not going to, and should not have to, apply for a second license to exercise my right to bear arms for self-defense in a separate county within the same state.

---

[1] https://www.youtube.com/watch?v=gC1L2rrztQs

27.     I carry my handgun concealed when I travel to New York City. Whether alone or with my family, I take the Metro North Train into Grand Central and the number 4 train to Times Square to get goodies at Junior's, and sometimes to Murray's Bagels on 8th Avenue. I also visit friends in Williamsburg, taking the shuttle to the L train, then to the 14th Street stop. I intend to continue being armed when I travel to New York City for my own protection and my family's.

28.     On September 2, 2022, I was informed by an NYPD police officer that if I "open carry" a handgun in New York City, I will be arrested. The officer told me that "there's no open carry in New York City…it's illegal."

29.     Regarding concealed carry, the NYPD police officer also told me that I "can't come into New York City because [my] permit is only for Westchester County", that my permit "is invalid to cross the county", that I "can't have it (a handgun) at all in New York City" or I will be arrested.

30.     I should not have to request permission from New York City to lawfully carry my licensed handgun across the border from Westchester into the City in the same state.

31.     But whether I carry open or concealed, I will be arrested by the NYPD and charged with a crime for possessing a handgun in the City. If I carry a handgun in a sensitive area or restricted location in New York City, I will be arrested by the NYPD for a felony, and if I am convicted, I will permanently forfeit my Second Amendment rights. The only reason I do not exercise the right to open carry in New York City is the fear of arrest, jail and the other criminal and civil penalties that will follow.

32.     Being subject to criminal penalties, arrested, and put in jail, having my license revoked, fines, losing my right to even possess a firearm for merely possessing a handgun in public

for self-defense – despite the fact that I have been issued and hold a valid New York State pistol license - is an absolute violation of my constitutional rights.

33.     To be clear, I do not intend to carry a firearm in polling places, courthouses, or other locations that the United States Supreme Court has indicated are presumptively sensitive places.

34.     Plaintiffs' motion for a preliminary and permanent injunction of the challenged statutes that bar carrying outside of my license restriction, carrying in New York City without a separate New York City license, carrying in sensitive places, and carrying in restricted locations should be granted.

The foregoing statement is made subject to and under the penalty of perjury.

Dated: October 16, 2022

Jason Frey

Jason Frey

A24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JASON FREY, BRIANNA FREY,                          Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                                    Plaintiffs,

              -against-
                                                   **DECLARATION OF**
NEW YORK CITY, New York, STEVEN NIGRELLI,          **WILLIAM SAPPE**
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,
                                    Defendants.
-----------------------------------------------------------------x

WILLIAM SAPPE, declares the following pursuant to 28 U.S.C. § 1746:

1.      I am a plaintiff in the above-captioned matter. I make this Declaration in support

of Plaintiffs' motion for a preliminary and permanent injunction. I make this Declaration of my

own personal knowledge and, if called as a witness, I could and would testify competently to the

truth of the matters set forth herein.

2.      I am eligible to possess and carry firearms in the State of New York and have met

all the qualifications for licensure. I was issued and have maintained an unrestricted (full carry)

New York State concealed carry handgun license ("CCW") for approximately 8 years without

incident.

3.      As a resident of Orange County, New York, my handgun license was issued by a

judicial licensing officer in Orange County; my license authorizes me to carry a handgun concealed

everywhere in the State except New York City. When I am not in New York City, I carry my

handgun (concealed) in public on a regular basis.

4.      I am licensed as an Armed Guard by the State of New York.

5.      I am licensed as an Armed Security Guard by the State of California. I also hold an open carry firearms permit issued by the State of California, which I have held without incident since 2015.

6.      I am also licensed to carry a handgun by the States of Connecticut, Florida, and Arizona.

7.      I am self-employed and work in the area known as the Diamond District in New York City. In the course of my profession, I transport substantial amounts of cash, diamonds, and jewelry for high-end jewelers in the Diamond District. I transport substantial amounts of cash, diamonds, and jewelry between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada.

8.      Under the New York State Penal Law, my CCW license is not valid in New York City. To lawfully carry a handgun concealed in New York City, the Penal Law requires me to apply for and obtain a second, separate license from the NYC Police Commissioner under New York City's discretionary licensing scheme.

9.       I previously applied to the NYPD Licensing Division to obtain a separate concealed carry license, as required by statute, and my application was denied.

10.      Now that the *Bruen* case established a clear test for analyzing Second Amendment challenges, I intend to carry my handgun concealed in New York City for self-defense on a daily basis. I also intend to carry my handgun to work every day because the number of random incidents of violent criminal attacks in New York City have risen sharply. Based on my work, including its location in the Diamond District where I am coming in and out of high-end jewelry stores, and the merchandise and cash that I carry, I am a high-level target for a violent attack and will be carrying a concealed handgun for self-protection on a regular basis from now on.

11.     I am unaware of any tradition in this country of requiring permission before being able to carry a weapon to defend yourself simply because you cross a county line from one county into another county in the same state. New York's law violates the plain text of the Second Amendment.

12.     Mayor Adams and NYPD Police Commissioner Sewell are working hand-in-hand with Governor Hochul and the New York State Police, including Acting Superintendent Nigrelli to disarm New Yorkers, make the whole state a 'sensitive' or 'restricted' area, and arrest anyone and everyone who violates their gun laws.[1]

13.     As part of my daily employment, I travel through the area designated by the Penal Law and New York City as "Times Square." Declaring any location a "gun free" zone only makes everyone in the "zone" an unarmed victim and unable to defend themselves from a violent attack – criminals do not follow the law and will continue to carry guns in the Times Square area. I am going to carry my handgun in the Times Square area for self-protection even though such constitutionally-protected activity had been made unlawful by New York State and New York City. My daily commute will now subject me to being arrested and charged with a felony.

14.     In August 2022, an internal NYPD memorandum instructed all NYPD officers that "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise", a view in conflict with the fact that the Second Amendment "presumptively protects" possessing and carrying a handgun for self-protection.

15.     The NYPD memorandum also instructs that "[o]fficers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm [ ] and may frisk that individual since the officer has reasonable suspicion  that the individual is armed and

---

[1] https://www.youtube.com/watch?v=gC1L2rrztQs

dangerous." Under that policy, simply engaging in Second Amendment-protected conduct now gives the NYPD reasonable suspicion to believe an individual is '*dangerous*.'

16.     As a large and imposing black man in New York City, I stand out in a crowd and am regularly scrutinized by police officers. Such close scrutiny heightens the likelihood that an officer will see a bulge from my concealed firearm or, if I were to reach for my wallet and incidentally expose my firearm, it is guaranteed that I would be arrested and put in jail. If pulled over for "fitting the description" of a violent criminal and asked for identification, an officer may very well see my firearm. At the very least, NYPD policy makes clear that the presumption is that I am "dangerous" just because I am armed.

17.     As mentioned above, I have held an open carry firearms permit issued by the State of California since 2015. When I am in California, where I travel on a regular basis, I carry my handgun open and exposed in a holster everywhere I go.

18.     In New York City, I regularly observe uniformed security personnel – like Brinks guards and other such uniformed security personnel - carrying handguns open and holstered – despite the fact that there is no such thing as an "open carry license" in New York and open carry is banned for regular people like myself.

19.     I intend to begin carrying my handgun open and exposed on those days that I am not carrying a handgun concealed on my person, both inside New York City and throughout the state.

20.     I face a credible and imminent threat of arrest and incarceration by the NYPD for carrying my handgun in New York City – whether open or concealed - because my intentions have been made public and the NYPD has informed at least one other plaintiff that carrying a handgun in New York City without a NYC license will get you arrested.

**A28**

21.     I also face a credible and imminent threat of arrest and incarceration from the NYPD and NYSP for carrying a handgun open and holstered because open carry is illegal in New York.

22.     In New York City, I face a credible and imminent threat of arrest and incarceration for carrying open and holstered because I am not in a security uniform and my open carriage of a handgun is enough for officers to approach me and ask to see a license under the August 2022 NYPD policy memorandum, which I do not have.

23.     I also face a credible threat of arrest and incarceration by the NYSP for carrying my handgun open and holstered. As recently as September 6, 2022, the NYSP Pistol Permit Bureau advised that, because the licensing scheme references "concealed carry" only, carrying a handgun open and exposed would either be considered a violation of § 400.00(15) for carrying outside of one's restriction or a felony under § 265 for criminal possession of a weapon. In either case, the NYSP view open carry to be a crime and, based on the public statements by Acting Superintendent Nigrelli and the NYSP "zero tolerance" policy[2], I face a credible threat of arrest and incarceration for violating any firearm-related provision of the Penal Law.

24.     To be clear, I have no intention of carry a handgun in polling places and courthouses and other locations that the Supreme Court has identified as 'sensitive places.'

25.     Based on the above, Plaintiffs' motion for a preliminary and permanent injunction should be granted.

Dated: October 16, 2022

_____
William Sappe

[2] https://www.youtube.com/watch?v=gC1L2rrztQs

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -----------------------------------x

 3   FREY, et al.,

 4                         Plaintiffs,

 5         -against-                        21 cv 5334 (NSR)
                                            ORAL ARGUMENT FOR
 6   NEW YORK CITY, NY, et al.,             PRELIMINARY
                                            INJUNCTION
 7
                          Defendants.
 8
     -----------------------------------x
 9

10                                   United States Courthouse
                                     White Plains, New York
11
                                     March 10, 2023
12

13   B e f o r e:

14                                   HONORABLE JUDGE NELSON S. ROMAN,
                                     United States District Judge
15
     A P P E A R A N C E S:
16
     THE BELLANTONI LAW FIRM, LLP
17        Attorney for Plaintiffs

18   BY:  AMY L. BELLANTONI

19
     NEW YORK CITY LAW DEPARTMENT
20        Attorney for NEW YORK CITY, NY and KEECHANT SEWELL
     BY:  RACHEL KANE MOSTON
21        NICHOLAS ROBERT CIAPPETTA

22   NYS OFFICE OF THE ATTORNEY GENERAL
          Attorney for STEVEN NIGRELLI
23   BY:  SUZANNA PUBLICKER METTHAM

24

25
```

**A30**

1                          PROCEEDINGS

2              THE DEPUTY CLERK:  Docket Number 21 cv 5334, Frey,

3     et al., versus New York City, New York, et al.

4              Will counsel please state their appearance for the

5     record, beginning with the plaintiff.

6              MS. BELLANTONI:  Good morning, your Honor.  Amy

7     Bellantoni for the plaintiffs.

8              MS. METTHAM:  Good morning, your Honor.  Suzanna

9     Publicker Mettham for the defendant; acting superintendent,

10    Steven Nigrelli.  Good morning, your Honor.

11             MR. CIAPPETTA:  Good morning, your Honor.  Nicholas

12    Ciappetta, Assistant Corporation Counsel for the City of New

13    York, and Keechant Sewell, police commissioner of the New York

14    City Police Department.

15             MS. MOSTON:  Good morning, your Honor.  Rachel

16    Moston, Assistant Corporation Counsel.  Also for the City

17    defendants.

18             THE COURT:  Good morning, everyone.  So is

19    everybody -- now there's been an application for a preliminary

20    injunction in this matter, and we put this on for a conference

21    because there was one particular issue we wanted to address.

22    And the scope of today's hearing, if you want to call it that,

23    is in regards to the plaintiff's challenge to the recently

24    enacted New York State law, and the focus of the inquiry was

25    with respect to bans of firearms on public transportation,

                Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
                   Official Court Reporter (914)390-4242

**A31**

1    including Metropolitan Transit Authority subway cars and train

2    cars in particular.  Section 265.01-e(2)(n) and also Section

3    265.01-e(2)(t), which bans the carrying of firearms in the

4    Times Square area.  That's the focus of the inquiry.  That's

5    why we put this matter on for today's hearing.  So let me start

6    off by making the most basic inquiry, and that is what is the

7    basic standard that the movant in this case, the plaintiff,

8    must achieve, with respect to the Court issuing a preliminary

9    injunction?

10            I'll hear from the plaintiff.  What's the standard?

11            MS. BELLANTONI:  So, your Honor, the plaintiffs

12    obviously need to have standing to challenge the statutes,

13    which -- the declarations set forth in the application do

14    establish standing to challenge the statutes, particularly

15    Jason Frey.

16            THE COURT:  I'm not concerned about the standing

17    issue.  I'm concerned about the standard for a preliminary

18    injunction.  What is the threshold standard for that?

19            MS. BELLANTONI:  The plaintiffs need to show the

20    likelihood of success on the merits.  They need to show that

21    granting the injunction would be in the public interest.

22    Historically, they need to show that the balance of the

23    equities are in their favor, but as I raised in my papers and

24    with regard to second amendment challenges, the *Bruen* court

25    made clear, as did *Heller* --

1          THE COURT:  I'm not asking about the *Bruen* decision

2  just yet.

3          MS. BELLANTONI:  So our position is that the

4  balancing test is inappropriate for Second Amendment

5  challenges.

6          THE COURT:  Even as it relates to a preliminary

7  injunction?

8          MS. BELLANTONI:  Yes.  Because the Supreme Court held

9  that the burden -- at preliminary injunction stage are the same

10  as the burdens at trial.  And if the balance stage of

11  inequities or balancing interests are precluded from the

12  consideration at trial or a determination on summary judgment,

13  then they are also precluded at the preliminary injunction

14  stage.  But even if the balancing test were employed here,

15  granting an injunction weighs in favor of holding the

16  Constitution and granting the injunction.

17          THE COURT:  Anything that any of the defendants want

18  to add to what was just stated?

19          MR. CIAPPETTA:  We would disagree, your Honor, that

20  there's any balancing test here.  As we set forth in our brief,

21  we believe the standard is that the plaintiff must demonstrate

22  a clear and substantial likelihood of success on the merits, a

23  strong showing of irreparable harm, and that the issuance of a

24  preliminary injunction is in the public interest.  That's the

25  standard that we believe applies, and we do not believe that

1    the plaintiff can satisfy that standard.

2         MS. METTHAM:  The State -- defendant agrees with the

3    City, your Honor.  I'd also point out, as we mentioned in our

4    brief, that the injunction -- because it affects the

5    governmental action -- just because a governor may have

6    consulted with other groups, this was still legislation passed

7    in the normal course and is entitled to all of the separate

8    normally afforded to statutes.

9         THE COURT:  Plaintiff's counsel, you didn't mention

10   irreparable harm.

11        MS. BELLANTONI:  I was just going to speak to that,

12   your Honor.  My apologies.  And the plaintiffs, they need to

13   show irreparable harm, which I believe they have shown in their

14   papers.

15        THE COURT:  Next.  If you could tell me:  What is the

16   standard that was articulated in the *Bruen* case and, in

17   particular, as it relates to *Heller*?  What's the precedent that

18   was set in the *Bruen* case with respect to the Second Amendment?

19        MS. BELLANTONI:  *Bruen* --

20        THE COURT:  *Bruen*.

21        MS. BELLANTONI:  Yes, your Honor.  *Bruen* set forth

22   the test and reiterated it.  Again, later on the decision that

23   the plaintiff has the burden to show that the conduct being

24   regulated is protected by the plain text of the Second

25   Amendment.  Once that is shown, the burden shifts to the

 1  government to demonstrate that the regulation is consistent

 2  with the historical traditions in this nation of firearm

 3  regulations.  *Heller* and *McDonald* and *Caetano* and *Bruen* all

 4  look to text, history, and tradition, and with respect to

 5  history, the relevant historical period as evidenced by Supreme

 6  Court *jurisprudence* is the founding era in 1791.

 7          THE COURT:  So tell me -- what is the historical

 8  perspective with respect to the Second Amendment, that if I

 9  agree with you that it's 1791 as it relates to public

10  transportation.

11          MS. BELLANTONI:  That's the defendant's burden to

12  show that there was some --

13          THE COURT:  You're the one that's seeking the

14  preliminary injunction here.  You have to show a likelihood of

15  success, do you not?

16          MS. BELLANTONI:  I do, and in their --

17          THE COURT:  So show me and tell me how is -- the

18  statute is written that it's unconstitutional because you're

19  presuming that it's unconstitutional.

20          MS. BELLANTONI:  It's not my burden to show that

21  is -- it's not my burden to show the history and tradition, but

22  I will say, your Honor, that the --

23          THE COURT:  No, no, no.  Let's take a step back.

24  Whose burden is it to demonstrate that they're entitled to a

25  preliminary injunction?

```
1            MS. BELLANTONI:  The plaintiffs'.

2            THE COURT:  Don't you have to demonstrate for me that

3    the statute, which you're saying is invalid, is flawed?  Why is

4    it flawed?  Why does it merit me issuing a preliminary

5    judgment?  Don't you have the burden?

6            MS. BELLANTONI:  I do.

7            THE COURT:  So demonstrate to me what is it about the

8    statute such that it's -- it is invalid as it relates to the

9    Second Amendment.

10           MS. BELLANTONI:  So --

11           THE COURT:  And tell me how is it invalid with

12   respect to places -- public transportation and a place such as

13   Times Square.

14           MS. BELLANTONI:  So I'm demonstrating the likelihood

15   of success on the merits with regard to the *Bruen* test.  The

16   plaintiffs seek to carry and bear arms for self-defense from

17   the public.  That is covered by and protected presumptively by

18   the --

19           THE COURT:  You're not answering my question.  I

20   understand what the claim is.  You have to demonstrate to me

21   that -- you're asking for relief.  You're asking for the Court

22   to issue a form of relief, and you carry the burden of

23   demonstrating that the statute is unconstitutional in

24   particular, right?  You attack certain provisions of the

25   statute.  I understand that you're saying that all of the
```

1   entire statutes are defective.  Is that your position or no?

2           MS. BELLANTONI:  Yes.

3           THE COURT:  Okay.  My inquiry is very specific as to

4   two sections.  That's the purpose of today's hearing.  All

5   right?  If you want me to issue a preliminary injunction, you

6   have to demonstrate a likelihood of success on the merits.  All

7   right?  So I'm asking you with respect to these two provisions,

8   the one dealing with public transportation, right, including

9   the Metropolitan Transit Authority subway cars, trains, and

10  that provision that bans the carrying of firearms in the

11  area -- in the Times Square.  That's a particular section in

12  the statute, correct?

13          MS. BELLANTONI:  Yes.

14          THE COURT:  Unless I'm mistaken.

15          MS. BELLANTONI:  You're correct.

16          THE COURT:  You're attacking those two sections?

17          MS. BELLANTONI:  Yes.

18          THE COURT:  So tell me:  What is the historical

19  perspective with respect to the Second Amendment?  And you're

20  saying that it has to go back to 1791 and the way it was

21  written and the way it was interpreted back then, right?  And

22  how it was applied back then, right?  So tell me:  What is the

23  historical perspective with respect to places of public

24  transportation and the means of public transportation?  I mean,

25  I would guess you would argue that back then there was no real

1    system, right?  Am I correct?

2              MS. BELLANTONI:  Yes.

3              THE COURT:  Was there anything akin to a rail system

4    in place where it forms or allowed or not allowed -- give me

5    the historical perspective with respect to the carrying or the

6    banning of firearms in areas of public transportation.

7              MS. BELLANTONI:  Open carry was exercised freely and

8    was not infringed by any licensing or regulations in 1791.

9              THE COURT:  Correct.

10             MS. BELLANTONI:  Yeah.  So that is

11   public transportation --

12             THE COURT:  Was there such a thing as public

13   transportation back then?

14             MS. BELLANTONI:  Well, I'm just going to -- just for

15   the record for public purposes, the plaintiff has no burden to

16   establish the historical perspective.  That's the burden of the

17   government and to justify its regulations.  So in establishing

18   the likelihood of success --

19             THE COURT:  But don't you have to demonstrate to me

20   that it's an invalid statute?

21             MS. BELLANTONI:  Yes.  And I --

22             THE COURT:  You have to demonstrate -- so on what

23   basis are you saying it's invalid?

24             MS. BELLANTONI:  In applying the *Bruen* test, which is

25   the test to apply in determining whether or not we have the

1  likelihood of success on the merits.

2       THE COURT:  So show me the likelihood success on the

3  merits with respect to this particular statute?  So you're

4  saying forget about all the other statutes.  This is a valid

5  statute, Judge.  It's unconstitutional, and let me tell you

6  why.  All right.  The *Bruen* case gave me a standard, applied

7  the *Bruen* test to those -- these two sections, and tell me why

8  it's unconstitutional.

9       MS. BELLANTONI:  It's unconstitutional because the

10 plaintiffs' conduct is protected by the plain text of the

11 Second Amendment, and the defendants have failed to show any

12 history of tradition in the founding era for these types of

13 regulations --

14      THE COURT:  How is that unconstitutional?

15      MS. BELLANTONI:  Because there is no historical

16 perspectives --

17      THE COURT:  Do you have an absolute right to bear

18 arms at all times?  Is it an absolute right?

19      MS. BELLANTONI:  I'm just speaking to the penal law

20 sections there, your Honor.  It's the defendants' burden.  They

21 show nothing.

22      THE COURT:  You carry the initial burden of

23 demonstrating that you warrant that the Court should grant you

24 a preliminary injunction.  They're not -- are you seeking a

25 preliminary injunction in this case?

1           MR. CIAPPETTA: No, your Honor.

2           THE COURT: Are you seeking a preliminary injunction

3 in this case?

4           MS. METTHAM: No, your Honor.

5           THE COURT: So who carries the burden?

6           MR. CIAPPETTA: The plaintiff.

7           THE COURT: Who carries the burden?

8           MS. METTHAM: The plaintiff, your Honor.

9           MS. BELLANTONI: Yes. And the plaintiff has proven

10 the first --

11           THE COURT: No, no, no. You haven't -- all you keep

12 saying is this is the precedent set in *Bruen*, and because it

13 was pronounced by *Bruen*, the statute is unconstitutional.

14           MS. BELLANTONI: No, I'm not saying that. I'm saying

15 the test was that -- so I have to prove to you all four

16 factors. Let's establish them for the Court. That's my

17 burden, to establish the four factors that weigh in our favor.

18 The first factor is whether we have a likelihood of success,

19 and within -- enshrined within that one factor is the *Bruen*

20 test. And under the *Bruen* test, I have a burden to show that

21 our conduct is covered by the plain text, and I've shown that.

22 Well, once I've shown that --

23           THE COURT: How?

24           MS. BELLANTONI: -- the burden switches.

25           THE COURT: How?

1          MS. BELLANTONI:  How have I shown that their conduct

2    in seeking to bear arms for self-defense in public is covered

3    by the plain text in the Second Amendment?  I've shown that

4    through the plain text of the Second Amendment, which protects

5    presumptively --

6          THE COURT:  You're making a circular argument now

7    with all --

8          MS. BELLANTONI:  No, I'm following the *Bruen* test,

9    Judge.

10          THE COURT:  No.  All you're doing is repeating the

11   *Bruen* test.  You're saying that this -- *Bruen* is the test.

12   You're not doing anything more.

13          MS. BELLANTONI:  *Bruen* was a public carry case, and

14   *Bruen* held that public carry is covered by the plain text of

15   the Second Amendment.

16          THE COURT:  Is it an absolute right?  Did it

17   articulate it's an absolute right, and it can't be curtailed in

18   any shape or form?

19          MS. BELLANTONI:  It's not the test, your Honor.  I'm

20   not arguing that it's an absolute right.  I'm not taking a

21   position on that.  I'm taking a position on these specific

22   regulations, and *Bruen* already held that hearing for

23   self-defense in public is protected by the Second Amendment.

24   Now the burden shifts to the defendant.

25          THE COURT:  It's protected by the Second Amendment,

```
 1   but the only question is whether or not -- the question that
 2   I've asked is whether or not the Bruen case and this case, that
 3   that's an absolute right.  If it is an absolute right, then we
 4   stop here, and there's no need for any further discussion.
 5              Would you agree that if Bruen said it's an absolute
 6   right, the State can't infringe upon that right?  There's no
 7   limits.  Would you agree that the discussion ends?
 8              MS. BELLANTONI:  There are limitations, Judge.  I'll
 9   concede that.  The Bruen case talks about --
10              THE COURT:  Thank you.  That's what I've been asking.
11              MS. BELLANTONI:  Well, the Bruen case talks about
12   limitations, yes.
13              THE COURT:  So what are those limitations?
14              MS. BELLANTONI:  They're fact based and situational,
15   and it remains the government's burden to show that their
16   regulations fit within the text and the traditions of the
17   Second Amendment.
18              THE COURT:  So do you have to articulate why this
19   case and the new statute -- New York State has issued new
20   legislation limiting the right to bear arms, correct?
21              MS. BELLANTONI:  Yes.
22              THE COURT:  You claim that it's deficient, right?
23              MS. BELLANTONI:  It's unconstitutional, yes.
24              THE COURT:  Unconstitutional.  I'll use your phrase.
25   It's unconstitutional.  If the State can set limits, which this
```

1  is -- which -- the New York State statute is an attempt to do

2  so, right?  Would you agree with that?

3          MS. BELLANTONI:  Certainly.  It's a ban.  So it's not

4  just a limitation.  It's a ban.

5          THE COURT:  It's not an absolute ban because it

6  doesn't say you can't bear arms at all times, right?

7          MS. BELLANTONI:  It's an absolute ban at all times in

8  these designated areas, and we've --

9          THE COURT:  It limits the use of firearms.

10          MS. BELLANTONI:  It's more restrictive than the

11  proper carry restriction that *Bruen* stuck as unconstitutional.

12  At least some people were able, under the proper cause, you

13  know, standard, to apply and make the argument.  Here there's

14  no argument to be made.  It's stricken.  I mean, it's banned.

15  There's no firearms to be carried --

16          THE COURT:  Tell me why it is banned.

17          MS. BELLANTONI:  Yes.

18          THE COURT:  If the State has the right according to

19  *Bruen* to set limits, as you put it, tell me why is this limit

20  or ban with respect to public transportation unconstitutional.

21          MS. BELLANTONI:  It's unconstitutional because the

22  defendants have failed to establish that their regulation is

23  consistent with the text history and tradition.  Everything

24  that they pointed to has been post the founding era, which is

25  not the --

1          THE COURT:  What founding era?  You're saying 1791?

2          MS. BELLANTONI:  1791, yes.

3          THE COURT:  Why is that the definitive period, and if

4   that's the definitive period, then tell me what means of public

5   transportation existed at that time.

6          MS. BELLANTONI:  1791 is the relevant period because

7   that's the period that the Supreme Court in its *jurisprudence*

8   with regard to the First, the Fourth, and the Fifth and the

9   Sixth and the Eighth Amendments --

10          THE COURT:  Well, I referenced 1791 as the definitive

11  period that -- period that we have to reference.

12          MS. BELLANTONI:  I'm sorry?

13          THE COURT:  Is that in the *Bruen* case?

14          MS. BELLANTONI:  The *Bruen* case specifically

15  references cases --

16          THE COURT:  That's not what I asked.  Listen to my

17  question.  Don't rephrase my question.  Does *Bruen* -- *Bruen*,

18  whatever way you want to pronounce it, talked about looking at

19  the Second Amendment from the historical perspective of 1791.

20          MS. BELLANTONI:  The *Bruen* case looks at the

21  ratification, and as does *McDonald*, and they specifically --

22          THE COURT:  I know that *McDonald* -- tell me where in

23  the *Bruen* case does it reference 1791 as the definitive

24  historical perspective that we have to look at?

25          MS. BELLANTONI:  Well, your Honor, I did supply an

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1  extensive detailed historical analysis that I couldn't do

2  justice to --

3          THE COURT:  I read that.

4          MS. BELLANTONI:  Yeah.  But I marked --

5          THE COURT:  I'm just trying to --

6          MS. BELLANTONI:  So I'm relying on those papers

7  because --

8          THE COURT:  You're not answering my question.  You're

9  not answering my question.

10          MS. BELLANTONI:  Okay.

11          THE COURT:  You're answering the question that you

12  want to answer.

13          MS. BELLANTONI:  *Bruen* referenced other cases the

14  Supreme Court has looked to and repeatedly refers to the time

15  period in which the statute, the Bill of Rights was enacted.

16  That's the period to look to.

17          THE COURT:  Is it fair to say that --

18          MS. BELLANTONI:  But, you know, I just say,

19  your Honor, that the *Bruen* case did specifically say --

20  Justice Thomas said it doesn't matter whether we look to 1791

21  or 1868 because the result remains the same.  The

22  interpretation of the Second Amendment and the scope of the

23  Second Amendment was the same.  That is in the *Bruen* case.

24          THE COURT:  Anything else you want to address with

25  respect to your burden?

**A45**

1          MS. BELLANTONI:  On the first factor or just

2    generally speaking?

3          THE COURT:  Generally speaking.

4          MS. BELLANTONI:  Generally speaking, I'll just

5    briefly reiterate that there's been no showing that these

6    regulations are consistent with the text history and tradition

7    of the Second Amendment, and the plaintiffs are facing

8    irreparable harm.  They're experiencing irrevocable harm.

9          THE COURT:  What's the irrevocable harm?

10         MS. BELLANTONI:  The constitutional violation of

11   their Second Amendment rights and not being able to defend

12   themselves outside of their homes, and they travel in public.

13   The sensitive places statute requires, you know, that they not

14   carry any private property unless they affirmatively have

15   permission where a sign has been posted -- that there's no

16   analogous --

17         THE COURT:  Can you repeat that last statement?

18         MS. BELLANTONI:  The restricted areas, the restricted

19   locations, your Honor, requires that -- or bans firearms from

20   being possessed on private property unless there is a sign that

21   is posted that allows them to carry firearms, which is

22   inconsistent with the plain language of the Second Amendment,

23   and *Bruen* did say that the later statutes and regulations

24   conflict with the plain text with the text controls.

25         THE COURT:  Just to be clear, the scope of the

1   inquiry here today has to deal with sensitive areas, in

2   particular that of those areas involving public transportation

3   and the Times Square area.  So we're not talking about private

4   properties.

5               MS. BELLANTONI:  Understood.  My apologies,

6   your Honor.  You know, I just wanted to reference a specific

7   page in *Bruen* for your Honor at page 2136 where the Court does

8   say that the constitutional rights are enshrined with the scope

9   or understood to have when the people adopted them and when the

10  people adopted the Bill of Rights in 1791.  And there's a cite

11  to *Heller* at page 634 to 35.

12              THE COURT:  So in 1791 did we have public

13  transportation?  What is the closest thing to public

14  transportation if you're asking me to look at that historical

15  perspective?  If we had a stagecoach.

16              MS. BELLANTONI:  To the extent there were

17  stagecoaches.

18              THE COURT:  And you didn't present any --

19              MS. BELLANTONI:  I don't --

20              THE COURT:  -- perspective with respect to public

21  transportation.

22              MS. BELLANTONI:  It's not my burden to do that,

23  Judge.  I mean, we're talking about the likelihood of success

24  and what controls the *Bruen* test.  It's the defendants.  It's

25  the states.  It's the government's burden to show that their

```
1    regulation has a historical analog.  They have not shown that.

