# 23-365

## United States Court of Appeals
## for the Second Circuit

JASON FREY, BRIANNA FREY, JACK CHENG, WILLIAM
SAPPE,

*Plaintiffs-Appellants,*

*against*

NEW YORK CITY, NEW YORK, KEECHANT SEWELL, in her
Official Capacity, STEVE NIGRELLI, In Her Official
Capacity,

*Defendants-Appellees,*

[*caption continued on inside cover*]

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR NEW YORK CITY APPELLEES**

RICHARD DEARING
CLAUDE S. PLATTON
ELINA DRUKER
  *of Counsel*

September 19, 2022

HON SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for New York City
Appellees
100 Church Street
New York, New York 10007
212-356-2609 or -2502
edruker@law.nyc.gov

Reproduced on Recycled Paper

*[continued caption]*

KEVIN BRUEN, Acting Superintendent of the New York
State Police, DERMOT SHEA, in his Official Capacity as
NYPD Police Commissioner,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT .................................................................. 1

ISSUE PRESENTED FOR REVIEW ........................................................ 4

STATEMENT OF THE CASE .................................................................. 4

    A. Passage of the CCIA following the Supreme Court's
       decision in *Bruen* .......................................................... 4

    B. Plaintiffs' challenge to the State and City's gun laws and
       the district court's denial of their third motion of a
       preliminary injunction ................................................... 8

SUMMARY OF ARGUMENT  AND STANDARD OF REVIEW .......... 12

ARGUMENT ........................................................................................ 15

    POINT I .......................................................................................... 15

    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR
    SECOND AMENDMENT CLAIMS................................................. 15

    A. Section 400.00(6)'s prohibition of carrying firearms in
       New York City without a license issued by the City's
       police commissioner is lawful. .................................... 16

       1. Plaintiffs' challenge to Penal Law § 400.00(6) fails at
          *Bruen*'s first step. .................................................. 17

       2. Penal Law § 400.00(6) easily passes muster under
          *Bruen*'s second step. ............................................ 20

i

# TABLE OF CONTENTS (cont'd)

**Page**

B.  Plaintiffs are unlikely to succeed on their claim that Section 400.00(15) impermissibly penalizes open carry by concealed-carry license holders. ................................................ 26

   1. Plaintiffs lack standing to pursue this injunctive relief. ..... 26

   2. To the extent Section 400.00(15) criminalizes open carry, it is entirely consistent with Second Amendment. .......................................................................... 29

C.  Plaintiffs are unlikely to succeed on their challenge to Penal Law § 265.01-e(2)'s designation of Times Square and public transportation as sensitive places. ........................ 36

   1. The prohibition of carrying firearms in Times Square is consistent with the nation's historical tradition of firearms regulations.............................................................. 38

   2. The prohibition of carrying firearms on public transportation is also consistent with the nation's historical tradition of firearms regulations. ........................ 43

POINT II ................................................................................ 53

THE OTHER FACTORS ALSO WEIGH AGAINST INJUNCTIVE RELIEF ................................................ 53

CONCLUSION ......................................................................... 58

CERTIFICATE OF COMPLIANCE ....................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

*Bonidy v. United States Postal Serv.,*
   790 F.3d 1121 (10th Cir. 2015) .......................................................... 47

*Calcano v. Swarovski N. Am. Ltd.,*
   36 F.4th 68 (2d Cir. 2022) ........................................................... 27, 28

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011) .............................................................. 56

*Dist. of Colum. v. Heller,*
   554 U.S. 570 (2008) ................................................................. *passim*

*Green Haven Prison Preparative Meeting of Religious Soc'y of*
   *Friends v. N.Y.S. Dep't of Corr. & Cmty. Supervision,*
   16 F.4th 67 (2d Cir. 2021) .......................................................... 12, 27

*Kachalsky v. Cnty. of Westchester,*
   701 F.3d 81 (2d Cir. 2012) ........................................................... 5, 29

*MacWade v. Kelly,*
   460 F.3d 260 (2d Cir. 2006) .............................................................. 51

*Maryland v. King,*
   133 S. Ct. 1 (2012) ........................................................................ 55

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ......................................................... 23, 34, 36, 37

*Munaf v. Geren,*
   553 U.S. 674 (2008) ...................................................................... 12

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ......................................................... 16, 19

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ............................................................. *passim*

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Owens v. State,*
   3 Tex. Ct. App. 404 (1878) .................................................... 46

*People v. Thompson,*
   92 N.Y.2d 957 (1998).............................................................. 7

*Porter v. State,*
   1 Tex Ct. App. 477 (1877) .................................................... 46

*State v. Jumel,*
   13 La Ann 399 (1858)............................................................ 32

*Strange v. Searcy,*
   574 U.S. 1145 (2015) ............................................................. 55

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019) ............................................... 48

*United States v. Smith,*
   945 F.3d 729 (2d Cir. 2019) ............................................ 28, 29

*Vitagliano v. Cnty. of Westchester,*
   71 F.4th 130 (2d Cir. 2023)............................................. 27, 28

*Waldman Publ'g Corp. v. Landoll, Inc.,*
   43 F.3d 775 (2d Cir. 1994) .................................................... 57

*We the Patriots USA, Inc. v. Hochul,*
   17 F.4th 266 (2d Cir. 2021) (per curiam) ........................ 12, 53

**Present-Day Statutes, Rules, and Regulations**

Concealed Carry Improvement Act, 2022 N.Y. Laws ch. 371 ................. 4

N.Y. Penal L. §§ 265.01-265.04 .................................................. 5

N.Y. Penal L. § 265.01-e(2)................................................... *passim*

iv

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

N.Y. Penal L. § 265.20(a)(3) ........................................................ 5

N.Y. Penal L. § 400.00(2)(f) ................................................... 5, 29

N.Y. Penal L. § 400.00(3)(a) ........................................................ 6

N.Y. Penal L. § 400.00(6) ..................................................... *passim*

N.Y. Penal L. § 400.00(15) ................................................... *passim*

38 RCNY §§ 5-01 *et seq.* ............................................................ 6

38 RCNY § 5-05 ............................................................................ 6

**Historical Laws**

1786 Va. Acts 35. (Ch. 49, An Act Forbidding and Punishing
    Affrays), https://perma.cc/AY87-FHEG .............................. 31

1825 Tenn. Priv. Acts 306-07, An Act to Amend an Act
    Passed at Murfreesboro, October 20, 1821, Incorporating
    Winchester and Reynoldsburgh, ch. 292, § 3,
    https://perma.cc/DA9X-DXR9 .............................................. 24

1883 Wis. Sess. Laws 1017, An Act To Incorporate The City
    of Nicolet, ch. 351, § 32(27), https://perma.cc/3V2Q-2CB8 ............... 24

1869-70 Tenn. Pub. Acts 23-24, ch. 22, § 2 ............................... 46

*A Digest of the Laws and Ordinances for the Government of
    the Municipal Corporation of the City of Reading,
    Pennsylvania* 240 (1897), https://perma.cc/VT3W-3VW7 .................. 41

*An Ordinance Respecting Public Balls, New Orleans, LA*
    (Passed 27 Oct. 1817), https://perma.cc/75B4-R5PU .......................... 46

v

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes* (1792), § 8, https://perma.cc/AB39-9VWX ............................................. 22

*City of Trenton, New Jersey, Charter and Ordinances* 390 (1903), https://perma.cc/R2EN-XND3 ................................. 41

Elliott Fitch Shepard, *Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority,* https://perma.cc/J5SM-SGD4 ................................................................................ 24

Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61* (Newbern 1792), https://perma.cc/H8W9-U9WY ................................................................................ 31

*New Mexico Act Prohibiting the Carrying of Weapons Concealed or Otherwise*, 1864-65 N.M. Laws 406 (Feb. 2, 1860) ................................................................................ 46

### Other Authorities

Ass'n of American Railroads, https://perma.cc/FW4P-3BVN ............. 50

*History of Education in the United States*, Wikipedia (Sept. 19, 2023), https://perma.cc/AU3H-A8BG. ........................................ 50

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U.L. Rev. 139 (2021) ..................................... 40

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ................ 25

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation* YALE L.J. (*forthcoming*) (July 27, 2023), https://ssrn.com/abstract=4522818 ..................................................... 48

Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century,* SSRN, (Jan. 15, 2013), https://ssrn.com/abstract=2200991 ..................................................... 24

*Metro-North Railroad,* WIKIPEDIA, (Sept. 19, 2023), https://perma.cc/PER2-PYQU .......................................................... 44

MTA Press Release: *New York City Transit President Davey Welcomes NYC Students Back to the Transit System* (Sept. 8, 2022), https://perma.cc/X56R-X27D ................................................ 45

MTA *Subway and Bus Facts 2019* (Apr. 2020), https://perma.cc/R8TA-ZK9L ........................................................... 44

https://www.nasdaq.com/marketsite ...................................................... 39

