# 23-365

## United States Court of Appeals
## for the Second Circuit

JASON FREY, BRIANNA FREY, JACK CHENG, WILLIAM SAPPE,

*Plaintiffs-Appellants*,

v.

NEW YORK CITY, NEW YORK, KEECHANT SEWELL, in her Official Capacity,
STEVEN NIGRELLI, in his Official Capacity,

*Defendants-Appellees*,

KEVIN P. BRUEN, Acting Superintendent of the New York State Police,
in his official capacity, DERMOT SHEA, in his official capacity as
NYPD Police Commissioner,

*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR APPELLEE STEVEN NIGRELLI**

|  |  |
|---|---|
| | LETITIA JAMES |
| | *Attorney General* |
| | *State of New York* |
| BARBARA D. UNDERWOOD | Attorney for Appellee Steven Nigrelli |
| *Solicitor General* | 28 Liberty Street |
| ESTER MURDUKHAYEVA | New York, New York 10005 |
| *Deputy Solicitor General* | (212) 416-6325 |
| PHILIP J. LEVITZ | |
| *Assistant Solicitor General* | |
| *of Counsel* | Dated: September 19, 2023 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................iii

PRELIMINARY STATEMENT ............................................................. 1

ISSUES PRESENTED ........................................................................... 4

STATEMENT OF THE CASE ................................................................ 4

    A.   Legal Background ..................................................................... 4

        1.   New York's firearm-licensing laws.................................... 4

        2.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* .......................... 6

        3.   New York's Concealed Carry Improvement Act .............. 9

    B.   Factual and Procedural Background...................................... 11

        1.   The plaintiffs................................................................... 11

        2.   Procedural history .......................................................... 12

        3.   The district court's denial of a preliminary injunction..... 14

STANDARD OF REVIEW...................................................................... 16

SUMMARY OF ARGUMENT ................................................................ 18

ARGUMENT ......................................................................................... 22

POINT I

    PLAINTIFFS FAIL TO ESTABLISH LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGES .......................... 22

i

**Page**

A. The Requirement to Possess a Carry License or Permit in New York City is Constitutional. ....................................... 22

B. Plaintiffs Lack Standing to Challenge New York's Prohibition on Open Carry, and the Challenge Is Meritless in Any Event. ....................................... 29

C. The Challenged Sensitive-Place Restrictions Are Constitutional. ....................................... 36

   1. The State has authority to prohibit firearms on subways and commuter trains. ....................................... 42

   2. The State has authority to prohibit firearms in Times Square. ....................................... 50

D. The District Court Did Not Err in Considering Incorporation-Era History. ....................................... 54

POINT II

THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH HEAVILY AGAINST AN INJUNCTION ....................................... 62

CONCLUSION ....................................... 67

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Abed v. United States*,
278 A.3d 114 (D.C. 2022) ................................................................. 32

*Andrews v. State*,
50 Tenn. 165 (1871) ....................................................................... 40-41

*Baird v. Bonta*,
No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) ........... 32, 61

*Calcano v. Swarovski N. Am. Ltd.*,
36 F.4th 68 (2d Cir. 2022) ............................................................... 30

*Cayuga Nation v. Tanner*,
824 F.3d 321 (2d Cir. 2016) ............................................................. 29

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) ......................................................... 17, 62

*Community Hous. Improvement Program v. City of New York*,
59 F.4th 540 (2d Cir. 2023) ............................................................. 49

*Connecticut State Police Union v. Rovella*,
36 F.4th 54 (2d Cir.) ....................................................................... 17

*Crawford v. Washington*,
541 U.S. 36 (2004) ........................................................................... 60

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................ passim

*Dowd v. Albany Ry.*,
47 A.D. 202 (3d Dep't 1900) ............................................................ 43

*Dred Scott v. Sandford*,
60 U.S. (19 How.) 393 (1857) .......................................................... 55

**Cases**                                                       **Page(s)**

*English v. State,*
    35 Tex. 473 (1871) .............................................................. 40

*Eslava v. State,*
    49 Ala. 355 (1873) ............................................................. 44

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011).............................................57

*GeorgiaCarry.Org, Inc. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012).........................................46

*Gould v. Morgan,*
    907 F.3d 659 (1st Cir. 2018) .............................................57

*Hill v. State,*
    53 Ga. 472 (1874) ........................................................ 39, 52

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,*
    412 F.3d 418 (2d Cir. 2005) ............................................. 12

*Kane v. De Blasio,*
    19 F.4th 152 (2d Cir. 2021)..........................................65-66

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019)............................................28

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).......................................................... 29

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)......................................................... 60

*MacWade v. Kelly,*
    460 F.3d 260 (2d Cir. 2006) .........................................47-48

*Maryland v. King,*
    567 U.S. 1301 (2012)....................................................... 64

iv

## Cases                                                          Page(s)

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ............................................................ 36, 56-57

*National Rifle Ass'n v. Bondi,*
   61 F.4th 1317 (11th Cir. 2023) ........................................ 57

*Nevada Comm'n on Ethics v. Carrigan,*
   564 U.S. 117 (2011) ............................................................ 60

*New York ex rel. Schneiderman v. Actavis*
   *plc*, 787 F.3d 638 (2d Cir. 2015) .................................... 17

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ............................................ 64

*New York State Rifle & Pistol Association v. Bruen,*
   142 S. Ct. 2111 (2022) ................................................ passim

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................ 16

*Norman v. State,*
   215 So. 3d 18 (Fla. 2017) .................................................. 33

*Nunn v. State,*
   1 Ga. 243 (1846) ............................................................ 33-34

*Osterweil v. Bartlett,*
   21 N.Y.3d 580 (2013) ........................................................ 27

*Owens v. State,*
   3 Tex. App. 404, 407 (1878) ............................................ 40

*Ramos v. Louisiana,*
   140 S. Ct. 1390 (2020) ...................................................... 60

*State v. Shelby,*
   90 Mo. 302 (1886) .............................................................. 40

v

**Cases**                                                          **Page(s)**

*Timbs v. Indiana,*
   139 S. Ct. 682 (2019).............................................................. 60

*Uniformed Fire Officers Ass'n v. De Blasio,*
   973 F.3d 41 (2d Cir. 2020) ................................................... 63

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019) .............................................. 46

*United States v. Sitladeen,*
   64 F.4th 978 (8th Cir. 2023) ................................................. 23

*Washington State Grange v. Washington State Republican
   Party,*
   552 U.S. 442 (2008)............................................................... 50

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.,*
   423 F.3d 137 (2d Cir. 2005) ................................................. 63

*Wilson v. Arkansas,*
   514 U.S. 927 (1995)............................................................... 60

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)........................................................... 16, 64

*Wrenn v. District of Columbia,*
   864 F.3d 650 (D.C. Cir. 2017) .............................................. 66

**Constitution**

U.S. Const. amend. II.............................................................. 22

**Laws**

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.)........................ 9, 62

**Laws**                                                      **Page(s)**

*New York (cont'd)*

Penal Law

§ 265.01-d ........................................................................ 10

§ 265.01-e .................................................................. 10, 41

§ 265.03 ............................................................................ 5

§ 265.20 ............................................................................ 5

§ 400.00 ........................................................... 4-5, 13, 36

§ 400.00 (2021) ................................................................ 6

§ 400.30 ............................................................................ 5

Public Authorities Law §§ 1263-1264 ................................. 46

*States (alphabetical)*

Ch. 98, 1879 Ind. Acts 201 ............................................... 26

Ch. 60, 1871 Kan. Sess. Laws 118 ................................... 26

Ch. 20 (Oct. Sess. 1777), *Laws of Maryland, Made Since [1763]*
(A. Hanson ed., 1787) ...................................................... 27

Ch. 7, 1776 Mass. Acts [31] (Mar. Sess.) ......................... 27

Ch. 26 (1795), 2 *Laws of the Commonwealth of Massachusetts*
652 (J.T. Buckingham printer, 1807) ................................. 31

Mont. Political Code § 4800,
*Complete Codes & Statutes of the State of Montana* 427 (1895) ........ 26

An Act for the Punishing Criminal Offenders, *Acts and Laws of
His Majesty's Province of New Hampshire* 11 (D. Fowle
printer, 1771) .................................................................. 31, 35

Ch. 187, 1806 N.J. Laws 536 ............................................ 28

Ch. 325, 1888 N.J. Laws 483 ............................................ 26

**Laws**                                                      **Page(s)**

*States* (*alphabetical*) (*cont'd*)

Ch. 6 (1777), 1 *Public Acts of the General Assembly of North Carolina* 229 (F.-X. Martin revisor, 1804) .........................28

Ch. 21, 1777 Pa. Laws 61 .................................................................27

Ch. 274 (1822), *General Laws of Pennsylvania* 316 (J. Dunlop comp., 1846) ............................................................28

Ch. 3 (May Sess. 1777), 9 *Statutes at Large of the Laws of Virginia* 281 (W.W. Henig ed., 1821).................................28

*English*

2 Edw. 3, c. 3 (1328) ..........................................................31, 34, 37

26 Hen. 8, c. 6 (1534) ...............................................................34, 37

*Municipal*

38 R. City of N.Y. ch. 5 ..................................................................5

N.Y.C. Admin. Code § 10-315.................................................10

Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881 (Elliott F. Shepard & Ebenezer B. Shafer revisors, 1881),.....................24, 26-27

**Miscellaneous Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .........................................................57

Assembly Sponsor's Mem. A41001 (2022), https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A41001&term=2021&Memo=Y.................................................9

## Miscellaneous Authorities                                                  Page(s)

City of New York, Events, *New Year's Eve in Times Square* (n.d.),
https://www.nyc.gov/events/new-years-eve-in-times-square/279186/1 .................................................................... 51

Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459 (2019) .................................. 51

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Comtemp. Probs. 143 (1986).......................................... 28

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022).......................................... 58

Francois-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* (1792) ............................................................. 35, 37

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013)................. 25

Josh Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation* (2023)......................................................................... 43-45

Metro. Transp. Auth., *Subway and Bus Ridership for 2021* (n.d.), https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 ...................................... 51

N.Y.C. Dep't of Educ., *Student MetroCards* (Sept. 7, 2023), https://www.schools.nyc.gov/school-life/transportation/bus-eligibility ...................................................................... 48

N.Y. Office of the Governor, Proclamation (June 24, 2022), https://www.governor.ny.gov/sites/default/files/2022-06/Proclamation_Extraordinary_Session_June_2022.pdf .................. 9

Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Test, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623 (2023) .........................................25-26, 38-39

**Miscellaneous Authorities** **Page(s)**

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ...................................................................... 28

Senate Sponsor's Mem. S51001 (2022), https://www.nysenate.gov/legislation/bills/2021/s51001 ..................... 9

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in History and Tradition?*, 87 Tex. L. Rev. 7 (2004) .............................. 58

Transportation Rsrch. Bd., *Transit Capacity and Quality of Service Manual* (1999), https://www.trb.org/publications/tcrp/tcrp_webdoc_6-c.pdf .............. 48

U.S. Census Off., Census Bulletin No. 38, *Population of New York by Counties and Minor Civil Divisions* (Jan. 22, 1901), https://www2.census.gov/library/publications/decennial/1900/bulletins/demographic/38-population-ny.pdf ..................................... 52

# PRELIMINARY STATEMENT

In this case under 42 U.S.C. § 1983, plaintiffs contend that several of New York's firearm laws violate the Second Amendment. Specifically, plaintiffs challenge (i) the longstanding requirement to obtain a license to carry in New York City even if an individual has a license issued in another county, (ii) the prohibition on open carry, and (iii) provisions prohibiting firearms on subways and commuter trains and in Times Square.[1] The U.S. District Court for the Southern District of New York (Román, J.) denied plaintiffs' motion for a preliminary injunction in relevant part.[2] This Court should affirm.

Plaintiffs are not likely to succeed on the merits of their claims for several reasons. *First*, the requirement to obtain a separate license to carry in New York City is consistent with the Second Amendment. The

---

[1] This brief is filed solely on behalf of the state defendant, Steven A. Nigrelli, Acting Superintendent of the New York State Police. The New York City defendants are separately represented.

[2] The district court stayed resolution of the motion with respect to provisions that are at issue in *Antonyuk v. Nigrelli*, No. 22-2908(L), and *Christian v. Nigrelli*, No. 22-2987, pending this Court's decision in those fully briefed and argued cases. Plaintiffs do not challenge this portion of the district court's decision.

Supreme Court made clear in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) that licensing schemes are generally permissible and gave no indication that the federal Constitution restricts different jurisdictions within a single State from imposing distinct licensing criteria based on local needs.

*Second*, plaintiffs lack standing to challenge the State's prohibition on open carry of firearms. Plaintiffs allege only vaguely that they "intend to begin" carrying firearms openly at some unidentified future time. Such "some day" intentions are insufficient for standing as a matter of law. Regardless, New York's prohibition on open carry is constitutional because it is entirely consistent with this nation's history of gun regulation. Governments have long regulated the manner of public carry to, among other things, prevent public fear and chaos.

*Third*, the State's prohibitions on firearms on Metropolitan Transit Authority (MTA) subways and trains and in Times Square are constitutional because they are consistent with a long history of sensitive-place regulations. In particular, firearms have long been restricted in unusually crowded places, especially where vulnerable and impaired people are often present. Subways, commuter trains, and

Times Square are quintessential modern examples of such places. And because subways and commuter trains are government owned, the government has independent authority to impose firearm restrictions there.

Contrary to plaintiffs' suggestion, the historical regulations on which the district court relied are not limited to the nineteenth century, but rather trace back as far as the medieval Statute of Northampton, and continue through the Founding era when the Second Amendment was adopted, as well as the Reconstruction era when it was incorporated against the States. Also contrary to plaintiffs' suggestion, all of those regulations shed important light on the history of firearm regulation and support the analogous modern regulations.

The remaining preliminary-injunction factors also weigh strongly in favor of the continued enforcement of the provisions at issue in this case. Because plaintiffs have shown no constitutional right to carry in the dangerous manner and in the sensitive places they desire, they have shown no irreparable harm from restrictions on their ability to so carry. Regardless, any harm plaintiffs might face from the relevant manner and place restrictions while this litigation is pending could not outweigh

the harms of exposing twenty million New Yorkers to a heightened risk of gunfire against the judgment of the Legislature.

## ISSUES PRESENTED

1. Did the district court reasonably exercise its discretion in denying plaintiffs' preliminary-injunction motion where plaintiffs failed to show that they are likely to succeed on the merits of their challenges to New York's firearm regulations?

2. Did the district court reasonably conclude that the remaining preliminary-injunction factors similarly weigh against an injunction?

## STATEMENT OF THE CASE

**A.  Legal Background**

**1.  New York's firearm-licensing laws**

As in dozens of other States, New York law has long set forth eligibility criteria for obtaining a license to carry a firearm in public, including that the licensee is over twenty-one years of age and has not been convicted of a felony or a serious offense. *See* Penal Law § 400.00(1). Also like many other States, New York has long granted

4

licenses only for concealed carrying in public—not open carrying. *See id.* § 400.00(2).

Firearm carrying licenses are issued by localities within New York. *Id.* § 400.00(3). Such localities may establish and apply more restrictive licensing requirements than the State at large. *Id.* § 400.30. New York City has long required that individuals wishing to carry firearms in the City must obtain a license issued by the City, or a special permit if the individual has already obtained a license elsewhere. *See id.* § 400.00(6). The requirement to obtain a special permit issued by the City has several exemptions, including for carrying firearms through the City in a locked container, carrying by armored car security guards, and carrying by active and former law-enforcement officers. *See id.* The City has its own regulations pertaining to the issuance of firearm carrying licenses and permits. *See* 38 R. City of N.Y. ch. 5.

Possessing a firearm without a license in the State is unlawful. *See, e.g.*, Penal Law §§ 265.03 (criminalizing possession of loaded handgun), 265.20(a)(3) (exempting license holders). A person who holds a valid firearm license but possesses a firearm in violation of the terms

5

of that license is subject to licensing penalties or prosecution for a misdemeanor offense. *See id.* § 400.00(15).

## 2. The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*

Until recently, one of the State's eligibility criteria for a concealed-carry license was "proper cause" to obtain the license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *Bruen*, the U.S. Supreme Court concluded that insofar as "proper cause" demanded showing "a special need for self-defense," 142 S. Ct. at 2122, this requirement infringed the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense, since it was not "consistent with the Nation's historical tradition of firearm regulation," *id.* at 2130-31.

*Bruen* rejected the framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges in favor of a restated standard. The new standard requires the plaintiff to show that "the Second Amendment's plain text covers an individual's conduct," and, if the plain text does cover the relevant conduct, the government seeking to regulate that conduct "must demonstrate that

the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also id.* at 2129.

*Bruen* recognized the necessity and constitutionality of modern firearm regulation. First, the Court announced that "nothing in our analysis" was meant "to suggest the unconstitutionality" of "shall-issue" licensing regimes. *Id.* at 2138 n.9. These licensing laws "often require applicants to undergo a background check or pass a firearms safety course" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Second, the Court "assume[d] it settled" that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. The opinion endorsed such "longstanding" bans in schools, legislative assemblies, polling places, and courthouses, while recognizing that this list was nonexhaustive and "that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

7

*Bruen* acknowledged that the application of the restated Second Amendment standard would require further development in the lower courts. For example, the court declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." *Id.* at 2134 (quotation and alteration marks omitted). *Bruen* instructed that the historical inquiry required in Second Amendment cases "will often involve reasoning by analogy," but declined to "provide an exhaustive survey of the features that render regulations relevantly similar," except to identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. The Court explained that, while, in some cases, historical analogies will be "relatively simple to draw," "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.

*Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "a historical twin" or "dead ringer" to support modern regulations. *Id.* at 2133 (emphasis omitted). The Court recognized that "[t]he regulatory challenges posed by firearms today are

8

not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations.'" *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

### 3. New York's Concealed Carry Improvement Act

The day after *Bruen* was decided, New York Governor Kathy Hochul announced that she would convene an extraordinary legislative session to bring New York's law into compliance with the ruling. *See* N.Y. Office of the Gov., Proclamation (June 24, 2022). On July 1, 2022, the Legislature passed the Concealed Carry Improvement Act (CCIA), which removed the proper-cause requirement that *Bruen* declared unconstitutional and made several other changes to New York's firearm licensing and possession laws. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.); *see also* Assembly Sponsor's Mem. A41001 (2022); Senate Sponsor's Mem. S51001 (2022). The statute took effect on September 1, 2022. *See* Ch. 371, § 26, 2022 N.Y. Laws.

9

As relevant here, the CCIA codifies several sensitive places in which carrying a firearm is not permitted, including public transportation and Times Square, "as such area is determined and identified by the city of New York" and "clearly and conspicuously identified with signage." Penal Law § 265.01-e(2)(n), (t); *see also* N.Y.C. Admin. Code § 10-315 (defining location of Times Square). The CCIA separately bars possessing a firearm on another person's private property, when the person carrying the firearm "knows or reasonably should know that the owner or lessee of such property" has not "given express consent" to carry firearms on the premises, whether by posted signage or other means. *Id.* § 265.01-d(1). The sensitive-place and private-property provisions have several exemptions, including for law-enforcement officers, military personnel, security guards, and persons lawfully hunting. *Id.* §§ 265.01-d(2), 265.01-e(3).