2            THE COURT:  You don't carry any burden with respect

3    to the application for a preliminary injunction.  You don't --

4            MS. BELLANTONI:  That's not what I'm saying.  I have

5    to prove --

6            THE COURT:  You don't have to demonstrate that the

7    statute is invalid, correct?  That's what you're saying, right?

8            MS. BELLANTONI:  There's a conflation here between my

9    burden under the first prong and my burden overall, and under

10   the first prong, I've met my burden.  We have a substantial

11   likelihood of success.

12           THE COURT:  Thank you, Counselor.

13           Who would like to address the Court next?

14           MS. METTHAM:  The State can, your Honor.

15           THE COURT:  All right.  Tell me:  What does *Bruen*

16   stand for?  Tell me whether or not the right to bear arms has

17   been obtained with respect to the Second Amendment, whether or

18   not it's an absolute right, and tell me what historical

19   perspective for analyzing the Second Amendment -- from what

20   perspective, and tell me whether or not the plaintiff has met

21   its burden.

22           MS. METTHAM:  So, your Honor, I'll start with what

23   the plaintiffs' burden is, and plaintiffs here bear the burden

24   of showing that the challenged conduct is within the scope of

25   the Second Amendment.  That is the plaintiffs' burden, and only
```

1   then does that burden shift to the government.  The Supreme

2   Court has repeatedly explained the laws forbidding the carrying

3   of firearms in sensitive places are presumptively lawful and

4   outside the scope of the Second Amendment.

5          As a result, the sensitive locations are not covered

6   by the plain text of the Second Amendment, and the State is not

7   required, under *Bruen*, to justify the regulations by

8   demonstrating that they are consistent with the nation's

9   historical tradition of firearms regulation.  Nonetheless, even

10  when considered within the plain text of the Second Amendment,

11  which we challenge -- as an exception to it, the sensitive

12  place provisions of the CCIA are nonetheless consistent with

13  this nation's history of firearm regulation.

14         In terms of the historical time period, as we've

15  mentioned in the brief, public transportation did not exist at

16  the time of the founding, and we believe that *Heller* and *Bruen*

17  doesn't require a view -- a historical perspective tethered to

18  1791.  Other years can be considered so long as they don't

19  conflict with the case law and the statutes at the time of this

20  nation's founding.  Because there was no transit -- public

21  transit at the time, we are able to look to later historical

22  evidence, to save evidence and comparable -- and, again*, Bruen*

23  does not require historical twins.  It requires analogs, and

24  looking at these later analog restriction of firearms on

25  subways does fit within New York historical -- I'm sorry --

1    within the country's historical tradition of firearm

2    regulation.  As a result, the plaintiffs have not met their

3    burden of showing the likelihood on the merits, and their

4    injunction should be denied.

5            THE COURT:  What's the historical perspective with

6    respect to the Second Amendment then?

7            MS. METTHAM:  With respect to the transit only,

8    your Honor?

9            THE COURT:  Yes.  And then if you can address the

10   same issue with respect to Times Square.

11           MS. METTHAM:  Yes, your Honor.  So when we look at

12   public transit, which, again, is somewhat anachronistic to the

13   period -- the founding period, we can look at private

14   railroads.  And, again, this was not the State, but the private

15   railroads did have a tradition of banning weapons as we've

16   shown through Dr. Rivas in our declaration.

17           Additionally, looking at the how and why of other

18   sensitive places that have existed throughout American history,

19   the New York City subway represents a confluence or

20   constellation of other sensitive places, which the Supreme

21   Court has recognized as meriting presumption of

22   constitutionality.  So, for example, the MTA is run by a

23   quasi-governmental agency, and like other governmental

24   buildings that operate for the public benefit, the government

25   is permitted and is presumptively constitutional to ban

1    firearms within that property.

2              It provides an important government service whose

3    purpose would be frustrated with the proliferation of openly

4    carried weapons as the plaintiffs have requested.  It has a

5    pivotal role in transporting students every day in New York

6    City even when school is not in session, and so, again, the

7    courts in *Heller* and *Bruen* have repeatedly stated that schools

8    are the kind of prototypical in sensitive locations and --

9              THE COURT:  Can I interrupt you because I'm just

10   discussing the plaintiff.  So it appears that you're engaging

11   in some type of balancing test?

12             MS. METTHAM:  No, not at all, your Honor.  What we're

13   saying is that the State's position is that the public transit

14   is a sensitive location, and when we look to historical analogs

15   for what have been presumptively sensitive locations that the

16   public transit shares the same qualities of those locations,

17   and as a result, it is entitled to the same presumption of

18   constitutionality.

19             THE COURT:  Okay.

20             MS. METTHAM:  I also think that one of the other

21   factors that has gone into the consideration of sensitive

22   location historically has been crowded locations where arms of

23   self-defense is impracticable, and so, again, the New York City

24   subways are enclosed locations, carrying millions of

25   individuals yearly and hundreds of individuals on each train,

1 hurtling metal trains under the river.  It is with limited, if

2 any, forms of egress.  So, again, the sorts of historical

3 analogs -- looking at these crowded locations with limited

4 egress would also support a finding of the subway stations and

5 subway trains as sensitive locations.

6    THE COURT:  What about the Times Square -- and we ask

7 the question, that if -- you reference Times Square.  And it's

8 an amorphous location, right?  It's not really defined.

9    MS. METTHAM:  I would dispute that with your Honor as

10 the Times Square area --

11    THE COURT:  Respectfully dispute.

12    MS. METTHAM:  It is defined.  So the New York -- the

13 Times Square area -- if you'll give me one second -- is defined

14 by the City as Times Square is the area in Manhattan from 40th

15 Street to 48th Street between 6th Ave. and 9th Ave. and 48th to

16 53rd between 6th and 8th Avenue.

17    So it is a defined location, and I guess I would tell

18 your Honor that, yes, the precise streets that make up Times

19 Square might be slightly different today than they were decades

20 ago, but the immutable characteristics of Times Square have

21 remained the same historically.  And they will continue to, and

22 that's why Times Square is this beacon and this historical

23 location internationally.  While the specific markers do change

24 and there is some flexibility in the statute for those markers

25 to again change as needed, the -- again, the immutable

1   characteristics of Times Square have remained the same.

2           THE COURT:  So why is this a sensitive -- why does

3   this fall into a sensitive location category?

4           MS. METTHAM:  Sure.  And, again, as with the subways,

5   it's the State's position that these -- this is a constellation

6   of factors that join together.  It contains these

7   characteristics of previously held sensitive locations to come

8   together.  So it is the site of children's field trips from

9   around the country.  It is a proud historical location of First

10  Amendment speech and activity.  In fact, it's named for

11  *The New York Times*, which is one of many First Amendment media

12  organizations that are centered there.  It's home to Nasdaq,

13  which is the -- one of the largest markets in the world today

14  and, again, looking back to the banning of weapons and markets

15  historically.

16          It's also a quintessential tourist destination for

17  visits to Broadway's comedy clubs, bars, restaurants, and

18  beneath it is the Times Square subway station, which happens to

19  be the most -- with the largest annual ridership of the city.

20          So in sum this represents large gatherings of

21  vulnerable populations, frequently impaired people analogous to

22  fairs and markets.  It's the site of expression for other

23  constitutional rights.  At all times of the day, it is home to

24  intoxicated members of the public engaging in revelry all days

25  of the year, and it has also been targeted multiple times for

1    terrorist plots.  And like any other proprietor again -- I'm

2    sorry.  It has been targeted by plots, and so it is home to

3    vulnerable and intoxicated populations.

4         THE COURT:  So how does that square off with the

5    historical perspective of the Second Amendment?

6         MS. METTHAM:  So I'd point your Honor's attention to

7    a passage in *Heller* that I found helpful on page 632 where the

8    majority addressed founding era statutes in cities like

9    New York that banned guns in certain places like New Year's Eve

10   and early January because of so-called hooliganism, and

11   obviously New York and Times Square on New Year's Eve fits that

12   bill.  But I would posit that looking today -- Times Square at

13   2 o'clock on a Tuesday probably looks a lot like New Year's Eve

14   in the founding era, and so these historical analogs still

15   apply to Times Square today.

16        THE COURT:  Anything else that you want to bring to

17   the Court's attention.

18        MS. METTHAM:  If you give me one second, your Honor.

19        THE COURT:  By the way, has anything been proffered

20   in response to the declaration of Dr. Rivas that calls into

21   question --

22        MS. METTHAM:  Her findings?

23        THE COURT:  Yes.

24        MS. METTHAM:  I don't believe so, your Honor.

25   Your Honor, I just also wanted to draw your attention -- if you

1    were not aware that the Second Circuit Court of Appeals will be

2    hearing another challenge to the CCIA on March 20 -- in just

3    ten days in the matter of *Antonyuk*.

4            THE COURT:  And are these issues also before

5    the Second Circuit?

6            MS. METTHAM:  Many of the questions -- not all of

7    them, but many of the questions and some of the frame work will

8    be addressed, we believe, by the Second Circuit, though, of

9    course, we have no way of knowing on what basis they might hold

10   though -- and, of course, the Second Circuit would not be

11   issuing a decision contemporaneous with the oral argument on

12   the 20, but based on the expedited briefing schedule and some

13   nudging, you could say, by Justice Alito, it seems like it

14   could be decided in a --

15           THE COURT:  Well, let me ask you this:  Are you

16   asking that the Court stay making a determination on this

17   matter until such time as the Second Circuit has ruled?

18           MS. METTHAM:  We are not asking for a stay,

19   your Honor.  I simply wished to inform you should that impact

20   your opinion.

21           THE COURT:  Anything else, Counselor?

22           MS. METTHAM:  No.  Thank you, your Honor.

23           THE COURT:  Thank you.

24           MR. CIAPPETTA:  May I be heard, your Honor?

25           THE COURT:  Yes.

1          MR. CIAPPETTA:  First, I'd like to start with your

2     question about whether the Second Amendment is an absolute

3     right, and there can be no restrictions whatsoever.  That

4     answer is clear, that it's no, and it's very important to

5     understand how different this case is from what was happening

6     in *Bruen*.  In *Bruen* you had an absolute ban on the ability of a

7     law-abiding, responsible citizen to obtain a concealed carry

8     license.

9          Here, in contrast, we're dealing with sensitive

10    locations, which is a restriction, not a ban, and counsel for

11    the plaintiff in *Bruen* -- they themselves recognize the

12    difference.  During oral argument they talked about how the

13    law -- in *Bruen* they talked about how the law at issue in *Bruen*

14    was different from a sensitive place law, and they themselves

15    recognize that a sensitive place law and the law in *Bruen* is

16    the difference between regulating constitutionally protected

17    activity and attempting to convert a fundamental right into a

18    privilege.

19          THE COURT:  What page is that on?

20          MR. CIAPPETTA:  That's page 5 of the transcript from

21    the *Bruen* case in the oral argument, and that was the argument

22    made by counsel for the plaintiffs themselves.  So they

23    themselves recognize how different a sensitive place law is

24    from what was happening in *Bruen*.

25          And Justice Thomas, as you know, wrote the majority

**A56**

1    of the opinion in *Bruen*.  He himself recognizes the difference.

2    In 2016 in the dissenting opinion in *Bonidy v. the United*

3    *States* in talking about sensitive places -- he said these

4    narrow restrictions neither prohibit nor broadly frustrate any

5    individual from generally exercising his right to bear arms.

6    And that's very important because a sensitive place law is

7    really an exception to the general right to carry.  And it's

8    clear that this is a lesser impact on your right of

9    self-defense than a blanket ban on carrying in public because a

10   citizen who wants to avoid it can just simply avoid the area

11   that is in the statute, and thus it's considered an exception

12   to the right to bear arms.

13          And that kind of goes into your second question about

14   the *Bruen* test.  Ms. Bellantoni somewhat defined it correctly,

15   in talking about the two prongs, with the plaintiff initially

16   having the burden to demonstrate the conduct that was protected

17   and then the burden eventually shifting to the government to

18   demonstrate the historical analogs, but the courts in *Bruen* as

19   well as *Heller* and *McDonald* -- they recognize quite a number of

20   exceptions to that test.  They recognize it for felons, they

21   recognize it for commercial restrictions, and they recognize it

22   for sensitive places as well.  And then they catalog a whole

23   list of sensitive place exceptions.

24          So in those situations, there is a well-established

25   list from *Heller* and *Bruen* of certain sensitive places that are

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1   presumptively constitutional if you restrict the possession in

2   those areas, and then they said you could analogize to items on

3   those lists.  And so if you do that, you don't need to find

4   historical analogs for those.  The court has already done that

5   work.  The court has already said a school, a polling place --

6   that those are presumptively lawful, sensitive places and that

7   you don't need historical analogs for those, and you can

8   analyze -- analogize two things and prove that either -- items

9   similar to those locations exist without the need to go back to

10  1781 or 1791 of the Fourteenth Amendment, which we disagree

11  with plaintiff on.

12          We believe that it's pretty clear that if the Second

13  Amendment and the Fourteenth Amendment -- those are both the

14  relative time periods we're talking about historical analogs.

15  Indeed the Second Amendment wouldn't be -- wouldn't have any

16  impact at all upon the City of New York or the State of

17  New York if the Fourteenth Amendment didn't come around to

18  incorporate it.  So you really can't tell the story or the

19  meaning of the Second Amendment with respect to states And

20  local municipalities certainly without the Fourteenth

21  Amendment.  So that kind of informs and, I think, lays the

22  founding work -- the foundation for what's happening here

23  today.

24          In terms of the two specific locations that you

25  mentioned, the subway is an interesting one because, as you

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1  noted, there was really no public transportation that came

2  about until the early 1900s when New York City and Boston, as

3  we were talking about in the city's brief, were competing for

4  the right to be the first mass transit.  And *Bruen* also talks

5  about that you need to have flexibility in the case of

6  unprecedented societal changes or technological changes.  In

7  those cases you need a more nuanced approach, and we suggest,

8  your Honor, in our brief that a more nuanced approach is very

9  appropriate here because -- particularly if you go back to the

10  Second Amendment's time, there's nothing to compare the 2, 3

11  train or the Metro-North or the Long Island Railroad.  They

12  didn't exist.

13       THE COURT:  What about the railroad system or the

14  stagecoach system?

15       MR. CIAPPETTA:  The stagecoach is a massively

16  different enterprise from what we're talking about here.  Those

17  were -- and I will acknowledge that there were some laws at the

18  time that banned concealed carry except for travel, but the

19  travel that was happening then was completely different.  It

20  was long-term travel through desolate areas on lightly

21  populated cars.

22       Here, in contrast, you have densely packed cars,

23  people standing shoulder to shoulder, hundreds of people on the

24  subway, perfect strangers standing next to one another, and

25  really -- and that density and that -- those people who are

1   packed in tight cars -- it presents a lot of problems, and

2   potentially you have situations where people can get upset

3   about a minor incident.  And if there was a fire or a fight,

4   you have innocent bystanders being hurt, and you have the

5   potential for more casualties than normal.  Those instances

6   could all shut down the entire subway system.

7           So it's completely different.  There's nothing quite

8   like it.  So I think the Supreme Court gives flexibility to the

9   courts in that situation.  They recognize that things are going

10  to come around that didn't exist before.  In those situations

11  also, you would have unbelievable panic, and you would have

12  people unable to escape from those subway cars because they're

13  located so far underground.  And they're close and you can't

14  get off.  So this is a very nuanced situation.

15          And the Supreme Court allows for courts to recognize

16  that, and what we've suggested is that in these type of nuanced

17  situations, what you do is identify a historical law with a

18  similar purpose to the modern regulation.  And that regulates

19  it in the same way even though it might not be exactly

20  identical to something that happened, and the stagecoach is not

21  identical to the Long Island Railroad.  It's not identical to

22  the 2 train or the 3 train, the 7 train.

23          THE COURT:  What are you asking me to use as a

24  comparable.

25          MR. CIAPPETTA:  So in those situations, your Honor,

1   we say look at the laws, and they're very similar to the ones

2   that we cited for Times Square.  Look at the laws that have a

3   concern about mass gatherings and large public gatherings, and

4   those are the plethora of those laws.  And those laws go back

5   to North Carolina, and they go back to -- in Virginia in 1786

6   and Tennessee in 1869 and where they talk about specifically

7   fairs and markets.  There was the concern about public spaces

8   and mass gatherings and the potential for violence and enhanced

9   injury and death when large numbers of people gathered close

10  together.

11          THE COURT:  So you're saying you're comparing a train

12  or the mass transit authority with a public gathering?

13          MR. CIAPPETTA:  What's that, your Honor?

14          THE COURT:  With a public gathering.

15          MR. CIAPPETTA:  They're different in qualitative

16  nature, but their purpose was concerns with large and dense

17  gatherings in specific locations.  And that's the same concern

18  that animates subways and railroads, and even Justice Thomas

19  said, your Honor, in -- during oral argument in the *Bruen* case,

20  he recognized the tailored approach.  He said on page 78 of

21  that transcript -- why can't you have a tailored approach on

22  the Second Amendment based its density in New York City.  If

23  that's a problem -- it's a subway.  So you have a different set

24  of concerns than Upstate New York, and so we're saying in these

25  cases of societal change and major technological change,

1    there's room for a more nuanced approach.  You don't have to

2    find an identical analog.  There's much more flexibility.  Look

3    at laws that have a similar purpose and a similar effect.

4              THE COURT:  Anything else?

5              MR. CIAPPETTA:  Just with respect to Times Square.

6    We think the case is even easier because these -- they're very

7    close analogs.  As I mentioned, the North Carolina law and the

8    Virginia law -- those talk about fairs and markets.  Tennessee

9    passed laws talking about public assemblies.  Texas, Missouri

10   followed suit as did Georgia and Idaho and Arizona.  So there's

11   a whole penalty of regulations that were concerned with public

12   gatherings and public spaces.  And those decisions are further

13   informing how the Second Amendment was interpreted, those were

14   upheld by many courts.  The Texas law that regulated public

15   assembly places and fairs and saloons -- that was upheld in

16   numerous cases.  The Tennessee law, which was kind of at the

17   forefront of this and considered a descendent statute of North

18   Hampton -- that was upheld by *Andrews v. State*.

19             All of those decisions when they -- when these type

20   of regulations were challenged back then, they were upheld, and

21   those decisions formed the Second Amendment and the scope of

22   the Second Amendment.  And those decisions really have very

23   broad language.  The courts were really amused and struck that

24   someone would think that they could carry a firearm anywhere

25   that they chose at any time, and that's clearly not the case.

**A62**

1    The Supreme Court said in *Bruen* that the Second Amendment is
2    not a right to carry whenever, however, and wherever you want.
3         Just to close, with respect to the upcoming oral
4    argument, I do not believe Times Square is part of that in the
5    Second Circuit.  Subways might be.  I just wanted to clarify
6    that.
7         THE COURT:  There's a possibility that both issues
8    may not be before the Second Circuit.
9         MR. CIAPPETTA:  I think subways -- well, let me just
10   go back to subways for a moment.  It raises a larger point that
11   we raised in our brief about plaintiff's standing issues.  The
12   plaintiff is making a very broad challenge to the section for
13   sensitive locations on public transportation.  That's very
14   broad.  The plaintiff does not have standing to challenge every
15   type of public transportation throughout New York State, and
16   they haven't -- that's one of the problems with their
17   complaint.  They haven't narrowly tailored it at all, you know.
18        But they're -- at best they can show a couple of
19   subways where they have standing and maybe the Metro-North.
20   They don't have standing to challenge any mass transit that's
21   up here.  They don't allege they use it.  They don't have a
22   challenge -- standing to challenge the trains, the bus system
23   in Suffolk County, and that's one of the problems, as I
24   mentioned, with the plaintiffs' complaint.  And standing is a
25   major issue on that, and then the Second Circuit case -- I'm

```
 1    not sure what they have standing to challenge.  They may not

 2    have standing to challenge the subways because I'm not sure any

 3    of those people allege that they ride on the subways.

 4         MS. METTHAM:  Your Honor, I can say that for

 5    Antonyuk v. The Second Circuit case that the district judge

 6    found they did not have standing to challenge Times Square.  We

 7    cited that decision in our brief, and I now have to admit on

 8    the record that I think my citation in the table authorities

 9    might be wrong.  But it's on page 44.  I think it might be on

10    45, but in the Antonyuk v. Hochul in the Northern District,

11    there's the November 7 decision where the court there found

12    that if the plaintiffs had shown standing regarding Times

13    Square, the court would have likely found an American

14    historical tradition of banning firearms in this unique,

15    regularly congested, commercial area filled with reckless

16    conduct.  The court did find that they did not have standing.