National League of Cities, *Principles of Home Rule for the 21st Century*, 100 N.C.L. REV. 1329 (June 2022) .............................. 23

Patrick Charles, *Article: The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373 (2016)......................................... 22

*Public Transportation Ridership Report*, Q4 2022, AM. PUB. TRANSP. ASS'N, https://perma.cc/P8M9-EW4F ................................... 44

Ruth Weissmann et al., *Lit firecracker thrown into subway train sparks morning commute chaos,* NEW YORK POST (May 31, 2019), https://perma.cc/PGJ6-JDAX .................................. 45

Times Square, WIKIPEDIA (Sept. 6, 2023), https://perma.cc/6ER6-FA4A ...................................................... 39, 42

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*World Population*, UNITED STATES CENSUS BUREAU (Dec. 2022), https://perma.cc/T7RJ-8XL3......................................................44

## PRELIMINARY STATEMENT

Plaintiffs seek to enjoin enforcement of several provisions of New York State's statutes addressing the licensing and carrying of concealed firearms, including provisions that were amended in the wake of the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). The U.S. District Court for the Southern District of New York (Román, J.) denied their motion for a preliminary injunction, largely because they are unlikely to succeed on the merits of any of their Second Amendment claims. This Court should affirm.

As the district court correctly held, the claims that plaintiffs press on appeal lack merit. The State's requirement that New York concealed-carry licensees who reside outside New York City obtain a special permit from the City's licensing officer to carry firearms in the City easily overcomes Second Amendment scrutiny. *Bruen* expressly approved of shall-issue licensing requirements so long as they are not administered in a way that prevents law-abiding, responsible individuals from carrying firearms. Plaintiffs object to having to apply at all, not to how the requirement is being administered. Because they have never claimed that the special-permit requirement prevents law-abiding, responsible

individuals from publicly carrying firearms in the City, their claim does not register under the Second Amendment. Even if it did, the requirement is fully consistent with our nation's history and tradition of firearms licensing.

Likewise, plaintiffs' challenge to the State's determination to allow concealed carry—and not open carry—by licensed individuals is unlikely to succeed. The district court correctly found that plaintiffs lack standing to pursue an injunction on this point. Even if they had standing, the Supreme Court expressly approved of regulations of the manner of public carry as consistent with the history of firearms regulation.

Finally, this Court need not reach plaintiffs' challenge to the State's designation of Times Square and public transportation (subways and commuter rail) as sensitive places where firearms are prohibited. Because the special-permit requirement easily withstands scrutiny, and plaintiffs do not dispute that they don't have special permits, they cannot ride trains or be in Times Square armed because they cannot lawfully carry firearms anywhere in the City. In any event, the designation of these sensitive places withstands Second Amendment scrutiny because these settings are relevantly similar to crowded public fairs and

2

gathering places where firearms were prohibited since long before the nation's founding. Moreover, the City's subway and Metro-North commuter rail are akin to crowded indoor spaces where people were historically disarmed. What's more, the government operates mass transit in its proprietary capacity, occupying a role formerly played by private rail operators, and those private proprietors' historical practice of prohibiting firearms is relevant in understanding the original public understanding of the right to bear arms.

Plaintiffs also are not entitled to an injunction because they failed to demonstrate that they would suffer irreparable harm without one, or that the public interest tips in favor of an injunction. Plaintiffs will not suffer a constitutional injury because they have failed to allege any viable constitutional claim. On the other side of the scale, the public interest overwhelmingly cuts against issuance of an injunction, which would sow confusion in an area of law that is flux and have the real-world consequence of pausing a set of regulatory requirements enacted to protect public safety and keep firearms out of the hands of irresponsible and non-law-abiding individuals, and away from locations where the presence firearms poses an acute risk to safety and property.

3

## ISSUE PRESENTED FOR REVIEW

Did the district court providently deny plaintiffs' motion for a preliminary injunction, where plaintiffs failed to show that they were likely to succeed on the merits and where the other preliminary-injunction factors weigh against an injunction?

## STATEMENT OF THE CASE

### A. Passage of the CCIA following the Supreme Court's decision in *Bruen*

In June 2022, the Supreme Court invalidated the "proper cause" requirement of the Sullivan Law, which had governed concealed-carry licensing in New York State for over a century. *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2156 (2022). In response, Governor Kathy Hochul immediately called a special legislative session, and, on July 1, 2022, the New York Legislature enacted the Concealed Carry Improvement Act to respond to *Bruen* and satisfy its constitutional limits (S.51001/A.41001).

The CCIA established new statewide standards for issuing concealed-carry licenses and regulating firearms more generally. *See* 2022 N.Y. Laws ch. 371; N.Y. Penal L. § 400.00 *et seq*. The legislation maintained New York's longstanding general prohibition on the

4

possession of firearms without a license, N.Y. Penal L. §§ 265.01-265.04, 265.20(a)(3), and the two types of licenses generally available to the public: premises licenses for possession in a specific home or business and concealed-carry licenses, *id*. § 400.00(2)(a)-(b), (c)-(f). The law eliminated the proper-cause requirement for a concealed-carry license, which *Bruen* had invalidated, and clarified that the existing "good moral character" licensure provision requires applicants to "hav[e] the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." *Id*. § 400.00(1).

New York law has long provided that concealed-carry licenses are "the *only* license available" to carry a handgun in public, unless based on employment and thus, by implication, the State has banned openly carrying firearms in public. *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 86 (2d Cir. 2012) (emphasis in original). The CCIA did not alter the prohibition of open carry, which has existed for over a century. N.Y. Penal L. § 400.00(2)(f).

The CCIA also maintained the State's longstanding division of labor with respect to firearms licensing. Licenses are issued at the local

5

level statewide by designated licensing officers, who are local judges in most of counties and local police officials in New York City, Nassau County, and Suffolk County. *Id*. § 265.00(10). The State Police formulate the application form to be used across most of the state. But in New York City, the NYPD's Licensing Division, as the police commissioner's designee, 38 RCNY § 5-05, devises its own application, N.Y. Penal L. § 400.00(3)(a), and promulgates its own licensing regulations, *see* 38 RCNY §§ 5-01 *et seq*.

Although concealed-carry licenses are generally effective throughout the state, there is an exception for New York City. As relevant here, Penal law § 400.00(6) provides that licenses issued by licensing officials outside of the City, other than certain employment-based licenses, are invalid in the City "unless a special permit granting validity is issued" by the City's licensing officer—the police commissioner. N.Y. Penal L. § 400.00(6). New York City-specific regulations reflect the City's unique size and population density—with roughly 8.5 million residents, the City has more residents than all but twelve states living within a mere 302 square miles.

6

The CCIA added a new provision prohibiting concealed-carry license holders, other than some law-enforcement officers, from carrying firearms in designated sensitive spaces. *Id.* § 265.01-e. Those sensitive places include, among others, government buildings, parks, schools, places of worship, public transportation, and Times Square. *Id.*

The CCIA is enforced through a mix of administrative and criminal penalties. Holders of concealed-carry licenses are generally exempt from criminal prosecution for unlawfully carrying firearms. *Id.* §§ 265.20(3), 400.00(17). If they violate license restrictions, they are subject to administrative penalties such as suspension or revocation of their licenses. *People v. Thompson*, 92 N.Y.2d 957 (1998). However, as relevant here, concealed-carry licensees may be criminally prosecuted if they violate licensing limits, including by carrying their firearms openly, which is a misdemeanor, N.Y. Penal L. § 400.00(15), or if they unlawfully possess firearms in a designated sensitive location, *id.* § 265.01-e, which is a felony.

### B. Plaintiffs' challenge to the State and City's gun laws and the district court's denial of their third motion of a preliminary injunction

Plaintiffs, Jason and Brianna Frey and William Sappe,[1] commenced this action against New York State and New York City officials[2] in June 2021 in the U.S. District Court for the Southern District of New York, a year before *Bruen* was decided, asserting a wide range of challenges to State and City gun laws (Appendix ("A") 3).[3] The Freys were issued concealed-carry licenses by local officials in Westchester County at some point before *Bruen* was decided, and Sappe, who is a licensed armed guard, was issued a concealed-carry license by Orange County officials in 2016 (ECF No. 47; A18, 24). Plaintiffs twice moved unsuccessfully for a preliminary injunction (ECF No. 20, 37, 42, 44).

After the Supreme Court decided *Bruen* and the State enacted the CCIA, plaintiffs filed the operative second amended complaint adding a

---

[1] A fourth named plaintiff did not join the preliminary-injunction motion that is the subject of this appeal.

[2] As of July 17, 2023, the NYPD commissioner is Edward A. Caban, who should be substituted in the caption in place of the former commissioner, Keechant Sewell.