**B.    Factual and Procedural Background**

**1.    The plaintiffs**

Plaintiff Jason Frey is a resident of Westchester County, New York (Appendix (A.) 17 (¶ 3).) He has a New York State "sportsman" license, permitting carrying of firearms to, during, and from sporting activities. (A. 18 (¶ 7).) Frey states that he nevertheless carries a firearm concealed at certain locations outside his sportsman-license restrictions. (A. 19 (¶ 14).) Frey also asserts that, although he is not going to apply for a license or permit to carry in New York City (A. 21 (¶ 26)), he carries his firearm concealed there, including on the Metro-North commuter train, on the subway, and through Times Square (A. 22 (¶ 27)). Frey also says that he "intend[s] to start carrying [his] handgun open and holstered," if and when he is not carrying concealed. (A. 21 (¶ 21).)

Plaintiff William Sappe is a resident of Orange County, New York. (A. 24 (¶ 3).) He has a license to carry a concealed firearm in New York State but does not have a license to carry in New York City. (A. 24 (¶ 3).) He says that he wishes to carry in the City because his employment involves transporting cash, diamonds, and jewelry there.

11

(A. 25 (¶ 7).) Although he has no license to carry in the City, he says that he nonetheless "will be carrying a concealed handgun" there "from now on" (A. 25 (¶ 10)), including through Times Square (A. 26 (¶ 13)), and that he "intend[s] to begin carrying my handgun open and exposed" if and when he is not carrying concealed (A. 27 (¶ 19)).[3]

## 2. Procedural history

Plaintiffs originally filed this action and sought a preliminary injunction in the U.S. District Court for the Southern District of New York in June 2021, alleging that several provisions of New York state and city firearm laws are inconsistent with the Second Amendment. (Compl. (June 21, 2021), ECF No. 1.) As relevant here, plaintiffs brought facial challenges to the constitutionality of the laws requiring a New York City-specific license or permit to carry a firearm in the City; permitting only concealed, and not open, carrying; and making it a

---

[3] Plaintiff William Cheng did not join the preliminary-injunction motion at issue in this appeal. (*See* Order to Show Cause (Proposed) (filed Oct. 20, 2022), ECF No. 48.) Plaintiff Brianna Frey makes no specific arguments with respect to her challenges on appeal, and plaintiffs have therefore waived any such argument. *See, e.g.*, *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

misdemeanor to possess a firearm outside license restrictions. *See* Penal Law § 400.00(2), (6), (15). (*See* Compl. ¶¶ 233-236, 241-248.) In February 2022, the district court (Román, J.) denied plaintiffs' motion for a preliminary injunction (Op. & Order (Feb. 22, 2022), ECF No. 37), and plaintiffs did not appeal.

After the U.S. Supreme Court decided *Bruen* in June 2022 and the Legislature enacted the CCIA the following month, plaintiffs filed an amended complaint that added facial Second Amendment challenges to several CCIA provisions, including the restrictions on firearms on public transportation and in Times Square, and the provision prohibiting firearms on others' private property without express consent. (Second Am. Compl. ¶¶ 211-219, 241-244 (Oct. 14, 2022), ECF No. 47.) In October 2022, plaintiffs filed the renewed preliminary-injunction motion now on appeal. (Order to Show Cause (Proposed), ECF No. 48.)[4]

--------

[4] Plaintiffs had filed an earlier renewed motion in August 2022 that was immediately denied without prejudice for being improperly filed. (Mem. Endorsement (Aug. 19, 2022), ECF No. 38.)

13

### 3.   The district court's denial of a preliminary injunction

In March 2023, the district court denied in relevant part the renewed preliminary-injunction motion in a thoroughly reasoned, 44-page opinion.[5] (*See* A. 143-186.)

The district court first held that plaintiffs lack standing to challenge certain of the challenged provisions, including, as relevant here, the prohibition on open carrying, and many of the sensitive-place restrictions on firearm carrying referenced in the complaint. The court so held because plaintiffs had not shown a concrete and imminent intent to carry openly, or to carry in those sensitive places. (A. 153-165.)

The district court further held that there is no merit to plaintiffs' challenges to the requirement to obtain a license or special permit to carry in New York City, and to restrictions on open carrying and carrying on MTA subways and commuter trains[6] and in Times Square,

---

[5] In the interest of judicial economy, the district court stayed resolution of the motion with respect to the CCIA provisions that are at issue in *Antonyuk v. Nigrelli*, No. 22-2908(L), and *Christian v. Nigrelli*, No. 22-2987, pending this Court's decision in those cases. (A. 170-172.)

[6] MTA subways and trains are the only forms of public transportation where plaintiffs alleged an intent to carry firearms; thus, the firearm restrictions on MTA subways and trains were the only public-

(*continued on the next page*)

because the challenged provisions are consistent with the text, history, and tradition of the Second Amendment under *Bruen*. (*See* A. 165-170, 173-184.) For the requirement to obtain a license or permit to carry within New York City, the court concluded that the Second Amendment does not protect a right to carry without a license, and, in any event, an extensive history of municipal gun regulation from the Founding era through the nineteenth-century era when the Second Amendment was incorporated against the States supports the City's authority to impose a similar requirement. (A. 165-169.) The court also held that an extensive history of regulation of the manner of public carry would support New York's open-carry prohibition, even if plaintiffs had standing to challenge it. (A. 169-170.) And the court held that similarly extensive history, for instance, on early trains, on government property, and in unusually crowded places, supports the sensitive-place restrictions on carrying firearms on MTA subways and trains and in Times Square. (A. 173-184.)

---

transit restrictions that the district court found plaintiffs had standing to challenge. (A. 172.)

The district court also found that plaintiffs did not show irreparable harm or that the balance of the equities and the public interest favor their requested preliminary injunction.[7] (A. 184-185.)

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Preliminary-injunction movants must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. Where, as here, the nonmovants are governmental entities or officials, the latter two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

In addition, where, as here, an injunction would alter the status quo operation of a law, movants are held to a "heightened" standard,

_____

[7] Plaintiffs moved in the district court for an injunction pending appeal, and the district court denied that motion in April 2023, in another thorough nine-page opinion. (Op. & Order (Apr. 13, 2023), ECF No. 88.) Plaintiffs did not renew their motion in this Court.

requiring a "clear" or "substantial" likelihood of success on the merits and a "strong showing" of irreparable harm. *See New York ex rel. Schneiderman v. Actavis plc*, 787 F.3d 638, 650 (2d Cir. 2015); *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (preliminary injunction altering status quo "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief" (quotation marks omitted)).

On appeal, this Court reviews a decision denying a preliminary injunction for abuse of discretion. *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 61 (2d Cir.), *cert. denied*, 143 S. Ct. 215 (2022).

## SUMMARY OF ARGUMENT

The district court properly exercised its discretion to conclude that plaintiffs did not meet their burden to demonstrate that enforcement of the provisions they challenge should be enjoined. Plaintiffs' legal challenges lack merit and the remaining injunction factors weigh strongly against an injunction.

I.A. The district court correctly concluded that plaintiffs have not shown a likelihood of success on the merits of their challenge to New York City's firearm licensing requirement. The Supreme Court has made clear that governments may require firearm licenses to demonstrate that licensees are in fact law-abiding and responsible. *See Bruen*, 142 S. Ct. at 2138 n.9; *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The Supreme Court has never indicated that jurisdictions within the same State are precluded from imposing distinct licensing requirements based on considerations of local need. Moreover, the City's licensing regulation is supported by an extensive history of similar municipal licensing regulations, including from the nineteenth-century period when the Second Amendment was

18

incorporated against the States, and earlier Founding-era regulations to disarm those deemed unable to carry firearms safely.

I.B. The district court also correctly concluded that plaintiffs have not shown a likelihood of success on the merits of their challenge to New York's open-carry prohibition. As an initial matter, plaintiffs have not demonstrated standing because they do not allege a concrete intent to carry openly in New York, much less an imminent threat of prosecution. Regardless, the open-carry prohibition is constitutional, because licensed individuals are free to carry concealed, and the Supreme Court has been clear that the manner of public carry has always been subject to regulation. *See Bruen*, 142 S. Ct. at 2150. Indeed, there is a centuries-old history of regulations prohibiting carrying openly in a manner that causes fear or disturbs the peace— just as carrying openly in crowded urban areas would today.

I.C. The district court likewise correctly concluded that plaintiffs have not shown a likelihood of success on the merits of their challenge to the CCIA's sensitive-place restrictions on carrying firearms on MTA subways and trains, and in Times Square. The Supreme Court has repeatedly held that such laws are "presumptively lawful." *Heller*, 554

U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133. Moreover, there is a lengthy history of firearm restrictions in unusually crowded sensitive places, dating back to medieval England and continuing through Founding-era America, where, for instance, carrying in fairs and markets was prohibited. These regulations expanded in the nineteenth-century incorporation period, when many States and cities restricted firearm carrying on government property and in a wide range of other places of public gathering, including where vulnerable people such as children or impaired people were present.

New York's restriction of firearms on MTA subways and trains fits squarely in this historical tradition. Indeed, trains restricted firearms from their earliest days, just as other unusually crowded places long had. Further, modern MTA trains are government-owned, and the trains' government ownership provides an independent basis for the government to regulate them.