17         THE COURT:  Thank you, Counselor.

18         MS. METTHAM:  Your Honor, if I may.  I failed to

19    mention before one other factor with regard to the subways.  I

20    understand as you were speaking to plaintiff's counsel we're

21    not here to talk about the private property rights, but it is

22    our position that the government, as proprietor, also has a

23    right to set the terms for entrance on their property.  So to

24    enter MTA, Metro-North, you need to buy a ticket, and that

25    ticket contains the terms for your entrance.  And so though
```

```
 1   here government is the proprietor -- as any proprietor they
 2   are permitted to set the terms for entrance.  Thank you,
 3   your Honor.
 4              THE COURT:  I have a question -- a couple of
 5   questions.  One for Ms. Bellantoni, and that is with respect to
 6   Bruen.  Was Bruen a case that dealt primarily with an absolute
 7   ban, and did it deal with sensitive locations?
 8              MS. BELLANTONI:  There was no sensitive location.  Do
 9   you mean Bruen, or do you mean the reason it was challenged?
10              THE COURT:  Bruen.
11              MS. BELLANTONI:  Bruen did talk about sensitive
12   locations.
13              THE COURT:  What was the nature of the statute that
14   was challenged, and was the challenge -- was that a case
15   dealing primarily with an absolute ban of firearms?
16              MS. BELLANTONI:  Thank you.  I needed clarification.
17   So the challenge was to the proper cause requirement, and that
18   was deemed to be unconstitutional because there was no
19   tradition or a founding era regulation where an individual
20   would have to show the government a reason for carrying for
21   self-defense other than wanting to carry for self-defense.  And
22   with regard to -- I'll let you --
23              THE COURT:  It as not a sensitive location?
24              MS. BELLANTONI:  It's not a sensitive location case,
25   no.
```

1          THE COURT:  So the statute doesn't question -- does

2    not deal with a sensitive location, or there are no challenges

3    to the issue of sensitive locations?

4          MS. BELLANTONI:  Yes.  New York did not have a

5    sensitive locations law at that time.  So that was not

6    challenged.

7          THE COURT:  All right.  And there's a current statute

8    with respect to sensitive locations that referenced government

9    buildings, number one, and, number two, are -- I guess, with

10   respect to the defendants, are you asking for an expansive

11   interpretation of what constitutes a government building?

12         MS. METTHAM:  If you could give me one second,

13   your Honor.  So the question is whether the statute

14   expressed -- includes government buildings?

15         THE COURT:  Right.

16         MS. METTHAM:  I believe it does, yes.

17         THE COURT:  Okay.  So you're asking -- with respect

18   to MTA, are you saying that that's the equivalent of a

19   government building?

20         MS. METTHAM:  Yes.

21         THE COURT:  Are you asking me to expand the

22   definition of "government buildings" to include the subway?

23         MS. METTHAM:  Yes.  And I will also note, your

24   Honor -- I can look for the citation, but, for example, the

25   USPS property, the United States Postal Service, which is also

1    a quasi-governmental agency -- their property has also been

2    found in other cases to be a sensitive location.

3              THE COURT:  Ms. Bellantoni, is there anything else

4    you'd like to --

5              MS. BELLANTONI:  Yes.

6              THE COURT:  -- address?

7              MS. BELLANTONI:  Yes, Judge.  Just going back a ways

8    earlier in the conference, I want to direct the Court's

9    attention to the *Bruen* decision at 2137, which does say that

10   the scope of protection applicable to the federal government

11   and states is pegged to the public understanding of the right

12   and the Bill of Rights that was adopted in 1791.

13             With regard to the sensitive locations that are

14   mentioned in the *Bruen* decision, those were locations where the

15   public does not typically go and congregate, polling places,

16   schools, legislatures, courthouses.  They are places that

17   everyday people are just going maybe for employment.  Maybe

18   they have a particular --

19             THE COURT:  What locations are those?

20             MS. BELLANTONI:  Legislatures, polling places,

21   courthouses.  They're not places where the public congregates

22   generally.

23             THE COURT:  Aren't they open to the public?  Can't

24   the public gather in those places?

25             MS. BELLANTONI:  Times Square is a large area where

1   people --

2           THE COURT:  Do me a favor.  I'll ask the question.

3   You made a statement.  You referenced legislative buildings.

4   What other locations did you reference?

5           MS. BELLANTONI:  Courthouses.

6           THE COURT:  Courthouses.  Your statement was that

7   those are places where people generally don't congregate?

8           MS. BELLANTONI:  The public does not typically

9   congregate in the courthouse, correct.

10          THE COURT:  Aren't those, in fact, public locations

11  which are open to the public?

12          MS. BELLANTONI:  They are.

13          THE COURT:  All right.  And at any given time, there

14  could be large gatherings?

15          MS. BELLANTONI:  True.  So people have the option not

16  to go to a courthouse.

17          THE COURT:  People have the option not to go to a lot

18  of places.  It doesn't mean that they're not places where

19  people generally gather.

20          MS. BELLANTONI:  *So Bruen* discussed that the nuanced

21  approach that the City had talked about before with regard to

22  analogies, historical analogs -- *Bruen* specifically said that

23  no nuanced approach was needed in their case because the proper

24  cause requirement was addressed in the same societal concerns

25  that existed back in 1791, crime, public safety, and as we are

1   aware, the balancing test, the interest in balancing has been

2   rejected by the *Bruen* court.

3           The proper cause statute that it was built on was

4   enacted based on public safety, handgun violence, and urban

5   areas and crowded populations, that, you know, the City

6   argued -- I'm sorry -- the State argued in its oral argument

7   that the more upstate areas of New York, you know, who had --

8   could be more free in carrying because they weren't as densely

9   populated, and the Supreme Court rejected the densely populated

10  justification for such a regulation.

11          The purpose of the sensitive locations regulation is

12  public safety and gun violence and urban areas and in

13  density -- and population density.  The same societal concerns

14  that existed in the *Bruen* case -- and they have been rejected

15  by the Supreme Court, and they're going to be rejected here

16  because Times Square, public transportation -- those are places

17  where people typically go through their day.  Many people don't

18  have a car in the city or, you know, in -- on Long Island or

19  traveling into the city for work.

20          And, you know, if you're going to limit -- you know,

21  the courthouse -- if I know I'm coming into the courthouse,

22  then I know I'm not supposed to, you know, have my firearm on

23  me because it's not allowed in the courthouse, but if I'm

24  going -- you know, I'm going to the courthouse for a very

25  limited period of time.  So keep in mind that when I'm leaving

1   the house to go to the courthouse and traveling back and moving

2   about, I'm not just disarmed and vulnerable in the courthouse.

3   I'm disarmed and vulnerable everywhere I go that day because my

4   firearm has been left at home.

5           And we're talking about the Times Square area.  The

6   Times Square area is very amorphous, and even though it's been

7   defined, it's the public street and a lot of private, you know,

8   businesses on that street, and that's a place where crowds go.

9   My client, Mr. Sappe, rides through that area to go to the

10  diamond district.  He's certainly vulnerable.  He carries

11  diamonds and jewelry and then hundreds of thousands of dollars

12  in cash on him on a regular basis, and he travels through that

13  area.  And he needs to be protected.  He needs to protect

14  himself.  You know, he's licensed in numerous other

15  jurisdictions.  He has a New York State license that was issued

16  by a judge in Orange County, but he can't carry in Times

17  Square.  And he can't carry in New York City, places -- the

18  *Bruen* court said to ban Second Amendment protected conduct in

19  places where people typically congregate eviscerates the right

20  of -- to publicly carry for self-defense.

21          And that's what this arbitrarily created zone in New

22  York City has done.  And to say that *The New York Times*

23  building is First Amendment protected -- well, *The New York*

24  *Times* building can post a -- you know, a picture or a sign that

25  says no firearms allowed, and then people know that when

**A70**

1    they're walking past, they're boarding or they're going to

2    their job or just visiting New York City, that they're not

3    allowed to go into *The New York Times* building, but they can't

4    say that everyone walking on the street in Manhattan has no

5    right to self-defense or taking the subway has no right to

6    self-defense.  We're talking about peaceable carry.  We're not

7    talking about --

8              THE COURT:  The statute doesn't give a very -- it's

9    not a blanket ban.  It's a very particular ban.

10             MS. BELLANTONI:  It's a ban on those -- that section

11   of the city and transportation.

12             THE COURT:  And it is -- the area is defined.

13   Counsel, just put on the record what that area is and what the

14   limits are.

15             MS. BELLANTONI:  Right.  And they're public streets

16   with private businesses and other businesses that are in other

17   government areas or buildings that are not --

18             THE COURT:  It's not even a ban.  It's a limit.  It's

19   a limitation.

20             MS. BELLANTONI:  It's a ban.  You can't carry if you

21   are a felon.  That's a ban.  In that area that's a ban.  You

22   have no rights in that area.  You have no Second Amendment

23   rights.

24             THE COURT:  So every restriction is a ban?

25             MS. BELLANTONI:  When it says that you can be charged

1   as a felon if you engage in this conduct, that's a ban.

2   THE COURT:  Every restriction is a ban?

3   MS. BELLANTONI:  That restriction is a ban.

4   THE COURT:  I'm asking a question.  Is that what you

5   want me -- that's your position?  However the restriction -- no

6   matter how limited in scope, it constitutes a ban?

7   MS. BELLANTONI:  Proper cause was a restriction, and

8   that's not a ban.  That's a regulation.  It curtailed who could

9   carry in public.  Absolutely, it restricted your ability to

10  carry for self-defense in public and said you can't carry

11  unless you prove this.  You could have target shooting.  You

12  could go with all of your guns to a target range, but you're

13  restricted everywhere else.  You can't carry unless you show

14  proper cause.  That's a restriction.

15  THE COURT:  Anything else that you wanted to put on

16  the record?

17  MS. BELLANTONI:  No, your Honor.

18  THE COURT:  Anything else from any other defense

19  attorneys?

20  MS. METTHAM:  Your Honor, just to take us back one

21  minute to your last question.  So *Bonidy* was the case I cited,

22  a Tenth Circuit case, and it is a -- it found their regulation

23  banning guns --

24  THE COURT:  What's the cite?

25  MS. METTHAM:  I'm sorry.  It is 790 F.3d 1121, and

1    it's the Tenth Circuit, 2015.  And to your question about

2    government property and then the subways is -- in that case

3    there was a statute, I believe, that banned guns on all USPS

4    property, including outdoor property open to the public.  And

5    it was found to be okay because the Second Amendment right to

6    bear arms has not been extended to government buildings.  So I

7    think --

8              THE COURT:  And legally permissible.

9              MS. METTHAM:  Yes.  And, your Honor, I apologize for

10   the flippancy.  So just because the statute includes government

11   buildings, the fact that the transit system has been made more

12   explicit, more clear, doesn't mean that, you know, we're

13   necessarily expanding the definition of government buildings in

14   the statute.  It's --

15             THE COURT:  Your position is the government building

16   includes or is inclusive of any governmental structure or

17   facility?

18             MS. METTHAM:  Yes, your Honor.

19             THE COURT:  Whether it's an open subway platform or

20   one underground?

21             MS. METTHAM:  Correct, your Honor.

22             THE COURT:  And it doesn't matter if it's a

23   quasi-government facility?

24             MS. METTHAM:  Yes, your Honor.

25             THE COURT:  That's the question I have -- just out of

**A73**

1  curiosity, would that also apply to state universities that are

2  government run?  SUNY?

3           MS. METTHAM:  Well, I believe as schools --

4           THE COURT:  Schools.  That would be encompassing

5  under the definition of schools?

6           MS. METTHAM:  Yes.  I believe that they're, again,

7  covered by other provisions.

8           THE COURT:  Okay.  Thank you, Counselor.

9           MS. BELLANTONI:  May I just make -- I'm sorry.  I

10  didn't know you were --

11          THE COURT:  Anything else?

12          MR. CIAPPETTA:  Yes, your Honor.  Just two brief

13  points.

14          THE COURT:  So I'm always leery when attorneys say

15  "brief."

16          MR. CIAPPETTA:  I'll be very brief.

17          THE COURT:  Even more when they say "very brief."

18          MR. CIAPPETTA:  I certainly do not agree with the

19  plaintiff's characterization of *the Bruen, Heller* list as

20  sensitive places -- that those are places that people do not

21  gather.  We've got all -- particularly with respect to schools.

22  I can tell you as a school board member -- I was at an event

23  last night where there were 300-plus people in an auditorium,

24  world language, and we have thousands of people at football

25  games sometimes.  The notion that people don't gather at

           Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
              Official Court Reporter (914)390-4242

**A74**

1  schools is just not correct as well as polling places.

2  Obviously, millions and millions of people go to polling places

3  to vote.

4          THE COURT:  Well, with respect to polling places, it

5  depends on who's running, right?  There's a huge difference

6  between whether or not it's a local election or statewide

7  election or a federal election, right?  But, nonetheless,

8  people gather in polling places, right?

9          MR. CIAPPETTA:  No doubt.  The turnout is different

10  depending upon the race, but people gather, and they gather in

11  large numbers.

12          And, finally, with respect to the *Bruen* opinion, it's

13  very important to note there were multiple concurring opinions,

14  and those concurrences -- judges in the concurrences -- they

15  were critical to getting a majority support for the decision,

16  and they wrote separately to take great pains to note how

17  limited the area was that the court was deciding in that case,

18  particularly Justice Alito's note said I reiterate.  All we

19  decide is that we protect the right of law-abiding people to

20  carry outside and that New York's law made this impossible.

21          And Justice Kavanaugh wrote to emphasize two points,

22  one of which is particularly relevant here, that the Second

23  Amendment is not a regulatory straightjacket, and that properly

24  interpreted, the Second Amendment allows for a variety of gun

25  regulations.  Those concurrences are very important and --

**A75**

```
1                THE COURT:  Say that again.

2                MR. CIAPPETTA:  Well, properly interpreted, the

3    Second Amendment allows for a variety of gun regulations.

4                THE COURT:  What's the last thing you said?  Gun

5    regulation allows for --

6                MR. CIAPPETTA:  I was saying that those concurrences

7    and those --

8                THE COURT:  I heard you.  There's a reason.  I just

9    wanted to reiterate it for a reason.

10               MR. CIAPPETTA:  I understand.  And that's all.  It

11   was brief.

12               THE COURT:  Ms. Bellantoni?

13               MS. BELLANTONI:  Nothing further.

14               THE COURT:  All right.  Thank you, all.  I'm going to

15   reserve the decision, and I hope the issue is somewhat soon.

16               MS. METTHAM:  Thank you, your Honor.

17               THE COURT:  Thank you.  Good luck to you all.

18               (Proceedings concluded)