[3] Appellants' Appendix omits all the State's and City's evidentiary submissions to the district court, as well as the plaintiffs' operative complaint and as-filed declarations. References in this brief to ("ECF No.") are to docket entries on the district court's electronic docket, SDNY ECF Case No. 21-cv-5334.

8

host of new allegations targeting provisions of the CCIA (ECF No. 47). They then moved for what they termed "emergency relief" (ECF No. 48), which the district court construed as their third motion for a preliminary injunction (A143).

In the district court, plaintiffs sought an "emergency" order enjoining a variety of state laws, local locals, and local regulations, but their appeal is limited to the following provisions of state law: Penal Law §§ 400.00(6), 400.00(15), 265.01-e(2)(n) & (t).[4] As relevant here, they challenged Penal Law § 400.00(6), the New York City-specific special-permit requirement, on the ground that having to seek a permit burdens their right to carry. They challenged Penal Law § 400.00(15) to the extent that it penalizes open carry statewide by concealed-carry license holders. Finally, plaintiffs sought to enjoin several provisions of the CCIA that bar members of the public from carrying concealed firearms in various designated sensitive places. N.Y. Penal L. § 265.01-e. The only designated locations at issue on appeal are Times Square, *id.*

---

[4] Plaintiffs challenged certain rules that apply to non-licensees, to individuals licensed by New York City, as well the designation of other sensitive locations, and rules concerning public carrying of firearms onto private property. None of these challenges are at issue on appeal.

§ 265.01-e(2)(t), and public transportation, including New York City subways and commuter rail, *id*. § 265.01-e(2)(n).[5] Only one of the plaintiffs, Jason Frey, mentions mass transit in his declaration, stating that he carries his firearms on "the Metro North Train into Grand Central and the number 4 train to Times Square" and "the L train … to the 14th Street stop" (A22; *see also* A24-28; ECF No. 51).

The district court denied a preliminary injunction after reviewing the parties' submissions, including dozens of historical laws supplied to the court by the State and City defendants (ECF Nos. 65 Exs A-BBB, 67 Exs. 3-15, and 68 Exs. 16, 18-22, 24). As relevant to this appeal, the court found that plaintiffs lacked standing to pursue their claim that Penal

---

[5] The district court stayed issuance of any decision on certain other issues raised by plaintiffs that overlap with those raised in *Antonyuk v. Hochul* and its companion cases. *See Antonyuk*, Dkt. Nos. 22-2908(L), 22-2972(Con) (challenge to CCIA's sensitive place designation of facilities providing behavioral-health and chemical-dependence care, public parks and zoos, airports, buses, establishments serving alcohol, theaters, and places of public assembly; private-property restrictions; and licensing regulations); *Hardaway v. Nigrelli*, Dkt. No. 22-2933 (addressing CCIA's designation of houses of worship as sensitive locations, with briefing focused on whether 1791 or 1868 is the more relevant period for Second Amendment analysis); *Christian v. Nigrelli*, Dkt. No. 22-2987 (addressing restrictions on public carry onto private property and in public parks); *Gazzola v. Hochul*, Dkt. No. 22-3068 (addressing new firearm-dealer recordkeeping rules); *Spencer v. Nigrelli*, Dkt. No. 22-3237 (addressing CCIA's designation of houses of worship and contours of *Bruen*'s methodology). Appellants have not challenged the district court's decision to defer ruling on those issues until this Court resolves these five cases, which were argued in March 2023.

10

Law § 400.00(15) violates their right to openly carry firearms because their declarations were equivocal at best about their intention to carry firearms openly (A163-64). The district court also considered the merits and found that plaintiffs were unlikely to succeed on their challenges to Penal Law §§ 400.00(6), 400.00(15), or 265.01-e(2)(n) & (t) because each provision passed constitutional muster as consistent with the nation's historical traditional of firearms regulations (A167-70, 174-76, 179-84). The court reached that conclusion after analogizing each provision to historical antecedents and finding that each burdens the right to bear arms to a similar degree as the historical laws, and for comparable purposes.

Plaintiffs filed a notice of appeal (A142). They moved in the district court for an injunction pending their interlocutory appeal of the denial of their preliminary injunction motion (ECF No. 85), which the district court denied (ECF No. 88). They also moved to expedite this appeal, which this Court denied (Second Circuit ECF, Case No. 23-365, Nos. 25, 34).

11

## SUMMARY OF ARGUMENT
## AND STANDARD OF REVIEW

This Court reviews the district court's denial of a preliminary injunction for an abuse of discretion, examining legal conclusions *de novo* and factual findings for clear error. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021). A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).

To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279-80 (2d Cir. 2021) (per curiam) (cleaned up).[6] Plaintiffs failed to make a sufficient showing on any of these prongs.

---

[6] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

12

As the district court correctly determined, plaintiffs have not shown a likelihood of success on the merits of their Second Amendment challenges to Penal Law §§ 400.00(6), 400.00(15), or 265.01-e(2)(n) & (t). Their challenge to the New York City special-permit requirement fails because *Bruen* expressly approved of licensing as a prerequisite to carrying firearms in public, and there is a robust historical tradition of local licensing that is relevantly similar to the special-permit requirement. Plaintiffs are unlikely to succeed on their open-carry theories, both because they lack standing to seek an injunction against this provision and because the Second Amendment does not guarantee a right to open carry in jurisdictions that have determined to offer concealed carry as the permissible manner of public carry. Finally, this Court need not weigh in on the issue of firearms on the subway or in Times Square: plaintiffs' challenge to the special-permit requirement is meritless, and without a special permit they cannot lawfully travel armed anywhere in New York City, including on the subways or in Times Square. A preliminary injunction against enforcement of these sensitive-place designations therefore would not redress any harm plaintiffs allege. Regardless, there is ample historical evidence that bans on firearms in

locations analogous to Times Square and public transportation are consistent with the nation's historical tradition of firearm regulation.

The remaining preliminary-injunction factors also strongly counsel against the imposition of injunctive relief. The injunction that plaintiffs seek would cause significant confusion by unnecessarily disrupting a newly enacted regulatory scheme that emerged out of the political process and is designed to protect public safety. And this Court should not weigh in on novel legal questions about how *Bruen*'s history-and-tradition test should apply to the CCIA provisions challenged here, where both this Court and the Supreme Court are poised to decide Second Amendment cases that could substantially affect the Court's treatment of the issues here. Finally, the injunction that plaintiffs seek is both overinclusive and insufficiently tailored to avoid the speculative harms they seek to avert. Indeed, because the only harm they claim is a constitutional injury, and they are unlikely to succeed on the merits, they have nothing to put on the other side of the scale at all.

14

# ARGUMENT

## POINT I

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR SECOND AMENDMENT CLAIMS

*Bruen* announced that Second Amendment challenges should be analyzed in two steps. 142 S. Ct. at 2126. A court must first assess whether "the Second Amendment's plain text covers [the challenger's] conduct." *Id.* If it does, "the Constitution presumptively protects the conduct," and, at the second step, the government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126, 2127 (cleaned up).

Under *Bruen*'s framework, plaintiffs are unlikely to succeed on any of their claims. As a threshold matter, plaintiffs bring only a pre-enforcement facial challenge to Penal Law §§ 400.00(6), 400.00(15), or 265.01-e(2)(n) & (t).[7] To prevail on the merits of these claims, they must

---

[7] Below, plaintiffs challenged several other provisions of the CCIA; the district court resolved some of those challenges against plaintiffs and deferred decision on others until this Court resolves *Antonyuk* and its companion cases. On appeal, plaintiffs do not challenge the district court's standing determinations or its decision to defer parts of its decision, except as to the provisions discussed in text.

15

show that there are no set of circumstances under which the challenged provisions could be valid. *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015). They have not even attempted to meet this high burden, nor could they. The challenged provisions of the CCIA, to the extent that they burden the right of law-abiding, responsible individuals to carry firearms at all, are consistent with the historical understanding of the right. Because plaintiffs cannot succeed on the merits, the district court providently denied their motion for a preliminary injunction.

## A. Section 400.00(6)'s prohibition of carrying firearms in New York City without a license issued by the City's police commissioner is lawful.

Plaintiffs are not likely to succeed on their claim that the special-permit requirement violates the Second Amendment. As a licensing provision that ensures that only law-abiding, responsible persons carry firearms within the City, plaintiffs' challenge fails at *Bruen*'s first step. In any event, the special-permit requirement passes constitutional muster at *Bruen*'s second step because the requirement is entirely consistent with the nation's longstanding tradition of ensuring that

16

firearms are carried only by law-abiding, responsible individuals and of administering firearm permitting at the local level.