New York's restriction of firearms in Times Square reflects a confluence of nearly all the qualities that have long defined sensitive places where firearms have been restricted: extreme crowding, frequent

presence of children and other vulnerable and impaired people, and First Amendment expressive activity.

I.D. Plaintiffs err in contending that only Founding-era, and not incorporation-era, history is relevant under *Bruen*. As an initial matter, ample history from both eras supports the regulations challenged here, so the court need not decide which era governs. In any event, the Supreme Court has repeatedly turned to history from both eras to interpret incorporated rights like the right to bear arms. And the incorporation era is at least as relevant as the Founding era when interpreting the scope of rights incorporated against the States.

II. The district court also properly exercised its discretion to conclude that the equitable injunction factors weigh heavily against an injunction. Plaintiffs have not shown any irreparable harm in the absence of an injunction, as their extended delay in seeking such relief confirms. And an injunction permitting individuals who are not even licensed to carry firearms in New York City to carry openly there, including in sensitive places like subways and Times Square, would sow chaos and create a serious risk of injury and death—against the judgment of the Legislature. Moreover, by upending longstanding

public-safety laws, the injunction would defy the purpose of a preliminary injunction to maintain the status quo while litigation is pending.

## ARGUMENT

## POINT I

### PLAINTIFFS FAIL TO ESTABLISH LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGES

### A. The Requirement to Possess a Carry License or Permit in New York City is Constitutional.

As the district court correctly concluded, plaintiffs are unlikely to succeed on the merits of their challenge to the requirement that individuals obtain a license or permit for carrying firearms in New York City even if they have a license issued by another county in the State.

*First*, the Second Amendment does not protect the right to carry a firearm without an applicable license. The Supreme Court has been clear that "the people" whose right to carry arms in self-defense is guaranteed by the Second Amendment are "'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also* U.S. Const. amend. II. Conversely, those who are not law-abiding, responsible citizens fall outside "'the people' entitled to keep

22

and bear arms." *United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023). Accordingly, *Bruen* emphasized that licensing regimes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" are constitutional. *See* 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence (joined by the Chief Justice) expressly "underscore[d]" that the Court's decision permits "licensing requirements for carrying a handgun for self-defense." *See id.* at 2161; *see also id.* at 2157 (Alito, J., concurring) (majority "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun"). Nothing in the Supreme Court's decisions indicates that licensing requirements must be uniform across States, or across individual jurisdictions within States.

*Second*, history and tradition strongly support municipal requirements for a license to carry, to ensure that individuals carrying firearms in the municipality can be expected to do so safely given the conditions in a particular community. Municipal firearm licensing regimes and related licensing regulations for handling firearms, fireworks, or gunpowder in cities date back to at least 1750 in Philadelphia. (*See, e.g.*, Decl. of N. Ciappetta, Ex. 3 (Nov. 30, 2022),

ECF No. 67-3; *see also id.* Exs. 4-5, ECF Nos. 67-4, 67-5.[8]) Such regulations rapidly multiplied starting in the late-nineteenth-century period when the Second Amendment was incorporated against the States, as firearm safety concerns proliferated in fast growing and crowding cities. (*See, e.g.*, Decl. of S. Mettham, Ex. A (Nov. 30, 2022), ECF No. 65-1, p. 3 (Brooklyn ordinance requiring license to carry firearm, 1880); *id.*, Ex. B, ECF No. 65-2, pp. 4-5 (Buffalo, 1891); *id.*, Ex. C, ECF No. 65-3, p. 4 (Elmira, 1892); *id.*, Ex. D, ECF No. 65-4, p. 4 (Syracuse, 1892); *id.*, Ex. E, ECF No. 65-5, p. 3 (Troy, 1905); *id.*, Ex. F, ECF No. 65-6, p. 4 (Lockport, 1909); *id.*, Ex. G, ECF No. 65-7, pp. 3-4 (Albany, 1905); Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881 ("N.Y.C. Ordinances") §§ 264-266, at 214-16 (Elliott F. Shepard & Ebenezer B. Shafer revisors, 1881) (similar New York City ordinance); *see also* Br. of *Amicus Curiae* Patrick J. Charles in Supp. of Neither Party, Appendix, *Bruen*, 142 S.

---

[8] Because plaintiffs' counsel proceeded without consulting the appellees regarding a joint appendix under Rule 30 of the Federal Rules of Appellate Procedure, some documents are cited and hyperlinked to the district court docket, with pincites to the file page (p.) image.

Ct. 2111 (No. 20-843) (linking to dozens of similar licensing laws from municipalities in other States).)

Contrary to plaintiffs' suggestion, it is wholly consistent with historical tradition for cities like New York City to be permitted to impose different, and sometimes more stringent, firearm restrictions than rural States. Guns in more crowded urban areas have always presented special public-safety considerations that are not present in sparsely populated rural areas, just as guns in rural areas could be commonplace for reasons not applicable in cities, such as hunting. Accordingly, firearm regulation has always varied across the country, and generally been more stringent in cities. *See* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013). Indeed, in the nineteenth century, many States expected cities to regulate firearms—as reflected in the predominance of municipal licensing laws from that period. *See* Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Test,*

*History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 659-65 & n.256 (2023).[9]

Plaintiffs are also wrong to suggest (*see, e.g.*, Br. for Pls.-Appellants (Br.) at 18) that there is no tradition of requiring a locality-specific firearm license like New York City's for those who have licenses issued elsewhere in the State. The incorporation-era municipal licensing laws generally applied to "any person" (except a peace officer) wishing to carry firearms in the municipality, whether or not the person had a license elsewhere in the State. (*See, e.g.*, Mettham Decl., Ex. A, p. 3 (Brooklyn); *id.*, Ex. B, p. 4 (Buffalo); *id.*, Ex. E, p. 3 (Troy); *id.*, Ex. G, p. 3 (Albany)); N.Y.C. Ordinances, *supra*, § 265, at 215 (New York City).) Moreover, these laws often specifically underscored that "any non-resident" who has occasion to carry in the municipality must apply for a license "in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions." (*See*

_____

[9] Some States enacted legislation expressly delegating authority to regulate firearms to municipalities. *See, e.g.*, Ch. 60, § 62, 1871 Kan. Sess. Laws 118, 134; Ch. 98, § 6, 1879 Ind. Acts 201, 202; Ch. 325, § 47, 1888 N.J. Laws 483, 501; Mont. Political Code § 4800(55), in *Complete Codes & Statutes of the State of Montana* 427 (1895).

Mettham Decl., Exs. A, E, G (Brooklyn, Troy, and Albany); N.Y.C. Ordinances, *supra*, § 265, at 215 (New York City).) The purpose of jurisdiction-specific licensing requirements—historically and today— was to discourage forum-shopping in counties where "investigations of applicants were much less thorough than in the city." *See Osterweil v. Bartlett*, 21 N.Y.3d 580, 586 (2013).

Plaintiffs likewise err (Br. at 19 & n.20) in suggesting that a Philadelphia ordinance is the only Founding-era support for New York City's modern requirement. Although municipal firearm licenses per se became common only in the nineteenth century—as cities became larger, more crowded, and more impersonal, and firearms more lethal— the nineteenth-century licensing schemes follow from a direct line of Founding-era and earlier laws disarming individuals deemed threats to public safety or lacking the moral character to be entrusted with firearms. For example, Revolutionary-era loyalty laws required those who might be "disaffected to the cause of America" to appear in person and take an oath of allegiance, or else be disarmed. *E.g.*, Ch. 7, 1776 Mass. Acts [31], 32 (Mar. Sess.); *see also, e.g.*, Ch. 21, 1777 Pa. Laws 61; Ch. 20 (Oct. Sess. 1777), *Laws of Maryland, Made Since [1763]* [n.p.]

27

(A. Hanson ed., 1787); Ch. 6 (1777), 1 *Public Acts of the General Assembly of North Carolina* 229 (F.-X. Martin revisor, 1804); Ch. 3 (May Sess. 1777), 9 *Statutes at Large of the Laws of Virginia* 281 (W.W. Henig ed., 1821). Early militia-mustering laws also provided for the disarmament of anyone who appeared unfit to bear arms. *See, e.g.*, Ch. 187, 1806 N.J. Laws 536; Ch. 274 (1822), *General Laws of Pennsylvania* 316 (J. Dunlop comp., 1846).

These laws reflect the long tradition of understanding the right to bear arms as a right of the "virtuous citizen," which permits laws denying firearms to those determined to be "unvirtuous" (e.g., dangerous). *See, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Comtemp. Probs. 143, 146 (1986); *see also Kanter v. Barr*, 919 F.3d 437, 451, 454 (7th Cir. 2019) (Barrett, J., dissenting) (historical record confirms that "legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," because the person "belongs to a dangerous category or bears individual markers of risk").

28

**B.** **Plaintiffs Lack Standing to Challenge New York's Prohibition on Open Carry, and the Challenge Is Meritless in Any Event.**

Plaintiffs' challenge to New York's open-carry prohibition is unlikely to succeed on the merits for at least two independent reasons, as the district court correctly concluded.

*First*, plaintiffs have not met their burden to demonstrate standing to challenge the prohibition on open carry of firearms. Neither Frey nor Sappe alleges any concrete and imminent intent to carry openly in New York, much less the imminent threat of prosecution required for standing for their pre-enforcement challenge. *See, e.g.*, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). Plaintiffs', at best, "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be— do not support a finding of the 'actual or imminent' injury that is required." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

On appeal, plaintiffs do not contest the district court's determination that Frey lacks standing to challenge the open-carry prohibition. Br. at 27-30. They also do not contest that Sappe attests only that he "'intend[s] to begin'" open carrying when he is not carrying

29

concealed. (A. 163 (quoting Sappe Decl. ¶ 19).) And they do not contest the district court's observation that this vague statement in fact appears to contradict another statement in Sappe's declaration, in that Sappe also attests that he plans to carry *concealed* "'on a daily basis.'" (A. 163-164 (quoting Sappe Decl. ¶ 10).) Plaintiffs cite no authority indicating that such vague and contradictory assertions can support standing, and the state defendant is aware of none. *Cf. Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) ("vague assertions" insufficient to demonstrate imminent, concrete injury necessary for standing).