19

20

21

22

23

24

25
```

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

**WORKING DRAFT – Subject to change**

"Not all History is Created Equal":

# In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868

Mark W. Smith

\*\*\*

Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, Oxford University; Presidential Scholar and Senior Fellow in Law and Public Policy, The King's College; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law. He also hosts the Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and issues. He is the author of multiple books including *First They Came for the Gun Owners: The Campaign to Disarm You and Take Your Freedoms* (Bombardier Books 2019) and *#Duped: How the Anti-gun Lobby Exploits the Parkland School Shooting—and How Gun Owners Can Fight Back* (Post Hill Press 2018).

Electronic copy available at: https://ssrn.com/abstract=4248297

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

I.    1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL
     UNDERSTANDING OF THE SECOND AMENDMENT. ............................................. 7

    A.  The meaning and scope of each provision in the Bill of Rights is the same whether
       applied against the states or against the federal government. ...................................... 7

    B.  The meaning of a constitutional provision is fixed when it is adopted. ....................... 9

    C.  The public understanding of the Bill of Rights by ratifiers in the Founding period
       controls the meaning of its provisions. ...................................................................... 10

    D.  All three of the Supreme Court's substantive interpretations of the Second
       Amendment assess its meaning and scope by looking at the Founding period. ......... 15

    E.  Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the
       Founding Period, not 1868. ......................................................................................... 17

    F.  If later understandings contradict the original understanding of the text, the original
       understanding controls. ............................................................................................... 27

    G.  The Court of Appeals' decisions cited to support 1868 as the determinative year have
       been abrogated or rely on an obvious misreading of McDonald. ............................... 31

II.   1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE
     BILL OF RIGHTS. ...................................................................................................... 33

    A.  It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they
       were incorporating against the states all of the provisions of the first eight
       amendments. ............................................................................................................... 33

    B.  The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill
       of Rights through the Privileges or Immunities Clause. ............................................. 40

    C.  The individual right to bear arms in the Second Amendment was understood the same
       way in 1868 as in 1791. .............................................................................................. 41

III.  THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES
     NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION
     JURISPRUDENCE. ...................................................................................................... 45

    A.  Professor Lash's approach is theoretically unsound and unlikely to be adopted. ...... 46

Electronic copy available at: https://ssrn.com/abstract=4248297

**A78**

**WORKING DRAFT – Subject to change**

B. Professor Amar's approach contains similar flaws and his theories have been rejected by Heller................................................................................................................. 51

CONCLUSION.................................................................................................................... 57

Electronic copy available at: https://ssrn.com/abstract=4248297

**A79**

**WORKING DRAFT – Subject to change**

## INTRODUCTION

In June of 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*,[1] its most significant case interpreting the scope of the Second Amendment since the landmark decision in *District of Columbia v. Heller* in 2008.[2] *Bruen* was a major victory for the constitutional right to keep and bear arms. One consequence of the decision has been to send the gun control movement scrambling for new ways to undercut the right to bear arms in a post-*Bruen* world. Opponents of the Second Amendment have seized upon a short passage by Justice Thomas, author of the *Bruen* opinion, to argue in the lower courts that an originalist interpretation requires courts to look at the meaning of the Second Amendment (and thus, logically, all provisions of the Bill of Rights) when the Fourteenth Amendment was ratified in 1868, not in 1791 when the Bill of Rights was ratified. This approach, if accepted, would revolutionize not only Second Amendment law, but also the Court's entire Bill of Rights jurisprudence. It is nonsensical, contrary to the Supreme Court's precedents, and contradicts the express text of *Bruen*.

Before looking at what the *Bruen* opinion said (or did not say) on that subject, *Bruen* itself needs to be placed in context. *Heller* held that the Second Amendment confirms an individual right to keep and bear arms for lawful purposes such as self-defense. It also rejected the use of a means-ends balancing test, such as levels of scrutiny, and instead relied on a "text, history, and tradition" test.

In the fourteen years between *Heller* and *Bruen*, most of the lower federal courts largely disregarded *Heller*'s historical methodology and instead applied a two-part interest balancing

---

[1] 142 S.Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

test.  The first part of the test looked at whether a particular ban or restriction fell within the scope of the Second Amendment.  If it did, the second part of the test was invoked, and the lower courts usually applied an "intermediate scrutiny" balancing test to render the Second Amendment's protections ineffectual.  That remained true even after the Court held in *McDonald v. City of Chicago*[3] that the Second Amendment is a fundamental individual right that is incorporated against states and localities by the Fourteenth Amendment's Due Process Clause.

*Bruen* changed all of that.  The Court expressly rejected balancing tests.  In the words of the Court, the second step was "one step too many."[4]  *Heller* and *McDonald*, the Court stated, "do not support applying means-end scrutiny in the Second Amendment context."[5]  Rather, Second Amendment cases must be firmly rooted in the text and history of that Amendment. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," the Court held.  To overcome that presumption, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[6]  That means that the government has the burden of showing that there were reasonably close historical analogues to the present-day restriction that is challenged.[7]

But at what point in history should courts look to determine if there were laws or restrictions analogous to those being challenged?  Immediately after *Bruen* was decided,

---

[3] 561 U.S. 742 (2010).

[4] *Bruen*, 142 S.Ct. at 2127.

[5] *Id.*

[6] *Id.* at 2127, 2130.

[7] *Bruen* established several important principles for the Second Amendment.  In addition to striking down the two-part test for the Second Amendment, it established that the Second Amendment protects the carrying of weapons outside the home.  It held that carry permit or license systems are unconstitutional if they vest discretion in state or local officials instead of being based on objective criteria. It also outlined the proper methodology for applying the Second Amendment based upon reasoning by historical analogy.

2

Electronic copy available at: https://ssrn.com/abstract=4248297

government defendants (and their anti-gun amici) in Second Amendment cases began to argue that in litigation against states and localities, as opposed to litigation against the federal government, the relevant time period is not 1791, when the Second Amendment was ratified, but 1868, when the Fourteenth Amendment was ratified.[8]

Here is the passage in *Bruen* on which they base this argument.  After reviewing the historical methodology to be employed by courts in future Second Amendment cases, the Court made a final observation that:

> Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [citations omitted] And we have *generally assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791.* See, *e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).
>
> We also *acknowledge* that there is an *ongoing scholarly debate* on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they

---

[8] See, *e.g.*, Br. of Def. John Harrington in Support of his Motion for Summary Judgment 24, *Worth v. Harrington*, No. 0:21-CV-01348,  Doc. 49 (D. Minn. Aug. 4, 2022) ("Especially relevant … are laws that were in effect around the time the Fourteenth Amendment, which made the Second Amendment applicable to the States, was ratified); Electronic Amicus Letter Br. of Everytown for Gun Safety 2, *Lara v. Commissioner Pennsylvania State Police*, No. 21-1832, Doc. 61 (3d Cir. Aug. 2, 2022) ("the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states."); [Proposed] Amicus Br. of Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction 7, *Antonyuk v. Bruen*, No. 1:22-cv-00734, Doc. 33 (N.D.N.Y. Aug. 18, 2022) ("Thus, when the people chose to extend the Bill of Rights to the states in 1868, their understanding of the scope of each right should control the originalist analysis today.").  The specific arguments made in these and similar cases are discussed in Part G, below.

Electronic copy available at: https://ssrn.com/abstract=4248297

readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings").[9]

That portion of the opinion concluded that: "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[10]

That has led gun control advocates to treat the issue of whether 1791 or 1868 is the relevant time period as an open question and to argue for 1868. Undoubtedly that is because there were more laws concerning firearms on the books in 1868 than there were in 1791, and thus more opportunities to find historical "analogues" to restrict individual rights. Also, the Reconstruction period is unusual in American history because the North was occupying the South with military force, and the South was trying to disarm the newly freed blacks. Such actions during that period are therefore not representative of either the Founding period or of the American historical tradition.

But 1791 vs. 1868 is not an open question. That the Founding period is the correct time to determine the original public meaning of an individual right is not a mere "assumption," as Justice Thomas stated in his respectful nod to the "ongoing scholarly debate." It is an integral and controlling part of the Court's Bill of Rights jurisprudence. As shown in this article, when history must be consulted to determine meaning, it has been the universal practice of the Court to look at the Founding period and relevant antecedents to determine original public understanding. No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it

---

[9] *Bruen*, 142 S.Ct. at 2137-38 (emphasis added). The SSRN article by Professor Lash has now been published as Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (Summer 2022).

[10] *Id*. at 2138.

4

Electronic copy available at: https://ssrn.com/abstract=4248297

is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791.

The Supreme Court has held that the meaning of the Constitution, including the Bill of Rights, is fixed at the time it was adopted, not later. A provision of the Bill of Rights has only one meaning, whether applied against the federal government or the states. And the time period for determining that single meaning, when history must be examined, is 1791. That is true of the three cases cited in the passage quoted above from *Bruen;* it is true of all of the Supreme Court's Second Amendment cases beginning with *Heller*, including *Bruen* itself; and it is true of Supreme Court cases examining other rights provisions of the Bill of Rights. The Court has also clearly stated that if a later interpretation differs from the original meaning at the time of ratification of the Bill of Rights, the later interpretation must yield.

As shown in detail below, the cases cited by post-*Bruen* defendants or amici in Second Amendment litigation were either abrogated by *Bruen* itself, resulted from a misreading (later corrected) of the *McDonald* decision by a single Circuit Court of Appeals, or were those which cited to that mistaken decision.

Even if one examines the period of ratification of the Fourteenth Amendment, there is no evidence that the ratifiers thought the existing rights in the Bill of Rights somehow changed in meaning. Rather, the Fourteenth Amendment's purpose was to include African Americans within the protections granted to citizens and to protect their rights against encroachments by the states. In fact, it did not take long for the Supreme Court to decide that "privileges or immunities" of citizens of the United States were a very limited set of rights indeed.

This article concludes with a description of the scholarly positions of Professors Lash and Amar regarding use of the year 1868 to determine the meanings of the Bill of Rights. Professor

Electronic copy available at: https://ssrn.com/abstract=4248297

**A84**

**WORKING DRAFT – Subject to change**

Lash's position would require a complete overturning of Supreme Court's Bill of Rights jurisprudence. Professor Amar's position is different, and his concerns, especially regarding the Second Amendment, may have been resolved by *Heller*, which was decided ten years after his cited book was published.

Electronic copy available at: https://ssrn.com/abstract=4248297

## I.    1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT.

### A.    *The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government.*

The key to understanding why *only* 1791 is the proper year for determining the original public meaning of the Second Amendment, or of any other right of individuals enumerated in the Bill of Rights, is found in *Bruen* itself: "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."[11]  The Court does not apply two different versions of the Second Amendment, or two versions of other incorporated provisions of the first eight amendments in the Bill of Rights.  Specifically, it does not apply one meaning when invoked against potential federal infringement and a different meaning when invoked against a potential state or locality infringement.

This has been a fundamental principle of Bill of Rights jurisprudence for more than five decades.[12]  That an incorporated right has only a single meaning was made crystal clear in *McDonald*, which quoted *Malloy v. Hogan* as establishing that the Court has:

> abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court."[13]

Instead, as *McDonald* noted, the *Malloy* Court "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment

---

[11] *Bruen*, 142 S.Ct. at 2137 (emphasis added).

[12] The concept that the federal government and state governments are restrained equally by the First Amendment, and by the incorporated First Amendment, appears to go back even further. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states *as incompetent as Congress* to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (emphasis added).

[13] *McDonald*, 561 U.S. at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 5–6 (1964)).

Electronic copy available at: https://ssrn.com/abstract=4248297

according to the same standards that protect those personal rights against federal encroachment.'"[14] The meaning of a provision of the Bill of Rights is *identical* whether applied against the states or the federal government. Similarly, the Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."[15]

*McDonald* discussed one anomalous case, *Apodaca v. Oregon*,[16] which when *McDonald* was decided allowed state criminal defendants to be convicted of a serious crime by a 10-2 vote rather than only by a unanimous jury as the Sixth Amendment requires in federal trials. That case has since been overruled in *Ramos v. Louisiana*, with the Court noting that it has "long explained … that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government."[17] As a case decided just one year earlier stated, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."[18] That means, however it is interpreted, the Second Amendment must apply *equally* against the states and the federal government.

---

[14] *McDonald*, 561 U.S. at 765-66 (quoting *Malloy*, 378 U.S. at 10, and further citing *Mapp v. Ohio*, 367 U.S. 643, 655–656 (1961); *Ker v. California*, 374 U.S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U.S. 108, 110 (1964); *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Duncan v. Louisiana*, 391 U.S. 145, 149, 157–158 (1968); *Benton v. Maryland*, 395 U.S. 784, 794–795 (1969); and *Wallace v. Jaffree*, 472 U.S. 38, 48–49 (1985)).

[15] *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

[16] 406 U.S. 404 (1972).

[17] *Ramos v. Louisiana,* 140 S.Ct. 1390, 1397 (2020).

[18] *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (incorporating the Excessive Fines Clause).

8

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

    *B. The meaning of a constitutional provision is fixed when it is adopted.*

    *Bruen* explained that the Constitution's "meaning is fixed according to the understandings of those who ratified it…."[19]  Since the Bill of Rights is part of the Constitution and was ratified just three years after the unamended Constitution went into effect, its meaning was fixed as of that time.  Noting that the "Constitution can, and must, apply to *circumstances* beyond those *the Founders* specifically anticipated,"[20] *Bruen* quoted from *United States v. Jones*,[21] which concluded that installation of a tracking device on a vehicle was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added).[22] Circumstances may change, but the central meaning is fixed.

    The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.  As Justice Thomas noted in his concurrence in *McIntyre v. Ohio Elections Comm'n*:[23]

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721 (1838).

---

[19] *Bruen,* 142 S.Ct. at 2132.

[20] *Id.*

[21] 565 U.S. 400, 404–405 (2012).

[22] *Id*. (emphasis added).

[23] 514 U.S. 334, 359 (1995) (emphasis added).

9

Electronic copy available at: https://ssrn.com/abstract=4248297

Thus, as long ago as 1838, the concept of a "historically fixed meaning" was an accepted proposition.  It remained an accepted proposition in 1905 when *South Carolina v. United States* was decided and has remained so to the present day.

C.  *The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions.*

As the above passages demonstrate, the relevant time period for ascertaining the *single* meaning of a provision of the Bill of Rights, as applied to the states and to the federal government, is the ratification of those amendments at the time of the Founding, not the time of incorporation of the right into the Fourteenth Amendment.  *Bruen* recognized that the "Second Amendment's *historically fixed meaning*" must date, like the Amendment itself, to 1791, when the Court reaffirmed *Heller*'s finding that the right applies to new circumstances, specifically that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence *in the 18th century.*'"[24]

In the passage from *Bruen* quoted above regarding the "assumption" that 1791 is the relevant time period, the Court cited three cases, all of which looked to the time of ratification of specific amendments in 1791 to determine their original public meaning:  *Crawford v. Washington*, 541 U.S. 36 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) (First Amendment).  Those cases all involve applications against the states of incorporated provisions of the Bill of Rights.  The *Bruen* opinion stated that the Court had "assumed" in those cases that the Founding was the relevant time period.  But, as those cases show, the Founding period is

---

[24] *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

expressly stated to be the period to be examined to determine the meaning of the provisions in question.[25]

*Crawford* is a Confrontation Clause case. Finding that the text alone did not resolve the specific meaning and purposes of that Clause, the Court observed that "[w]e must therefore turn to the historical background of the Clause to understand its meaning."[26] The Court then examined pertinent English legal history, colonial laws and practices, the common law as understood at the time of the Founding, comparable provisions in eighteenth century state constitutions, and some early nineteenth century cases and commentary to determine its meaning. Throughout its historical review, the Court repeatedly used expressions such as:

- "…*the Framers* would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify..."

- "The *founding generation's* immediate source of the concept, however, was the common law..."

- referring to certain evils "…that English law's assertion of a right to confrontation was meant to prohibit; and that the *founding-era rhetoric* decried. The Sixth Amendment must be interpreted with this focus in mind."

- "…ex parte examinations might sometimes be admissible under modern hearsay rules, but *the Framers* certainly would not have condoned them."

---

[25] See also *Heller*, 554 U.S. at 576-77 (stating that the normal meaning of the words in the Second Amendment excludes meanings "that would not have been known to ordinary citizens *in the founding generation*." (emphasis added).

[26] *Crawford*, 541 U.S. at 43.

11

Electronic copy available at: https://ssrn.com/abstract=4248297

- [the Sixth Amendment] "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established *at the time of the founding*..."

- "…the *common law in 1791* conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."

- "We do not infer from these that *the Framers* thought exceptions would apply even to prior testimony."

- "Our cases have thus remained faithful to *the Framers' understanding:*"

- "…we do not think *the Framers* meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence..." [27]

There is no indication whatsoever in *Crawford* that when the Sixth Amendment is applied through the Fourteenth Amendment to a state, the public understanding of the Sixth amendment at the time of ratification of the Fourteenth Amendment determines its meaning or changes the 1791 meaning. And the Supreme Court's reliance on Founding-era history in *Crawford* was not a mere "assumption"; it was inseparable from its holding.

The second case cited is *Virginia v. Moore,*[28] a Fourth Amendment case, where the protection of that Amendment was asserted against a state's actions. The issue was whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law.[29] The Court looked to the Founding era for guidance:

---

[27] *Id.* at 36, 43, 50, 51, 54, 56, 59, 61 (emphasis added).

[28] 553 U.S. 164 (2008).

[29] *Id.* at 166 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

In determining whether a search or seizure is unreasonable, we begin with history. We look to the *statutes and common law of the founding era* to determine the norms that the Fourth Amendment was meant to preserve.[30]

The Court stated that it was "aware of no historical indication that *those who ratified the Fourth Amendment* understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."[31]  Instead, the "immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that *English judges had employed against the colonists*."[32]  Emphasizing the focus on the Founding period, the Court continued, "[n]o early case or commentary, to our knowledge, suggested the Amendment was intended to incorporate subsequently enacted statutes," and "[n]one of the early Fourth Amendment cases that scholars have identified sought to base a constitutional claim on a violation of a state or federal statute concerning arrest."[33]

According to the Court, this is "not a case in which the claimant can point to 'a clear *answer [that] existed in 1791* and has been generally adhered to by the traditions of our society ever since.'"[34]  As with *Crawford*, there was no indication in *Virginia v. Moore* that the understanding of the ratifiers of the Fourteenth Amendment was relevant or should even be considered.

In the third case, *Nevada Comm'n on Ethics v. Carrigan*,[35] the issue was whether a provision of the state's Ethics in Government Law requiring legislators to recuse themselves from voting on certain measures violated the First Amendment.  The Court held that it did not

---

[30] *Id.* at 168 (emphasis added).

[31] *Id.* (emphasis added).

[32] *Id.* at 166-69 (citations omitted) (emphasis added).

[33] *Id.* at 169.

[34] *Id.* at 170-71 (quoting *Atwater v. Lago Vista*, 532 U.S. 318, 345 (2001) (cleaned up) (emphasis added).

[35] 564 U.S. 117 (2011).

13

Electronic copy available at: https://ssrn.com/abstract=4248297

because voting by legislators does not implicate a personal right of free speech, but is an exercise of legislative power on behalf of the citizenry. One of the arguments in support of that conclusion was that such recusal laws had existed at the time of the Founding and were not considered to be restraints on speech.

As with *Crawford* and *Moore*, the Court never even considered whether the scope of the First Amendment meaning should be determined by the understanding of the ratifiers of the Fourteenth Amendment. Instead, it looked to the Founding period to determine whether a law requiring recusal violated the right to freedom of speech or expression. The Court noted that "Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws *existed in 1791* and have been in place ever since."[36] The Court found that recusal rules like the one at issue in the case have existed since the founding of the Republic:

> "*[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning,*'" *Printz v. United States*, 521 U.S. 898, 905 (1997) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723–724 (1986)). *That evidence is dispositive here. Within 15 years of the founding*, both the House of Representatives and the Senate adopted recusal rules. The House rule—to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 10 (1997)—was adopted within a week of that chamber's first achieving a quorum.[37]

The Court observed that "The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate" in 1801.[38] It also looked to recusal requirements for federal judges as early as 1792.[39]

---

[36] *Id*. at 122 (emphasis added).

[37] *Id.* (emphasis added).

[38] *Id.* at 123.

[39] *Id.*

14

Electronic copy available at: https://ssrn.com/abstract=4248297

When the Supreme Court looks at history to determine the intent of ratifiers, it always looks to the Founding era as the period of sole or primary relevance.  In addition to the three cases cited by *Bruen*, decisions under the Second Amendment, and all of the other amendments that have been incorporated, look to the Founding period.[40]

> D.  *All three of the Supreme Court's substantive interpretations of the Second Amendment assess its meaning and scope by looking at the Founding period.*

There have been three Supreme Court cases—*Heller*, *Caetano*, and *Bruen*—that have applied the substantive meaning of the Second Amendment.  *McDonald* surveyed the importance of the right to keep and bear arms over our nation's history to determine if it should be incorporated through the Fourteenth Amendment.  But *McDonald* did not attempt to expound on its exact substantive meaning because Chicago's handgun ban was clearly unconstitutional under *Heller* if the Second Amendment was incorporated.  *Heller*, *Caetano*, and *Bruen* all used the Founding period to determine the scope and meaning of the Second Amendment.

*Heller* first analyzed the meaning of the text of the Second Amendment by examining sources that either preceded 1791 or were close enough in time thereafter to validly ascertain what the language meant to the Founding generation.[41]

While it is unnecessary to review every citation by *Heller* as evidence of meaning in the Founding era, a few examples will illustrate the point.  The Court stated that in interpreting the Second Amendment's text, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'  Normal meaning may of course include an idiomatic

---

[40] The Seventh Amendment has not been incorporated generally against the states because it is a provision governing trials in federal courts.

[41] *Heller*, 554 U.S. 577-592.

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning, but it excludes secret or technical meanings that would not have been known to *ordinary citizens in the founding generation*."[42]

To ascertain the meaning of "militia," the Court stated: "As we will describe below, the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range."[43]  *Heller* looked at the *colonial* militia, not the militia as it existed in 1868 or some later period.

For the meaning of "arms," *Heller* looked exclusively at mid- to late eighteenth-century dictionaries and sources, such as Samuel Johnson's famed dictionary.[44]  It concluded that "The term was applied, *then as now*, to weapons that were not specifically designed for military use…."[45]  "Then" refers to the Founding period.  The Court concluded that "Although one *founding-era* thesaurus limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms.'"[46]

Regarding the meaning of "keep," the Court again cited Johnson's Dictionary, with a confirmatory reference to the early Webster definition.  The opinion noted that "The phrase 'keep arms' was not prevalent in the written documents *of the founding period* that we have found," but cited three examples, all of which preceded 1791.[47]  The Court construed "bear" in the same way, stating, "from our review of *founding-era sources*, we conclude that this natural meaning [which the Court had adopted] was also the meaning that 'bear arms' had in the 18th

---

[42] *Id.* at 576-77 (citations omitted) (emphasis added).

[43] *Id.* at 580.

[44] The opinion did contain a "see also" reference to Noah Webster's 1828 dictionary, but it was merely cited as "similar."  It also cited *State v. Duke*, 42 Tex. 455, 458 (1874), but noted only that that case cited state court decisions construing "arms."

[45] *Heller*, 554 U.S. at 581 (emphasis added).

[46] *Id.* (emphasis added).

[47] *Id.* at 583 (emphasis added).

16

Electronic copy available at: https://ssrn.com/abstract=4248297

century."[48] In the end, the Court concluded that it was "adopt[ing] . . . the original understanding of the Second Amendment" as its definitive interpretation.[49] That can only mean the understanding that prevailed at its ratification.

*Caetano* applied the Second Amendment against the Commonwealth of Massachusetts.[50] Although this *per curiam* opinion did not itself engage in historical analysis, it expressly relied on *Heller*'s language and reasoning, which were rooted in the Founding period. There was no suggestion by the Court that 1868 was the proper date, or that the understanding of the ratifiers of the Fourteenth Amendment was even pertinent, much less controlling.

*Bruen* again confirmed that the time of ratification of the Bill of Rights is the pertinent period. Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[51] The Second Amendment was adopted in 1791, so that should be conclusive.

    E. *Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868.*

As described in *Bruen*, the meaning of a constitutional provision is fixed when adopted. That includes the provisions of the Bill of Rights, which have the same meaning when incorporated against the states as when they apply directly to the federal government. In numerous cases involving all of the amendments in the Bill of Rights that have been incorporated, the relevant time period has been held to be the Founding period. None has looked

---

[48] *Id.* at 584 (emphasis added).

[49] *Id.* at 625.

[50] *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

[51] *Bruen*, 142 S.Ct. at 2136.

Electronic copy available at: https://ssrn.com/abstract=4248297

primarily to the post-Civil War period to determine the scope of a provision within the Bill of Rights. To the extent late 19th century interpretations have been discussed in these cases, it was never because the understandings of the ratifiers of the Fourteenth Amendment were found to prevail over those of the Founders in 1791. Instead, discussions of late 19th century history are treated as confirmation of the 1791 understanding. While the list here cannot be exhaustive, some examples will illustrate.

*First Amendment:*

The *Nevada Commission on Ethics* case was one of the three cases cited by Justice Thomas as showing that the Court had "assumed" that 1791 is the proper period for determining the scope and meaning of a provision of the Bill of Rights.[52] As described above, it was alleged in that case that Nevada had infringed on respondent's right of freedom of speech. The Court looked to the Founding period, and an unbroken tradition since then, to determine that the conduct in question was not speech protected by the First Amendment.

In *Near v. Minnesota*,[53] applying the principles of the First Amendment regarding freedom of the press against a state, the Court heavily emphasized the historical understanding of freedom of the press in 1791 when striking down a state law that imposed prior restraint on a publication deemed a "public nuisance." The Court stated that "The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as *historically conceived and guaranteed.*"[54] It alluded to the struggle in England over prior restraints before the Founding era, quoted from Blackstone's *Commentaries* on the nature of the right, cited an early Massachusetts case regarding the meaning of the right, relied on

---

[52] *Id.* at 2137-38.

[53] 283 U.S. 697 (1931).

[54] *Near*, 283 U.S. at 713.

Electronic copy available at: https://ssrn.com/abstract=4248297

Madison's Report on the Virginia Resolutions to show differences between the right in England and in America, and included an extensive excerpt from that Report.[55]  This was, of course, a case relying on incorporation against a state, but there was no mention of 1868 as purportedly being the relevant time period for ascertaining the meaning of freedom of the press.

The famous case of *Reynolds v. United States*[56] presented the question of whether a federal statute governing the Territory of Utah could prohibit bigamy without violating the Free Exercise Clause.  Although the case was purely federal, the Supreme Court turned to history at the time of the Founding and before, to determine the meaning of religion and the scope of the right.  The Court noted that:

> The word 'religion' is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to *the history of the times in the midst of which the provision was adopted*. The precise point of the inquiry is, what is the religious freedom which has been guaranteed.[57]

The Court then reviewed some colonial history in which religious freedom was circumscribed, and considered in detail a dispute concerning a bill in Virginia in 1784, regarding which James Madison:

> prepared a 'Memorial and Remonstrance,' which was widely circulated and signed, and in which he demonstrated 'that religion, or the duty we owe the Creator,' was not within the cognizance of civil government. [citation omitted]. At the next session the proposed bill was not only defeated, but another, 'for establishing religious freedom,' drafted by Mr. Jefferson, was passed.[58]

The Court considered Jefferson's bill and his views about religious freedom and reviewed the treatment of that subject in the Constitutional Convention and during the period of

---

[55] *Id*. at 713-17.

[56] 98 U.S. 145 (1878).

[57] *Reynolds*, 98 U.S. at 163.

[58] *Id*.

19

Electronic copy available at: https://ssrn.com/abstract=4248297

ratification of the Bill of Rights.[59]  There was no hint that the public understanding of the First Amendment in 1868 was important, let alone that passage of the Fourteenth Amendment somehow retroactively changed the meaning of the Free Exercise Clause.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,[60] a case involving a dispute between a religious school and a teacher who was a "minister" at the school, the EEOC brought suit against the school, alleging that the minister had been unlawfully terminated because she had threatened litigation under the Americans with Disabilities Act.[61] The Court reviewed English, colonial, and Founding era evidence as to the extent to which American governments could be involved in personnel decisions in religious institutions.[62]  It noted that "It was against this background that the First Amendment was *adopted*."[63]  Among other things, "the *founding generation* sought to foreclose the possibility of a national church…."[64] "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."[65]

In a recent free exercise case, *Fulton v. City of Philadelphia*,[66] the Court's majority opinion found it unnecessary to perform a historical analysis to determine the meaning of the First Amendment's text because the case could be decided under existing precedents.  However,

---

[59] *Id.*

[60] 565 U.S. 171 (2012).

[61] *Id.* at 179-80.

[62] *Id.* at 182-83.

[63] *Id.* at 183

[64] *Id.*

[65] *Id.* at 184.

[66] 141 S.Ct. 1868 (2021).

Electronic copy available at: https://ssrn.com/abstract=4248297

Justice Alito, joined by Justices Thomas and Gorsuch, concurred in the judgment, and wrote a lengthy analysis of the text and historical meaning of the Free Exercise Clause, which focused nearly entirely on the meaning in 1791.[67]  After quoting key words from the First Amendment, the concurrence noted that those "words had essentially the same meaning *in 1791* as they do today."[68] Justice Alito wrote that, following *Heller*'s lead, "we must ask whether the Free Exercise Clause protects a right that was known *at the time of adoption to have defined dimensions.*"[69]  He noted that "critical state ratifying conventions approved the Constitution on the understanding that it would be amended to provide express protection for certain fundamental rights, and the right to religious liberty was unquestionably one of those rights."[70] Because of deeper constitutional scholarship in recent years, "we are now in a good position to examine how the free-exercise right was understood *when the First Amendment was adopted.*"[71]

*Lynch v. Donnelly*, a case involving whether a municipality could include a creche as part of its Christmas display, said that interpretation of the Establishment Clause should comport with "what history reveals was the contemporaneous understanding of its guarantees."[72]  It looked to the actions of the First Congress in 1789 in determining the meaning of that clause:  "In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid chaplains for the House and

---

[67] *Fulton*, 141 S.Ct. at 1894-912.

[68] *Id*. at 1896.

[69] *Id*. at 1899.

[70] *Id*. at 1901.

[71] *Id.* at 1899.

[72] *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).

Electronic copy available at: https://ssrn.com/abstract=4248297

A100

**WORKING DRAFT – Subject to change**

Senate."[73]  The time of the ratification of the Fourteenth Amendment played no such role in interpreting the right.