### 1. Plaintiffs' challenge to Penal Law § 400.00(6) fails at *Bruen*'s first step.

Plaintiffs' challenge fails at *Bruen*'s first step because Penal Law § 400.00(6) does not burden conduct within the plain text of the right as it was originally understood. As relevant here, this analysis begins by asking whether the individual is "part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. Under its original understanding, "the people" to whom the right extended were only "law-abiding, responsible" individuals. *Dist. of Colum. v. Heller*, 554 U.S. 570, 635 (2008); *Bruen*, 142 S. Ct. at 2131.

*Bruen* approved licensing regimes across the country that are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" that the Second Amendment protects. *Id.* at 2138 n.9. Justice Kavanaugh, in concurrence, further underscored that the Second Amendment "does not prohibit … the imposition of licensing requirements for carrying a handgun for self-defense." *Id.* at 2161. Thus, *Bruen* ends plaintiffs' challenge to Penal Law

17

§ 400.00(6) at its first step: licensing regimes have no Second Amendment valence of their own, so long as they do not prevent law-abiding, responsible individuals from carrying firearms.

Speaking at the highest level of generality, plaintiffs say that Penal Law § 400.00(6) impairs "peaceable carriage of firearms for self-defense" (App. Br. 19), but they never actually allege that the special-permit requirement prevents any law-abiding, responsible individual from carrying firearms in the City. Plaintiffs raise no challenge to the standards for granting special permits, but rather contest only the requirement to obtain one at all. They do not dispute that special-permit requests are granted on a "shall-issue" basis and withheld only if applicants are unable or unwilling to demonstrate they are law-abiding and responsible—and so do not impact conduct falling within the scope of the Second Amendment.

To be sure, *Bruen* leaves a path open for challenging licensing regimes that are administered in a manner that "den[ies] ordinary citizens their right to public carry," for instance, through "lengthy wait times in processing license applications or exorbitant fees." 142 S. Ct. at 2138 n.9. But plaintiffs have not attempted to make any such showing,

18

as they have brought only a facial challenge. *See N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 265 (pre-enforcement challenges are facial challenges). Nor would plaintiffs have standing to claim that the NYPD License Division is impermissibly withholding special permits or making the process of obtaining a special permit particularly difficult, time-consuming, or expensive, as plaintiffs have not applied for, let alone been denied, a special permit since the CCIA's enactment.

Plaintiffs' objection is to having to obtain a permit at all, no matter how straightforward and unexacting the process may be, because they believe they should be automatically eligible to carry in the City merely by virtue of being licensed elsewhere. Because plaintiffs do not contend that the special-permit requirement is being administered in a manner that deprives "ordinary citizens their right to public carry," 142 S. Ct. at 2138 n.9, it does not infringe on the right of "the people" to bear arms—and so falls outside the scope of the Second Amendment.

Nor is there any merit to their implication that Penal Law § 400.00(6) is unconstitutional because concealed-carry licenses must be valid statewide. Neither the plain text of the Second Amendment nor any Supreme Court jurisprudence even gestures at the notion that firearms

19

licenses must have some specific geographical reach. And, again, plaintiffs have not undertaken to show that the scheme is being impermissibly applied—for instance, by overly segmenting the state to a point that ordinary citizens cannot exercise their right to carry. The New York City-specific provision is the only special-permit requirement in the state, and it reflects the State Legislature's judgment that the City presents unique circumstances and should be able to make its own licensing decisions as to who can publicly carry within its jurisdiction. Plaintiffs have not shown that the conduct they wish to engage in— carrying concealed in the City with a New York State concealed-carry license but no special permit—is within the scope of the Second Amendment.

### 2. Penal Law § 400.00(6) easily passes muster under *Bruen*'s second step.

Even if the special-permit requirement did implicate the Second Amendment's protections at *Bruen*'s first step, plaintiffs' claim would still fail. If a law burdens conduct failing within the historical scope of the right to bear arms, the government must demonstrate that the law is "consistent with the Nation's historical tradition of firearm regulations."

20

142 S. Ct. at 2130. One way it can do so is through "reasoning by analogy." *Id*. at 2132.

At this second step, the government must generally identify measures "from before, during, and even after the founding [that] evince[] a comparable tradition of regulation," and courts must judge whether the "historical regulation is a proper analogue" by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33 (cleaned up). A modern regulation survives scrutiny if it "impose[s] a comparable burden on the right of armed self-defense" and "that burden is comparably justified." *Id*. at 2133. *Bruen* stressed that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. (emphasis in original).

A license requirement for public carry is permissible under *Bruen*'s history-and-tradition test. Long before the Founding-era, "the Statute of Northampton and the common law dictated a person would be immune from prosecution if they were carrying dangerous weapons *with the*

21

*license of government.*"[8] Continuing this tradition, in 1792 Virginia passed a law that provided that all free black men living "at any frontier plantation" could "keep and use guns, powder, shot, and weapons offensive or defensive," if they obtained a "license from a Justice of Peace of the County wherein such plantation lies."[9] While the prejudices inherent in this historical law are discredited today, the core concept of ensuring that only law-abiding, responsible persons carry firearms remains evergreen.

Indeed, as is implicit in *Bruen*'s approving discussion of 43 states' shall-issue licensing regimes, *id.* at 2138 n.9, a longstanding tradition supports licensing regulations. Thus, by the time of Reconstruction, the Founding-era practice had become an established tradition of issuing licenses to protect the right of "all loyal and well-disposed inhabitants to bear arms," while excluding dangerous and incompetent people from bearing arms. *Id.* at 2152 (quoting Cong. Globe, 39th Cong., 1st Sess., at 908-09, which disarmed any "disorderly person, vagrant, or disturber of

---

[8] Patrick Charles, *Article: The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 392 (2016) (emphasis added) (surveying pre-founding history).

[9] *An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes* (1792), § 8, https://perma.cc/AB39-9VWX.

the peace"). A through-line connects these early licensing laws to the special-permit requirement.

The Second Amendment jurisprudence does not require a government to find a historical match not only for the degree of burden and justification, but also for the level of government enacting a law.[10] In any event, as the district court correctly found, many locality-specific gun regulations can be found in our nation's historical tradition (A167-68). For instance, as early as 1825, Tennessee allowed the mayor and aldermen of the towns of Winchester and Reynoldsburgh "to restrain and

---

[10] It would make little sense to require a one-for-one match between regulators. The Supreme Court has consistently relied on evidence from long before the founding through the 19th century when discerning the historical understanding of the right to carry, and has never focused on the level of government adopting any particular measure. *See Bruen*, 142 S. Ct. at 2132; *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Heller*, 554 U.S. 570. For instance, in *Heller*, the Court canvassed treatises, legal writings, laws, court cases, and historical accounts spanning from England's Glorious Revolution through the early 19th century to conclude that the Second Amendment secured a preexisting individual right to bear arms for self-defense. 554 U.S. at 595. *Bruen* announced the applicable framework for analogical reasoning and made no suggestion that level of government would be relevant, provided the measure was not an outlier.

What's more, requiring an analogue from the same level of government would be ahistorical, as concepts of federalism, state sovereignty, municipal home rule, and the proper allocation of regulatory authority between federal, state, and local governments have oscillated since the Founding. *See* National League of Cities, *Principles of Home Rule for the 21st Century*, 100 N.C.L. REV. 1329, 1332-1333 (June 2022). Which level of government exercises regulatory police powers is irrelevant to the analysis, so long as the government does so in a manner that does not impermissibly encroach on individual rights.

23

punish … carrying guns."[11] Likewise, the State and City defendants submitted dozens of historical city-specific laws from the mid-19th century through early 20th century that required individuals to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon in the jurisdiction (ECF Nos. 65 Exs A-G, 67 Exs. 3-10).[12] A precursor to the special-permit requirement dates back at least to 1881, when New York City required non-residents who wished to carry in the City to apply to the local police precinct for permission "in the same manner as is required by residents of said city, and … subject to the same conditions and restrictions."[13] These laws reflect the deeply rooted understanding that varied local conditions call

---

[11] 1825 Tenn. Priv. Acts 306-07, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292, § 3, https://perma.cc/DA9X-DXR9. As another example, the State of Wisconsin authorized the common council of the cities of Oshkosh and Nicolet to regulate firearms in their cities in the 1880s to prevent "any situation which may be considered by the council dangerous to the city or any property therein, or annoying to any citizens thereof." ECF 67, Ex. 8 at 7; 1883 Wis. Sess. Laws 1017, An Act To Incorporate The City of Nicolet, ch. 351, § 32(27), https://perma.cc/3V2Q-2CB8.

[12] *See also* Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century,* SSRN (Jan. 15, 2013), https://ssrn.com/abstract=2200991.

[13] Elliott Fitch Shepard, *Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority*, Page 214-215, Image 214-215 (1881), https://perma.cc/J5SM-SGD4.