Plaintiffs gain no support from their observation (Br. at 28-29) that Sappe attested that he holds an open-carry permit in California and carries openly there. Sappe's willingness to carry openly elsewhere with a permit to do so says nothing about his intention to carry openly in New York when such conduct would be unlawful. Indeed, plaintiffs acknowledge that Sappe "would" carry openly in New York "but for the fact that open carry is banned and punished as a crime." Br. at 29. Plaintiffs therefore lack standing to challenge the prohibition on open carry.

30

*Second*, the open-carry prohibition is constitutional in any event. As the Supreme Court has explained, historical evidence "demonstrate[s] that the *manner* of public carry was subject to reasonable regulation." *Bruen*, 142 S. Ct. at 2150 (emphasis in original); *see id.* at 2144, 2145-50, 2155 & n.30 (citing several laws and cases from the colonial period through the late-nineteenth century).

Many of *Bruen*'s cited laws had roots in the Statute of Northampton of 1328, which prohibited carrying arms openly "in affray of the peace," 2 Edw. 3, c. 3 (1328) (Mettham Decl., Ex. AA, <u>ECF No. 65-27</u>, p. 4), or Founding-era American versions of the same law that prohibited carrying openly "to the fear or terror of the good citizens of this Commonwealth." Ch. 26 (1795), 2 *Laws of the Commonwealth of Massachusetts* 652 (J.T. Buckingham printer, 1807); *see also*, *e.g.*, An Act for the Punishing Criminal Offenders, *Acts and Laws of His Majesty's Province of New Hampshire* 11 (D. Fowle printer, 1761) (similar). (*See also* Mettham Decl., Ex. CC, <u>ECF No. 65-29</u> (similar 1786 Virginia law).)

New York's modern open-carry prohibition likewise prohibits only a particular manner of carrying—i.e., carrying openly, rather than

concealed—largely to prevent disruption of the peace and fear among citizens, particularly in crowded modern urban settings. Such a prohibition is wholly consistent with historical tradition. Indeed, *Bruen* specifically recognized that, "[u]nder the common law, individuals could not carry deadly weapons in a manner likely to terrorize others." 142 S. Ct. at 2150. And whether or not all open carrying is likely to cause terror, carrying openly—like carrying in a manner likely to terrorize—is plainly only one "*manner* of public carry," which is "subject to reasonable regulation" under *Bruen*. *See id.* (emphasis in original).

Accordingly, as explained by the only appellate court to have addressed the issue since *Bruen* of which the state defendant is aware, "nothing in the [*Bruen*] opinion implies that a State must allow open carry," *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022).[10] And courts likewise upheld open-carry prohibitions before *Bruen*, for similar reasons—i.e., that an open-carry restriction "does not diminish an

---

[10] The Ninth Circuit recently reversed the denial of a preliminary injunction in a case challenging California's limitation on open carry, but only on the ground that the district court there failed to address likelihood of success on the merits. *See Baird v. Bonta*, No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023).

individual's ability to carry a firearm for self-defense," so long as a firearm may be "carried in a concealed manner." *See, e.g.*, *Norman v. State*, 215 So. 3d 18, 28 (Fla. 2017).

In taking issue (Br. at 17-18, 30) with the district court's reliance on antebellum historical evidence regarding open-carry restrictions because it postdated the Founding, plaintiffs disregard the pre-antebellum, Founding-era historical evidence supporting open-carry restrictions cited above (*supra* at 31). Plaintiffs also take issue with *Bruen* itself, because that case expressly relied on the antebellum history on this precise point. *See* 142 S. Ct. at 2150.[11]

Plaintiffs' reliance (Br. at 31-32) on *Nunn v. State*, 1 Ga. 243 (1846), is similarly misplaced. *Nunn* found a nineteenth-century arms-carrying restriction unconstitutional only insofar as it "cut[] off the exercise of the right of the citizen altogether to bear arms." *Id.* at 243 (emphasis omitted). *Nunn* underscored that "[a] law which merely

---

[11] Plaintiffs are simply incorrect to assert (Br. at 33 n.33) that *Bruen* did not rely on this history to interpret the scope of the Second Amendment. The only issue in *Bruen* was interpretation of the Second Amendment and the Court spent several pages analyzing antebellum-era history for purposes of that interpretation. *See* 142 S. Ct. at 2145-50.

inhibits carrying" in a particular manner "is valid." *Id.* (emphasis omitted). The Supreme Court therefore cited *Nunn* in both *Heller* and *Bruen* as exemplar history supporting the proposition that "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and does not permit carrying "in any manner whatsoever." *Heller*, 554 U.S. at 626; *see also Bruen*, 142 S. Ct. at 2147, 2150.

Plaintiffs err in asserting (Br. at 33-34) that there is no tradition of imposing criminal penalties or revoking carry licenses for carrying a firearm in a way that does not accord with license restrictions. The tradition of penalizing those who carry weapons in an unlawful manner dates back to the medieval Statute of Northampton, which made the offense of "go[ing]" or "rid[ing] armed" openly, "in affray of the peace," or in certain sensitive places, punishable by forfeiture of the offender's "armour" and "their bodies to prison at the King's pleasure." 2 Edw. 3, c. 3 (1328) (Mettham Decl. Ex. AA, ECF No. 65-27); *see also* 26 Hen. 8, c. 6 § 4 (1534) (Mettham Decl. Ex. BB, ECF No. 65-28, p. 8) (punishing similar offenses with "forfeiture" of one's weapon or armor, "imprison-ment," or "mak[ing] fine and ransom to the King's Highness"). In the Founding era, carrying in affray of the peace was likewise punished

34

with "forfeit[ing]" one's arms and "commit[ment] to prison." (*E.g.*, Mettham Decl., Ex. CC, ECF No. 65-29 (Virginia law).) *See also, e.g.*, An Act for the Punishing Criminal Offenders, in *Acts and Laws of His Majesty's Province of New Hampshire*, *supra*, at 17 (similar); Francois-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (1792) (similar).

When municipal firearm licensing schemes were established starting in the nineteenth-century incorporation period, violation of license requirements also was punished as a crime, i.e., a misdemeanor—just as it is in New York today. (*See, e.g.*, Mettham Decl., Ex. C, ECF No. 65-3, p. 4 ("A violation of any of this [licensing] section shall be a misdemeanor and punishable as such."); *id.*, Ex. F, ECF No. 65-6, p. 4 ("Any person violating any of the provisions of this [licensing] ordinance shall be guilty of a misdemeanor and shall be punishable by a fine not to exceed fifty dollars, or imprisonment not to exceed six months, or by both . . . .").)[12]

---

[12] Plaintiffs are also incorrect to assert that New York "recognizes no Second Amendment 'Right'" and "continues to enforce a discretionary may-issue licensing regime." Br. at 33. Indeed, the fundamental

(*continued on the next page*)

## C. The Challenged Sensitive-Place Restrictions Are Constitutional.

The district court correctly concluded that plaintiffs are unlikely to succeed on the merits of their challenges to the State's prohibition on the possession of firearms on MTA subways and trains and in Times Square.[13]

The Supreme Court has repeatedly explained that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). Plaintiffs have not rebutted the presumptive lawfulness of New York's laws forbidding carrying of

---

purpose of the CCIA was to replace New York's former may-issue licensing regime with a shall-issue regime consistent with *Bruen*'s new interpretation of the scope of the Second Amendment. See *supra* at 9. *See also* Penal Law § 400.00(2) (public-carry license "shall be issued" to anyone satisfying the licensing requirements).

[13] Plaintiffs do not contest on appeal the district court's determination (A. 159-160) that they lack standing to challenge several other sensitive-place restrictions, including the public-transit prohibition as applied to any modes of transportation other than subways and trains operated by the MTA.

36

firearms in designated sensitive places, including MTA subways and trains and Times Square.

Whether sensitive places fall outside the scope of the Second Amendment altogether, or because the CCIA's sensitive-place regulations at issue here are "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2135, the challenged regulations are constitutional. Dating back to at least the fourteenth century in England, arms bearing has been prohibited in sensitive places analogous to public transportation and Times Square. The Statute of Northampton of 1328, 2 Edw. 3, c. 3, provided that Englishmen were generally not permitted to "ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers." *See also* 26 Hen. 8 c. 6 § 4 (prohibiting arms in any "fair, market, or other congregation" in Wales).

Such laws made their way to America, where the colonies and then Founding-era States prohibited bearing arms in sensitive places such as "fairs or markets." (*See*, *e.g.*, Mettham Decl. Ex. CC, ECF No. 65-29 (Virginia, 1786); Martin, *A Collection of the Statutes of the*

*Parliament of England in Force in the State of North-Carolina*, *supra*, at 60-61.)[14]

By the nineteenth-century period when the Second Amendment was incorporated against the States, many jurisdictions prohibited firearms in a broad range of sensitive places, including governmental property; places where vulnerable people like children or impaired people like the intoxicated were likely to be present; and other places where people crowded or assembled. For instance, laws from that period from Georgia (1870), Missouri (1883), and Texas (1870) prohibited firearms in, inter alia, courts, polling places, schools, and "any other public gathering in this State" (Mettham Decl. Ex. U, ECF No. 65-21, p. 3), place of public assembly (*id.*, Ex. W, ECF No. 65-23), or "social gathering" or "public assemblage of persons," respectively (*id.*, Ex. V, ECF No. 65-22, p. 3). The Missouri law also prohibited firearm carrying while intoxicated (*id.*, Ex. W, ECF No. 65-23), as did an 1867 Kansas law (*id.*, Ex. DD, ECF No. 65-30), and an 1883 Wisconsin law (*id.*, Ex.