*Fourth Amendment:*

      As described above, another of the three cases cited by Justice Thomas in support of the Court's looking to the time of the Founding was *Virginia v. Moore*, a Fourth Amendment case. As noted, that case relied on the "statutes and common law of the founding era," and sought to determine the understanding of "those who ratified the Fourth Amendment."[74]  Other cases applying the Fourth Amendment against the states have similarly looked to the Founding period, not the time of ratification of the Fourteenth Amendment.

      In *Wyoming v. Houghton*, the Court said that to determine whether government action violates Fourth Amendment rights, "we inquire first whether the action was regarded as an unlawful search or seizure under the common law *when the Amendment was framed.*"[75] Similarly, in *Wilson v. Arkansas*,  the Court stated that in evaluating the scope of Fourth Amendment rights, "we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law *at the time of the framing*."[76]  *Houghton* and *Wilson*, like *Moore*, both applied the Fourth Amendment to states, but not a word was mentioned regarding 1868 being the proper time for assessing the scope or meaning of the right.

---

[73] *Id.* at 674.

[74] *Virginia v. Moore*, 553 U.S. at 168.

[75] 526 U.S. 295, 299 (1999) (emphasis added).

[76] 514 U.S. 927, 931 (1995) (emphasis added).

22

Electronic copy available at: https://ssrn.com/abstract=4248297

**A101**

**WORKING DRAFT – Subject to change**

*Fifth Amendment:*

In *Benton v. Maryland*,[77] the case that incorporated the Fifth Amendment's Double Jeopardy Clause against the states, the Court performed a brief review of the history of that concept's inclusion in American law, especially noting the Founding period. The right to be free of multiple prosecutions:

> became established in the *common law of England long before this Nation's independence*. [citations omitted]. As with many other elements of the common law, it was carried into the jurisprudence of this Country through the medium of Blackstone, who codified the doctrine in his Commentaries…. Today, every State incorporates some form of the prohibition in its constitution or common law…. [The underlying principle against double jeopardy] has *from the very beginning been part of our constitutional tradition*.[78]

Similarly, in *Gamble v. United States*,[79] the Court recently examined the meaning of the "dual-sovereignty" doctrine in Fifth Amendment double jeopardy jurisprudence. The text of the Fifth Amendment protects individuals from being twice put in jeopardy "for the same offence." Accordingly, the Court looked at the meaning of the word "offence" in the Founding period and found that it "was commonly understood *in 1791* to mean 'transgression,' that is, 'the Violation or Breaking of a Law.'"[80] The Court continued, "As *originally understood*, then, an 'offence' is defined by a law, and each law is defined by a sovereign. So where there are two sovereigns, there are two laws, and two 'offences.'"[81] Although *Gamble* was a federal case, the Court

---

[77] 395 U.S. 784 (1969).

[78] *Id.* at 795-96 (emphasis added).

[79] 139 S.Ct. 1960 (2019) (citations omitted, emphasis added).

[80] *Id.* at 1965 (emphasis added).

[81] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4248297

recognized that through incorporation the very same principles applied to the state court proceedings under which Gamble had already been convicted.[82]

*Sixth Amendment:*

*Crawford v. Washington*,[83] described above, was a Sixth Amendment Confrontation Clause case and one of the three cases noted by Justice Thomas in *Bruen* to have "assumed" that the Founding period is the relevant time for determining the scope of provisions of the Bill of Rights. It repeatedly relied on evidence regarding the Framers, 1791, and the Founding period.

In *Ramos v. Louisiana*,[84] the Court considered whether the incorporated Sixth Amendment right to a jury trial in state criminal cases requires a unanimous verdict. The Court looked at precedents arising from before the Founding period, and practices around the time the Sixth Amendment was ratified:

> The requirement of juror unanimity emerged in 14th century England and was soon accepted as a vital right protected by the common law. As Blackstone explained, no person could be found guilty of a serious crime unless "the truth of every accusation ... should ... be confirmed by the unanimous suffrage of twelve of his equals and neighbors…."[85]

> This same rule applied in the *young American States.* Six State Constitutions explicitly required unanimity. Another four preserved the right to a jury trial in more general terms. But the variations did not matter much; consistent with the common law, state courts appeared to regard unanimity as an essential feature of the jury trial.[86]

The Court further recognized that it was the original time of ratification that was pertinent for determining the meaning of trial by jury, explaining that:

---

[82] *Gamble*, 139 S.Ct. at 1963, 1979.

[83] *Crawford v. Washington*, 541 U.S. 36 (2004).

[84] 140 S.Ct. 1390 (2020).

[85] *Id*. at 1395.

[86] *Id*. at 1396 (emphasis added).

24

Electronic copy available at: https://ssrn.com/abstract=4248297

It was against this backdrop that James Madison drafted and *the States ratified the Sixth Amendment in 1791*. By that time, unanimous verdicts had been required for about 400 years. If the term "trial by an impartial jury" carried any meaning at all, it surely included a requirement as long and widely accepted as unanimity.[87]

In other Sixth Amendment cases, the Court has also looked to the Founding period to determine the scope, meaning, or importance of various provisions of that Amendment. *See, e.g.*, *Powell v. Alabama,*[88] (right to counsel; examining scope of right at English law in Founding period, Blackstone's rejection of English limitations on the right, and inclusion of right to counsel in early American constitutions); *Klopfer v. North Carolina*[89] (right to speedy trial; reviewing early English law, Magna Carta, Coke's *Institutes* and the American familiarity with them at the time of the Founding, Virginia's 1776 Declaration of Rights, and early state constitutions); *In re Oliver,*[90] (right to public trial; relying on "our English common law heritage" and state constitutions in most of the original states); *Duncan v. Louisiana,*[91] (right to jury trial in all state criminal cases in which such right would exist in federal court; reviewing early English history and English Bill of Rights, Blackstone, Stamp Act Congress, First Continental Congress, Declaration of Independence, and constitutions of original states); *Washington v. Texas,*[92] (Compulsory Process Clause; stating that the Framers included this clause to overcome certain limits on who could testify at common law).

---

[87] *Id*. (emphasis added).

[88] 287 U.S. 45, 60-67 (1932).

[89] 386 U.S. 213, 223-25 (1967).

[90] 333 U.S. 257, 266–268 (1948).

[91] 391 U.S. 145, 151-54 (1968).

[92] 388 U.S. 14, 20, 23 (1967).

25

Electronic copy available at: https://ssrn.com/abstract=4248297

**A104**

**WORKING DRAFT – Subject to change**

*Eighth Amendment:*

In *Timbs v. Indiana*, to determine whether the Excessive Fines Clause was incorporated against the states, the Court examined early English legal history from the time of Magna Carta, Blackstone, the abuses by the Stuart kings, the English Bill of Rights, and colonial and state constitutions.[93] It noted that the statements in the English Bill of Rights that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted," were adopted almost verbatim first by the Virginia Declaration of Rights and then in the Eighth Amendment itself.[94] The Court did discuss the period around ratification of the Fourteenth Amendment, but only to note that then 35 of the 37 states had prohibitions against excessive fines, but that abuses of fines to control black people nevertheless continued.[95] As in *McDonald*, the inclusion of post-bellum nineteenth century developments in the Court's historical review was aimed only at determining that the right is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition."[96] There was no suggestion that 1868 was the primary period to determine the meaning of the clause, or that its meaning was somehow changed by the process of incorporation. Indeed, given the deep roots into English and American history not only of the principle but the very language prohibiting excessive fines, that would have been an untenable exercise.

The author has not found, and litigants in post-*Bruen* litigation have so far not pointed to, a *single* Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or

---

[93] 139 S.Ct. 682, 687-88 (2019).

[94] *Timbs,* 139 S. Ct. at 688.

[95] *Id*. at 688-99.

[96] *Id.* at 687 (quoting *McDonald*).

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning of a provision of the Bill of Rights.[97] The Second Amendment is not a "second class right"[98] and there is no reason for it to be treated differently from the other provisions of the Bill of Rights in this respect. In addition, adoption of 1868 as the proper focus for determining the meaning of the Second Amendment would mean that the Supreme Court was utterly wrong in looking to the Founding period in *Heller*, *Caetano*, and *Bruen*.

> ### F. If later understandings contradict the original understanding of the text, the original understanding controls.

*Heller*, *McDonald*, and *Bruen* all considered some amount of 19th century history. *McDonald* did so not to discern the meaning or scope of the right to keep and bear arms, but rather to determine whether it has historically been considered "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."[99] *Caetano* relied on the Founding-era research and principles announced in *Heller*. But both *Heller* and *Bruen* engaged in extensive historical analysis and provided some clear guideposts regarding the proper uses of post-Civil War history.

The post Founding-era history examined by *Heller* and *Bruen* was used by the Court only to confirm rather than to contradict the Founding era understanding. Regarding *Heller*, the *Bruen* Court observed that:

> we made clear in *Gamble*[100] that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century

---

[97] Litigants have cited lower court decisions that they claim have done this, and I discuss the errors in those claims in Part IG.

[98] *McDonald*, 561 U.S. at 780, 781-87.

[99] *McDonald*, 561 U.S. at 767.

[100] *Gamble v. United States,* 139 S.Ct. 1960 (2019).

27

Electronic copy available at: https://ssrn.com/abstract=4248297

evidence was "treated as mere confirmation of what the Court thought had already been established."[101]

*Bruen* itself found that the text of the Second Amendment plainly covers the right to carry arms in public.[102]  It also carefully noted that "to the extent later history contradicts what the text says, the text controls."[103]  It adopted the view of then-Judge Kavanaugh in a D.C. Circuit Second Amendment case that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."[104]  And, obviously, the insistence by some scholars and advocates that 1868 should control, is only of importance if they believe they can show that the 1868 understanding was *different* from the 1791 understanding.  But if the 1868 understanding is different from that of 1791, it must be rejected because it is inconsistent with the text and the original meaning that "is fixed according to the understandings of those who ratified it."[105]

But even if the arguments that 1868 trumps 1791 did not conflict with *Heller*, *Caetano*, and *Bruen*, and the Court's entire incorporation jurisprudence—which they plainly do—the Court would give them little weight in any event, due to the sheer remoteness in time of any post-Civil War statements, understandings, or legal developments.  The Court warned against giving "post-enactment history more weight than it can rightly bear," and reaffirmed *Heller*'s observation that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much

---

[101] *Bruen*, 142 S.Ct. at 2137 (quoting *Gamble*, 139 S.Ct. at 1975-76).

[102] *Id.* at 2134.

[103] *Id*. at 2137.

[104] *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

[105] 142 S. Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4248297

insight into its original meaning as earlier sources."[106]  In fact, faced with twentieth-century evidence that *did* contradict the Founding-era evidence, the *Bruen* Court rejected that evidence, stating that the Court will not:

> address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.[107]

Justice Barrett, concurring in *Bruen*, also cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."[108]  That is quite right—*Bruen*'s analysis forecloses that type of reasoning.

An example of the errors that can occur when courts engage in such "freewheeling reliance" on mid-to late 19th century analogues is contained in a recent temporary restraining order enjoining enforcement of some of New York State's new restrictions on carry enacted after the *Bruen* decision.[109]  In that case, the District Court let stand a ban on carrying concealed firearms in places of worship, with some exceptions for keeping the peace, despite the fact that *Bruen* did not include places of worship in its list of "sensitive places."[110]  The District Court relied on only six "analogues," which were state statutes enacted between 1870 and 1890.[111] But these alleged analogues come far too late, as indicated by *Bruen* itself and by Justice Barrett's concurrence in *Bruen*.  To illustrate, in 1740, South Carolina required that "every white male

---

[106] *Id.* at 2136–37 (quoting *Heller*, 554 U.S. at 614).

[107] *Id.* at 2154 n.28.

[108] *Id.* at 2163 (Barrett, J., concurring).

[109] *Antonyuk v. Hochul*, No. 1:22-CV-0986, Doc. 27 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*").

[110] *Bruen*, 142 S.Ct. at 2133.

[111] *Antonyuk II* at 33 n.25.

Electronic copy available at: https://ssrn.com/abstract=4248297

inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who…is…liable to bear arms in the militia of this Province," who shall "go and resort to any church or any other public place of divine worship," must "carry with him a gun or a pair of horse-pistols…with at least six charges of gunpowder and ball."[112]  In 1770, Georgia required that "every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia…and resorting…to any church…shall carry with him a gun, or a pair of pistols." Each man was required to "take the said gun or pistols with him to the pew or seat," and these arms were to "be fit for immediate use and service."[113]

As discussed, all Supreme Court cases on the Bill of Rights have looked to the Founding Period for determining meaning, not to the late 19th century.  If there is no analogue in the Founding period, one cannot jump—as the New York court did—to the late 19th century to look for analogues in the first place.  Justice Barrett in her concurrence pointedly quoted from *Espinoza v. Montana Dept. of Revenue,* 140 S.Ct. 2246, 2258-2259 (2020), which stated that a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment.[114]  If such a practice cannot establish a pertinent American tradition for the First Amendment, it cannot do so for the Second Amendment, either.

---

[112] 7 David J. McCord, Statutes at Large of South Carolina 417-19 (Columbia, S.C.: A.S. Johnston, 1840) (enacted 1740, re-enacted 1743).

[113] Horatio Marbury and William A. Crawford, Digest of the Laws of the State of Georgia, 241-42 (1802) (law of Feb. 27, 1770, § 1).

[114] *Bruen*, 142 S.Ct. at 2163.

Electronic copy available at: https://ssrn.com/abstract=4248297

G. *The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of McDonald.*

The briefs supporting the pro-gun control litigants in the *Worth*, *Lara*, and *Antonyuk* cases, *supra* n.8, rely on Court of Appeals cases that supposedly establish that the time of ratification of the Fourteenth Amendment is the key time period for determining the scope and meaning of the Second Amendment. Even a cursory review of those cases belies that contention.

The amicus brief by Everytown for Gun Safety in *Lara* offers a more robust argument than the defendant's brief in *Worth*. It contends that for the historical inquiry:

> the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Several circuits reached this conclusion in applying the first step of the pre-*Bruen* framework.[115]

For this proposition, it provides the following footnote:

> *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is [to] a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *criticized on other grounds by Bruen,* 142 S. Ct. at 2124, 2126-27; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp*., 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments) (quoting *Ezell*).[116]

Taking these in order, *Gould* was not "criticized on other grounds" by *Bruen*. *Gould* was entirely abrogated by *Bruen*. It is a legal nullity. The *Ezell* quote is accurate. The problem there is that *McDonald* did not state that if the claim involves a state or local law where the "scope"

---

[115] Amicus Letter Br. of Everytown for Gun Safety, *Lara v. Comm'r Pa. State Police*, No. 21-1832, Doc. 61, at 2 (3d Cir. Aug. 2, 2022).

[116] *Id.* at 2–3.

Electronic copy available at: https://ssrn.com/abstract=4248297

question asks how the right was understood when the Fourteenth Amendment was proposed and ratified. The Seventh Circuit in Ezell simply got it wrong. For this proposition, it cites "*McDonald*, 130 S.Ct. at 3038–47."[117] But there is no such holding in those pages of *McDonald*. They are simply part of the Court's historical survey of why the right is "fundamental," and do not specify 1868 as the time period to determine the extent of the right. *Bruen* certainly did not read *McDonald* that way and instead focused on 1791 in an approach that it asserted was consistent with all its other Second Amendment precedents, *McDonald* included. And the Seventh Circuit changed course shortly after *Ezell* was decided, observing that "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*."[118]

*Greeno* simply quoted the mistaken language in *Ezell*, apparently without investigating its accuracy.[119] It was also a somewhat cursory "plain error" review in a criminal case because the defendant had not raised the Second Amendment issue at trial.[120] The *Drummond* case did not hold that 1868 is the proper date. It merely stated, without any elaboration or citation of authority, that "[f]or the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted."[121] It then cited authorities from 1825, 1885, and 1895 as part of its analysis, but did not attempt to determine what the ratifiers of the Fourteenth Amendment may have understood the right's scope to be in 1868.[122] The citation to

---

[117] *Ezell*, 651 F.3d at 702.

[118] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

[119] 679 F.3d at 518.

[120] *Id*. at 516.

[121] 9 F.4th at 227.

[122] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

*Binderup* is to a concurrence, not the Court's opinion, and it, too, merely recites the mistaken language of *Ezell*.[123]

In short, litigants arguing for 1868 as the proper date for historical inquiry in incorporation cases would have the lower courts overlook the unbroken line of Supreme Court cases that the right must be the same against both the federal government and the states; that the right is fixed when the relevant Bill of Rights provision is adopted; and that the Founding period is the relevant period for determining the meaning of the Constitution generally and for particular provisions of the Bill of Rights. In opposition to these firm and consistent holdings by the Supreme Court, they offer one abrogated opinion by one Court of Appeals, a single Court of Appeals opinion that clearly made a mistake that was later corrected, and a series of cases that relied on that mistake apparently without further investigation.

II. **1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE BILL OF RIGHTS.**

    A. *It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they were incorporating against the states all of the provisions of the first eight amendments.*

If those who advocate for 1868 as the proper year for determining the meaning of the Second Amendment were to prevail, an important consequence must be faced. There is no reason for the Second Amendment to be different from any other provision of the Bill of Rights in this respect. It is not a "second class right" as *McDonald* pointedly observed.[124] So, if those advocates were to be successful, consistent application of the doctrine of incorporation must look to 1868 for the public meaning of all of the provisions of the Bill of Rights, not just the Second

---

[123] 836 F.3d at 362.

[124] 561 U.S. at 780, 781–87.

33

Electronic copy available at: https://ssrn.com/abstract=4248297

**A112**

**WORKING DRAFT – Subject to change**

Amendment. Furthermore, those meanings must displace the original understandings of 1791. As shown above, both of these propositions are flatly contradicted by well-settled Supreme Court lines of precedent.

But there is a further problem. If the understanding of the ratifiers of the Fourteenth Amendment of each provision of the Bill of Rights must take precedence, then we must be certain that those ratifiers understood that they were incorporating all of the provisions of the Bill of Rights against the states, and that those rights had a particular, different meaning to them at the time. This is not only contrary to logic and precedent, but as a practical matter impossible, or nearly so.

The Fourteenth Amendment does not state that it is applying the first eight amendments against the states. It does not even mention the Bill of Rights. Furthermore, the Due Process Clause was not the principal or stated means by which the Fourteenth Amendment sought to give protection to black freedmen to exercise the right to keep and bear arms. The operative language considered critical at the time was the Citizenship Clause in the first sentence of Section 1 of the Fourteenth Amendment, coupled with the Privileges or Immunities Clause in the second sentence. Together, they read:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States….[125]

The first sentence was arguably necessary to overcome the holding of the infamous *Dred Scott* case, which held that African Americans were not citizens of the United States and

---

[125] U.S. CONST. AMEND. XIV, § 1.

34

Electronic copy available at: https://ssrn.com/abstract=4248297

therefore could not bring suit in federal courts, among other things.[126]  The second sentence was to protect the privileges or immunities of citizens against state infringement.

But what did "privileges or immunities of citizens of the United States" mean? Throughout the Congressional debates on the Fourteenth Amendment, the Civil Rights Act of 1866, and other Congressional enactments for which the Fourteenth Amendment was intended to provide constitutional authority, contradictory and vague accounts were given by members of Congress and others of the Amendment's meaning and effect.

Let us recall the state of the law regarding the Bill of Rights then.  In *Barron v. Baltimore*, the Supreme Court held that the Fifth Amendment's Takings Clause provided a limit only on the federal government and not on actions by state or local governments.[127]  It was widely, though not universally, assumed thereafter that none of the provisions of the first eight amendments in the Bill of Rights applied against the states.  In fact, that had been the prevailing view even before *Barron*.  At the time of ratification of the Fourteenth Amendment, was it clear that that Amendment was meant to reverse *Barron* and apply all of the protections in the Bill of Rights against the states? If that was not clear at the time, the ratifiers of the Fourteenth Amendment would have had no occasion to reconsider their understandings of the Bill of Rights, including the Second Amendment.

The first difficulty in looking at the likely understanding of the ratifiers of 1868 is that "privileges and immunities" already had a widely accepted meaning.  Article IV, Sec. 2, the Comity Clause of the Constitution, provides that "[t]he Citizens of each State shall be entitled to

---

[126] *Dred Scott v. Sandford*, 60 U.S. 393 (1857).  Also, had African Americans been considered citizens, *Dred Scott* presented a parade of horribles that would have ensued, including that it would give them the right "to keep and carry arms wherever they went." *Id.* at 417. As Justice Thomas observed for the Court in *Bruen*, "even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, 142 S.Ct. at 2151.

[127] *Barron ex rel. Tiernan v. City of Baltimore*, 32 U.S. 243, 250–51 (1833).

Electronic copy available at: https://ssrn.com/abstract=4248297

all Privileges and Immunities of Citizens in the several States."[128]  The opinion of Supreme

Court Associate Justice Bushrod Washington, sitting as a member of a circuit court, was widely

quoted to interpret the meaning of "privileges and immunities."  In *Corfield v. Coryell* he wrote:

> The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities….[129]

Notably absent from this list is any direct reference to the provisions making up the Bill

of Rights.  Of course, the Bill of Rights was not written or ratified until after the adoption of the

Constitution.  But Justice Washington wrote this passage in 1823. If "privileges and immunities"

encompassed all of the provisions in the first eight amendments, it seems at least somewhat

---

[128] U.S. CONST. art. IV, § 2.

[129] 6 F. Cas. 546, 551–52 (E.D. Pa. 1823).

Electronic copy available at: https://ssrn.com/abstract=4248297

strange that he did not describe any of the specific rights named in the Bill of Rights or state analogues to those rights.[130]

    In debating the Civil Rights Bill of 1866, 42 U.S.C. § 1981, Senator Lyman Trumbull of Illinois (co-author of the Thirteenth Amendment and Chairman of the Senate Judiciary Committee) quoted the portion of the *Corfield* decision set forth above.[131]  The Fourteenth Amendment, of course, was thought by some to be necessary to provide constitutional authority for the Civil Rights Act.  Trumbull described the first section of the bill, which declared all persons of African descent to be citizens of the United States, and noted that there "shall be no discrimination in civil rights or immunities" among the inhabitants of any state "on account of race, color, or previous condition of slavery," as "the basis for the whole bill."[132]  The other provisions contained only "necessary machinery" for enforcement.  After reading aloud the passage from *Corfield*, Trumbull stated that it enumerates "the very rights belonging to a citizen of the United States which are set forth in the first section of this bill."[133]  It was anything but clear from Trumbull's speech that "privileges or immunities" or "civil rights or immunities" was meant to include wholesale the first eight amendments in the Bill of Rights.

    When the Fourteenth Amendment itself was presented to the Senate on behalf of a Joint House and Senate Committee, Senator Jacob Howard took a contrasting position.  He again quoted the passage from *Corfield* as constituting "privileges and immunities," but then said that "to these should be added the personal rights guaranteed and secured by the first eight

---

[130] The Comity Clause of Art. IV, Sec. 2, was meant to preclude states from denying to citizens of other states the rights, processes, and privileges afforded its own citizens within its boundaries. That would mean only those privileges or rights held by citizens as part of state law and would not include provisions such as those in the federal Bill of Rights that were designed to prevent federal overreach.

[131] CONG. GLOBE, 39th Cong., 1st Sess. 474–75 (1866).

[132] *Id.*

[133] *Id.*

37

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments of the Constitution; such as the freedom of speech and of the press; the right of the

people to peaceably assemble and petition the government for a redress of grievances; … the

right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house

without the consent of the owner," and so forth down through the remaining amendments.[134]  He

continued:  "The great object of the first section of this amendment is, therefore, to restrain the

power of the States and compel them at all times to respect these great fundamental

guarantees."[135]

Howard's opinion that "privileges or immunities" embraced the first eight amendments

was by no means universal.[136]  Sen. Thomas Hendricks of Indiana stated that he had not "heard

any Senator accurately define, what are the rights and immunities of citizenship" or that "any

statesman has very accurately defined them."  He described the terms as "not very certain" and

"vague."[137]  Senator Reverdy Johnson of Maryland favored the citizenship and due process

clauses, but stated that "I think it quite objectionable to provide that 'no State shall make or

enforce any law which shall abridge the privileges or immunities of citizens of the United

States,' simply because I do not understand what will be the effect of that."[138]  Rep. Benjamin

Boyer of Pennsylvania found Section 1 "objectionable also in its phraseology, being open to

ambiguity and admitting of conflicting constructions."[139]

---

[134] *Id*. at 2765.

[135] *Id*. at 2766.

[136] Indeed, that was news to Justice Felix Frankfurter in 1947.  In his concurring opinion in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 467–68 (1947), Justice Frankfurter wrote: "Not until recently was it suggested that the Due Process Clause of the Fourteenth Amendment was merely a compendious reference to the Bill of Rights whereby the States were now restricted in devising and enforcing their penal code precisely as is the Federal Government by the first eight amendments."

[137] CONG. GLOBE, 39th Cong., 1st Sess. 3039 (1866).

[138] *Id.* at 3041.

[139] *Id*. at 2467.

38

Electronic copy available at: https://ssrn.com/abstract=4248297

A117

**WORKING DRAFT – Subject to change**

If the very members of Congress that were debating the Fourteenth Amendment disagreed as to its meaning, or found it "vague" and open to "conflicting constructions," then determining how the ratifiers in the states in 1868 understood the meanings of each of the provisions of the first eight amendments in 1868, particularly when it was unclear that those eight amendments were being incorporated wholesale against the states, is a very fraught endeavor (as well as an unjustified one).

There is also a practical difficulty in determining what the state ratifiers in 1868 may have understood. There were thirty-seven states in 1868. Few records exist on the ratification of the Fourteenth Amendment. What little exists is found in messages of governors who submitted the Fourteenth Amendment to their state legislatures, legislative debates (which were recorded in only Pennsylvania and Indiana), and committee reports (Massachusetts, Texas, and Wisconsin). One controversy was whether the Constitution already protected basic rights versus whether the Fourteenth Amendment was necessary. Voting rights were discussed, which had generally been held to be a political right conferred by a constitution or statute, rather than a natural civil right.[140]

Finally, whatever the meaning of "privileges or immunities," it is clear that the Fourteenth Amendment, and legislation that preceded and followed it, were meant to curb abuses of the rights of African Americans. It is also clear that the drafters and ratifiers of the Fourteenth Amendment wanted to enforce those rights *against the states*. They were not inventing new rights or changing what those rights meant. The proponents of the Fourteenth Amendment simply wanted the same civil rights that white people already had to be extended to African

---

[140] See STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS 67–70 (Updated ed. 2010).

Electronic copy available at: https://ssrn.com/abstract=4248297

Americans and to prevent states from denying or infringing those rights or applying the laws in a discriminatory fashion.

None of this is intended to cast doubt on the doctrine of incorporation, the Court's incorporation through the Due Process clause, or incorporation of the Second Amendment, all of which have been decided. It is only to point out that anyone seeking to determine the specific understanding by ratifiers of the Fourteenth Amendment in 1868 of each provision of Bill of Rights is likely to be chasing a chimera. Using a time period so long after the Founding should not be done for the Second Amendment or for any other specific rights in the first eight amendments.

B. *The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause.*

Although there was disagreement in Congress about what "privileges or immunities" meant, the biggest disagreement was with the Supreme Court. In fact, the Supreme Court rejected the proposition that the Amendment incorporated the Bill of Rights at the first opportunity it had to do so. In the *Slaughter-House Cases*, the Court held that the "privileges or immunities" language in the Fourteenth Amendment included only rights that depended on federal citizenship, including:

> to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions. He has the right of free access to its seaports, through which all operations of foreign commerce are conducted, to the subtreasuries, land offices, and courts of justice in the several States.[141]

The Court further stated that:

> Another privilege of a citizen of the United States is to demand the care and protection of the Federal government over his life, liberty, and property when on

---

[141] *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

40

Electronic copy available at: https://ssrn.com/abstract=4248297

> the high seas or within the jurisdiction of a foreign government. Of this there can be no doubt, nor that the right depends upon his character as a citizen of the United States. The right to peaceably assemble and petition for redress of grievances, the privilege of the writ of habeas corpus, are rights of the citizen guaranteed by the Federal Constitution. The right to use the navigable waters of the United States, however they may penetrate the territory of the several States, all rights secured to our citizens by treaties with foreign nations, are dependent upon citizenship of the United States, and not citizenship of a State. One of these privileges is conferred by the very article under consideration. It is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State.[142]

Although the First Amendment right to peaceably assemble and petition for redress of grievances is included, no other rights under the Bill of Rights are mentioned, and the Court did not suggest that all of the rights in the first eight amendments are protected from violation by the states.

Even though there was widespread agreement in Congress that the Fourteenth Amendment and contemporaneous legislation was meant to prevent the disarming of African Americans, there is little evidence that the ratifiers of that amendment had in mind specific meanings for all of the first eight amendments, much less that those meanings differed from the original meanings of 1791. There wasn't even agreement on which rights in the Bill of Rights would be incorporated. Thus, any attempt to shift the relevant period for determining the meaning of the Bill of Rights from 1791 to 1868 will be fraught with difficulty, as well as having no basis in logic or in the Supreme Court's incorporation jurisprudence.

    *C. The individual* right *to bear arms in the Second Amendment was understood the same way in 1868 as in 1791.*

The debate about whether 1791 or 1868 is the critical year ultimately only has significance if there were important differences in the understandings of the ratifiers between those two time periods. But in the discourse that led to the Fourteenth Amendment, the right to

---

[142] *Id.* at 79–80.

Electronic copy available at: https://ssrn.com/abstract=4248297

keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding.  The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states.

Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866.  Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[143]  He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms…."[144]  Accordingly, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms."[145]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[146]  Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[147]  The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[148]

---

[143] CONG. GLOBE, 39th Cong., 1st Sess. 517 (1866).

[144] Id. at 657.

[145] Id. at 654.

[146] Id. at 371.

[147] Id. at 1182.

[148] Id. at 3210.

42

Electronic copy available at: https://ssrn.com/abstract=4248297

A common theme in the media was that freedmen had the right to bear arms because they were part of "the people."  The *American Citizen*, a Pennsylvania newspaper, quoted the Second Amendment and wrote: "Now what is here meant by 'the people' – Webster defines it as 'the body of persons who compose a community, town, city or nation….'"  So defined, "not a black person in the South, or anywhere else in the country, can be excluded under it from the right to bear arms," and "if the negro be not included in the militia, they are peculiarly the 'people' of the nation, and under the words of the Constitution are entitled to bear arms."[149]

Far from changing the meaning of the right to keep and bear arms, the Civil Rights Act and the Freedmen's Bureau Act, precursors of the Fourteenth Amendment, used phraseology taken from Blackstone with which the Founders were familiar.  Representative James Wilson, Chairman of the Judiciary Committee, explained the background to the Civil Rights Bill's phraseology "civil rights and immunities" and "full and equal benefit of all laws and proceedings for the security of person and property …."[150]  He equated those rights and immunities with those enumerated by Blackstone, on which the Founders also relied:

Blackstone classifies them under three articles, as follows:

1.      The right of personal security; which, he says, "Consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."

2.      The right of personal liberty; and this, he says, "Consists in the power of locomotion, of changing situation, or moving one's person to whatever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law."

3.      The right of personal property; which he defines to be, "The free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the law of the land."[151]

---

[149] *The Right to Bear Arms*, AMERICAN CITIZEN (Butler, Pa.), Nov. 7, 1866, at 4.

[150] CONG. GLOBE, 39th Cong., 1st Sess. 1117 (1866).

[151] *Id*. at 1118.

Electronic copy available at: https://ssrn.com/abstract=4248297

Representative Wilson had the Second Amendment partly in mind when he stated that every right enumerated in the federal Constitution is "embodied in one of the rights I have mentioned, or results as an incident necessary to complete defense and enjoyment of the specific right."[152]  Indeed, the Freedmen's Bureau Act explicitly declared that:

> the right…to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.[153]

The same Blackstonian concepts basic to the Founders, including the right to bear and use arms, were thus inherited and applied by the drafters of the Fourteenth Amendment.  There was no change in the meaning of the right itself; instead, there was a change to who could exercise the right and who was prevented from restricting its exercise.