24

for locally tailored approaches to firearms. As one Second Amendment scholar put it, "perhaps no characteristic of gun control in the United States is as 'longstanding' as the stricter regulation of guns in cities than in rural areas."[14]

Laws from before the Founding through the special-permit requirement imposed comparable burdens and were comparably justified. *See Bruen*, 142 S. Ct. at 2133. With respect to burden, plaintiffs do not argue that obtaining a special permit under Penal Law § 400.00(6) is onerous; the only burden they identify is having to apply at all. This is the same burden all of the historical local permitting laws imposed. The requirement does not meaningfully diminish plaintiffs' concealed-carry licenses, which allow them to carry their firearms across 99.5% of state, or roughly 54,250 square miles, with the exception of New York City, a mere 302 densely packed square miles. And, again, they are not prevented from carrying firearms in New York City, but are merely required to obtain a permit from the City's licensing officer first.

---

[14] Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 85 (2013).

The justification, too, is comparable to that which supported historical laws: to ensure that only law-abiding and responsible individuals publicly carry by through licensure. It is no answer that a licensee received a license from some another jurisdiction. As with the many precursor laws authorizing licensing at the local level, the New York Legislature has determined that the City—as a licensing jurisdiction—should be able to make its own determination whether an applicant may carry a concealed firearm within its borders.

Because Penal Law § 400.00(6) is comparably justified and imposes comparable burdens to historical local licensing laws, the district court correctly found that plaintiffs are unlikely to succeed on their challenge to Penal Law § 400.00(6).

## B. Plaintiffs are unlikely to succeed on their claim that Section 400.00(15) impermissibly penalizes open carry by concealed-carry license holders.

### 1. Plaintiffs lack standing to pursue this injunctive relief.

Plaintiffs challenge the State's ban on openly carrying firearms. The district court correctly found that plaintiffs lack standing to seek a preliminary injunction of Penal Law § 400.00(15) to the extent it

26

penalizes open carry by concealed-carry licensees because plaintiffs never clearly articulated a concrete, specific intention to carry firearms openly (A163-64). Plaintiffs also fail to establish that an injunction would redress the constitutional injuries they assert.

To establish standing to obtain a preliminary injunction, the plaintiff's burden "will normally be no less than that required on a motion for summary judgment." *Green Haven Prison*, 16 F.4th at 78. Plaintiffs "cannot rest on mere allegations but must set forth by affidavit or other evidence specific facts that establish the three familiar elements of standing: injury in fact, causation, and redressability." *Id.* To establish an injury-in-fact for purposes of a pre-enforcement preliminary injunction, plaintiffs must demonstrate "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that the intended conduct is proscribed by the challenged law; and (3) that there exists a credible threat of prosecution thereunder." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136-37 (2d Cir. 2023) (cleaned up). A "threatened injury must be *certainly impending*," and "allegations of *possible* future injury" are insufficient. *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (cleaned up, emphasis in original).

27

Plaintiffs fall short of meeting their burden of showing an injury in fact, as the district court found (A163-64). Frey and Sappe speculate that they might, at some unspecified point in the future, carry their firearms openly if they are not carrying them concealed (A22, 25, 27). Yet they also state an intention to continue carrying their firearms concealed throughout the state. Such vague and internally inconsistent "cookie-cutter assertion[s] of standing" are too speculative to support a pre-enforcement preliminary injunction during the pendency of this litigation, *Calcano*, 36 F.4th at 77 (cleaned up), because plaintiffs have not shown that they face an immediate "credible threat of prosecution," *Vitagliano*, 71 F.4th at 132.

What's more, plaintiffs' assertion of standing fails for lack of redressability in two respects. *United States v. Smith*, 945 F.3d 729, 736-37 (2d Cir. 2019). First, "there is a fundamental misalignment between [their] alleged injury and [their] legal claim." *Id.* They challenge section 400.00(15), a general provision making it a misdemeanor to violate the various licensing requirements of section 400.00 of the Penal Law. *See* N.Y. Penal L. § 400.00(15) ("Any violation by any person of any provision of this section is a class A misdemeanor."). But the prohibition of open

28

carry derives from section 400.00(2)(f), which establishes a concealed-carry license as the exclusive means of carrying a firearm in public, thereby precluding open carry. *See Kachalsky*, 701 F.3d at 86. An injunction against enforcement of section 400.00(15) against licensees might preclude arrest or criminal prosecution for open carry, but would not make open carry permissible or preclude revocation of their licenses for doing so. *See Smith*, 945 F.3d at 737. Second, to the extent that they seek to carry firearms openly in New York City, the injunction that they seek would not accomplish that result. They would still need a valid special permit to be able to publicly carry a firearm in the City at all, and as discussed above they have not applied for such permits or articulated any valid basis to be relieved of the requirement to do so. Plaintiffs therefore lack standing to obtain any such injunction as to the New York City defendants, at a minimum.

### 2. To the extent Section 400.00(15) criminalizes open carry, it is entirely consistent with Second Amendment.

Plaintiffs also failed to demonstrate a likelihood of success on the merits of their claim because the Second Amendment does not guarantee a right to open carry.

29

The claim fails at the first step of the *Bruen* analysis. The plain text of the Second Amendment makes no mention of open or concealed carry; it talks about keeping and bearing arms. To "bear arms" is to publicly carry arms "ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 142 S. Ct. at 2134-35 (cleaned up). Thus, bearing arms, in the sense of the Second Amendment, does not imply any right to carry firearms openly rather than concealed. And, indeed, the Supreme Court has never suggested that bearing arms means carrying firearms in any manner one wishes. Governments thus are free to regulate the manner of carriage, provided they preserve the right to public carry. And in fact, plaintiffs admit that they regularly bear arms in public, as they are currently authorized to do (*see, e.g.*, A19 (Jason Frey "regularly carr[ies] a handgun concealed on [his] person in public")). Allowing only concealed carry and not open carry does not register as an impairment of the right to bear arms secured by the Second Amendment's plain text, so plaintiffs' challenge to Penal Law § 400.00(15) fails at *Bruen*'s first step.

In any event, at *Bruen*'s second step, the State's ban on open carry easily survives historical scrutiny. There were comparable manner-of-

30

carriage regulations in the Founding era, such as Virginia's 1786 law forbidding carrying firearms in a manner that caused "terror."[15] Many Founding-era "affray" laws similarly allowed for public carry, but prohibited carrying arms in a frightening manner.[16]

The *Bruen* Court reviewed historical regulations of the manner of public carry and observed that, during the Antebellum period, states broadly approved of concealed-carry prohibitions "only if they did not similarly prohibit *open* carry." *Id.* at 2146 & n.19 (emphasis in original). As an example, the Court cited a Georgia court decision upholding the state's 1837 concealed-carry ban and invalidating a prohibition on open carry, because "it was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry." *Bruen* 142 S. Ct. at 2147. The Court also cited an 1858 Louisiana decision that upheld a concealed-carry ban because the law did "not infringe the right of the

---

[15] 1786 Va. Acts 35. (Ch. 49, An Act Forbidding and Punishing Affrays), https://perma.cc/AY87-FHEG.

[16] For example, in 1792, North Carolina prohibited carrying weapons "in affray of peace." Francois Xavier Martin*, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792), https://perma.cc/H8W9-U9WY. Similar provisions prohibiting riding "armed Offensively … by Night or by Day, in Fear or Affray of Their Majesties Liege People." *Bruen*, 142 S Ct at 2142-43 (cleaned up).

31

people to keep or bear arms," but was "a measure of police [power],
prohibiting only *a particular mode* of bearing arms which is found
dangerous to the peace of society." *State v. Jumel*, 13 La Ann 399, 399-
400 (1858) (emphasis in original). The *Bruen* Court concluded that "[t]he
historical evidence from Antebellum America does demonstrate that the
manner of public carry was subject to reasonable regulation." 142 S. Ct.
at 2150.

Plaintiffs misconstrue this section of *Bruen* and contend the Court
did not conclude that regulations of the manner of public carry are
permissible (App. Br. 17). But the Court clearly concluded that
"[t]hroughout modern Anglo-American history, the right to keep and bear
arms in public has traditionally been subject to well-defined restrictions
governing the intent for which one could carry arms, *the manner of carry*,
or the exceptional circumstances under which one could not carry arms."
142 S. Ct. at 2138 (emphasis added). The Court found that "States could
lawfully eliminate one kind of public carry—concealed carry—so long as
they left open the option to carry openly." *Id.* at 2150.

Fully in accord with this longstanding tradition, the State of New
York regulates the manner of public carry by allowing for concealed carry

and banning open carry—a regulation of the manner of public carry of same type that *Bruen* found was consistent with the nation's tradition of firearms regulation. The district court correctly concluded that plaintiffs are unlikely to succeed on the merits of their challenge to Penal Law § 400.00(15) to the extent it criminalizes open carry.