---

[14] *See also* Charles, *The Fugazi Second Amendment*, *supra* at 702 & n.518 (citing Founding-era laws from several States prohibiting armed assemblies).

EE, ECF No. 65-31, p. 4). And Arizona (1889) and Oklahoma (1890) laws prohibited firearms in any "place where persons are assembled for amusement" or "circus, show or public exhibition of any kind" and any place where liquor was sold (*id.*, Ex. X, ECF No. 65-24, pp. 4-5; *id.*, Ex. Y, ECF No. 65-25, p. 4), while an 1869 Tennessee law prohibited firearms in any "fair, race course, or other public assembly of the people" (*id.*, Ex. T, ECF No. 65-20, p. 3). Several cities across the country enacted similar restrictions, either prohibiting firearm carrying altogether within city limits, or in particular sensitive places. *See, e.g.*, Charles, *The Fugazi Second Amendment*, *supra*, at 708-12 (citing numerous example laws).

During this period, state high courts repeatedly confirmed the constitutionality of sensitive-place restrictions and rejected Second Amendment challenges. For example, the Georgia Supreme Court found carrying arms in the sensitive places covered by its law "a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874). The Missouri Supreme

Court likewise concluded that its regulation of firearms in a public "assemblage of persons" is "in perfect harmony with the constitution," given the associated threat to "personal security" and risk of "lawlessness." *State v. Shelby*, 90 Mo. 302, 305-06 (1886). The Texas Supreme Court found it "little short of ridiculous" to claim a right to carry "into a peaceable public assembly" or another place "where ladies and gentlemen are congregated together." *English v. State*, 35 Tex. 473, 478-79 (1871), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.[15] And the Tennessee Supreme Court held that "a man may well be prohibited from carrying his arms" to a "public assemblage, as the carrying them to such places is not an appropriate use of them." *Andrews v. State*, 50 Tenn. 165, 182 (1871).[16]

------

[15] *See also Owens v. State*, 3 Tex. App. 404, 407 (1878) ("no excuse" for "wearing deadly weapons" in places of public assembly, because "lives of innocent people there assembled [may be] placed in jeopardy or sacrificed").

[16] Although some of the state courts referenced here did not recognize the Second Amendment to apply against the States in the nineteenth century, their States typically had state constitutional provisions analogous to the Second Amendment, and the courts decided these cases pursuant to those state constitutional provisions. Because the courts typically held "that, necessarily, the same rights, and for similar reasons, were being provided for and protected in both the

*(continued on the next page)*

Plaintiffs are wrong to suggest (Br. at 20-22) that the Supreme Court rejected sensitive-place restrictions in *Heller* and *Bruen*. Quite the contrary, the Supreme Court held in those cases that it was "settled" law that "arms carrying could be prohibited consistent with the Second Amendment" in sensitive places. *Bruen*, 142 S. Ct. at 2133; *see also Heller*, 554 U.S. at 626-27 & n.26 (sensitive-place restrictions are "presumptively lawful"); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (similar). *Bruen* simply noted that States could not expand the category of sensitive places so broadly as to include all places where people "congregate" and "where law-enforcement and other public-safety professionals are presumptively available"—like the whole "island of Manhattan." 142 S. Ct. at 2133-34 (quotation marks omitted). But the CCIA does nothing of the sort. The CCIA designates a set of specifically defined sensitive locations, such as government buildings, schools, and public transit—not whole cities. *See* Penal Law § 265.01-e. The set of sensitive places designated by the CCIA overlaps with the

Federal and State Constitutions," *e.g.*, *Andrews*, 50 Tenn. at 177, the courts' understanding of the analogous state constitutional provisions sheds important light on contemporary understandings of the Second Amendment, as well as its state analogs.

sensitive places already recognized by the Supreme Court. *See Bruen*, 142 S. Ct. at 2133. And insofar as the CCIA adds additional sensitive places, it merely follows the Supreme Court's guidance that the Court's identification of example sensitive places was not intended to "comprehensively define" such places; rather, States were expressly invited to regulate firearms in additional "*new* and analogous sensitive places." *See id*.

### 1. The State has authority to prohibit firearms on subways and commuter trains.

The prohibition on firearms in MTA subways and commuter trains at issue in this case fits squarely within the historical tradition of firearm regulation in sensitive places, as the district court correctly concluded. Passenger trains have themselves had similar firearm restrictions from their earliest days, and modern subways and commuter trains share nearly all the characteristics that have historically characterized other sensitive places where firearms were restricted: (1) they are government property; (2) they are often extremely crowded; and (3) they are often used by vulnerable people,

such as children traveling to and from school, as well as seniors and disabled people.

As the State's expert historian explained, although public train transportation is relatively new and did not exist in its modern form at the times of the Founding or incorporation, private passenger trains began appearing in the nineteenth century and the proprietors of those services regularly restricted firearms. (*See* Decl. of B. Rivas ¶¶ 13-17, ECF No. 64.) For instance, the North Pennsylvania Railroad's June 1875 "rules and regulations" stated that conductors must prevent passengers from taking "into the cars *guns*, dogs, valises, large bundles or baskets." (*Id.* ¶ 13 & Ex. B (emphasis added), ECF No. 64-2.) And the Albany Railway had a rule that "[p]assengers must not be permitted to take into the cars packages or goods that are cumbersome or dangerous." *Dowd v. Albany Ry.*, 47 A.D. 202, 203 (3d Dep't 1900). That rule was applied to prohibit someone from carrying firearms on a streetcar, and that application was upheld by a court as reasonable as a matter of law. *Id.* Additional recent historical research indicates that similar rules were commonplace from the earliest analogs of modern public transportation. *See* Josh Hochman, Note, *The Second*

43

*Amendment on Board: Public and Private Historical Traditions of Firearm Regulation* 11-20 (2023) (manuscript) (forthcoming 133 Yale L.J.).[17]

Plaintiffs err in discounting (Br. at 27) the historical firearm regulations imposed by the owners of private train companies on the basis that the regulations were not government-imposed. Early "private" train companies were in fact often quasi-public in that they were chartered and given rulemaking authority by the government; had governmentally appointed directors or officers; and/or received at least some governmental funding. *See, e.g.*, Hochman, *supra*, at 7-14. Regardless, the trains' regulations are an important part of "the

---

[17] Some longer-distance trains permitted firearms to be checked (or taken onboard unloaded and/or in a closed case), presumably to provide a way to carry the firearms for longer journeys. *See* Hochman, *supra*, at 11-20. As the State's expert historian explained, nineteenth-century firearm carrying restrictions sometimes had exceptions permitting carrying on lengthy journeys outside one's local region. But those exceptions were strictly limited to "travel to a distance from home, and not within the ordinary line of the person's duties, habits, or pleasure"—i.e., not within the range of modern subways and commuter trains. *E.g.*, *Eslava v. State*, 49 Ala. 355, 357 (1873). (*See* Rivas Decl. ¶¶ 8-12, ECF No. 64.) Accordingly, shorter-distance transportation more analogous to modern subways and commuter trains, like the North Pennsylvania Railroad and the Albany streetcar, generally did not permit any firearm carrying. *See* Hochman, *supra*, at 11-20.

Nation's historical tradition of firearm regulation," 142 S. Ct. at 2126, 2130, and they are strikingly similar to the CCIA's public transportation regulations in their "how and why," *see id.* at 2132-33. All those regulations were intended to restrict firearms in passenger cars to protect the safety of riders. It is hardly surprising that then largely private transportation would have been privately regulated, while now public transportation has generated more interest in public regulation.

Moreover, as *Bruen* emphasized, its history and tradition standard was not intended to be a "regulatory straightjacket" requiring a "historical twin" in order to support modern regulations. *Id.* at 2133 (emphasis omitted). Indeed, *Bruen* emphasized that "a more nuanced approach" to historical analogy is particularly necessary where, as here, "unprecedented societal concerns," such as regulation of newly public transportation, emerge. *Id.* at 2132; *see also* Hochman, *supra*, at 20-37 (explaining that private firearm regulations on trains are part of the historical tradition of firearm regulation now implemented in the CCIA).

45

In any event, even putting aside the historical record on trains specifically, MTA subways and commuter trains share almost all the qualities that characterized other historical sensitive places where firearms were restricted.

*First*, MTA subways and commuter trains are government property.[18] It has always been the case that governments, like other property owners, can make their own determinations regarding whether to permit firearms on their property. The Second Amendment provides no "right to bring a firearm on the private property of another against the wishes of the owner." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Government property is no exception: "the government—like private property owners—has the power to regulate conduct on its property." *E.g.*, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

---

[18] The MTA is a public benefit corporation of New York State, which is treated as a state agency for a number of purposes. *See generally* Public Authorities Law §§ 1263-1264. The MTA owns its own commuter trains; its subways are owned by New York City and leased to an MTA subsidiary (the New York City Transit Authority) to operate (*see* Ciappetta Decl., Ex. 23, ECF No. 68-10).

46

Moreover, the Supreme Court has already expressly recognized "government buildings" as sensitive places where laws prohibiting firearms are longstanding and appropriate. *See Bruen*, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626). Such prohibitions are similarly appropriate on government-owned public transportation such as subways and commuter trains. That fact alone justifies the firearm restriction on government-owned subways and trains at issue here.