That the nature of the right was viewed as unchanging in 1868 is well illustrated by the Supreme Court's nearly contemporaneous decision in *United States v. Cruikshank*.[154]  There the Court explained that private infringement of the right to assemble was not a subject for federal enforcement:

> The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government…. It was not, therefore, a right granted to the people by the Constitution. The government of the United States when established found it in existence, with the obligation on the part of the States to afford it protection. As no direct power over it was granted to Congress, it remains … subject to State jurisdiction.[155]

---

[152] *Id*. at 1118–19.

[153] Freedmen's Bureau Act of 1866, §14, 14 Stat. 173, 176–77 (1866) (emphasis added).

[154] 92 U.S. 542 (1875).

[155] *Id*. at 551.

44

Electronic copy available at: https://ssrn.com/abstract=4248297

The Court found the counts of the indictment alleging private infringement of the right to bear arms under the Second Amendment to be "equally defective," explaining:

> The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the Amendments that has no other effect than to restrict the powers of the national government....[156]

Like the right to assemble, the right to bear arms was a pre-existing and unchanged right not "granted" by the Constitution but guaranteed against infringement.

Thus, the Supreme Court in 1875 viewed the right to keep and bear arms as having the same contours as at the Founding period, which saw the right in the same terms. Just as the authors or ratifiers of the Second Amendment sought to guarantee a pre-existing right, the ratifiers of the Fourteenth Amendment sought only to *extend* that protection, not change the right itself.

## III. THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE.

As previously noted, the *Bruen* opinion stated that the Court has "assumed" that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. The opinion went on to acknowledge that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."[157] The only two sources cited for the existence of this debate were Kurt Lash,

---

[156] *Id.* at 553.

[157] *Bruen*, 142 S. Ct. at 2138.

45

Electronic copy available at: https://ssrn.com/abstract=4248297

*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022) and A. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

As described below, Professor Lash frankly seeks to use 1868 as the definitive period for determining the meaning and scope of all incorporated provisions of the Bill of Rights. His proposal is not just a radical departure from the Supreme Court's incorporation jurisprudence that has been so carefully fought over and eventually worked out over a period of many decades. Instead, it candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights.

Professor Amar's approach is more nuanced. In the work cited, he proposes to rely more heavily on what he believes to be the changed 1868 meaning of the Second Amendment in particular. But any necessity for that is undermined by the decision in *Heller* (2008), a decade after Professor Amar's book was published (1998).

   A.   *Professor Lash's approach is theoretically unsound and unlikely to be adopted.*

Professor Lash believes that if a provision of the Bill of Rights meant something different to the ratifiers of the Fourteenth Amendment than it did to the ratifiers of the Bill of Rights, the 1868 meaning must control. At the outset of his article, he describes the conundrums that positing a different meaning in 1868 would create. "Do incorporated rights have the same meaning and scope as their counterparts in the 1791 amendments, or does the original Free Speech Clause have a different meaning and scope than the 'incorporated' Free Speech Clause?"[158] He contends that if the meanings are different, originalists "seem forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable

---

[158] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1440 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings."[159]  This is simply not the case.  If it turns out that a later meaning has ostensibly departed from the original meaning, one must reject the later meaning, as Supreme Court principles discussed above instruct, and apply the original meaning to the states.

Noting, as set forth in Part IA, above, that the Supreme Court has definitively and repeatedly held that the rights against the federal government and the states must be the same, Lash inquires:  If the meanings must be the same, "are the original 1791 meanings carried *forward* into the 1868 amendment, or are the understandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal government by way of 'reverse incorporation'?"[160] But as just explained, this is a problem exclusively of Lash's own making, which is divorced from the actual intentions of the ratifiers of the Fourteenth Amendment. They did not intend to alter the content of the Second Amendment—they just wanted to extend its protections to all citizens against encroachments by state governments.

Lash's answer to his own question is that rights as understood in 1868 must be "reverse incorporated" into the Bill of Rights.  He states that there is only "one Freedom of Speech Clause—the one the people spoke into existence in 1791 but then *respoke* in 1868."[161]  The drafters' views are secondary at best, according to Lash, because "the legally operative understanding must be that of the ratifiers.  Only the latter counts as the voice of the people."[162] He argues that "[w]hen the people adopted the Fourteenth Amendment, they readopted the

---

[159] *Id.* at 1441.

[160] *Id.* at 1440 (emphasis in original).

[161] *Id.* at 1441.

[162] *Id.* at 1443.

Electronic copy available at: https://ssrn.com/abstract=4248297

original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."[163]

There are many issues with this approach. Until now, "reverse incorporation" has never involved using 1868 meanings of incorporated Bill of Rights provisions to revise or replace the original meanings of the Bill of Rights at the time of the Founding. In *Brown v. Bd. of Educ. of Topeka, Kan.*,[164] the Court declared school segregation unconstitutional based on the Fourteenth Amendment's Equal Protection Clause. But a companion case, *Bolling v. Sharpe*,[165] concerned school segregation in the District of Columbia, a federal enclave. The original Bill of Rights lacked an equal protection clause. So, the Warren Court read the Fourteenth Amendment's Equal Protection Clause back into the Due Process Clause of the Fifth Amendment. It was, plainly, a limited, *ad hoc* device for sidestepping a constitutional impediment to reaching the desired result.[166] So, "reverse incorporation" doesn't have much of a pedigree and it has not been applied in other contexts.

There are at least five major problems with Professor Lash's approach.

First, his analysis is completely contrary to Supreme Court precedents. As noted in Part IB, above, constitutional meanings are fixed when they are ratified, and that includes the Bill of Rights, which was ratified in 1791. Further, when it has been necessary to consult history to determine the meaning of incorporated provisions of the Bill of Rights, every Supreme Court case has considered the Founding era to be the determinative period even though later evidence

---

[163] *Id.* at 1441.

[164] 347 U.S. 483 (1954).

[165] 347 U.S. 497 (1954).

[166] Note that the Equal Protection Clause of the Fourteenth Amendment was an express protection spelled out in Section 1. The Court did not use the ostensible meaning of an incorporated provision of the Bill of Rights to change the original meaning of that provision. Reverse incorporation has not extended past inserting "equal protection" into the Fifth Amendment's Due Process Clause. See *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995).

Electronic copy available at: https://ssrn.com/abstract=4248297

is sometimes examined for confirmation. And if later practice or understanding conflicts with the original understanding, the original understanding must prevail.

Second, there is no compelling, principled basis for concluding that the 1868 meaning, if different, ought to prevail. Is it just because 1868 is later in time than 1791? That does not preclude using the original meaning of the Bill of Rights, and simply applying those meanings to additional persons and entities: that is, in favor of African Americans, and against the states. And in fact, that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate. See Part IIC, above.

Third, it is untrue that the ratifiers "spoke into existence" Bill of Rights provisions in 1791, but then "respoke" them in 1868. Although "spoke into existence" and "respoke" are intriguing metaphors, that is not what happened. Most of the provisions of the first eight amendments were either considered natural rights or rights inherited by Englishmen at common law and then carried forward, possibly somewhat modified, into the new Republic. The Bill of Rights was largely a confirmation of existing rights, not an original grant of rights. And the drafters of the Fourteenth Amendment did not "respeak" them; they extended their protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

In fact, "speaking" is a particularly inapt metaphor for Lash to choose, when there is *no* textual evidence in the Fourteenth Amendment that it was revising the Bill of Rights. As the Court explained in *Heller*, constitutional provisions must be given their "normal and ordinary" meaning, which "may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."[167]

---

[167] 554 U.S. at 576–77.

Electronic copy available at: https://ssrn.com/abstract=4248297

Lash is essentially arguing for a secret, unspoken meaning, hidden in the Fourteenth Amendment.

Fourth, Lash's "reverse incorporation" relies on the Privileges or Immunities Clause of the Fourteenth Amendment to incorporate the provisions of the Bill of Rights against the states. The *Slaughterhouse Cases*[168] relegated the Privileges or Immunities Clause to a relative backwater, and *Cruikshank*[169] declined to use that Clause to incorporate First and Second Amendment rights. Although there is respectable opinion that regards the Privileges or Immunities Clause as a better vehicle for incorporation than the Fourteenth Amendment Due Process Clause, the Court has refused the invitation to recast its incorporation jurisprudence under the rubric of the Privileges or Immunities Clause. When counsel proposed during oral argument in *McDonald* that the Privileges or Immunities Clause was the proper vehicle for incorporation, Chief Justice Roberts warned that, "Of course, this argument is contrary to the Slaughter-House Cases, which have been the law for 140 years … it's a heavy burden for you to carry to suggest that we ought to overrule that decision."[170]

Finally, Lash himself suggests the reason his proposal is unlikely to find acceptance. He writes that the "1868 respeaking of the Bill of Rights…transforms 'reverse incorporation' from a proposition about equal protection and a single clause of the Fifth Amendment into a proposition about the entire content of the Bill of Rights."[171] One suspects that the Supreme Court will not want to have the entirety of its Bill of Rights jurisprudence "transformed" retroactively based

---

[168] 83 U.S. at 79.

[169] 92 U.S. at 554–57.

[170] Transcript of Oral Argument at 4, *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ( No. 08-1521).

[171] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1441–42 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

upon an unnecessary, unjustified, and unprecedented reliance on 1868 as the focus for

determining meaning and scope of the Bill of Rights.

B. *Professor Amar's approach contains similar flaws and his theories have been rejected by Heller.*

Turning to Professor Amar's book,[172] his emphasis on 1868[173] is more subtle and less

drastic than the wholesale reverse incorporation proposed by Lash.  Amar proposes a theory of

"refined incorporation" that would allegedly reconcile the different approaches to incorporation

proposed by Justices Hugo Black, William Brennan, and Felix Frankfurter.[174]  He commends

Justice Black's view "that *all* of the privileges and immunities of citizens recognized in the Bill

of Rights" are incorporated through the Fourteenth Amendment.[175]  But he does not recognize all

of the provisions of the Bill of Rights as "privileges or immunities of citizens," stating that some

are more akin to rights of states, and others are "alloyed provisions," part citizen right and part

state right, that may have to undergo "refinement and filtration" before their citizen-right

elements can be "absorbed" by the Fourteenth Amendment.[176]  He also contends that other

provisions of the Bill of Rights may become "less majoritarian and populist, and more

libertarian, as they are repackaged in the Fourteenth Amendment as liberal civil rights—

'privileges or immunities' of individuals—rather than republican political 'right[s] of the people'

as in the original Bill."[177]  He disagrees with the formulation by Justice Brennan that the key

---

[172] A. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

[173] Professor Amar typically refers to 1866, the year the Fourteenth Amendment was drafted and proposed by Congress to the states for ratification.

[174] Amar at xiv.

[175] Amar at xiv (emphasis in original).

[176] *Id.*

[177] *Id.* at xiv-xv.

Electronic copy available at: https://ssrn.com/abstract=4248297

question for incorporation is whether the right is "fundamental."[178]  He also disagrees with Justice Frankfurter's "insistence" that incorporation turned on "abstract conceptions of 'fundamental fairness' and 'ordered liberty' as the sole litmus tests for incorporation."[179]  Thus, his "refined incorporation" differs in critical respects from the Court's current test, as stated in *McDonald*: whether the right "is fundamental to our scheme of ordered liberty, or as we have said in a related context, whether this right is 'deeply rooted in this Nation's history and tradition.'"[180]

Amar observes that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment," that provisions in the Bill of Rights may be "transformed when they come into contact with the Fourteenth Amendment," and that in some cases, "the gravitational pull of the Fourteenth Amendment has altered the trajectory of the original Bill."[181]  This is contrary to *Bruen*'s asseverations that the Constitution's "meaning is fixed according to the understandings of those who ratified it."[182]

Moreover, Amar's book was written ten years before *Heller* was decided, and his specific analysis of the Second Amendment rests on foundations that were rejected by *Heller*.  In his book, Amar spends eighteen pages summarizing his view on "the military amendments" (Second and Third Amendments) as he thinks they were seen at the time of the Founding.  He writes that:

> As with our First Amendment, the text of the Second is broad enough to protect rights of private individuals and discrete minorities; but, as with the First, the Second's core concerns are populism and federalism. At heart, the amendment reflects a deep anxiety about a potentially abusive federal military….[183]

---

[178] *Id*. at xiv.

[179] *Id.*

[180] 561 U.S. at 767 (citations omitted) (emphasis omitted).

[181] Amar at xv.

[182] 142 S. Ct. at 2132.

[183] Amar at 46.

Electronic copy available at: https://ssrn.com/abstract=4248297

A131

**WORKING DRAFT – Subject to change**

He goes on to discuss standing armies and the Founders' distrust of them. He states unequivocally that "[t]he ultimate right to keep and bear arms belongs to 'the people,' not the states," and that "'the people' at the core of the Second Amendment are the same people at the heart of the Preamble and the First Amendment."[184] Thus, he recognizes the individual right to arms, but claims that at the time of the Founding protection of such rights was not the main purpose. Indeed, "to see the un-Reconstructed amendment as primarily concerned with an individual right to hunt or to protect one's home is like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge or to have sex."[185] The contrast between *Heller*'s conclusion that protecting one's home was a central component of the right, and Amar's view, is stark.

Like Lash, he believes that the meaning of the right to keep and bear arms had been transformed by the time of the Fourteenth Amendment. Originally, the right was "intimately connected with federalism concerns about a federally controlled standing army that might seek to overawe state-organized militias."[186] He observes that, "By contrast, in 1866, John Bingham, Jacob Howard, Thaddeus Stevens and company were hardly in the mood to rail against a federal standing army; these men, after all, wanted to use precisely such an army to reconstruct recalcitrant southern states."[187] Furthermore, "the people" in Amar's view corresponded roughly with the militia, and "political rights" such as voting rights, service on juries, and eligibility for public office, were (like service in the militia) largely limited to white males. But the Privileges

---

[184] Amar at 51.

[185] Amar at 49.

[186] Amar at 216.

[187] *Id*.

53

Electronic copy available at: https://ssrn.com/abstract=4248297

**A132**

**WORKING DRAFT – Subject to change**

or Immunities Clause "spoke of all citizens, pointedly including women and children…."[188]

Thus, the rights protected by the Privileges or Immunities Clause focused on "civil rights," not

"political rights."  Even though the right to keep and bear arms was a paradigmatic "privilege" of

"citizens of the United States," the "right in 1789 and the right in 1866 meant different things,"

according to Amar.[189]

He concludes:

Indeed, as the Second Amendment illustrates, the very same words "the right…to
keep and bear arms" take on a different coloration and nuance when they are
relabeled "privileges or immunities of citizens" rather than "the right of the
people," and when they are severed from their association with a well-regulated
militia.  To recast the textual point as a historical one, the core applications and
central meanings of the right to keep and bear arms and other key rights were very
different in 1866 than in 1789.  Mechanical incorporation [Amar's term for due
process incorporation as advocated by Justice Black] obscured all this and,
indeed, made it easy to forget *that when we "apply" the Bill of Rights against the
states today, we must first and foremost reflect on the meaning and the spirit of
the amendment of 1866, not the Bill of 1789.*[190]

Thus, in a more subtle and less extreme way, Amar agrees with Lash that the time of the

Fourteenth Amendment is more important than the Founding period for determining the meaning

of incorporated provisions of the Bill of Rights.

It is unclear, at best, whether Amar's distinction between 1868's relabeling the right as a

privilege or immunity of citizens, and 1791's the "right of the people" in connection with the

militia, has any continuing relevance in Second Amendment interpretation.  At the time of

Amar's book, the Second Amendment had not been incorporated, and was generally held by

lower courts to relate only to militia service.  The Court's opinion in *Heller* carefully recognized

the role of the citizen militia in the colonies and early Republic, but it accurately determined that

---

[188] *Id.*

[189] Amar at 257.

[190] Amar at 223 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

the right was an individual right for self-defense as well, the position for which Amar seems to be contending.  Thus, *Heller* may have largely dispelled Amar's concerns about the nature of the right.  Critically, however, these findings in *Heller* did not depend in any way on the understandings of the ratifiers in 1868, but looked to that general time period only as confirmation of the nature of the right as both militia-related and individual, just as it considered some antebellum interpretations as confirmation.

Amar's analysis may be rejected on grounds similar to (though not identical with) those on which Lash's may be rejected:  he relies on the Privileges or Immunities Clause for incorporation; that reliance leads him to differ from the Supreme Court as to what, exactly, is incorporated; and the test for incorporation is different from the Supreme Court's test.  He does not directly address whether the provisions of the Bill of Rights differ in substance when applied against the federal government or against the states, though he seemingly believes that they may be different, stating that it is "[h]arder to understand" Brennan's "insistence that once a provision of the Federal Bill was deemed incorporated, it applied identically in state and federal proceedings."[191] But that question has long ago been resolved by the Court.

So both Lash and Amar would shift the focus to 1868 rather than 1791, though Amar doesn't expressly state, as Lash does, that the 1868 understanding must displace the 1791 understanding.  Gun control proponents will undoubtedly latch on to these positions, as the briefs cited above do, to argue that more extensive restrictions on firearms in 1868 (and no doubt thereafter) as opposed to the Founding are the proper historical analogues when evaluating the constitutionality of present-day gun laws.  But the reasoning behind the approaches of both of these scholars flies in the face of many decades of settled Supreme Court precedent.  The Court

---

[191] Amar at 222.

Electronic copy available at: https://ssrn.com/abstract=4248297

A134

**WORKING DRAFT – Subject to change**

is unlikely to reverse itself on its fundamental incorporation doctrine principles and case law, and the lower courts are bound by those decisions. The alleged "scholarly dispute" about the proper time for determining the meaning of an incorporated provision of the Bill of Rights really consists of one scholarly dissent and one partial scholarly dissent from Supreme Court jurisprudence that has definitively resolved this issue.

Electronic copy available at: https://ssrn.com/abstract=4248297

**CONCLUSION**

The Supreme Court has held that provisions of the Bill of Rights have only a single meaning, whether applied against the federal government or against the states. That meaning is fixed at the time of adoption; that is, in 1791. What a provision of the Constitution meant then, it means now, even though circumstances might change.

The three cases cited by the *Bruen* opinion for the "assumption" that 1791 is the critical period all relied on Founding era history extensively and as an integral part of their analyses. All Supreme Court cases that have engaged in historical review of the Second Amendment to determine its meaning have looked to 1791 as the primary period. Any examination of later periods has been done only to confirm the conclusion already reached regarding the original meaning at the Founding. As the review in this article of Supreme Court cases construing other provisions of the Bill of Rights shows, the Founding period is the exclusive period for determining meaning. The Supreme Court has never looked to 1868 as the primary period for determining the meaning of provisions of the Bill of Rights, and its decisions generally do not even mention that period. Neither litigants nor the scholars mentioned in the Court's reference to the "ongoing scholarly debate" have pointed to a single Supreme Court case which determined the meaning of a provision of the Bill of Rights based primarily on the time of ratification of the Fourteenth Amendment, and to the exclusion of the 1791 understanding.

The lower court cases cited by litigants in current litigation were either abrogated by *Bruen* or relied on a mistake (later corrected) in the Seventh Circuit's *Ezell* decision.

Reliance on the ostensible public understanding of the Fourteenth Amendment when it was ratified—even if such an approach did not contradict existing Supreme Court precedent regarding the determinative period—is fraught with difficulty. It is unclear that the ratifiers of the Fourteenth Amendment thought that they were incorporating all of the first eight

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments against the states.  The Fourteenth Amendment doesn't mention the Bill of Rights, and there were conflicting interpretations at the time regarding what that amendment meant and did.  Most notably, the Supreme Court in the *Slaughterhouse Cases* and the *Cruikshank* case immediately disagreed with what some of the proponents of the Fourteenth Amendment believed to be its effect.  In any event, there is little or no evidence that the ratifiers of the Fourteenth Amendment believed that the Second Amendment meant anything different than it had meant since the Founding.

The "ongoing scholarly debate" about whether 1868 is the proper year amounts to little. Professor Lash's approach, in addition to being theoretically unsupported, would upset the entire Supreme Court jurisprudence on the Bill of Rights.  Professor Amar's approach has likely been rendered unnecessary by *Heller.*

In short, it can be said with confidence that the Supreme Court will not adopt 1868 as the primary or determinative period for construing the meaning of the Second Amendment or any other provisions of the Bill of Rights.  For that reason, it is inadvisable, to say the least, for the lower courts to look to 1868 --rather than 1791-- when searching for historical analogues to justify modern-day gun control laws.

Electronic copy available at: https://ssrn.com/abstract=4248297

OFFICE OF THE DEPUTY COMMISSIONER - LEGAL MATTERS

# LEGAL BUREAU BULLETIN

Vol. 51, No. 2

August 2022

## New York State Restrictions on Carrying Concealed Firearms

### Key Points

- Possessing a firearm in New York City requires a special license issued by the New York City Police Department.
- Carrying a firearm in New York City requires a concealed carry license issued by the New York City Police Department.
- Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise.
- License holders are required to carry their license when carrying a firearm and must provide their license to law enforcement upon request.
- Recent changes in law do not impact the way officers conducts investigative encounters. Officers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm (Level 3) and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous.

### Overview

It is a crime in New York State (NYS) to possess a firearm without a firearms license. Since the early 1900s, NYS required people who wanted a license to carry a firearm to demonstrate a particular need to carry a gun – such as threats, attacks, or other extraordinary danger to personal safety. On June 23, 2022, the United States Supreme Court (SCOTUS) ruled that New York State cannot require people to demonstrate a particular need for a carry license, but may still require a license.[1]

Specifically, the Court stated that: (1) state and local governments are still authorized to require people to obtain licenses in order to lawfully carry guns, and (2) state and local governments may continue to have criteria that must be met before a license will be issued. For these reasons, the SCOTUS decision does not affect the legal requirement that those who want to carry a firearm in New York City must still obtain a license from the New York City Police Department's License Division, with some exceptions.[2]

---

[1] York State Rifle & Pistol Assn., Inc. v Bruen, 142 S.Ct. 2111 (2022).

[2] nal Law Section 400.00(6) which says that a handgun license issued in New York State is valid throughout the state, except ... w York City, where a special permit is granted by the Police Commissioner. Exceptions to this rule apply to those who: (1) have a lawfully-issued firearms license from another state, (2) are traveling through New York City in a continuous and

After the SCOTUS ruling, New York State passed new laws that prohibit people who are licensed to carry firearms from bringing their firearms to certain locations. This bulletin outlines the new laws which take effect on September 1, 2022.

It is important to note that possessing a firearm *without* a license continues to be a crime in New York State. Also, the SCOTUS decision does not change the Department's training or guidance on investigative encounters. Officers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm (Level 3) and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous.

## Sensitive vs. Restricted Locations

The new law designated certain locations as "sensitive" and others as "restricted."

- **Sensitive Locations**: Even though a person may be licensed to carry a firearm, they *may not* bring a firearm to a "sensitive" location. The list of sensitive locations is outlined below. However, there are exceptions:
  - **Active and Retired Law Enforcement**: May bring firearms to sensitive locations, as long as they are lawfully carrying the firearm.
  - Additional exceptions are outlined below.

- **Restricted Locations**: All private property (residential and commercial) that is not on the sensitive location list is considered "restricted." People who are licensed to possess firearms *may not* bring firearms to a restricted location unless they get permission from the property owner. However, there are exceptions:
  - **Off-Duty Active Law Enforcement and Retired Law Enforcement**: May bring firearms to restricted locations without getting permission from the property owner, so long as they are lawfully carrying the firearm. However, if the owner expressly prohibits all firearms on the property, they *may not* bring firearms onto the property.
  - Additional exceptions are outlined below.

- **On-Duty Law Enforcement**: There are *no* restrictions at either sensitive or restricted locations for on-duty law enforcement. Owners *may not* prohibit on-duty law enforcement from carrying firearms on their property.

## Sensitive Locations

Under new Penal Law § 265.01-e, it is a class E felony for a person, even if they have a license, to possess a firearm, rifle or shotgun in a "sensitive location." However, there are some exceptions to this rule as outlined below.

---

uninterrupted fashion, and (3) the firearm is stored in a locked container. Exceptions also exist for retired police officers and federal law enforcement officers, licensed New York State peace officers, and others.

**The following are sensitive locations:**

- Government buildings or property used for government administration (i.e., courts, City Hall, city agencies)
- Hospitals, doctor's offices, health clinics, urgent care facilities, substance abuse or mental health screening and treatment centers, or other behavior health services
- Places of worship
- Public libraries, parks, playgrounds, and zoos
- Facilities where child care, daycare, after-school programs or foster care are administered
- All public and private schools, including college and university buildings and campuses, as well as preschools, nursery schools, and summer camps
- All shelters for homeless, youth or domestic violence victims, or areas where domestic violence services are provided
- Adult care, nursing homes or assisted living facilities, veteran homes or school-based health centers
- On public transportation and in public transportation facilities including buses, bus terminals, subways, subway stations, trains, train stations, ferries, ferry terminals, airports, etc.
- Any establishment where on-premises consumption of alcohol or cannabis is authorized, such as a bar, restaurant or cannabis lounge
- In or on the grounds of performing arts centers, theaters, stadiums, arenas, racetracks, museums, art galleries, amusement parks, banquet and catering halls, and casinos
- Any location being used as a polling location
- Any public sidewalk or public area that is restricted from general public access by a government entity for a limited time or for an authorized event such as a parade or outdoor concert (signs **must** be posted alerting the public that the area is temporarily a sensitive location)
- Protests, demonstrations, marches, or any assembly where individuals are gathered to collectively express their constitutional rights of free speech
- Times Square, as the area will be designated by signage[3]

**Exceptions: The following individuals *are allowed* to possess a firearm in sensitive locations:[4]**

- Off-duty active police officers
- Retired police officers who are lawfully carrying
- Active peace officers employed in NYS

---

[3] For the purposes of section 265.01-e of the Penal Law, Times Square means and includes the following two tracts: (i) the tract in Manhattan including and bounded on the west by the west side of Eighth Avenue, on the south by the south side of West Fortieth Street, on the east by the east side of Sixth Avenue, and on the north by the north side of West Fifty-third Street; and (ii) the tract in Manhattan including and bounded on the west by the west side of Ninth Avenue, on the south by the south side of West Fortieth Street, on the east by the east side of Eighth Avenue, and on the north by the north side of West Forty-eighth Street.

[4] See Penal Law Section 265.01-e(3) for full list of exceptions. If a person operates a licensed or certified program, such as a daycare or health services, in their home, they may possess a firearm in their home so long as the possession is lawful and does not violate the terms of the program's license or certificate. This exception only applies to the operator of the program.

3

A140

- Armored truck guards while on duty
- Judges, licensed to possess a firearm, while in the course of their official duties
- Corrections officers in the course of their official duties
- Active-duty military personnel

## Restricted Locations

Under new Penal Law § 265.01-d, it is a class E felony for a person, even if they have a license, to possess a firearm, rifle or shotgun at a "restricted location" unless permission is granted by the owner or lessee of the property. However, retired law enforcement and off-duty law enforcement may bring firearms to restricted locations without getting express permission from the property owner, but if the owner expressly prohibits all firearms on the property, they may not bring firearms onto the property. Note that owners *may not* prohibit on-duty law enforcement from carrying firearms on their property. Additional exceptions are outlined below.

Property owners and lessees who want to authorize lawful firearms holders to bring firearms onto the property may post clear and conspicuous signs granting permission. Owners may also give express permission to individual people.

**The following are restricted locations**:

- All residential property
- All commercial property including stores and businesses which are not on the sensitive location list noted above[5]

**Exceptions: The following individuals *are allowed* to possess firearms at restricted locations without express permission from the owner: [6]**

- Off-duty active police officers
- Retired police officers who are lawfully carrying
- Active peace officers employed in NYS
- Licensed security guards while on duty
- Armored truck guards while on duty
- Judges, licensed to possess a firearm, while in the course of their official duties
- Corrections officers in the course of their official duties
- Active-duty military personnel

However, if a property owner expressly prohibits firearms on their property, the individuals listed above must comply. If they do not, they may be committing trespass.[7] Remember, owners *may not* prohibit on-duty law enforcement from carrying firearms on their property.

---

[5] For example, since a bar that is licensed by the NYS Liquor Authority is a "sensitive" location under Penal Law Section 265.01-e, the owner may not give customers permission to bring licensed firearms onto the premises.

[6] See Penal Law 265.01-d(2) for full list of exceptions.

[7] If any such individuals bring a firearm onto private property against the owner's articulated wishes, they may be committing a trespass. However, they are not violating § 265.01-d, because they are not required to get an owner's permission before bringing a firearm onto their property.

4

As of September 1, 2022, individuals who are licensed to possess or carry a firearm are prohibited from *storing*[8] a rifle, shotgun, or firearm in a vehicle unless the ammunition has been removed and locked in a safe storage box that is not visible from outside of the vehicle. A glove compartment *does not* qualify as a safe storage box. This law applies to all people who are licensed to carry firearms. A violation of this law is a class A misdemeanor.

## Investigative Encounters

This Supreme Court decision does not change the way the Department conducts investigative encounters. **People who are carrying firearms in New York State are presumed to be doing so unlawfully, until proven otherwise**. Officers may stop an individual when the officer has reasonable suspicion that such individual is carrying a firearm (Level 3) and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous. Officers may conduct a common law right of inquiry (Level 2) if they have founded suspicion that the individual is carrying a firearm. Officers may effect an arrest of an individual when the officer has probable cause that the individual is carrying a firearm without being licensed to do so. Officers are reminded that under New York State law, all firearms license holders are required to carry their license while carrying a firearm and must produce their license to law enforcement upon request.

## Pending Legislation

At this time, the New York City Council is drafting proposed legislation that may impact the guidance provided in this bulletin. If the draft legislation becomes law, this bulletin will be amended.

## Summary

- Unlicensed firearm possession in New York State is still a crime under the Penal Law.
- New laws place restrictions on where firearm license holders may carry firearms.
- None of the changes in law impact an officer's ability to carry a firearm in the course of their duties at any location.
- No changes are being made to the way the Department conducts investigative encounters.
- License holders are required by law to provide their firearm license to law enforcement upon request.
- Officers should carefully review and understand the above concepts as a result of these new laws. Questions regarding the contents of this Bulletin may be directed at the Legal Bureau by contacting 646-610-5400. The Legal Bureau will update this bulletin as the laws on this subject continue to develop.

---

[8] This prohibition applies when the firearm is left in a vehicle that is not attended by the firearm license holder.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JASON FREY, BRIANNA FREY,                         Case No. 21 Civ. 05334 (NSR)
JACK CHENG, and WILLIAM SAPPE,

                                   Plaintiffs,

              -against-                            **NOTICE OF
                                                  INTERLOCUTORY APPEAL**
NEW YORK CITY, New York, STEVEN NIGRELLI,
in his Official Capacity, KEECHANT SEWELL,
in her Official Capacity,
                                   Defendants.
------------------------------------------------------------------x

     PLEASE TAKE NOTICE that the plaintiffs, JASON FREY, BRIANNA FREY, JACK

CHENG, and WILLIAM SAPPE hereby appeal to the United States Court of Appeals for the

Second Circuit from the attached Opinion and Order dated March 13, 2023 of the Hon. Nelson S.

Roman denying Plaintiffs' motion for a Preliminary Injunction, and each and every part thereof

that was and is contrary to and/or prejudiced the plaintiffs' rights, claims, and interests.

Dated: March 16, 2023, 2023