Plaintiffs argue that *Bruen*'s analysis of Antebellum laws does not support the State's open-carry ban because the government must identify identical laws from before 1791 (App. Br. 17-18). For the reasons just discussed, they misconstrue *Bruen*'s discussion, which settles the issue. But in any event, plaintiffs are wrong in claiming that identical Founding-era laws are necessary.

*Bruen* noted that "there is an ongoing scholarly debate on whether courts should *primarily rely* on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" incorporating the Bill or Rights against the states, or the "public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137-38 (emphasis added). This does not mean that only one period matters and the other is irrelevant, as plaintiffs suggest.

Rather, *Bruen* teaches that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). But regulators may not have chosen to adopt a particular approach to a problem during the Founding, Antebellum, or Reconstruction eras for other reasons. There is a difference between the scholarly dispute over the date that controls the original public meaning of the right and the task *Bruen* assigns to lower courts to consider historical analogues and decide whether and to what extent their absence is meaningful evidence when discerning the original public understanding of the right. Even if the original public meaning of the right was set in 1791, laws that emerged later can still be highly relevant in discerning that meaning. Far from suggesting that either time frame should be ignored, the Court discussed trends that span centuries.

Thus, in *Heller*, *McDonald*, and *Bruen*, the Supreme Court looked to history from before, during, and after the Founding and Reconstruction eras as evidence of the original understanding of the right

to keep and bear arms. Indeed, in *McDonald*, the Court recognized that the meaning of the right had changed somewhat from the Founding to the Antebellum periods—shifting from being primarily concerned with the threat that the federal government might disarm militias to focusing on an individual right of self-defense—which shows that the Court hasn't limited the inquiry into the meaning of the Second Amendment right to just one period. *McDonald*, 561 U.S. at 770.

The *Bruen* Court did not need to answer the question of which period's understanding should trump in the event of conflict because the public understanding of the right to public carry in both periods was "for all relevant purposes, the same." 142 S. Ct. at 2138. The same is true here. New York's open-carry prohibition, as a regulation of the manner of carriage, is consistent with manner-of-carriage regulations dating from well before the Founding and continuing through the present day.

Contrary to appellant's suggestion, from the Founding era on, government has regulated the manner of carry by prohibiting carrying in an offensive manner. Picking up the thread, the Antebellum laws discussed in *Bruen* allowed for open carry but prohibited carrying arms in a concealed manner, which was perceived as suspicious. And New York

35

now allows concealed carry but bans open carry. Consistent with *Bruen*, governments have consistently preserved the public right to carry while regulating the manner of carry since before the nation's founding.

### C. Plaintiffs are unlikely to succeed on their challenge to Penal Law § 265.01-e(2)'s designation of Times Square and public transportation as sensitive places.

Plaintiffs also are unlikely to succeed on their challenge to the CCIA's designation of Times Square and public transportation as sensitive locations. Initially, they lack standing to seek an injunction regarding Times Square or any mode of public transportation within New York City unless the Court concludes that they are likely to succeed on their challenge to the special-permit requirement.[17] As discussed above, they do not hold, and have not sought, special permits that would allow them to carry firearms in public anywhere in the City, and they have no concrete interest in whether others may carry firearms in these specific

---

[17] Plaintiffs lack standing to pursue a challenge based on hypothetical travel on Metro-North wholly outside of the City, because only Jason Frey mentions mass transit in his declaration, stating that he carries his firearms on "the Metro North Train into Grand Central and the number 4 train to Times Square" and "the L train … to the 14th Street stop" (A22, *see also* A24-28; ECF No. 51). He only mentions Metro-North as part of a trip into New York City.

36

New York City locations. (As discussed below, similar points defeat their ability to show irreparable harm from the challenged sensitive-locations provisions for the purpose of a preliminary injunction.) The Court need go no further to resolve this aspect of the appeal.

In any event, plaintiffs' challenges to the sensitive-locations provisions are meritless. The Supreme Court has consistently maintained that the individual right to keep and bear arms secured by the Second Amendment is "not unlimited" and that "longstanding prohibitions" on "carrying firearms in sensitive places such as schools and government buildings" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786. In these sensitive places, carrying firearms can "be prohibited consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133.

*Bruen* discussed sensitive places in the context of its admonition to lower courts to use flexible, analogical reasoning to assess whether a modern regulation is "relevantly similar" to a historical law. *Id.* The Court's running list of sensitive places—schools, government buildings, legislative assemblies, polling places, and courthouses—"does not purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26; *see Bruen*, 142 S.

Ct. at 2133. The Court explained that the lawfulness of these prohibitions is undisputed and directed that lower courts use analogies to those places to determine if "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

Thus, to the extent plaintiffs argue that any designation of a sensitive place beyond the "short list" specifically identified in *Heller* and *Bruen* is a "version of the rejected proper-cause standard" (App. Br. 20-21, 23) that argument runs contrary to those decisions, which expressly approved of identifying *new* sensitive places by using analogical reasoning. And the designation of Times Square and public transportation as sensitive places is readily justified under this form of analysis.

> ### 1. The prohibition of carrying firearms in Times Square is consistent with the nation's historical tradition of firearms regulations.

Plaintiffs challenge the State's designation of Times Square as a sensitive place because they believe that the "Times Square ban has no historical analogue" (App. Br. 22). They are wrong.

38

Times Square is one of the country's most congested outdoor marketplaces, with street vendors, buskers, and displays of public art and expressive conduct, surrounded by stores, theaters, office buildings, hotels, and more. It is one of the busiest pedestrian areas on the planet, with nearly a half a million people walking through it on peak days, and is one of the world's most visited tourist attractions, with an estimated 50 million annual visitors.[18] Times Square is also the hub of the City's Theater District, a major center for shopping and entertainment, and a base of operations for numerous media companies, as well as the NASDAQ.[19] To the extent there was anything comparable in the 18th and 19th centuries, Times Square resembles historical fairs and markets, where strangers congregated for commercial and cultural activities, and places of public assembly, where people gathered for entertainment and to engage in protected expressive conduct.

As the district court noted, there was a relevant Founding-era tradition of regulating firearms in fairs and marketplaces, dating back to the 1328 Statute of Northampton and incorporated into a Virginia law

---

[18] Times Square, WIKIPEDIA (Sept. 6, 2023) https://perma.cc/6ER6-FA4A.

[19] https://www.nasdaq.com/marketsite.

from 1786 and a North Carolina law from 1792 (A173-74 (citing ECF No. 67 Ex. 12)).[20] These two laws are particularly compelling evidence of the public meaning of the right during the Founding era because they applied to more than a quarter of the population (A175). Plaintiffs suggest that these laws are five years too early and one year too late, contending that the "district court abused its discretion by relying on restrictions that predate and postdate the Founding Era" (App. Br. 22). *Bruen* does not absurdly require the government to rely exclusively on laws enacted in 1791 because its purpose is to determine what types of restrictions the Founding and Reconstruction generations who adopted and incorporated the Second Amendment would have viewed as permissible.

The district court also correctly observed that the Founding-era historical tradition continued with Reconstruction-era laws prohibiting firearms in places of public assembly, where people gathered for recreational purposes or to engage in expressive conduct. The court noted that historical laws from Tennessee, Texas, Missouri, Arizona,

---

[20] *See also* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U.L. Rev. 139, 165 (2021) (discussing the 1328 Statute of Northampton and explaining that "[t]he 'fairs' and 'markets' of fourteenth-century England were important sites of community life").

Oklahoma, Montana, Georgia, and Idaho banned firearms in public gathering places and places of public assembly (A176, citing ECF No. 67 Exs. 5, 13-16). There were also many similar laws prohibiting the discharge of firearms in town squares.[21]

The prohibition of firearms in Times Square is "relevantly similar" to regulations of firearms in fairs, marketplaces, town squares, and places of public assembly. *Bruen*, 142 S. Ct. at 2132. These historical laws similarly burdened the right to public carry by restricting firearms or their discharge in defined spaces that were likely to be packed with large numbers of strangers engaged in commerce, civic activities, and entertainment. And the laws are comparably justified, as they aimed to prevent dangers to bystanders and the possibility that a crowd could erupt into panic. The CCIA's designation of Times Square is not based on mere speculation; in 2019, a backfiring motorcycle resulted in a stampede injuring twelve people "due to the sound being mistaken for gunfire," and

---

[21] *A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania* 240 (1897), https://perma.cc/VT3W-3VW7 ("No person shall carry firearms, or shoot in the common, or within fifty yards thereof…."); *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903), https://perma.cc/R2EN-XND3 ("No person shall carry firearms … in said park or squares, or within fifty yards thereof….").