*Second*, there is no dispute that MTA subways and trains are exceptionally crowded, and the government has long prohibited firearms in similarly crowded locations like fairs, markets, and public assemblies (see *supra* at 37-39). All these crowded locations share elevated risks of widespread injury and death from shootings, and, even if there is no shooting, from chaos that may follow firearm-related fears and threats. In addition, self-defense is often not feasible or safe in crowds.

The risks are particularly elevated in train cars "where millions of diverse New Yorkers and visitors stand elbow to elbow as they traverse the metropolis," *MacWade v. Kelly*, 460 F.3d 260, 264 (2d Cir. 2006). Passengers have no escape from enclosed train cars. And, especially

while on moving trains, strangers jostling each other could accidentally discharge firearms, or cause disputes that escalate into armed violence. Furthermore, the New York City subway trains at issue here are the most crowded in the country, with just four square feet per passenger at peak times. *See* Transportation Rsrch. Bd., *Transit Capacity and Quality of Service Manual* 3-29 (1999); *see also MacWade*, 460 F.3d at 264 ("[b]y any measure, the New York City subway system is America's largest and busiest"). Such extreme crowding has always justified firearm restrictions like the CCIA's.

*Third*, MTA subways and trains serve millions of children and disabled, elderly, or otherwise vulnerable or impaired individuals who depend on public transit as their only available transportation. In New York City, over 1.1 million students are eligible to ride the subway for free to and from school if they live more than half a mile from their school—and a huge number of them do ride every day. *See* N.Y.C. Dep't of Educ., *Student MetroCards* (Sept. 7, 2023). Firearms on MTA subways and trains pose a special threat to them, and history supports firearm restrictions in places where such vulnerable people are likely to be present. See *supra* at 38-39.

48

Plaintiffs' assertion (Br. at 25) that prohibiting firearms on MTA subways and trains negatively impacts lower-income individuals who may rely on these forms of transportation is both unsupported and irrelevant to the Second Amendment analysis. The purpose of designating subways and trains as sensitive places where firearms are not permitted is to protect all riders, and particularly vulnerable and impaired riders. If that purpose constrains certain riders' desired carrying of firearms, that constraint is one the Legislature reasonably determined was necessary to promote the safety of the public at large. In any event, the Second Amendment inquiry before the Court is whether the sensitive-place restriction on MTA subways and trains is consistent with the Amendment's text and history, not the restriction's impact on particular individuals. Indeed, the plaintiffs' facial challenge can succeed only if the challenged restrictions are unconstitutional in *all* applications, not just as to particular individuals. *See, e.g.*, *Community Hous. Improvement Program v. City of New York*, 59 F.4th

540, 548-50 (2d Cir. 2023), *pet. for cert. filed*, No. 22-1095 (May 8, 2023).

The challenged restrictions here are not.[19]

### 2. The State has authority to prohibit firearms in Times Square.

The district court also correctly concluded that the designation of Times Square as a sensitive place where firearms are prohibited is consistent with history and tradition, and thus constitutional. Like MTA subways and trains, Times Square represents a confluence of many of the factors that characterize historically recognized sensitive places where firearms were prohibited.

If any contemporary place epitomizes the sort of crowding—and resulting public-safety risks—that justified historical firearm restric-

---

[19] For the same reasons, plaintiffs' invocation (*see, e.g.*, Br. at 23) of their own individual purported burdens in being unable to lawfully carry firearms on subways or trains or in Times Square are largely irrelevant to the merits inquiry before the Court. The rigorous facial-challenge standard makes good sense because facial challenges like plaintiffs' "run contrary to the fundamental principle of judicial restraint" and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008) (quotation marks omitted).

tions in fairs, markets, and other public gathering places, it is Times Square. Known as the "Crossroads of the World," the iconic Times Square is New York's busiest hub for commercial and cultural activities. On an average day, Times Square has more than 300,000 visitors— including large numbers of children and other vulnerable people, as well as intoxicated and impaired people. (Ciappetta Dec. Ex. 17, ECF No. 68-2.) And on New Year's Eve, New York City estimates that a million people squeeze into Times Square's few blocks to watch the ball drop. *See* City of New York, Events, *New Year's Eve in Times Square* (n.d.). Moreover, the Times Square subway station is the busiest station in the busiest subway system in America—with an average of more than 80,000 riders entering the station per day in 2021 (when ridership was still down significantly from the pandemic). *See* MTA, *Subway and Bus Ridership for 2021* (n.d.).

Times Square is also a hub for First Amendment assembly and expressive activity, and the home of many leading press and media institutions, like the *New York Times*, the *Wall Street Journal*, the *New York Post*, and Fox Corporation. Many historical firearm regulations have been applied to places like Times Square that are devoted to the

exercise of constitutional rights like free assembly, expression, and press, which may be chilled by the presence of firearms. *See generally* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 475-478 (2019). As one state high court explained in upholding the constitutionality of such a regulation from 1870, the right to bear arms "is not to swallow up all others"—such as the right to free assembly—because such other rights are "just as sacred," and "seriously interfered with" if others are present "armed as though for battle." *Hill*, 53 Ga. at 478.

Plaintiffs are incorrect to suggest (Br. at 22) that there is no Founding-era tradition justifying the Times Square sensitive-place restriction. Defendants cited Founding-era restrictions on firearms in similarly crowded places of public assembly like fairs and markets, as part of a much longer tradition of such regulations in various places of public assembly. See *supra* at 37-39. Although there may be no identical Founding-era regulation of firearms in Times Square per se, that is because Times Square did not yet exist at the Founding, and the Founders could hardly have anticipated a place like modern Times Square, where roughly the same number of people as the entire

52

population of New York State at the Founding pass through every day.[20] *Bruen* recognized that the Constitution must adapt to modern regulatory challenges posed by places like Times Square, that are "beyond those the Founders specifically anticipated." 142 S. Ct. at 2132.

Plaintiffs also err in characterizing (Br. at 24-25) the district court's upholding of the Times Square sensitive-place restriction as a function of "[p]ublic safety[] interest balancing." On the contrary, in concluding that both the Times Square restriction and historical sensitive-place restrictions were imposed because groups of people "in confined spaces render[] a location uniquely vulnerable to firearm violence" (A. 176), the district court was comparing the "how" and "why" of the Times Square restriction with historical restrictions, and finding them relevantly similar. *See Bruen*, 142 S. Ct. at 2132-33. In other words, the district court was conducting precisely the historical analogical inquiry *Bruen* requires, particularly to address

---

[20] The population of New York State in 1790 was about 340,000. *See* U.S. Census Off., Census Bulletin No. 38, *Population of New York by Counties and Minor Civil Divisions* 1 (Jan. 22, 1901).

circumstances—like Times Square—that the Founders did not anticipate. *See id.*

**D.  The District Court Did Not Err in Considering Incorporation-Era History.**

As explained, the district court was correct to conclude that there is an extensive history of firearm regulation analogous to the New York regulations plaintiffs challenge here. Plaintiffs err in attempting to discount much of that history by contending that only regulations from immediately before the 1791 adoption of the Second Amendment are relevant. As an initial matter, plaintiffs' attempt has no effect on the result in this case because there is ample history to support the challenged regulations from the pre-1791 period. In any event, the Supreme Court has rightly embraced post-1791 history, including from the period around the 1868 incorporation of the right to bear arms against the States, when interpreting such incorporated rights.

*First*, Founding-era history is consistent with the incorporation-era history of the firearm regulations at issue here, so this Court—like *Bruen*—need not decide if either era is dispositive. *Cf. Bruen*, 142 S. Ct. at 2138 ("We need not address this issue today because . . . the public

understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same."). For example, both in the Founding era and in the incorporation era, it was understood that the right to bear arms in public was limited to law-abiding and responsible citizens who had been determined to be able to do so safely (*supra* at 23-25, 27-28), and the right could be limited in the manner of permitted public carriage (*supra* at 31), or in sensitive places of public gathering (*supra* at 37-39). Thus, the analogous regulations at issue here are supported by historical tradition even under plaintiffs' improperly cramped analytical framework.[21]

---

[21] Plaintiffs are wrong to assert (Br. at 16) that the State's historian, Dr. Brennan Rivas, acknowledged that there was no pre-nineteenth-century history of such regulations. To the contrary, she was explicit "that Americans of *the late-eighteenth* and nineteenth centuries had regulations that restricted the presence of weapons in public spaces," and she cited eighteenth-century Founding-era laws. (*E.g.*, Rivas Decl. ¶ 6, ECF No. 64 (emphasis added).) Plaintiffs also misplace their repeated reliance (Br. at 15-16, 37-38) on the notorious, abrogated Supreme Court decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857). That decision's passing rhetorical reference to citizens' right "to keep and carry arms wherever they went," *id.* at 417, simply does not address the long-recognized limitations the government may impose on the right.

55

*Second*, and in any event, contrary to plaintiffs' suggestion, the Supreme Court has repeatedly embraced post-Founding era—including incorporation-era—history in interpreting the Second Amendment. Indeed, *Heller* describes evidence of post-ratification understanding of a right as a "critical tool of constitutional interpretation." 554 U.S. at 605. And *McDonald v. City of Chicago* exhaustively retraces incorporation-era public understanding of the right to bear arms to support the Supreme Court's conclusion that the Fourteenth Amendment incorporated the Second Amendment against the States. 561 U.S. at 770-78. *Bruen* likewise examines incorporation-era and other nineteenth-century evidence at length. *See* 142 S. Ct. at 2145-56.