      Scarsdale, New York

                                 THE BELLANTONI LAW FIRM, PLLC
                                 *Attorneys for Plaintiffs*

                                 _____/s/_____
                                 Amy L. Bellantoni (AB3061)
                                 2 Overhill Road, Suite 400
                                 Scarsdale, New York 10583
                                 abell@bellantoni-law.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/13/2023____

JASON FREY, BRIANNA FREY, JACK CHENG,
and WILLIAM SAPPE,

                         Plaintiffs,

        v.

STEVEN NIGRELLI, Acting Superintendent of the
New York State Police, in his official capacity, NEW
YORK CITY, New York, and KEECHANT
SEWELL, in her official capacity as NYPD
Commissioner,

                       Defendants.

21 CV 05334 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

      Plaintiffs Jason Frey, Brianna Frey, Jack Cheng, and William Sappe bring this action against the Acting Superintendent of the New York State Police, Steven Nigrelli ("Acting Superintendent" or "State Defendant"), and New York City and the NYPD Police Commissioner, Keechant Sewell (together, the "City Defendants"), alleging various violations of the Second Amendment. (ECF No. 47.) Presently before the Court is Plaintiffs Jason Frey, Brianna Frey, and William Sappe's (hereinafter, "Plaintiffs") motion for preliminary and permanent injunction seeking to enjoin the enforcement of the following New York State and New York City gun laws: N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code § 10-315. (ECF No. 48.) For the following reasons, Plaintiffs' motion is DENIED in part and STAYED in part.

**BACKGROUND**

**I.   NEW YORK STATE AND NEW YORK CITY FIREARM LAWS**

On September 1, 2022, the State of New York amended its existing gun laws via the Concealed Carry Improvement Act ("CCIA"). On July 1, 2022, the CCIA had been passed by the New York State Legislature in a special session, then promptly signed into law by Governor Kathy Hochul. The bill was designed "to align with the Supreme Court's recent decision in []*Bruen*" *See* Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation, https://on.ny.gov/3BM6Hz7 (July 1, 2022). The CCIA updated New York's licensing framework to eliminate the "proper cause" requirement that was held unconstitutional by *Bruen*, to clarify the requirement of "good moral character," and to establish additional requirements, as discussed below.

New York maintains a general prohibition on the possession of firearms without a license. *See* N.Y. Penal Law §§ 265.01–265.04, 265.20(a)(3). New York State's firearm licensing law is codified in New York Penal Law § 400.00. Aside from licenses connected to particular employment or professions, New York has two general types of licenses: a premises license for the home or place of business and a concealed carry license. N.Y. Penal Law § 400.00(2)(a)–(b), (c)–(f). Because New York permits concealed carry, it does not permit the open carry of firearms. A violation of licensing restrictions is a Class A misdemeanor under N.Y. Penal Law § 400.00(15).

All licensees must meet general eligibility requirements, including, *inter alia*, requirements that the licensee is over twenty-one years of age, "of good moral character," and has not been convicted of a felony or a serious offense. N.Y. Penal Law § 400.00(1).

Licensing is a largely local process in New York State. *See Sibley v. Watches*, 194 A.D.3d 1385, 1386 (4th Dep't 2020). Applications for a license are adjudicated by local licensing officers, who are local judges throughout most of the State. N.Y. Penal Law § 265.00(10). In New York City, Nassau County, and Suffolk County, local police officials serve as licensing officers. *Id.*

The State Police formulate the application form throughout most of New York, and concealed carry licenses issued in New York are valid throughout the State, with the exception of New York City. Pursuant to §§ 400.00(3)(a) and (7), New York City may devise its own licensing application, and it requires that any handgun owner seeking to conceal carry in the City obtain "a special permit . . . issued by the police commissioner." N.Y. Penal Law § 400.00(6). New York City has its own regulations pertaining to the issuance of handgun licenses and provides for premises licenses and different forms of concealed carry licenses. *See* 38 RCNY §§ 5-01, 5-02.

Part of the CCIA enacted the new "Private Property Provision," which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee. N.Y. Penal Law § 265.01-d. Additionally, New York Penal Law § 265.01-e enumerates a set of "sensitive locations" in which individuals may not possess "a firearm, rifle or shotgun." As with the Private Property Provision, this section contains exceptions for police officers, registered security guards, active-duty military, and other designated persons.

## II. THE PLAINTIFFS

### A. *Jason and Brianna Frey*

Jason and Brianna Frey are both United States citizens who reside in Westchester County. (*See* ECF No. 47, Second Amended Complaint ("SAC") ¶¶ 12–13; Declaration of Jason Frey ("Jason Frey Decl.") ¶ 2, annexed as Exhibit ("Ex.") 1 to the Declaration of Amy L. Bellantoni in support of Plaintiffs' Motion for Preliminary Injunction ("Bellantoni Decl."); Declaration of Brianna Frey ("Brianna Frey Decl.") ¶ 2, annexed to the Bellantoni Decl. as Ex. 2). Before the *Bruen* decision, both Freys applied for and were granted concealed carry licenses by a Westchester County judge. (Brianna Frey Decl. ¶ 3; Jason Frey Decl. ¶ 3.) The licenses were restricted "sportsman" licenses, limiting possession of their handguns to the inside of their home, to and

from target shooting, and during sporting activities.  (Brianna Frey Decl. ¶ 6; Jason Frey Decl. ¶ 7.)

In 2019, both Freys applied for an amendment to allow for unrestricted concealed carry licenses.  (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 8.)  The licensing officer denied the applications because neither Frey had met the governing "proper cause" standard.  (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 9.)  The requirement that concealed carry license applicants show "proper cause" in order to be eligible to get a license was struck down by the Supreme Court on June 23, 2022 in a decision captioned *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022).

Jason Frey does not allege that he applied for a concealed carry license after the *Bruen* decision, or after the enactment of the CCIA legislation, to obtain an unrestricted license to carry his handgun.  Brianna Frey alleges that "[i]n July 2022, [she] applied to have the restrictions on her handgun license removed to allow for 'full carry', which was denied in September 2022." (SAC ¶ 54.)  Brianna Frey does not allege that she appealed that decision through an Article 78 proceeding in New York State court.  Neither Brianna or Jason Frey alleges that he or she sought to obtain a separate handgun license in New York City, and Jason Frey states that he is not going to apply for a separate handgun license to legally carry in New York City.  (Jason Frey Decl. ¶ 26.)

As of October 14, 2022, Brianna Frey alleged that she intended "to carry her handgun concealed on her person on a daily basis for self-defense everywhere she goes, on public and private property, commercial and residential, where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and she intends to continue such protected conduct on a regular basis until her natural death."  (SAC ¶ 52.)  As of the date of her declaration, on October

16, 2022, she continued to indicate that she intended on carrying a handgun outside of her licensing restrictions. (*See* Brianna Frey Decl. ¶¶ 11–13.) Mr. Frey declares that he has begun to "regularly carry a handgun concealed on [his] person in public–not only to and from target shooting or when [he is] engaging in sportsman activities like camping and hiking, for the protection of [him]self and [his] family–but during [his] everyday life…." (Jason Frey Decl. ¶ 14.) He also states that he "intend[s] to start carrying [his] handgun open and holstered . . . at times when [he is] not carrying the same handgun concealed." (*Id*. ¶ 21.) Mr. Frey states that he carries his handgun to go shopping in shopping centers, restaurants subject to the alcohol and beverage control laws, movie theaters, various parks, and gas stations. (*Id*. ¶ 14.) Mr. Frey alleges that he travels to New York City in order to "get goodies at Junior's," travel to Murray's Bagel's on 8th Avenue, and visit friends in Williamsburg. (*Id*. ¶ 27.) Brianna Frey does not allege that she has traveled to, or intends to travel to, New York City.

### B. William Sappe

William Sappe is a resident of Orange County. *See* Declaration of William Sappe ("Sappe Decl."), ¶ 3, annexed to the Bellantoni Decl. as Ex. 3.) He is self-employed and alleges that his business involves transporting "substantial amounts of cash, diamonds, and jewelry for high-end jewelers . . . between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada." (*Id*. ¶ 7.) Mr. Sappe is licensed as an Armed Guard in New York. (*Id*. ¶ 4.) He holds a valid license to carry a concealed handgun everywhere in New York State, with the exception of New York City, which was issued by a judicial licensing officer in Orange County. (*Id*. ¶ 3.)

Mr. Sappe states that he "previously applied to the NYPD Licensing Division to obtain a

separate concealed carry license, as required by statute, and [his] application was denied." (*Id*. ¶ 9.) He does not allege when he applied for the license, when his license was denied, or the reason for the denial. Mr. Sappe has not alleged whether he has applied for a license to carry his handgun in New York City since the Supreme Court's decision in *Bruen*, or since the enactment of the CCIA.

Mr. Sappe alleges that "[b]eginning [on October 14, 2022], Mr. Sappe intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed." (SAC ¶ 81.) Mr. Sappe alleges that he "intend[s] to begin carrying my handgun open and exposed on those days that [he is] not carrying a handgun concealed on my person, both inside New York City and throughout the state." (*See* Sappe Decl. ¶ 19.) Mr. Sappe also alleges that as part of his daily employment, he travels through Times Square. (*Id*. at ¶ 13.) He states that "I am going to carry my handgun in the Times Square area for self-protection." (*Id*.)

## III.    PROCEDURAL BACKGROUND

Plaintiffs commenced this action on June 16, 2021. (ECF No. 1.) Plaintiffs requested leave to file a Motion for Preliminary Injunction, which was filed and fully briefed on September 21, 2021. (ECF No. 20.) On October 14, 2021, City Defendants filed their Answer while State Defendant filed a Motion to Dismiss on January 3, 2022. (ECF No. 31.) Oral arguments on the Preliminary Injunction were held on February 1, 2022, and the Court subsequently issued a decision denying the injunction on February 22, 2022. (ECF No. 37.)

On June 23, 2022, the Supreme Court issued its decision in *Bruen*, and on August 22, 2022, Plaintiffs requested permission to file a Second Motion for Preliminary Injunction based on the holding in *Bruen*. (ECF No. 42.) On September 1, 2022, the Court issued a Decision and Order

denying Plaintiffs' request for a Second Preliminary Injunction and granted State Defendant's

Motion to Dismiss as to them.  (ECF No. 44.)  Plaintiffs filed an Amended Complaint and a Second

Amended Complaint on October 4 and October 14, 2022, respectively, along with a stipulation

signed by all parties agreeing to the filing of the amended complaints.[1]  (*See* ECF Nos. 46 and 47.)

Plaintiffs Jason Frey, Brianna Frey, and William Sappe filed the present motion on October 20,

2022, styling it as an "Emergency Order to Show Cause," but which the Court construed as a Third

Motion for Preliminary Injunction.[2]  (ECF No. 48.)  The parties fully briefed their arguments on

the Third Motion for Preliminary Injunction on December 15, 2022.

On March 20, 2023, the Court held oral argument on Plaintiff's challenge to N.Y. Penal

Law § 265.01-e (banning guns in sensitive places), with a focus on § 265.01-e(2)(n) which bans

firearms in public transportation, including Metropolitan Transit Authority ("MTA") subway cars

and train cars and § 265.01-e(2)(t) which bans the carrying of firearms in the Times Square area.

## LEGAL STANDARD

### I.   PRELIMINARY AND PERMANENT INJUNCTION STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008).  A party seeking a preliminary injunction "must demonstrate that it will suffer

irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of

the action, or (2) that there are sufficiently serious questions going to the merits to make them a

fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the

---

[1]      The Second Amended Complaint, which was filed 10 days after the First Amended Complaint was filed,
replaces formerly named Defendant Kevin Bruen, the former Superintendent of the New York State Police, with
Steven Nigrelli, the Acting Superintendent of the New York State Police, and adds a new count challenging NYC
Admin. Code 10-315 and NYPD rules promulgated thereunder.  (SAC ¶¶ 245–48.)

[2]      Plaintiff Jack Cheng is not a party to the instant preliminary injunction motion.

moving party." *Mullins v. City of New York*, 626 F.3d 47, 52–53 (2d Cir. 2010) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010)).

Where "a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient[.]" *Mullins*, 626 F.3d at 53. However, where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," such as in this case, that party "must meet [a] more rigorous standard." *Almontaser v. N. Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo . . . ."). The moving party must establish "a clear showing that the moving party is entitled to the relief requested," or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Tom Doherty Assocs.*, 60 F.3d at 34.

## II. ANALYSIS FOR SECOND AMENDMENT CLAIMS POST-*BRUEN*

On June 23, 2022, the U.S. Supreme Court announced a new standard of review when evaluating whether a regulation violates the Second Amendment, and expressly rejected the previous approach widely used by federal courts. *See Bruen*, 142 S. Ct. at 2126.

Finding that the second step was inconsistent with the principles articulated in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), the Court pronounced a new standard consistent with the approach used in Heller: (i) "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; (ii) "[t]he government must then justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2129–30. In other words, at the second step, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

The "historical inquiry . . . will often involve reasoning by analogy . . ." *Bruen*, 142 S. Ct. at 2132. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133. Moreover, to "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33. More specifically, courts must consider the following: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id*. at 2133.

In addition, when courts review historical sources, those that arose around when the Second Amendment was adopted (1791) and when the Fourteen Amendment was adopted (1868) are particularly instructive, whereas laws that long predated the adoption of the Constitution or long post-dated the enactment of the Fourteenth Amendment are given less weight, though courts may still consider them:

> "We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for

courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies."

*Bruen*, 142 S. Ct. at 2136 (internal quotations and citations omitted).

"Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined "a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . . ratification. And, in other contexts, we have explained that a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases in the Constitution."

*Id*. at 2136 (internal quotations and citations omitted) (emphasis in original)

Lastly, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*.

## DISCUSSION[3]

Plaintiffs are requesting a preliminary and permanent injunction that will enjoin Defendants from enforcing N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.01-d, 265.01-e, 265.03(3), and NYC Admin. Code § 10-315 against those who (i) possess a valid New York State handgun license and who carry a handgun open and exposed (holstered) on their person,

---

[3] In addition to the parties' moving papers and accompanying exhibits, the Court has considered the amicus brief filed by Everytown for Gun Safety (ECF No. 72) as well as the Declaration of Dr. Brennan Rivas, a historian and independent scholar on behalf of defendant Nigrelli. (ECF No. 64.)

and (ii) possess a valid unrestricted New York State concealed carry handgun license who carry a handgun concealed on their person within New York City. (*See* ECF No. 52 (Pls.' Br.) and ECF No. 74 (Pls.' Reply")). Defendants argue that Plaintiffs do not have standing to assert claims against several of the statutes and have otherwise failed to satisfy their burden for a preliminary injunction. The Court will first examine Plaintiffs' standing, and then will discuss the merits of Plaintiffs' injunctive request.

## I. STANDING

The Supreme Court has called the doctrine of standing "perhaps the most important" of the case-or-controversy doctrines. *Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrine requires a plaintiff to have a "personal stake," in the outcome of the action. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). That is, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. "[T]he 'irreducible constitutional minimum' of standing consists of three elements[:] [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The party seeking to invoke federal jurisdiction has the burden of establishing each element. *Id.* at 561.

To have standing to seek injunctive relief, a plaintiff must establish a "real or immediate threat" of injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

Mere "allegations of possible future injury are not sufficient"; the "injury must be certainly impending." *Izquierdo v. Panera Bread Co.*, 450 F.Supp.3d 453, 460 (S.D.N.Y. 2020) (quoting *Daniel v. Tootsie Roll Indus., LLC*, No. 17 CIV. 7541 (NRB), 2018 WL 3650015, at *6 (S.D.N.Y. Aug. 1, 2018)). Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Moreover, with respect to pre-enforcement challenges to statutes, a credible threat of prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). That being said, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt*, 442 U.S. at 298). In addition, "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (citing *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quoting *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)).

### A. Standing to raise a challenge against N.Y. Penal Law §§ 265.01, 265.01-b, & 265.03(3)

The City Defendants point out that Plaintiffs do not state why they seek an injunction against NPYL §§ 265.01, 265.03(3), and 265.01-b, but it appears that Plaintiffs do so because they seek to prevent enforcement of these laws against the following conduct: (i) carrying a handgun open and exposed; and (ii) carrying concealed firearms outside the restrictions placed on the licenses of Jason Frey and Brianna Frey. (ECF No. 63 ("City Defs.' Opp.") at 6.)

The Court finds, like it did in denying Plaintiff's first motion for preliminary injunction, that Plaintiffs continue to lack standing to challenge N.Y. Penal Law §§ 265.01(1), 265.01-b, and 265.03(3) because they have not and cannot be injured by those statutes. These three provisions impose misdemeanor and felony penalties for the illegal carrying of firearms without a license. *See* N.Y. Penal Law §§ 265.01(1); 265.01-b; 265.03(3). For the reasons discussed below, the Court agrees and DENIES Plaintiffs' preliminary and permanent injunction motion as to their challenge against these three statutes.

The Court previously found that Plaintiffs failed to establish standing to challenge N.Y. Penal Law §§265.01(1), 265.01-b, and 265.03(3) in its Order and Opinion on Plaintiff's first motion for preliminary injunction, dated February 22, 2022. *See Frey v. Bruen*, No. 21 CV 05334 (NSR), 2022 WL 522478, at *6 (S.D.N.Y. Feb. 22, 2022). There the Court reasoned that, *inter alia*, as "each Plaintiff has been issued such a license, they do not and will not face criminal liability under Section 265." *Id*. As previously discussed by the Court in the prior Order and Opinion, "Section 265.20(a)(3) explicitly states that these Sections 'shall not apply' to '[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section 400.00 or 400.01.'" *Id*. (citing N.Y. Penal Law § 265.20(a)(3). "In addition, Section 400.00(17) states:

> "[t]he provisions of article two hundred sixty-five of this chapter relating to illegal possession of a firearm, shall not apply to an offense which also constitutes a violation of this section by a person holding an otherwise valid license under the provisions of this section and such offense shall only be punishable as a class A misdemeanor pursuant to this section."

N.Y. Penal Law § 400.00(17).

As each Plaintiff has been issued such a license, they do not and will not face criminal liability under Section 265." (*Id*. (citing N.Y. Penal Law § 400.00(17)).

# A156

That same reasoning continues to apply here in the instant motion for preliminary and permanent injunction. The Court agrees with the State Defendant that since neither Plaintiffs' circumstances, as expressed in their recent declarations, nor those statutes have changed since the Court's prior ruling on February 22, 2022, Plaintiffs still face no criminal penalties or threats of prosecution for violating §§ 265.01, 265.01-b, and 265.03(3). (*See* State Def's Opposition at 12.).[4]

Plaintiffs fail to present any meaningful arguments to the contrary. In their opening brief, Plaintiffs merely argue that they have announced "their intention to carry a firearm in violation of the challenged laws sufficient to confer Article III standing," (Pls.' Br. at 6), but they fail to provide any arguments countering the State Defendant's point that those statutes will not apply to the Plaintiffs as firearms license holders. Nor do Plaintiffs satisfy their burden of establishing standing as to these three statutory provisions in their reply brief. In their reply brief, Plaintiffs appear to argue that they only have standing to assert the constitutionality of all of the statutes, including §§ 265.01, 265.01-b, and 265.03(3), with respect to the purported right to open carry, (Pls.' Reply at 17), and state that "[t]he ambiguity in the law, and risk of arrest, calls for a judicial declaration before finding that Plaintiffs do not have standing to challenge Penal Law 265.00, et seq." (*Id.*) Plaintiffs fail to cite to any legal authorities for their statement. The Court therefore finds that Plaintiffs fail to satisfy their burden to establish standing to challenge §§ 265.01, 265.01-b, and 265.03(3).

## B. Standing to raise a challenge against N.Y. Penal Law §§ 265.01-d and 265.01-e

---

[4]     To the extent that Plaintiffs point to these statutes as possibly being enforced against them in the event that they open carry their firearms, Plaintiffs' concerns are misplaced. As discussed in the Court's previous Order and Opinion, "if Plaintiffs were to carry their weapons openly, they would at best be committing a violation of their handgun license restrictions, and subject to potential penalties under N.Y. Penal Law Section 400.00(15)." *Frey*, 2022 WL 522478, at *7.

State Defendant concedes that the N.Y. Penal Law § 265.20(a)(3) exception does not apply to newly added a N.Y. Penal Law §§ 265.01-d and N.Y. Penal Law §§ 265.01-e, both of which did not apply at the time of the Court's prior ruling. (*See* ECF No. 66 ("State Def.'s Opp.") at 12 n.5). Therefore, the Court will assess whether Plaintiffs have standing to raise a challenge against N.Y. Penal Law § 265.01-d and N.Y. Penal Law § 265.01-e.

### 1. Standing to challenge N.Y. Penal Law § 265.01-d

The City Defendants argue that Plaintiffs do not have standing to assert a claim challenging N.Y. Penal Law § 265.01-d, which states that one shall not carry firearms onto private property without permission of the owner or lessee of that property. N.Y. Penal Law § 265.01-d. The City Defendants mainly argue that "[i]f Plaintiffs ask and obtain permission from private property owners and/or lessees, they would not be aggrieved by the statute." (City Defs.' Opp. at 13.)

However, recently, district courts have found standing to challenge N.Y. Penal Law § 265.01-d where plaintiffs, like Plaintiffs do here, state that they intend to carry arms into private property without obtaining permission. *See Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *4 (W.D.N.Y. Nov. 22, 2022) (finding that individual with concealed carry license established standing where (i) he swore that he would typically bring his firearm on private property open to the public and to establishments that neither prohibit the carrying of firearms nor post signage consenting to the carry of firearms; and where (ii) New York Governor Kathy Hochul and Police Superintendent Nigrelli publicly announced enforcement action against gun law violations.). *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700, at *39 (N.D.N.Y. Nov. 7, 2022) ("Based on the fact that Plaintiffs Johnson and Leman have sworn that they have frequently carried concealed in privately owned, open-to-the-public locations and will

do so again soon (regardless of the absence of CCIA signage), the Court finds they have asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.").

The Court finds that Plaintiffs Jason and Brianna Frey meet the injury-in-fact element of standing to challenge this particular statute. When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 158–59, 134 S.Ct. 2334. (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Jason Frey states he will not "seek permission" or refrain from carrying because there is no "conspicuous signage" granting permission to carry. (Jason Frey Decl. ¶ 16.) Likewise, Brianna Frey declares that "I am not going to ask permission from the above locations, or from every property owner or lessee or refrain from going about in public to all of the places that members of the general public go – on public and private property, residential and commercial – just because there is no 'conspicuous sign' granting me permission to exercise my right to be armed for self-defense." (Brianna Frey Decl. ¶ 16.). In addition, as Plaintiffs discuss, both N.Y. Governor Hochul and First Deputy State Police Superintendent Steven Nigrelli (now Acting Superintendent and Defendant) announced a "zero tolerance" policy to violations of gun law violations, and indicated that New York State, troopers "are standing ready" to ensure that "all laws are enforced." (Pl.'s Br. at 10–11 (citing Governor Hochul's August 21, 2022 press conference at 38:00-25).[5] Therefore, the Court finds that there is a credible threat of prosecution regarding this statute. In addition, given the recency of the law and lack of any indication that it

---

[5] "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," (Aug. 31, 2022), available at https://www.youtube.com/watch?v=gC1L2rrztQs.

will be repealed, the Court is and should be "willing to presume that the government will enforce" it. *See Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

The Court notes that Mr. William Sappe fails to provide any statement like the Freys do indicating that he will not seek permission before carrying in a private property, so the Court finds that he fails to establish injury-in-fact as to his challenge of this statute. (*See generally*, Sappe Decl.).

With respect to the other two elements to establish standing—traceability to the conduct of the Defendants and redressability—the Court finds that Plaintiffs Jason and Brianna Frey meet these elements, given that the named Defendants are specifically tasked with enforcing the gun laws. *See Antonyuk*, No. 2022 WL 16744700, at *39 (finding traceability and redressability against officials who "each has the specific duty to enforce [N.Y. Penal Law § 265.01-d].").

## 2. Standing to challenge N.Y. Penal Law § 265.01-e

Plaintiffs do not allege that they seek to carry their handguns in the vast majority of locations deemed "sensitive" under Penal Law § 265.01-e(2)(a)-(t) – *e.g.*, places of worship, zoos, nursery schools, etc. (City Defs.' Opp. at 10–11; State Def. Opp. at 23–24.) Plaintiffs therefore cannot demonstrate an injury-in-fact with a "fairly traceable connection" to the entirety of Penal Law § 265.01-e, *see Lujan*, 504 U.S. at 560; Penal Law § 265.01-e(2)(a)-(t), but only those sensitive locations where they have alleged or sworn "sufficiently concrete intention to carry." *See Antonyuk v. Hochul,* 2022 WL 16744700, at *11 (denying preliminary injunction motion for lack of standing in challenge of N.Y. Penal Law § 265.01-e (a) [prohibiting firearms "any place ... under the control of federal, state or local government, for the purpose of government administration . . . "] because plaintiffs failed to allege or assert a concrete intention to carry concealed on government property or in a government building in the immediate future.); *see id.* at 8

("'someday' intentions—without any description of concrete plans, or indeed even any specification of when the 'someday' will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Per their declarations, Plaintiffs have only indicated that they currently have or plan on violating the current gun laws in parks, theaters, restaurants with on-premise alcohol consumption, the MTA subway and train cars, and Times Square. (Jason Frey Decl. ¶¶ 14–15, 18–19; Brianna Frey Decl. ¶¶ 12–14, 17–18; William Sappe Decl. ¶¶ 7, 13.). Therefore, they only have standing to challenge those specific sensitive locations. *See* §§ 265.01-e(2)(d) [public parks], e(2)(p) [theaters]; e(2)(n) [subway and Metro North train cars); e(2)(o) [restaurants with on-premises alcohol consumption; e(2)(t) [Times Square].

### C. Standing to Raise a Challenge Under N.Y. Penal Law §§400.00(6) and 400.00(15)

#### 1. Standing to Invalidate Restrictions Placed on the Concealed Carry Licenses Issued to Jason Frey and Brianna Frey

The City Defendants argue that Plaintiffs Jason and Brianna Frey do not have standing to challenge restrictions placed on their concealed licenses. (City Defs.' Opp. at 11–12.). A violation of the restrictions on the firearm licenses would derogate N.Y. Penal Law § 400.00(15). Defendants mainly argue that the City and State Defendants cannot redress the alleged violations—in other words, the City and State Defendants cannot remove the restrictions given that they were put in place by Westchester County licensing officials, and Plaintiffs Jason and Brianna Frey should instead undergo the appropriate administrative process to seek to remove restrictions on their licenses (*i.e.* applying to upgrade their licenses and/or commencing an Article 78 proceeding in New York State Court to appeal a denial of a license upgrade. For the reasons stated below, the Court agrees and DENIES preliminary and permanent injunction to the extent that Plaintiffs Jason and Brianna Frey seek to challenge restrictions placed on their concealed licenses.

Mr. Jason Frey, who was issued a New York State pistol license by a judicial licensing officer in Westchester County, fails to allege that he applied to the Westchester County licensing official to remove the restrictions on his license. (SAC ¶¶ 23, 25.) Brianna Frey, who holds a firearms license limited to sportsman activities that was issued by an officer in Westchester County, applied to remove restriction on her carry license to allow for full carry, but her application was denied in September 2022. (SAC ¶ 54.) The City Defendants argue that to the extent that these Plaintiffs challenge restrictions placed on their licenses under *Bruen*, they should apply to the applicable judicial licensing officers in Westchester County to upgrade their licenses. (City Defs.' Opp. at 12.) In addition, the City Defendants argue that Plaintiff Brianna Frey should challenge the Westchester County judicial licensing officer's determination denying her application in September 2022 in New York State Supreme Court, pursuant to N.Y. C.P.L.R. 78. (*Id*.)

The "case or controversy" limitation of Art. III of the Constitution requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court. *See Antonyuk*, 2022 WL 16744700, at *9. Because the named Defendants cannot remove the licensing restrictions that were imposed pre-*Bruen*, and the Westchester County officials who are responsible for licensing are not named as defendants, Plaintiffs Brianna and Jason Frey therefore do not have standing with respect to this challenge.

### 2. Standing to Challenge N.Y. Penal Law § 400.00(6) and 400.00(15) with respect to carrying in New York City

The Court finds, and Defendants do not contest, that Plaintiffs William Sappe and Jason Frey have standing to challenge N.Y. Penal Law §§ 400.00(6) (requiring a special permit in New York City) and 400.00(15) (criminalizing carrying of firearms outside of licensing restrictions)

with respect to carrying in New York City.[6]  The Court finds that Plaintiffs William Sappe and

Jason Frey have sufficiently alleged their concrete and imminent intention to carry their firearms

in New York City based on their following statements:

> "Now that the *Bruen* case established a clear test for analyzing Second Amendment
> challenges, I intend to carry my handgun concealed in New York City for self-
> defense on a daily basis. I also intend to carry my handgun to work every day
> because the number of random incidents of violent criminal attacks in New York
> City have risen sharply. Based on my work, including its location in the Diamond
> District where I am coming in and out of high-end jewelry stores, and the
> merchandise and cash that I carry."

Sappe Decl. ¶ 10.

> "I am going to carry my handgun in the Times Square area for self-protection even
> though such constitutionally-protected activity had been made unlawful by New
> York State and New York City."

Sappe Decl. ¶ 13.

> I carry my handgun concealed when I travel to New York City. Whether alone or
> with my family, I take the Metro North Train into Grand Central and the number 4
> train to Times Square to get goodies at Junior's, and sometimes to Murray's Bagels
> on 8th Avenue. I also visit friends in Williamsburg, taking the shuttle to the L train,
> then to the 14th Street stop. I intend to continue being armed when I travel to New
> York City for my own protection and my family's.

Jason Frey Decl. ¶ 27.

Because both Plaintiffs Jason Frey and William Sappe indicate that they have or plan to

carry a handgun when in New York City, even though they do not have a permit allowing them to

lawfully do so, the Court finds that they have alleged a sufficiently concrete and imminent intention

of violating N.Y. Penal Law §§ 400.00(6).  *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 386-87

(2d Cir. 2015) (finding standing for pre-enforcement challenge to statute banning certain types of

---

[6]      In her declaration, Brianna Frey provides no indication that she has a concrete or imminent intention to
carry her firearms in New York City.  (*See generally*, Brianna Frey Decl.).

knives where the plaintiffs alleged that "they have in the past carried, and wish again to carry, common folding knives")

For the reasons discussed above with respect to public announcements by relevant government officials that gun laws will be enforced, the Court finds that the Plaintiffs have established that there is a credible threat of prosecution. *See supra*. In addition, traceability and redressability are established here, given that the named Defendants are tasked with enforcing the gun laws. *See Antonyuk*, No. 2022 WL 16744700, at *39.

### 3. Standing to Challenge N.Y. Penal Law § 400.00(15) With Respect to Open Carry

Regarding Plaintiffs' challenge to N.Y. Penal Law 400.00(15) with respect to open carry, the Court finds that Plaintiffs do not have standing. Brianna Frey provides no allegations that she has a concrete and imminent intention of carrying her firearm in an open manner. *See generally,* Brianna Frey Decl. While Jason Frey and William Sappe allege an intention to open carry, they fail to allege that such intention is concrete and imminent, as required in pre-enforcement suits. *Lujan*, 504 U.S. at 564.

Jason Frey alleges as follows: "I intend to start carrying my handgun open and holstered at the above locations at times when I am not carrying the same handgun concealed." Jason Frey ¶ 21. William Sappe similarly alleges as follows: "("I intend to begin carrying my handgun open and exposed on those days that I am not carrying a handgun concealed on my person, both inside New York City and throughout the state." William Sappe Decl. ¶ 19

Their allegations are also slightly contradictory or at least they are unclear about their actual intentions to carry open. William Sappe, for example, states that he "intend[s] to carry [his] handgun *concealed* in New York City for self-defense on a daily basis." (Sappe Decl. ¶ 10) (emphasis added). Sappe also states he regularly carries his handgun concealed while not in New

# A164

York City, but he gives no concrete indication of when he plans to carry open.  (Sappe Decl. ¶ 3).

Jason Frey states he intends to carry open, but also states that "[t]he only reason I do not exercise

the right to open carry in New York City is the fear of arrest, jail and the other criminal and civil

penalties that will follow," (Jason Frey Decl. ¶ 31), and he otherwise gives no specific allegations

regarding when he intends to carry open.

In any event, regarding Jason Frey's and William Sappe's statements that they "intend to"

violate the open carry ban, such "'some day' intentions—without any description of concrete

plans, or indeed even any specification of when the some day will be—do not support a finding of

the 'actual or imminent' injury" that is required."  *Lujan*, 504 U.S. at 564; *see also San Diego Cty.*

*Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (holding the plaintiffs' assertions

that they "wish and intend to engage in activities prohibited" by the Crime Control Act, which

prohibited the manufacture, transfer or possession of semiautomatic assault weapons, was

insufficient to establish a genuine threat of imminent prosecution); *see, c.f. Susan B. Anthony List*

*v. Driehaus*, 573 U.S. 149, 161 (2014) (petitioners sufficiently alleged intention to violate law by

pleading specific statements they intend to make in future election cycles).

Therefore, the Court DENIES Plaintiff's preliminary injunction motion challenging N.Y.

Penal Law 400.00(15) with respect to open carry.

### D.  Standing to raise a challenge under NYC Admin. Code § 10-315 and the NYPD Rules promulgated thereunder

The City Defendants argue that Plaintiffs have no basis of challenging NYC Admin. Code

§ 10-315 and rules promulgated thereunder because that law was repealed by operation of law

when Local Law 91 became effective, and there are not any current rules implementing or

expounding upon Administrative Code § 10-315.  (*See* City Defs.' Opp. at 25 n.20.)  In addition,

as the City Defendant persuasively state, Administrative Code § 10-315, however, simply

determined the boundaries of the area commonly known as Times Square, and Plaintiffs do not allege that the City improperly defined Times Square." (*Id.*)  Plaintiff presents no arguments to the contrary and does not mention challenging NYC Admin. Code 10-315 anywhere in their reply papers.  Therefore, the Court determines that Plaintiff concedes to the City Defendant's argument. *Vann v. Persico*, No. 20-CV-628 (KMK), 2022 WL 4368110, at *9 (S.D.N.Y. Sept. 20, 2022) ("'[b]y failing to respond to that argument in its Reply Memorandum, [Riggs] concedes the point for purposes of [its Motion].'") (citing *Cornelius v. Macy's Retail Holdings, Inc*., No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019) (collecting cases).