41

in 2021, four bystanders were shot in two separate incidents, including a four-year old child.[22]

Plaintiffs, again misreading the Supreme Court's Second Amendment jurisprudence, claim that any consideration of the public-safety concerns animating historical or modern laws amounts to impermissible "interest balancing" (App. Br. 24). The *Bruen* Court rejected this very argument, explaining that while means-end scrutiny entails impermissible interest balancing *by the Judiciary*, analogical reasoning requires comparing, among other things, "how and why" the right to armed self-defense has been burdened, including whether legislative justifications animating firearm regulations were comparable. 142 S. Ct. at 2133 & n.7. The government's ability to identify specific public-safety concerns that are grounded in the particular characteristics of a designated sensitive place, and resemble similar features of a historical sensitive place, are the "why" that brings the modern regulations in line with their historical antecedents—and not a version of means-end scrutiny.

---

[22] Times Square, WIKIPEDIA (Sept. 6, 2023), https://perma.cc/6ER6-FA4A.

42

**2. The prohibition of carrying firearms on public transportation is also consistent with the nation's historical tradition of firearms regulations.**

Plaintiffs' challenge to the designation of the New York City subway and Metro-North Railroad transportation networks as sensitive places fares no better (App. Br. 22).[23] As the district court recognized, multiple historical traditions of firearms restrictions—not just a single lineal precursor—intersect in the regulation of firearms on modern mass transit. There have been dramatic technological leaps in the area of mass transit in the last century but, as *Bruen* emphasized, this does not mean that regulation of firearms on trains is impermissible. To the contrary, the principles enshrined in our Constitution are "intended to endure for ages to come" by adapting to modern regulatory challenges. *Bruen*, 142 S. Ct. at 2132 (cleaned up).

First, New York City subways, Metro-North trains, and their stations are, as the district court concluded (A182-83), congested and

---

[23] To the extent plaintiffs mention buses in their brief (App. Br. 25), they did not do so below (ECF No. 53) and do not indicate that they intend to travel armed on buses in New York City in their declarations (A160). As noted, *supra* 36 n.17, only Jason Frey mentions mass transit in his declaration, discussing taking firearms on "Metro North Train into Grand Central Station" (A22).

43

highly trafficked areas, much like Times Square today and marketplaces and places of public assembly in the past. As many subway riders will know from experience, it is not uncommon for a subway car to be packed that riders can barely move. The New York City subway network transports 5.5 million people daily.[24] Last year, there were roughly 1.8 billion subway rides taken[25]—more than the entire world population in 1791 or 1868.[26] That includes hundreds of thousands of school children who ride subways in lieu of yellow buses. Metro-North, meanwhile, is the third busiest commuter railroad in the country; it has an annual ridership of approximately 52 million.[27] Everyone from school children from all five boroughs and across the tri-state area, to residents from every corner of the City and larger metropolitan area, and tourists from every corner of the earth ride our subways and commuter rails. As places with uniquely high population density, where diverse groups of strangers including hundreds of thousands of unaccompanied children come

---

[24] MTA *Subway and Bus Facts 2019* (Apr. 2020), https://perma.cc/R8TA-ZK9L.

[25] *Public Transportation Ridership Report*, Q4 2022, AM. PUB. TRANSP. ASS'N, at 2, https://perma.cc/P8M9-EW4F.

[26] *Historical Estimates of World Population*, UNITED STATES CENSUS BUREAU (Dec. 2022), https://perma.cc/T7RJ-8XL3.

[27] *Metro-North Railroad,* WIKIPEDIA, (Sept. 19, 2023), https://perma.cc/PER2-PYQU.

together, the subway and commuter rail networks are, as the district court concluded, properly designated as sensitive places for much the same reasons Times Square is.[28]

Second, unlike congested outdoor locations where people have relative freedom of movement, straphangers on the subway and commuters on Metro-North are closely confined with highly limited means of egress—particularly while cars are in motion. During rush hour, people are packed shoulder to shoulder in enclosed train cars, often in underground tunnels or on elevated tracks. Under these conditions, a firecracker set off on a crowded subway train during a morning commute caused a "full stampede," leaving one person hospitalized.[29] This distinctive feature makes these settings "relevantly similar," *Bruen*, 142 S. Ct. at 2132, to crowded indoor gathering places like "public ball rooms" of the past, where firearms were restricted. For instance, in an 1817 ordinance, New Orleans made it unlawful "for any person to enter into a

---

[28] The MTA president has stated that "hundreds of thousands of students" use the MTA daily. MTA Press Release: *New York City Transit President Davey Welcomes NYC Students Back to the Transit System* (Sept. 8, 2022), https://perma.cc/X56R-X27D.

[29] Ruth Weissmann et al., *Lit firecracker thrown into subway train sparks morning commute chaos,* NEW YORK POST (May 31, 2019), https://perma.cc/PGJ6-JDAX.

public ball-room" with a weapon and required that firearms be checked until after a person pays and is prepared to leave.[30] Other states likewise prohibited firearms in indoor gathering spaces such as "any circus, show, or public exhibition of any kind, or … a ball room...." *Porter v. State*, 1 Tex Ct. App. 477, 478 (1877) (citing Texas Act to Regulate the Keeping and Bearing of Deadly Weapons, ch. 34, 1871 Tex. Laws 25 (Apr. 12, 1871)).[31]

The particular danger of firearms in such crowded, enclosed spaces has long been appreciated. A Texas court explained that there was "no excuse" for carrying firearms in ballrooms, even for purposes of self-defense when fearing "an immediate and pressing attack," because, if there were a gunfight, the "lives of innocent people there assembled [would be] placed in jeopardy or sacrificed." *Owens v. State*, 3 Tex. Ct. App. 404, 407 (1878). Far more than indoor ballrooms of the past, the

---

[30] *An Ordinance Respecting Public Balls, New Orleans, LA* (Passed 27 Oct. 1817), https://perma.cc/75B4-R5PU.

[31] *See also Nat'l Ass'n for Gun Rights v. Naperville, Illinois,* ECF Case No. 23-1353 Doc. No. 38, Statutory Appendix, at 561 (*New Mexico Act Prohibiting the Carrying of Weapons Concealed or Otherwise*, 1864-65 N.M. Laws 406 (Feb. 2, 1860) (prohibiting carrying firearms in "balls or fandangos" in New Mexico)); *id.* at 561 (1869-70 Tenn. Pub. Acts 23-24, ch. 22, § 2 (prohibiting "any person attending any fair, race course, or other public assembly of the people" in Tennessee to carry firearms)).

subway and commuter rail are vital indoor community spaces where strangers are hemmed in and the presence of firearms creates an analogous, but vastly greater risk of harm to tightly packed groups of bystanders.

Third, and finally, the prohibition of firearms on subways and commuter rails carries forward a prior practice that began when railways were first introduced by private operators. While the government is a state actor and so must comply with the Constitution, it "often has more flexibility to regulate when it is acting as a proprietor … than when it is acting as a sovereign." *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) (upholding USPS's business decision to ban firearms from postal property). The government acting in its proprietary capacity—"like private property owners—has the power to regulate conduct on its property." *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (the government, as proprietor, can bar firearms in post office parking lots). It is for perhaps this reason that there is "no dispute" about the lawfulness of prohibitions on bringing firearms in "government buildings." *Bruen*, 142 S. Ct. at 2133; *see also Heller*, 554 U.S. at 626.

47

There was a historical tradition of restricting firearms on private railways that continued once governments took over as the primary operators of mass transit.[32] As evidence of historical regulations adduced below by the State shows, private rail networks in the 19th century generally prohibited passengers from carrying firearms aboard trains to ensure peace and safety and protect the rail company's property (ECF No. 64 at 9-14).[33] This broad historical practice undercuts any meaningful inference that might otherwise be drawn from a lack of governmental action to disarm passengers immediately after trains were invented. Legislatures tend to respond to problems, and there was no need to address arms on trains via public enactment when private railways were already prohibiting them.

The business concerns animating these prohibitions carry forward to subways and commuter railways today. The discharge of a firearm on a packed train can cause not just physical and psychological harm to

---

[32] It was undisputed below, and is also true, that the State and City own public-benefit corporations that operate the New York City subway and Metro-North (A49; ECF No. 68-10).

[33] *See also* Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation* YALE L.J. (*forthcoming*) at 12-20 (July 27, 2023), https://ssrn.com/abstract=4522818 (compiling private railway rules and finding a sweeping practice of prohibiting passengers from carrying firearms).

48

passengers, but also widespread service disruptions, damage to transit property, and lost fares if riders perceive the system as unsafe. The government today has the same proprietary interests for imposing the same types of restrictions as private operators imposed historically.

And though consideration of private railway rules is not necessary to sustain the challenged provision, there is no merit to the hodgepodge of arguments that plaintiffs offer for why private railway rules supposedly should be ignored. Nothing in *Bruen*'s history-and-tradition approach prevents courts from looking beyond statutes and court cases to discern the original public understanding of the right. Plaintiffs are wrong to suggest that the district court erred in looking to the rules and restrictions of private railways, presumably (though they do not explicitly say) because these private operators were not bound by the Second Amendment (App. Br. 27). *Bruen*'s approach to history is not narrowly focused on whether historical governmental actions were undertaken against the backdrop of the Second Amendment. After all, the Second Amendment was not incorporated against the states until 1868, but the Court has considered pre-Reconstruction state regulations

as relevant when discerning the original public understanding of the right. *See*, *e.g.*, *Bruen*, 142 S. Ct. at 2144-48.[34]

Looking beyond statutes and court cases is particularly important when considering situations that have undergone dramatic changes since the Founding era, and which should be assessed using flexible analogical reasoning. The *Bruen* Court observed that, in some cases the inquiry into whether a modern regulation is consistent with the Second Amendment's text and historical understanding "will be fairly straightforward," but "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" 142 S. Ct. at 2131-32.

Plaintiffs' suggestion that subways and commuter rail trains "do not present an issue that implicates unprecedented societal concerns or dramatic technological changes" (App. Br. 26) (cleaned up)) blinks reality. The "golden age" of rail travel did not begin until the 1860s.[35]

---

[34] For this reason, too, schools are sensitive places where firearm bans are presumptively lawful based on longstanding historical tradition, *Heller*, 554 U.S. at 626, even though many schools, particularly after primary school, were historically run privately or parochially. *See History of Education in the United States*, WIKIPEDIA, (Sept. 19, 2023), https://perma.cc/AU3H-A8BG.

[35] ASS'N OF AMERICAN RAILROADS, https://perma.cc/FW4P-3BVN.

Over the next few decades, New York City and others experimented on a small scale with public transit—building small networks of trolleys and elevated railways, but the subway did not start running until 1904. Since then, as this Court put it, the New York City subway system has become "a singular component of America's urban infrastructure," "an icon of the City's culture and history, an engine of its colossal economy, a subterranean repository of its art and music, and, most often, the place where millions of diverse New Yorkers and visitors stand elbow to elbow as they traverse the metropolis." *MacWade v. Kelly*, 460 F.3d 260, 264 (2d Cir. 2006). By any reasonable measure, that is a dramatic change across the span of a century.

Thus, there is no merit to plaintiffs' contention that the analogues for mass transit on which the district court relied are not close enough to publicly operated trains (App. Br. 26-27). As noted, there are numerous historical analogues for the challenged sensitive-place designations. But, given that this case involves unprecedented technological advances and dramatic societal changes, the Court can take a more nuanced look under which restrictions on subways and commuter rails even more readily survive scrutiny.

51

Plaintiffs speculate that a prohibition on public carry on mass transit will "disparately impact[] lower socioeconomic individuals— usually non-whites" who disproportionately rely on public transportation (App. Br. 25). This allegation, if cognizable, sounds in equal protection. Even if plaintiffs' theory were right, it would not move the needle on the likelihood of success on their *Second Amendment* challenge to Penal Law § 265.01-e(2)(n), which is the only constitutional challenge they brought.

Likewise, because *Bruen* rejects means-end scrutiny, plaintiffs cannot press a claim on the theory that the CCIA is not sufficiently tailored for people without cars and prevents them from reaching end-points where they might be permitted to publicly carry (App. Br. 25-26). The relevant question under *Bruen* is if the challenged regulation is consistent with the American historical tradition of firearms regulations. Historical bans on carrying firearms into sensitive places imposed the same burden; a person who intended to visit a sensitive place, say, a polling place, during a given day had to plan ahead, and might have been prevented from publicly carrying firearms to other places that day. This is a feature of every such regulation in every era, and not a basis to enjoin the designation of public transportation as a sensitive place.

52

## POINT II

## THE OTHER FACTORS ALSO WEIGH AGAINST INJUNCTIVE RELIEF

The district court also correctly determined that the preliminary injunction plaintiffs sought was not necessary to avert irreparable harm and was against the public interest because plaintiffs had failed to show any likely violation of their constitutional rights (A184-85). And, as noted, they do not face any imminent threat of arrest with respect to their open-carry claim because they have not demonstrated a concrete intent to actually openly carry firearms in the near future (*supra* Point I.B.1). Plaintiffs failed to satisfy either of these prongs of the preliminary-injunction standard for several other reasons too. *See We the Patriots*, 17 F.4th at 279-80.

*First*, a preliminary injunction would cause significant disruption and disorder across the state. An injunction would cause immediate confusion among licensing officials and applicants, and members of the public in the early days of implementing a new licensing regime, in a regulatory space that has already undergone significant upheaval. This would lead to uncertainty and could require officials to expend resources to pivot to a new set of protocols. If plaintiffs do not ultimately prevail on

53

the merits, licensing officials and law enforcement would have to roll back any new protocols, further compounding these costs.

This concern is particularly acute given that both the Supreme Court and this Court are poised to weigh in on many questions touching on the issues raised in this case. The Supreme Court only recently upended years of Second Amendment doctrine in the lower courts in *Bruen* and it will be hearing oral argument in its first post-*Bruen* Second Amendment case on November 7, 2023 in *United States v. Rahimi*, No. 22-915, which involves a federal law disarming certain domestic abusers. In *Rahimi,* the Court is likely to further clarify how *Bruen*'s framework should be applied. And closer to home, a panel of this Court heard oral argument on March 20, 2023 in five cases involving similar Second Amendment challenges to comparable CCIA provisions (*see supra* 10 n.5). The decisions in those cases will likely provide guidance for how plaintiffs' challenges should be assessed. This Court should not prematurely enjoin any provision on the CCIA while there is significant development in this area of law.

*Second*, an injunction would not serve the public interest because any preliminary injunction of provisions of the CCIA, which was enacted

by representatives chosen by the people of New York, would cause a "form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (cleaned up)); *Strange v. Searcy*, 574 U.S. 1145, 1145 (2015) (Thomas, J., dissenting) ("The equities and public interest … generally weigh in favor of enforcing duly enacted state laws." (cleaned up)).

*Third*, a preliminary injunction of the CCIA's provisions regarding special permits, open carry, and sensitive-place designations would cause real-world harm to the public. *See King*, 133 S, Ct. at 3 (staying injunction pending appeal because, among other things, it causes "an ongoing and concrete harm to Maryland's law enforcement and public safety interests"). The CCIA is intended to ensure that only law-abiding, responsible individuals carry firearms in public, in a manner that is calculated to raise the least alarm, and not in places too sensitive to allow firearms at all. A preliminary injunction would dispense with important public-safety provisions, potentially leading to panic and deaths. The public interest tips decidedly against a preliminary injunction.

*Fourth*, an injunction would also be inappropriate because the injunction plaintiffs seek is misconceived in several respects. As discussed, plaintiffs are prohibited by multiple, overlapping provisions from carrying firearms, openly or concealed, in the City, whether in Times Square, on mass transit, or elsewhere. Thus, they would need to show a likelihood of success, as a threshold matter, on their challenge to the special-permit requirement for the injunction they seek to have any practical effect. Because that claim utterly lacks merit, they cannot obtain any injunction against the City of New York—even if their other claims presented closer questions.

Plus, as also discussed above, there is a disconnect between the preliminary injunction that plaintiffs seek and the alleged harm. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (injunctive relief must be tailored to the specific legal violations). Plaintiffs seek the enjoin the provision that criminalizes any violation of the Penal Law by licensees, instead of directly challenging the provision that prohibits open carry. Such an injunction would be overinclusive and could unnecessarily interfere with enforcement of unchallenged aspects

56

of the regulation. *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994).

Plaintiffs have utterly failed to demonstrate that any of the preliminary-injunction factors weigh in favor of the relief they seek. The district court correctly applied *Bruen*'s framework when it compared the challenged regulations to historical laws from before, during, and after the Founding and Reconstruction eras, and properly found that the challenged CCIA provisions are consistent with the longstanding historical understanding of the right to public carry. Because these provisions are entirely lawful, plaintiffs are not likely to succeed on the merits and will suffer no harm, let alone irreparable injury, if the CCIA remains in effect while they litigate the merits of their dispute in the district court. That the public interest tips decidedly against any injunction just confirms that this Court should affirm.

# CONCLUSION

This Court should affirm.


Dated:   New York, NY
         September 19, 2023

                          Respectfully submitted,

                          HON SYLVIA O. HINDS-RADIX
                          *Corporation Counsel*
                          *of the City of New York*
                          Attorney for New York City
                          Appellees


                     By: _____
                          ELINA DRUKER
                          Assistant Corporation Counsel

                          100 Church Street
                          New York, NY 10007
                          212-356-2609
                          edruker@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
ELINA DRUKER
    *of Counsel*

58

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word 2010, and according to that software, it contains 11,535 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
ELINA DRUKER