The Supreme Court's approach makes good sense because history from the period when the Second Amendment was incorporated against the States through the Fourteenth Amendment is, at a minimum, highly probative of the intended constitutional scope of state regulation of firearms—and perhaps more probative than Founding-era history. As the Supreme Court has explained, "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634-35). The people who

56

adopted the Second Amendment in 1791 shared the understanding that it "applied only to the Federal Government." *McDonald*, 561 U.S. at 754; *see also id.* at 806 (Thomas, J., concurring in part and concurring in the judgment). It was only when the States adopted the Fourteenth Amendment in 1868 that they made the Second Amendment applicable to the States. *Id.* at 764. Consequently, the people bound the States to respect the right to keep and bear arms through "the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137. Accordingly, the understanding of the scope of the right at the time the people adopted the Fourteenth Amendment is at least highly probative of the right's intended scope against the States, and perhaps more probative than the public understanding when the people adopted the Second Amendment.

Leading judges and scholars across the political spectrum have reached the same conclusion that "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *E.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (Sykes, J.); *see also, e.g.*, *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) (Selya, J.) (similar),

57

*abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-23 & n.9 (11th Cir.) (Rosenbaum, J.) (similar), *vacated and reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 223 (1998) ("when we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 (2004) ("Amar is exactly right"—"the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868"); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (describing the same view as "ascendant among originalists").

As the district court correctly explained, the Supreme Court recognized in *Bruen* that there is "'an ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of

an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope.'" (A. 168 (quoting 142 S. Ct. at 2138).) But the open question is "how much importance to attribute to historical evidence from the Fourteenth Amendment's ratification period, and not whether that evidence deserves any weight." (A. 162.)

Plaintiffs rely heavily (*see, e.g.*, Br. at 12-16, 34-37) on an unpublished "working draft" article by attorney Mark Smith, contending—contrary to the appellate opinions and diverse scholars surveyed above—that the 1791 Founding era is the only "critical period" for analyzing the history of firearm regulation.[22] But that contention is unpersuasive. Smith principally observes that the Supreme Court has recognized that the meaning of constitutional provisions "'does not alter,'" and "'[t]hat which it meant when adopted, it means now.'" (A. 87 (quoting *South Carolina v. United States*, 199 U.S. 437, 448 (1905)).) But the modern right to bear arms, applied against the States, was adopted when the Second Amendment was incorporated in 1868—not in 1791.

---

[22] Despite its reproduction in plaintiffs' appendix (A. 76-136), the Smith article is not part of the record of this case.

While Smith cites a number of Supreme Court decisions addressing other incorporated constitutional rights that relied on Founding-era historical sources in interpreting the scope of those rights, most of the cited cases, like *Heller* and *Bruen*, considered a wide range of historical sources—including from the incorporation era.[23] Although plaintiffs note (Br. at 14-15) that some of those cases observed that the scope of incorporated rights "bear the same content when asserted against States as they do when asserted against the federal government," *Ramos*, 140 S. Ct. at 1397, the cases did not decide whether that content was fixed in 1791 or could have been reevaluated

---

[23] *See, e.g.*, *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011) (in interpreting First Amendment, finding consistent tradition from Founding era through twentieth century); *Lynch v. Donnelly*, 465 U.S. 668, 673-78 (1984) (in interpreting Establishment Clause, finding "unbroken history" from at least 1789 through nineteenth- and twentieth-century sources); *Wilson v. Arkansas*, 514 U.S. 927, 931-36 (1995) (considering sources from 1603 to the twentieth century to interpret Fourth Amendment); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395-96 (2020) (considering sources from fourteenth through late-nineteenth centuries to interpret Sixth Amendment); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (considering sources from sixteenth through nineteenth centuries to interpret Confrontation Clause); *Timbs v. Indiana*, 139 S. Ct. 682, 687-89 (2019) (considering sources from Magna Carta to nineteenth century and later to interpret Eighth Amendment).

when the right was incorporated in 1868. *See, e.g., id.* And, in either case, the Supreme Court apparently understood that post-1791 history remains relevant, either to shed further light on the Framers' intent in 1791, to understand the reevaluated incorporated right, or both. Otherwise, the Court would not have cited post-1791 history.

Contrary to plaintiffs' suggestion, *Bruen* did not decide that the scope of incorporated rights "'is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.'" Br. at 12, 34 (emphasis omitted) (quoting *Bruen*, 142 S. Ct. at 2137). Plaintiffs omit the beginning of the quoted sentence, which indicates that the Supreme Court had merely sometimes "assumed"—without deciding—that the scope of such rights was defined by the 1791 understanding. *See Bruen*, 142 S. Ct. at 2137. And plaintiffs also omit the further context casting doubt on this assumption, because "[s]trictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.*; *see also Baird*, 2023 WL 5763345, at *3 (interpreting *Bruen* to require consideration of firearm regulation "in effect when the Second *or Fourteenth* Amendment was ratified" (emphasis added)).

# POINT II

## THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH HEAVILY AGAINST AN INJUNCTION

The district court also properly exercised its discretion to conclude that plaintiffs have failed to demonstrate, much less to make the requisite "clear showing," that the remaining injunction factors—irreparable harm, the balance of equities, and the public interest—weigh in favor of an injunction. *See, e.g., Citigroup Glob. Mkts.*, 598 F.3d at 35 n.4. Indeed, those equitable factors weigh heavily *against* an injunction.

Although plaintiffs contend (Br. at 38-39) that violation of their constitutional rights constitutes irreparable harm, for all the reasons discussed above, plaintiffs' constitutional rights are not being violated. Moreover, plaintiffs' inordinate delay in seeking relief undermines their claim of irreparable harm. After *Bruen* was decided in June 2022 and the CCIA was enacted in early July, plaintiffs took months to file the renewed preliminary-injunction motion now on appeal—filing only in late October (ECF No. 48), after the CCIA had already been in effect for nearly two months, *see* Ch. 371, § 26, 2022 N.Y. Laws. And after the district court denied plaintiffs' preliminary-injunction motion (A. 143-

186), plaintiffs requested a deadline for their opening appeal brief of June 19, 2023—more than three months later (CA2 ECF No. 39). Plaintiffs' "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (quotation marks omitted).

In addition, the public interest weighs strongly against enjoining New York's firearm licensing requirements. Most importantly, an injunction poses a substantial public-safety risk. Plaintiffs' requested injunction would, for example, allow anyone, without a license to carry firearms in New York City in the first instance, to carry—openly—on subways and commuter trains and in Times Square. Such carrying would likely result in widespread chaos and could easily result in fatal confrontations, or accidents. Resulting deaths or serious injuries "could not be undone, thus rendering the consequences irreparable," *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020).

Furthermore, "[t]hat [a State] may not employ a duly enacted statute to help prevent" the injuries the State intends to "constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., granting stay). That rule applies even if the Legislature's statute does not implicate public-safety concerns, but is all-the-more important where, as here, the statute does. *See id.* Although plaintiffs may disagree with the Legislature's weighing of its public-safety concerns, plaintiffs' view cannot negate the informed determination of the State's elected officials. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015).

Plaintiffs are incorrect that this Court may not weigh such vital public-safety concerns because the "'burdens at the preliminary injunction stage track the burdens at trial.'" Br. at 40-41 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). Either on a preliminary injunction or upon final judgment, it is the plaintiffs' burden to prove that the balance of the equities and the public interest support injunctive relief, *see, e.g.*, *Winter*, 555 U.S. at 20, 32, and "[i]t is beyond cavil" that public safety and crime prevention are compelling public interests, *Cuomo*, 804 F.3d at 261.

64

Further, plaintiffs' proposed injunction defies the purpose of a preliminary injunction, which "is only to preserve the status quo" during a lawsuit. *See Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam) (quotation marks omitted). Here, the requested injunction bars the enforcement of laws that are already in effect—including some that have been in effect for many years, as well as newer provisions of the CCIA that have nevertheless been in effect for more than a year. There is no basis to reverse the status quo as to the challenged provisions while the litigation is pending, thereby creating substantial confusion for the public and for those tasked with enforcing the law.

In short, the harms of exposing twenty million New Yorkers to a heightened risk of gunfire in their daily routines, by blocking enforcement of duly enacted laws that are already in effect, severely outweigh any harm to plaintiffs from not being permitted to carry firearms in precisely the manner and locations they wish to while this litigation is pending. Thus, the Court should deny plaintiffs' request for a preliminary injunction and permit the ongoing implementation and

enforcement of the CCIA and the other, longstanding firearm regulations plaintiffs challenge.[24]

Finally, because plaintiffs have failed to show a likelihood of success on the merits—much less that their success on the merits is "inevitable," *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017)—or that the equities favor an injunction, there is no basis for plaintiffs' request for this Court to enter a *permanent* injunction. Indeed, plaintiffs cite no authority from this Court even permitting a permanent injunction before a final adjudication of the merits, and the state defendant is aware of none. *See* Br. at 41-42. To be sure, even if plaintiffs had shown a likelihood of success on the merits and equities favoring a preliminary injunction (which they have not), the ordinary and proper course would be to allow for full litigation of the merits below, potentially including expert discovery on the extensive history

---

[24] Alternatively, contrary to plaintiffs' overbroad request, any injunction should be limited to plaintiffs, because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Kane*, 19 F.4th at 173 (quotation marks omitted).

and tradition of the various firearm regulations plaintiffs challenge here.

## CONCLUSION

For all these reasons, the Court should affirm the district court's order on appeal.

Dated: New York, New York
September 19, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellee Nigrelli

By:   */s/ Philip J. Levitz*
PHILIP J. LEVITZ
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
PHILIP J. LEVITZ
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6325

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,821 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Oren L. Zeve*