Accordingly, the Court DENIES Plaintiff's motion for preliminary injunction challenging NYC Admin. Code § 10-315.

## II. PRELIMINARY AND PERMANENT INJUNCTION

### A. Likelihood of Success on the Merits

#### 1. Challenge to N.Y. Penal Law § 400.00(6)

Plaintiffs contest the constitutionality of N.Y. Penal Law § 400.00(6) under *Bruen*, arguing that the law is not consistent with the Nation's historical tradition of firearm regulation.  (Pls.' Reply at 10.)  In relevant part, N.Y. Penal Law § 400.00(6) states that "[a] license to carry or possess a pistol or revolver, or to purchase or take possession of a semiautomatic rifle, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city.  *See* N.Y. Penal Law § 400.00(6).  At its core, Plaintiffs wish to possess a firearm in New York City without the need for a separate license from the NYPD.  For the reasons discussed below, the Court denies Plaintiffs' preliminary injunction motion challenging N.Y. Penal Law § 400.00(6).

# A166

First, Plaintiffs do not contest anything about the requirements of obtaining a New York City gun permit, rather, they just complain that they have to get a permit in the first place. Nothing in *Bruen* suggested that the Second Amendment protects the right to carry a firearm without a license, and concurring opinions indicate the opposite. *See, e.g., Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (the holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun . . . . Nor have we disturbed anything that we said in [*D.C. v. Heller*, 554 U.S. 570, 595, 128 S. Ct. 2783, 2799 (2008)] or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns."); *Bruen*, 142 S. Ct. at 2157 (Kavanaugh, J., concurring) (Justice Kavanaugh wrote separately to "underscore . . . the Court's decision does not prohibit . . . the imposition of licensing requirements for carrying a handgun for self-defense.").

It is clear that governments can impose firearm restrictions so long as they are consistent with individuals' Second Amendment rights. *See Heller*, 554 U.S. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the First Amendment's right of free speech was not . . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for any purpose."); *Bruen*, 142 S. Ct. at 2128 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.") (quoting *Heller*, 554 U.S. at 626). Plaintiffs' attempt to dismantle that long-standing rule by indicating that the City cannot impose its own permitting requirements goes too far.

In any event, the Court will also evaluate this issue under the *Bruen* analysis. At the first step, the Court finds that N.Y. Penal Law § 400.00(6) does implicate the text of the Second Amendment because it pertains to the right to keep and bears arms. Here, the law implicates the right to carry arms while in New York City. *See Bruen*, 142 S.Ct. at 2134 ("As we explained in Heller, the "textual elements" of the Second Amendment's operative clause— "the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation.") (citing *Heller*, 554 U.S. at 592).

At the second step of the *Bruen* analysis, Defendants are able to establish in their papers that there is a historical tradition of firearm regulations, and in particular, firearm regulations at the municipal and town level. *See* ECF No. 65, Declaration of Suzanna Publicker Mettham (hereinafter "SPM Decl."), Exh. A at 2 (Brooklyn licensing ordinance, 1880); SPM Decl., Exh. B at 176–77 (Buffalo licensing ordinance, 1891); SPM Decl. Exh. C at 3 (Elmira licensing ordinance, 1892); SPM Decl. Exh. D at 243 (Syracuse licensing ordinance, 1892); SPM Decl. Exh. E at 425 (Troy licensing ordinance 1905); SPM Decl. Exh. F at 337 (Lockport licensing ordinance, 1909); and Albany, SPM Decl. Exh. G at 849–50 (Albany licensing ordinance, 1905); *see also* ECF No. 67, Ciappetta Decl., Exh. 3 (collecting laws from Pennsylvania in 1750, Tennessee in 1821, Virginia in 1847, Arizona in 1867, Texas in 1871, and North Carolina in 1899); *see also* Ciappetta Decl., Exh. 4 (collecting laws that regulated or empowered municipalities to regulate storage, sale, or transport of gunpowder from Pennsylvania in 1782, Connecticut in 1836, New Jersey in 1837, Florida in 1838, Iowa in 1846, and Nebraska in 1867 and 1869); *see also* Ciappetta Decl., Exh. 5 (collecting laws prohibiting public carry in populated areas from Colorado in 1862; Montana in 1864; New Mexico in 1869; Maryland in 1872 addressing only the city of Annapolis; Wyoming in 1875; Kansas in 1881; Idaho in 1889). In addition, more than two dozen various municipalities

required an individual to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon between 1881 and 1910. *See* Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a person to carry firearms in cities across the United States subject to the discretionary determination of a local official).

Plaintiffs argue that the examples provided by the Defendants showing city-based licensing regulations should be rejected because they do not reflect "founding-era tradition." (Pls.' Reply at 10.). Plaintiffs argue that the scope of Second Amendment protections are "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791, not the mid-late 1800s and beyond." (*Id.* (citing *Bruen*, at 2137–38)). However, Plaintiff's argument is overstated. The Supreme Court in *Bruen* indicated that while the Court "generally assumed" that the reference point should start at laws in 1791, there is also an "ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 142 S.Ct. at 2138 (emphasis added). In other words, as the City Defendants persuasively argue, the Supreme Court's language demonstrates that there is an open question regarding how much importance to attribute to historical evidence from the Fourteenth Amendment's ratification period, and not whether that evidence deserves any weight. (City Defs.' Opp. at 16.). Therefore, the Court finds no issue in considering the abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century. *See also D.C. v. Heller*, 554 U.S. 570, 605, 128 S. Ct. 2783, 2805

(2008) (indicating that post-enactment history that sheds light on "the public understanding of a legal text … is a critical tool of constitutional interpretation.").

For the aforementioned reasons, the Court denies the preliminary injunction as to N.Y. Penal Law § 400.00(6).

### 2. Challenge to N.Y. Penal Law § 400.00(15) Regarding Open Carry

In their preliminary injunction motion (and in their Second Amended Complaint), Plaintiffs want the Court to find that they have a right to open carry, and that the criminalization of open carry is unconstitutional. (*See* Pls.' Br. at 14–17.) As explained above, New York state prohibits open carry, though individuals may public carry as long as they carry their firearm in a concealed manner and if they have a valid gun permit.

As indicated above, *see*, Discussion I.C.3, *supra,* the Court finds that Plaintiffs do not have standing to challenge N.Y. Penal Law § 400.00(15) with respect to open carry. Even assuming, arguendo, that Plaintiffs had standing to bring this challenge and request a preliminary injunction, their request would be denied.

Undertaking the first step of the *Bruen* analysis, the Court agrees with Plaintiffs' point that the text of the Second Amendment does plainly cover Plaintiffs' purported right to publicly carry, as indicated by the Court in the *Bruen* decision. *Bruen*, 142 S.Ct. at 2135 ("The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense."). While the text of the Second Amendment itself does not explicitly say anything about open or concealed carry, it is not difficult to find that the term "'bear' arms" means to cover either public concealed or public open carry. *See id*. (the Second Amendment guarantees a general right to public carry).

Regarding the second step of the *Bruen* analysis – a review of historical traditions, Plaintiffs argue that the manner of public carry was not regulated in 1791, and that "[i]t was not until "the early to mid-19th century, [that] some States began enacting laws that proscribed the concealed carry of pistols and other small weapons." (Pls.' Reply at 7–8.) However, as correctly pointed out by the Defendants, the Supreme Court has already stated that "[t]he historical evidence from antebellum America does demonstrate that the *manner* of public carry was subject to reasonable regulation . . . . State's could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly." *Bruen*, 142 S. Ct. at 2150 (emphasis in original). Because New York does allow concealed carry so long as the individual has a proper license, Plaintiffs cannot properly argue, as they try to do, that New York has no way to allow people to public carry. (*See* Pls. Br. at 18.) The fact that the manner in which New York allows public carry – concealed rather than open – is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional. Therefore, the Court finds that the Plaintiffs are unlikely to succeed on the merits with respect to their challenge to enforcement against open carry.

Accordingly, the Court denies Plaintiff's motion for preliminary injunction as to its challenge N.Y. Penal Law § 400.00(15) regarding open carry.

### 3. Challenge to N.Y. Penal Law § 265.01-d

Plaintiffs challenge N.Y. Penal Law § 265.01-d [the "Private Property Provision"], which covers the following two locations: (1) all privately owned property that is not open for business to the public (and that is not a "sensitive location" under N.Y. Penal Law § 265.01-e); and (2) all privately owned property that is open for business to the public (and that is not a "sensitive location" under N.Y. Penal Law § 265.01-e). The law criminalizes a license holders' entrance

into, or remaining on, those retail commercial establishments in New York State that "(1) have not been deemed "sensitive locations" by [N.Y. Penal Law § 265.01-e], (2) operate on privately owned property, and (3) are unable for whatever reason (such as time constraints) to give express consent to each license holder on their doorstep other than by posting a sign containing a controversial message that must (by definition) be visible to all persons passing by (including potential "anti-gun" customers)." *Antonyuk*, 2022 WL 16744700, at *78.

It bears noting that two courts in this Circuit have already issued a preliminary injunction enjoining the enforcement of N.Y. Penal Law § 265.01-d. *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *12 (W.D.N.Y. Nov. 22, 2022) ("Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing all of N.Y. Penal Law § 265.01-d with respect to private property open to the public, and their regulations, policies, and practices implementing it.")); *Antonyuk v. Hochul*, 2022 WL 16744700, at *86 (enjoining prohibition on carrying in "the 'restricted locations' provision contained in Section 5 of the CCIA except for fenced-in farmland owned by another or fenced-in hunting ground owned by another).

Both cases are currently on appeal before the Second Circuit. *See Antonyuk et al., v. Hochul, et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022); *Christian v. Nigrelli*, C.A. No. 22-2987 (2d Cir. filed Nov. 23, 2022). As of the date of this Opinion, the Second Circuit has stayed the Northern District of New York's injunction pending resolution of the appeal, which was affirmed by the Supreme Court. *See Antonyuk et al.*, C.A. No. 22-2908 at ECF No. 76 (issued Dec. 7, 2022), *affirmed*, 598 U.S. __ (issued Jan. 11, 2023) (No. 22A557).

Because the same issue regarding the constitutionality of N.Y. Pen. L. § 265.01-d is currently being reviewed by the Second Circuit, the Court will STAY resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in *Antonyuk* and *Christian* as to this issue. *See McCracken v. Verisma Sys., Inc.,* No. 6:14-CV-06248, 2018 WL 4233703, at *2 (W.D.N.Y. Sept. 6, 2018) ("It is within the sound discretion of a district court to enter a stay pending the outcome of independent proceedings that are likely to affect a case on its calendar") (citations omitted); *see also Christian v. Nigrelli*, No. 22-CV-695 (JLS), ECF No. 60 (W.D.N.Y. Dec. 21, 2022) (staying resolution of portions of plaintiffs' motion for preliminary injunction pertaining to public parks and public transportation pending resolution by the Second Circuit in *Antonyuk v. Hochul*).

### 4. Challenge to specific portions of N.Y. Penal Law § 265.01-e

As indicated above, *see supra*, Plaintiffs have standing to challenge several provisions in N.Y. Penal Law § 265.01-e, which prohibits carrying in certain "sensitive locations," based on their allegations on where they have or intend to frequent. (*See* Jason Frey Decl. ¶¶ 14–15, 18–19, 27; Brianna Frey Decl. ¶¶ 12–14, 17–18; William Sappe Decl. ¶¶ 7, 13.) Specifically, the Court will consider their challenge to the following provisions: (i) public parks, § 265.01-e(2)(d); (ii) theaters, § 265.01-e(2)(p); (iii) public transportation (MTA subway and train cars), § 265.01-e(2)(n); (iv) restaurants with on-premises alcohol consumption, § 265.01-e(2)(o); and (v) Times Square, Penal Law § 265.01-e(2)(t).

Currently, in *Antonyuk et al., v. Hochul, et al*., C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), the Second Circuit is reviewing an appeal by the State Defendant and other officials that overlaps with issues presented in this subsection, namely and among other things, the injunction imposed by the court in *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700

(N.D.N.Y. Nov. 7, 2022) against the enforcement of § 265.01-e(2)(d) [prohibiting guns in pubic parks]; 265.01-e(2)(o) [prohibiting guns in restaurants with on-premises alcohol consumption]; and § 265.01-e(2)(p) [prohibiting guns in theaters]. The Court will stay resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in *Antonyuk* with respect to these three provisions. It is worth noting that the Second Circuit has stayed the Northern District of New York's injunction against enforcement of the gun laws with respect to §§ 265.01-e(2)(d), (o), and (p) pending resolution of the appeal, which was affirmed by the Supreme Court. *See Antonyuk et al.,* C.A. No. 22-2908 at ECF No. 76 (issued Dec. 7, 2022), *affirmed,* 598 U.S. __ (issued Jan. 11, 2023) (No. 22A557).

Therefore, the only subsections that the Court will evaluate are § 265.01-e(2)(n) which bans firearms in public transportation, including MTA subway cars and train cars and § 265.01-e(2)(t) which bans the carrying of firearms in the Times Square area. For the foregoing reasons, the Court DENIES the preliminary and permanent injunction as to § 265.01-e(2)(n) and § 265.01-e(2)(t).

### a. N.Y. Penal Law § 265.01-e(2)(t): Times Square

On the first step of the *Bruen* analysis, the Court finds that Plaintiffs met their burden of showing that the prohibition against carrying arms in the Time Square area implicates the text of the Second Amendment. *See Bruen*, 142 S.Ct. at 2134.

Moving on to the second step of the *Bruen* analysis, the Court finds that Defendants have sufficiently met their burden of establishing that there is a historical tradition of banning firearms in regularly congested commercial areas. For this reason, the Court DENIES Plaintiffs' motion for preliminary and permanent injunction with respect to N.Y. Penal Law § 265.01-e(2)(t).

**A174**

Known to many as the "Crossroads of the World," the iconic Times Square is a major hub for commercial and cultural activities, known for its plentiful shopping, street vendors, entertainment, and displays of public art, which attracts residents and visitors alike. *See* https://www.timessquarenyc.org/locations/shopping and http://arts.timessquarenyc.org/times-square-arts/index.aspx (last visited November 21, 2022). Times Square is also recognized as an important space for public gatherings and is often highly congested— for example, in September 2022, there were an average of 312,611 daily visitors to Times Square (Ciappetta Decl., Exh. 17) and in 2021, Times Sq-42 St was the busiest of the 472 subway stations in New York City's transit system. *See* https://www.nyc.gov/site/cecm/permitting/times-square.page.[7]

The State and City Defendants present a number of laws between 1328 to 1903 that show a historical tradition of banning firearms in "fairs" or "markets" or areas that large crowds, which appears to address places with characteristics akin to those found in Times Square. First, Defendants point to a 1328 law from Northampton, England barring arms in "fairs, markets…" Statute of Northampton, 2 Edw. 3, ch. 3 (1328), reprinted in 1 THE STATUTES OF THE REALM 258 (*See* SMP, Exh. AA). A 1328 law from England is too remote from the relevant time period to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868, *see Antonyuk*, 2022 WL 16744700, at *37 n.66, but as the City Defendants point out, there are two additional laws—a 1786 law in Virginia and a 1792 law in North Carolina—which also contains a "fairs" and "markets" prohibition and that traces in relevant part the 1328 Northampton, England law with the same or similar language. (City Defs.' Opp. at 25–26; Ciappetta Decl., Exh. 12.); *see also* 1786 Va. Laws 33, ch. 21, An Act Forbidding and

---

[7] The boundaries of Times Square are set forth in the emergency rules signed by New York City Mayor Eric Adams and NYPD Commissioner on Sewell on August 23, 2022, and published in The City Record on August 31, 2022 (Ciappetta Decl., Exh. 1.).

**A175**

Punishing Affrays ("[N]o man, great nor small, [shall] go nor ride armed by night nor by day, in fair or markets ... in terror of the Country...."); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence . . . be so hardy to . . . ride armed by night nor by day, in fairs [or] markets . . . ."). According to 1790 census data (*i.e.* from the founding era period), Virginia contained about 17.6% of the American population (691,737 people out of 3,929,214 people), and North Carolina contained about 11% (393, 751 out of 3,569,100 people). *See* Richard L. Forstall, Dep't of Commerce, Population of States and counties of the United States: 1790-1990, available at https://www2.census.gov/library/publications/decennial/1990/population-of-states-and-counties-us-1790-1990/population-of-states-and-counties-of-the-united-states-1790-1990.pdf. The fact that around 28.6 % (as estimated by this Court) of total American population in the founding era period "were governed by such laws regulating the carrying of firearms in 'fairs' or "markets' lends support to Defendants' arguments that the tradition of prohibiting arms in places resembling "markets" and "fairs" was sufficiently well-established and representative during the founding era. *See also Antonyuk*, 2022 WL 16744700, *37 n.66 ("The fact that 31.9 percent of Americans in 1791 were governed by such laws regulating the carrying of firearms in "fairs" or "markets" (albeit one of which was limited to terroristic behavior) would appear to shed some light on the public meaning of the words "keep and bear arms" in Second Amendment when it was adopted. ").

The Court also considers other laws from the latter half of the 19th Century that prohibited firearms involving instances where there are public gatherings engaged in recreational, entertainment, or expressive purposes. While not as persuasive as the founding era laws described above (particularly those coming from the late 19th century), these laws support Defendants'

arguments that there was an ongoing trend in American history of banning firearms in locations where people heavily congregate. For example, the Defendants point to an 1869 Tennessee law that prohibited both open and concealed carry at any "fair, racecourse, or other public assembly of the people…." (Ciappetta Decl., Exh. 13.) The City Defendants also present a similar 1870 Texas law that encompassed churches, schools, ballrooms, social parties, election sites, and the catchall language "other public assembly" (Ciappetta Decl., Exh. 14), and which also appears to have served as a model for other laws such as follows: Missouri (1883) (prohibiting concealed carry "where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary, or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other assemblage of persons met for any lawful purpose . . ."), Arizona (1889 and 1901), Oklahoma (1890), and Montana (1903). (*See* Ciappetta Decl., Exh. 15; *see also* SPM Decl. Exhs. V (1870 Texas law), X (1889 Arizona law), Y (1890 Oklahoma law). Lastly, the City Defendants provide copies of laws in Georgia (1879) and Idaho (1889), which adopted their own sensitive location statutes prohibiting firearms in places of public assembly or public gatherings. (Ciappetta Decl., Exhs. 5 and 16.)

The Court is therefore persuaded by the Defendants' argument that N.Y. Penal Law § 265.01-e(2)(n) is in line with the historical tradition of banning firearms in locations where large groups of people are congregated for commercial, social, and cultural activities. These laws appear to recognize that the presence of groups of people, often in confined spaces, renders a location uniquely vulnerable to firearm violence.

During oral argument, Plaintiffs' counsel argued that N.Y. Penal Law § 265.01-e(2)(n) is overly burdensome, and pointed to the fact that William Sappe often needs to drive through Times

Square while employed as an armed guard for businesses in the New York City Diamond District (which falls just outside of Times Square), and that Sappe and similarly situated individuals would be at risk of facing felony charges. Putting aside the fact that Sappe did not allege in his declaration that he has attempted to secure a New York City gun permit at all since the enactment of the CCIA, the Court would not find it burdensome for similarly situated individuals who do have permission to carry guns in New York City to drive around the congested Times Square area in order to avoid running afoul of § 265.01-e(2)(n). The Court also notes that N.Y. Penal Law § 265.01-e provides numerous exceptions for individuals who need to have guns on them in sensitive locations, including the following: (i) persons licensed under N.Y. Penal Law § 400.00 2(c) ("have and carry concealed while so employed by a messenger employed by a banking institution or express company") while in the course of his or her official duty; and (ii) security guards as defined by and registered under article seven-A of the general business law, who have been granted a special armed registration card, while at the location of their employment and during heir work hours as such a security guard. *See* N.Y. Penal Law § 265.01-e(3)(e) and (g). While neither of the parties argued whether Sappe could fall under any of the exceptions had he carried a valid New York City gun permit, the fact that these exceptions exist belies Plaintiffs' argument that N.Y. Penal Law § 265.01-e is overly burdensome. Therefore, the Court does not find that Plaintiffs have established a substantial likelihood of success on the merits to challenge N.Y. Penal Law § 265.01-e(2)(n).

### b. N.Y. Penal Law § 265.01-e(2)(n): Subway and Rails

The Court finds that the Second Amendment's plain text covers the conduct in question (*i.e.* carrying a concealed handgun for self-defense in public in "subways" and "train cars"). *Bruen*, 142 S.Ct. at 2134. Therefore, under *Bruen*, Defendants must rebut the presumption of

**A178**

protection against the regulation by showing that the law is consistent with the Nation's historical tradition of firearm regulation.

As the City Defendants indicate, the New York City subway system consists of 6,455 subway cars, 665 miles of track and 472 stations, the most of any public transit subway system in the world.  *See*  https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 (last visited Nov. 28, 2022). The first stage of the New York City subway system opened in October 1904, with nine miles and twenty-eight stations. *See* HISTORY, The Race to Construct the First Subway: The Engineering that Built the World (S1), at 05:22, YOUTUBE, https://www.youtube.com/watch?v=cVBhvKxw4ow.  On an average weekday in 2019, the last year before the Covid-19 pandemic, the system's ridership was nearly 5.5 million, and in the same year, there were almost 1.7 billion total riders.  *See id*.

In summary, the Defendants argue that N.Y. Penal Law § 265.01-e(2)(n) should be upheld as to the MTA subway system and train rails because: (i) the government has the right to control whether firearms are allowed on its property; (ii) there is historical support for firearm prohibition on trains; (iii) subways and the rails  are also places where large crowds are gathered; and (iv) the MTA system plays an integral role in the school system and must be afforded the same protections as schools, which are paradigmatic sensitive places because of the presence of children.  (State Def.'s Opp. at 37–43; City Defs.' Opp. at 38–40.)

As discussed during oral argument, the City Defendants are correct that the MTA subway system and rails, which obviously did not exist during the founding era or during the enactment of the Fourteenth Amendment, presents an issue that implicates "unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach," *Bruen*, 142 S. Ct. at 2132.  As indicated by the City Defendants, however, the Supreme Court did not explain what

such an approach would entail. The City Defendants argue that the "nuanced approach" should entail "identify[ing] historical laws that have a similarity of purpose to the modern regulation, even if the historical analogue regulated a different subject. (City Defs.' Opp. at 37.) *See also Antonyuk*, 2022 WL 16744700, at \*41 ("nuanced approach" "essentially mean[s] broaden its conception of what constitutes an "analogue" and focus its attention on the justification for, and burden imposed by, it"). As such, the Court will consider historical laws that are analogous in purpose.

### *Government-as-proprietor*

First, the State and City Defendants argue that just as it is well-established that the government has the power to exclude firearms from "government buildings" such as courthouses and legislative buildings, such right should also extend to the MTA's subway cars and rails, all of which are quasi-governmental. (*See* Ciappetta, Exh. 23)[8] (City Defs.' Opp. at 35.) *See Heller*, 128 S. Ct. at 2786 ("The Court's opinion should not be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings . . . ."); *Bruen*, 142 S. Ct. at 2118 ("courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible."). The City Defendants aver that the application of § 265.01-e to relatively modern forms of public transportation, simply continues the longstanding tradition of allowing the government to regulate gun carrying on its own property.[9]

---

[8]     The New York City subway system is owned by the City of New York and leased to the New York City Transit Authority, a public-benefit corporation, to operate. This arrangement is pursuant to a lease that was first executed in 1953. (Ciappetta Decl., Exh. 23.).

[9]     The State Defendant makes similar arguments with respect to public parks, averring that because federal, state, and local governments have long prohibited deadly weapons in government-owned parks, and several statutes contain language covering public functions, that subways and rails should fall within that purview. As indicated, this issue is on appeal before the Second Circuit in *Antonyuk et al., v. Hochul, et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

# A180

During oral argument, the State Defendant's counsel argued that "government buildings" should stretch to encompass the MTA's subways and rails. The State Defendant's counsel highlighted *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015), where the Tenth Circuit found that the government could prohibit guns in a U.S. Postal Service building as a "government building." *Id*. at 1125. The State Defendant's counsel, moreover, emphasized that the Tenth Circuit had found that the government could also prohibit guns in the parking lot adjacent to the U.S. Postal Service building. *Id*. at 1126 ("the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis. The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service)."). Notably, however, the Tenth Circuit's finding with respect to the building's adjacent parking lot was made under the pre-*Bruen* standard, *i.e.* an intermediate scrutiny analysis. *Id*. at 1126. In its opposition papers, the State Defendant also cites to *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), where the D.C. Circuit found that a federal statute prohibiting possession of firearms on U.S. Capital grounds, as applied to the facts of that case, did not violate Second Amendment rights, and stated that "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property."). *Id*. at 464. The court came to that conclusion after finding, *inter alia*, that "Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government," and therefore could "consider the lot as a single unit with the Capitol building, and conclude that the lot is a 'sensitive' place where firearms prohibitions are presumptively lawful." *Id*. at 464.

Two interesting questions arise: (i) whether the MTA subway and rail system should be considered a "government building" and therefore a *per se* a sensitive area; and (ii) whether post-*Bruen*, the government, as proprietor, can prohibit guns in any of its property without regard to any historical tradition consideration and regardless of whether such property can be properly deemed a "government building."  The Court, however, finds that neither question needs to be answered, because Defendants have established a sufficient historical tradition, in the specific context of the rail systems, showing that proprietors of rail systems had authority to lay out their own gun-carrying restrictions within their train cars.

As discussed by the State Defendant's historian, there was no public transportation as such during the relevant time period; instead, train travel was provided by private transportation systems until the 20th century, sometimes operating under a government charter.  (Rivas ¶¶ 13–17.).  As indicated by Rivas, "carriage would have been would have been subject to any rules laid out by the private transportation company in question.  Private companies would have had the authority to decide where and how legally transported weapons."  (*Id.* ¶ 13.)

While admitting that the opportunity to conduct thorough historical research was limited due to the time constraints of a preliminary injunction schedule and the fact that certain of the historical research involves in-person review of in paper archives, (State Def. Opp. at 43), the State Defendant and his expert historian, Brennan Rivas, provide examples of gun-carrying restrictions imposed by private rail companies against passengers on their trains.  For example, the State Defendant's expert points to the North Pennsylvania Railroad's June 1875 "rules and regulations" which stated that that conductors must prevent passengers from taking "into the cars guns, dogs, valises, large bundles or baskets." (Rivas. ¶ 13.)  Rivas also describes that rail companies tended to ship sporting firearms for hunters and treat them like baggage, therefore separating them from

the passenger. (*Id.* ¶ 14.) Lastly, Rivas describes that several states, including Georgia, Ohio, and Pennsylvania, set out parameters in the late 19th century allowing railway personnel to possess and exercise powers of policemen or to employ their own police forces in order to enforce relevant laws, including laws regarding firearms, to ensure peace and safety of passengers in transit. (*Id.* ¶¶ 15–16.)

Taking the "nuanced approach" required in this context of the MTA subway and rails, the Court finds that an adequately analogy could be made between (i) the fact that historically, the rail systems were privately owned and that "[p]rivate transportation companies possessed the power to create their own reasonable customer/passenger rules, which in at least some instances included prohibitions against the presence of guns in passenger cars" (Rivas ¶ 20) and (ii) the fact the MTA subway and rails are government owned and operated, and therefore the government as proprietor can impose its own restrictions on gun-carrying upon its passengers.[10]

Coupled with the indication, as discussed directly below, that there is a tradition of prohibiting firearms in highly congested settings presenting a high risk of violence (which undoubtedly describes the MTA subway system), the Court finds that a preliminary injunction is not warranted here with respect to N.Y. Penal Law § 265.01-e(2)(n).

### *Prohibition of Firearms in Congested Locations*

The City Defendants argues that the Court should look at laws that regulated the presence of firearms in populated spaces, stating that doing so is more informative than trying to analogize

---

[10]     State Defendant and Rivas also point to several cases involving laws that prohibited carrying guns on one's person except for during long-distance travel. (State Def. Opp. at 41–42; Rivas ¶¶ 6–13.) The Court points out that two of the cases cited do not support the State Defendant's arguments that guns were completely prohibited while traveling short distances in certain jurisdictions. *See Willis v. State*, 105 Ga. 633 (1898) ("Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol, dirk, sword in a cane, spear, bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense, shall be guilty of a misdemeanor."); *Eslava v. State*, 49 Ala. 355 ("If the necessity existed only while he was travelling, then, if after he reached the city and had a reasonable opportunity of divesting himself of the weapon, or of changing the manner of carrying it so as not to offend the statute, he continued to bear it concealed about his person, he is guilty as charged).

this law with regulations concerning early forms of transportation such as trolleys, omnibuses, or horse carts.  (City Defs.' Opp. at 37.)  The City Defendants aver that this approach "recognizes the unique nature of modern life and eliminates the need to make comparisons between things that only bear a superficial similarity (trolleys and subway cars)."  (*Id*.)

The State Defendants point to the same laws described above in the N.Y. Penal Law § 265.01-e(2)(t): Times Square (Discussion II.A.4.a, *supra*), arguing that there is a historical tradition of banning firearms in highly crowded locations where the risk of violence is high. While those laws do not relate to public transportation, the Court does find persuasive Defendants' argument that N.Y. Penal Law § 265.01-e(2)(n) is consistent with those laws, considering that a main concern animating the gun restrictions in the MTA subways and rails is the high amount of foot traffic and related safety issues.   (City Defs.' Opp. at 37–38; State Def. Opp. at 31–33.)

### *Subways as part of the school system*

The Court is less persuaded by Defendant's argument that because the MTA public transportation system "plays an integral role in the school system," it "must be afforded the same protections as the school system."  (State Def. Opp. at 39.)   On one hand, schools are a paradigmatic sensitive place because of the presence of children.  *See Class*, 930 F.3d at 465, *Heller*, 554 U.S. at 626; *McDonald,* 561 U.S. at 786.  Indeed, *Bruen* "assume[d] it settled that" schools full of children "were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S.Ct. at 2133; *see also id*. at 2157 (Alito, J., concurring).

In addition, Defendants present data indicating that New York City has over 1.1 million students at more than 1,800 schools, *see* Explore NYC Schools, N.Y. City Council, https://council.nyc.gov/data/school-explorer/ (last accessed on Nov. 29, 2022), and conjectures that "there could be over 1.1 million students traveling on the MTA system."  (State Def.'s Opp.

at 40.)   The Court also recognizes that the MTA system plays an important indirect role in the school system. The Court is nonetheless not prepared to state the MTA subway and rails should be considered "sensitive places" just by virtue of its connection with the school system, particularly as Defendants do not show that the MTA subways and rails are "densely populated" by children the way schools are.  *See, e.g., Antonyuk*, 2022 WL 16744700, at *25 ("the State Defendants adduce no evidence that those shelters are as densely populated by children as are schools").

**B.  Irreparable Harm**

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).  "[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co*., 934 F.2d 30, 34 (2d Cir. 1991).

In addition, "[i]n the Second Circuit ... [the] presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Joglo Realties, Inc. v. Seggos*, 16-CV-1666 (ARR)(CLP), 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016). Instead, "[b]ecause the violation of a constitutional right is the irreparable harm asserted [ ], the two prongs of the preliminary injunction threshold merge into one" and "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000). As the Second Circuit has held that it is "more appropriate to determine

irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights," *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997), the alleged violations of Plaintiffs' Second Amendment rights, by themselves, are not sufficient to show irreparable harm.

As discussed above, Plaintiff has failed to show a likelihood of success with respect to its challenges against N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.03(3), §§ 265.01-e(2)(n) and 265.01-e(2)(t), and NYC Admin. Code § 10-315, Plaintiff therefore fails to show that they will suffer irreparable harm without an injunction against those statutes.

### C. Balance of Hardships and Public Interest

Putting aside the issues which the Court stays its resolution on pending Second Circuit review in analogous cases, the Court otherwise finds that a preliminary injunction is not in the public interest.

When the Government is the opposing party, irreparable harm and public interest factors merge. *See Nken v. Holder,* 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009). As stated above, because Plaintiffs failed to show a likelihood of success of the merits with respect to the aforementioned statutes, Plaintiffs therefore cannot show that the balance of hardships tips in their interest.

### <u>CONCLUSION</u>

For the foregoing reason, Plaintiffs' motion for preliminary injunction is DENIED in part, and STAYED in part, as follows:

- The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of N.Y. Penal Law §§ 400.00(6), 400.00(15), 265.01, 265.01-b, 265.03(3), and NYC Admin. Code § 10-315.

- The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of N.Y. Penal Law §§ 265.01-e(2)(n) (with regards to the MTA subway and rails) and 265.01-e(2)(t).

- The Court STAYS its decision on the preliminary injunction motion with respect to Plaintiff's challenge of N.Y. Penal Law §§ 265.01-d, 265.01-e(2)(d), 265.01-e(2)(p), and 265.01-e(2)(o) pending resolution by the Second Circuit in *Antonyuk et al., v. Hochul, et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

The parties are DIRECTED to submit a letter to the Court once a resolution is reached in *Antonyuk et al., v. Hochul, et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), which may impact the Court's resolution on the preliminary injunction motion with respect to Plaintiff's challenge of N.Y. Penal Law §§ 265.01-d, 265.01-e(2)(d), 265.01-e(2)(p), and 265.01-e(2)(o).

Dated:   March 13, 2023                   SO ORDERED:
          White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge