UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-365-cv _____     _____ Caption [use short title]_____

Motion for: Leave to File a Brief as Amicus Curiae

_____

_____

Set forth below precise, complete statement of relief sought:

The Metropolitan Transit Authority seeks leave to file an amicus

brief in support of Defendants-Appellants and affirmance.

Frey v. Bruen

_____

_____

_____

_____

| MOVING PARTY: The Metropolitan Transit Authority | OPPOSING PARTY: Plaintiffs-Appellants Jason Frey, Briana Frey, Jack Cheng, William Sappe |
|---|---|
| ☐ Plaintiff       ☐ Defendant | |
| ☐ Appellant/Petitioner    ☐ Appellee/Respondent | |

MOVING ATTORNEY: Allan J. Arffa                     OPPOSING ATTORNEY: Amy L. Bellatoni
_____     _____
[name of attorney, with firm, address, phone number and e-mail]

Paul, Weiss, Rifkind, Wharton & Garrison LLP         The Bellatoni Law Firm, PLLC

1285 Avenue of the Americas                          Suite 400, 2 Overhill Road

New York, NY, 10019-6064                             Scarsdale, NY 10583

Court- Judge/ Agency appealed from: U.S. District Court for the Southern District of New York, Hon. Nelson Stephen Roman

Please check appropriate boxes:                      FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                     INJUNCTIONS PENDING APPEAL:
Has movant notified opposing counsel (required by Local Rule 27.1):     Has this request for relief been made below?  ☐ Yes ☐ No
☑ Yes   ☐ No (explain): _____      Has this relief been previously sought in this court?  ☐ Yes ☐ No
_____              Requested return date and explanation of emergency: _____
                                                  _____
Opposing counsel's position on motion:            _____
☐ Unopposed  ☑ Opposed  ☐ Don't Know              _____
Does opposing counsel intend to file a response:  _____
☐ Yes  ☐ No  ☑ Don't Know

Is oral argument on motion requested?  ☐ Yes  ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes  ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

/s/ Allan J. Arffa _____ Date: 9/26/2023 _____ Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 23-365-cv

## In the United States Court of Appeals for the Second Circuit

JASON FREY, BRIANA FREY, JACK CHENG, WILLIAM SAPPE,
PLAINTIFFS-APPELLANTS

*v.*

NEW YORK CITY, NEW YORK; KEECHANT SEWELL, in her official capacity;
STEVE NIGRELLI, in her official capacity,
DEFENDANTS-APPELLEES

KEVIN P. BRUEN, Acting Superintendent of the New York State Police, in his official capacity,
DERMOT SHEA, in his official capacity as NYPD Police Commissioner,
DEFENDANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (21-CV-05334)
(THE HONORABLE NELSON ROMAN, J.)*

**MOTION OF AMICUS CURIAE
THE METROPOLITAN TRANSPORTATION AUTHORITY
FOR PERMISSION TO FILE BRIEF**

MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300*

ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000*

*Counsel to Amicus Curiae
Metropolitan Transportation Authority*

Pursuant to Federal Rule of Appellate Procedure 29(b), *amicus curiae* the Metropolitan Transit Authority (the "MTA") respectfully moves for leave to file the attached brief, *see* Ex. A, in support of Defendants-Appellees ("Appellees") in the captioned appeal.

1.　　The MTA operates North America's largest metropolitan transportation service.　Its transportation network spans 5,000 square miles, and it provides travelers in and around New York City, lower New York State, Long Island and Connecticut safe transportation to and from New York City and within its five Boroughs.　MTA riders take about 2.6 billion riders per year across its network of subways, buses, and commuter rails, including hundreds of thousands of K-12 students traveling to and from school each day.

2.　　In particular, the decision below, among other things, addressed whether New York State's current regime of gun regulation, as applied to the Metro-North Railroad and the New York City subway system, runs afoul of the Second Amendment to the U.S. Constitution.　The MTA, through its subsidiaries the Metro-North Railroad and the New York City Transit Authority, respectively, is responsible for the operation of those systems, and thus has an extremely strong interest in this issue.

3.　　Accordingly, on September 22, 2023, the MTA requested (by email) consent to file a brief as *amicus curiae* from the parties to this appeal, pursuant to Rule 29 of the Federal Rules of Appellate Procedure.　Defendants-

Appellees consented the same day.  Earlier today, however, Plaintiffs-Appellants refused to consent to such a filing.

4.     Accordingly, the MTA now respectfully requests leave to file a brief as *amicus curiae* in support of Defendants'-Appellees' position on this appeal.

5.     Notwithstanding Plaintiffs'-Appellants' opposition, it is abundantly clear that the MTA has an obvious overriding interest in the resolution of this appeal.  Whether the State of New York may lawfully regulate the possession of firearms on MTA subways and subway stations and Metro-North commuter trains and stations will have a profound impact on the MTA's ability to provide safe transportation to the millions of New Yorkers (and others) who use its services, including the hundreds of thousands of students who rely on MTA transportation to travel to and from school.  The decision will also affect the safety of the thousands of MTA employees and contractors who operate and maintain MTA vehicles and stations every day.

6.     The MTA submits that the Court would benefit from review of the MTA's *amicus* brief because the MTA is best-suited to explain the reasons MTA subways and stations and Metro-North train cars and stations are sensitive locations that should be subject to gun regulation, consistent with the Second Amendment principles set out in *New York State Rifle & Pistol Association, Inc.* v. *Bruen*, 142 S. Ct. 2111 (2022).  This brief will help the Court

2

receive a full picture of the crowded, confined conditions present on those trains and stations and the problems that introducing firearms into such environments may bring. The brief will also provide further support to Appellees' legal and historical arguments.

7. Accordingly, the MTA respectfully requests that the Court permit it to file the attached brief of *amicus curiae* in the above appeal.

Respectfully submitted,

MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*

/s/ Allan J. Arffa
ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 AVENUE OF THE AMERICAS*
*NEW YORK, NY 10019*
*(212) 373-3000*

*Counsel for Amicus Curiae*
*The Metropolitan Transportation*
*Authority*

SEPTEMBER 26, 2023

3

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Allan J. Arffa, counsel for amicus curiae Metropolitan Transportation Authority, and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached Motion for Leave to File Brief of Amicus curiae in Support of Defendants-Appellees is proportionately spaced, has a typeface of 14 points or more, and contains 522 words.

/s/ Allan J. Arffa

ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*

SEPTEMBER 26, 2023

## CERTIFICATE OF SERVICE

I, Allan J. Arffa, counsel for amicus curiae the Metropolitan Transportation Authority, and a member of the Bar of this Court, certify that, on September 26, 2023, a copy of the attached Motion for Leave to File Brief of Amicus curiae in Support of Defendants-Appellees was filed with the Clerk through the Court's electronic filing system, which sent notice to all counsel of record.

/s/ Allan J. Arffa
ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000e*

# Exhibit A

# 23-365-cv

## In the United States Court of Appeals for the Second Circuit

---

JASON FREY, BRIANA FREY, JACK CHENG, WILLIAM SAPPE,
PLAINTIFFS-APPELLANTS

*v.*

NEW YORK CITY, NEW YORK; KEECHANT SEWELL, in her official capacity;
STEVE NIGRELLI, in her official capacity,
DEFENDANTS-APPELLEES

KEVIN P. BRUEN, Acting Superintendent of the New York State Police, in his official capacity,
DERMOT SHEA, in his official capacity as NYPD Police Commissioner,
DEFENDANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (21-CV-05334)
(THE HONORABLE NELSON ROMAN, J.)*

---

**BRIEF OF AMICUS CURIAE
THE METROPOLITAN TRANSPORTATION AUTHORITY
IN SUPPORT OF DEFENDANTS-APPELLEES**

---

MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300*

ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Metropolitan Transportation Authority, an amicus curiae in this action, states that it is a public benefit corporation created by and organized under the New York State Public Authorities Law and has a number of affiliates and subsidiaries, including Metro-North Railroad and the New York City Transit Authority, which are also New York public authorities. *See* N.Y. PUB. AUTH. LAW § 1260, *et seq.*

## TABLE OF CONTENTS

Page

Table of Authorities ............................................................................ iii

STATEMENT OF INTEREST ...........................................................1

INTRODUCTION ................................................................................2

I.    The MTA Is Responsible For Safely Transporting Millions of People Each Year ........................................................................3

II.   Subways, Trains, and Stations Are Sensitive Places Where The Regulation Of the Carrying of Firearms Is Constitutionally Permissible .................................................................................5

III.  Defendants-Appellees Are Correct That the Challenged Laws Are Constitutional..............................................................................7

A.    The State Should be Able to Regulate Firearm Carry on the MTA Facilities, Which Are Analogous to Government Buildings...........8

B.    Subways and Commuter Trains Did Not Exist in the Eighteenth or early Nineteenth Centuries ...............................................10

CONCLUSION..................................................................................14

# TABLE OF AUTHORITIES

Page(s)

## CASES

*District of Columbia v. Heller*,
554 U.S. 570 (2008).........................................................................13

*New York State Rifle & Pistol Association, Inc.* v. *Bruen*,
142 S. Ct. 2111 (2022) ...................................................10, 12, 13, 16

## CONSTITUTIONS AND STATUTES

U.S. Const. Amend. II..............................................1, 10, 12, 13, 14, 15

N.Y. General Construction Law § 66(4) (2012).....................................11

N.Y Public Authority Law § 1202(1) ...................................................2

N.Y Public Authority Law § 1202(2) ...................................................2

N.Y. Public Authority Law § 1261(16) ...............................................11

N.Y Public Authority Law § 1263 ......................................................11

N.Y Public Authority Law § 1264 ..................................................11, 12

## MISCELLANEOUS AUTHORITIES

A Right to Bear Arms?: The Contested Role of History in
Contemporary Debates on the Second Amendment
(Jennifer Tucker et al. eds., 2019)...................................................14

Adam Burns, *Metro-North Railroad*, American Rails
(Mar. 21, 2023)...............................................................................4

*Frank James Pleads Guilty to Mass Shooting on New York
Subway*, U.S. Department of Justice (Jan. 3, 2023) .......................9

Page(s)

Miscellaneous Authorities—Continued:

Josh Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation* (2023) (manuscript) (forthcoming 133 Yale Law Journal) .......................... 15

*The MTA Network*,
Metropolitan Transportation Authority ...................................... 3, 5

*New York City's Independent Subway System Opened*,
Library of Congress ............................................................. 4

*New York City Subway Opens*,
History Channel .................................................................. 14

*Notes from the Archive: Tremont Street Subway*,
City of Boston (July 25, 2017) ............................................... 14

Press Release, *Metro-North Railroad Celebrates Its 40-Year History of Public Service by Honoring Predecessors* ................................... 4

*Railroads in the Late 19th Century*, Library of Congress ............................. 14

Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, *in American History, in* A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment (Jennifer Tucker et al. eds., 2019) ........................ 14

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*,
73 Fordham Law Review 487 (2004) .............................................. 14

## STATEMENT OF INTEREST

The Metropolitan Transportation Authority (MTA) is North America's largest public transportation network, serving a population of over 15 million people across a 5,000-square-mile travel area, including millions of students in the New York City metropolitan area. Its network includes the nation's largest bus fleet, and more subway and commuter rail cars than all other U.S. transit systems combined. Among its affiliates and subsidiaries are two entities whose operations are implicated in this matter: Metro-North Railroad, which operates commuter railroads in the New York City metropolitan area, and the New York City Transit Authority, which operates subways and buses in New York City and provides paratransit services. The MTA is committed to maintaining a safe, reliable and accessible transportation system.

The MTA has an exceptional interest in this appeal. Whether the State of New York and the City of New York may lawfully regulate the carrying of firearms on MTA conveyances and in MTA facilities directly impacts the MTA's statutory duty to provide safe transportation services. As explained in this amicus brief, the MTA's subways, trains and stations are the types of sensitive places in which the carrying of firearms may be regulated.

## INTRODUCTION

Every day, millions of people travel on Metro-North trains and New York City subways. Those passengers travel to and from home, work, and school. The safe transportation of those millions of passengers, including children, is the statutory duty and critical mission of the Metropolitan Transportation Authority (MTA). In fact, the fundamental purpose of New York City Transit Authority and of Metro-North Railroad is "the operation of transit facilities . . . for the . . . safety of the public," a purpose that is "in all respects for the benefit of the people of the State of New York." N.Y Public Authorities Law §§ 1202(1), 1202(2).

The MTA strongly supports the challenged legislation. For firearms to be brought into the frequently crowded and confined space of a train or subway car, or in stations, would present a clear safety hazard.[1] Such locations are the ultimate "sensitive locations" that—as the City and New York State Attorney General set forth in their briefs—the laws of this nation have long recognized as the types of sensitive places in which the carrying of firearms may be regulated.

The MTA fully agrees with the arguments submitted by the City and Attorney General on this appeal. Regulating the carrying of firearms in the

---

[1] There are, of course, exceptions in which it is permissible to carry firearms in otherwise sensitive areas, including for law enforcement agents. This appeal does not concern those reasonable exceptions.

transportation system, including trains and subways, is consistent with the historical tradition of regulating guns in crowded locations, particularly where vulnerable persons such as school children are likely to be present, and with a proprietor's (particularly the government's) right to regulate firearms on its premises.

## ARGUMENT

### I. The MTA Is Responsible For Safely Transporting Millions of People Each Year

The MTA operates the largest railroad and subway system in North America. Established in 1965 as a public benefit corporation, the MTA includes several subsidiary and affiliate entities that, collectively, operate a vast network of trains, buses, bridges, and tunnels throughout the five boroughs of New York City and in the wider metropolitan region, including Long Island, areas north of New York City, and parts of Connecticut.[2] In 1968, the MTA took control over the New York City Transit Authority,[3] which continues to operate the subways. Just this year, Metro-North celebrated its fortieth

---

[2] *The MTA Network*, Metropolitan Transportation Authority <new.mta.info/about-us/the-mta-network>.

[3] *See New York City's Independent Subway System Opened*, Library of Congress <guides.loc.gov/this-month-in-business-history/september/new-york-city-independent-subway-system-opened>.

anniversary.[4]  Some of the train lines now operated by Metro-North date back
to the 1800s.[5]

People from all walks of life use MTA transportation—including young
and elderly people; students and retirees; and first responders and tourists.[6].
This year, there were approximately 4 million paid riders using New York City
subways each day.  Just last year, there were roughly 1.8 billion subway rides
taken,[7] which is more than the entire world population in 1791 or 1868.[8]  The
MTA "provides around 2.6 billion trips each year, accounting for about one-
third of the nation's mass transit users and two-thirds of its commuter rail
passengers."[9]

---

[4] *See* Press Release, *Metro-North Railroad Celebrates Its 40-Year History of Public Service by Honoring Predecessors*, Metropolitan Transit Authority <new.mta.info/press-release/metro-north-railroad-celebrates-its-40-year-history-of-public-service-honoring>.

[5] *See* Adam Burns, Metro-North Railroad, American-Rails.com, <american-rails.com/mncw.html> (revised March 21, 2023).

[6] There are more than 70,000 MTA employees, many of whom work in subways, trains, and stations.  Just as it is crucial for all of the MTA's passengers to be able to enjoy mass transportation safely, it is paramount to the MTA that its employees have a safe workplace that is free of dangerous weapons.

[7] *Public Transportation Ridership Report* at 2, American Public Transportation Association <apta.com/wp-content/uploads/2022-Q4-Ridership-APTA.pdf>

[8] *Historical Estimates of World Population*, United States Census Bureau (Dec. 2022) <census.gov/data/tables/time-series/demo/international-programs/historical-est-worldpop.html>.

[9] *The MTA Network, supra* note 2.

But MTA ridership is not limited to adult commuters. Because all students in grades K-12 who live over a half-mile from their school may ride a New York City bus or the subway for free on school days, and because there are more than one *million* children in the City's public schools, hundreds of thousands of students may be riding on the MTA's subways and buses every week. In fact internal MTA statistics show that on any given day there can be over 235,000 student swipes for the subway alone. At two daily swipes per student, one to go to school and one to return, it means that—each day—about 120,000 students ride the subway. The MTA's networks thus play an integral role in the school system, both by delivering children to classes and other activities and by ensuring they return home safely at night.

## II. Subways, Trains, and Stations Are Sensitive Places Where The Regulation Of the Carrying of Firearms Is Constitutionally Permissible

The trains, subways, and stations the MTA operates are confined spaces that are often crowded, with limited means of entry and exit. Train riders are the ultimate "captive audience" who cannot easily escape from a dangerous situation that may arise. Commuter and subway stations also provide restricted means of egress.

The transportation of large numbers of people in the small and confined spaces of subways, trains, and stations, both underground and on elevated tracks, renders the subways, trains and stations sensitive spaces that need to

be protected from the increased risk of danger that the unregulated carry of firearms would bring. As the City and Attorney General highlight in their briefs, crowded and occasionally confined spaces have long received legal protection from firearms. For example, English laws forbade individuals from bringing weapons into public marketplaces, and States prohibited possessing firearms in ballrooms and other sensitive locations. *See* Br. of City at 39–40, 46; Br. of Att'y General at 37–39.

It is hard to imagine that the MTA's subway and train cars, especially at peak hours, are not more densely populated than the average ballroom or marketplace—where, for hundreds of years, firearms have been lawfully regulated. Such locations have received protection because the danger to the public if a weapon were to be discharged is unacceptably high. *See* Br. of City at 46 (citing *Owens* v. *State*, 3 Tex. Ct. App. 404, 407 (1878)). Indeed, the chance of injury or death in a subway, Metro-North train, or station may be even greater than that in a public marketplace or a ballroom. Train cars are enclosed, confined, and frequently underground vehicles. As a matter of common sense, an individual likely can more easily hide in or flee from a marketplace or a ballroom in an emergency than from a subway or train car.

Experience demonstrates that the crowded and confined nature of subways, trains, and stations exacerbates the danger that may result when firearms and the like are carried and discharged on subways and trains or in

6

stations. As the City notes in its brief, in 2019, a firecracker detonated on a subway car, causing a stampede that hospitalized one individual. *See* Br. of City at 46 & n.29 (citing Ruth Weissmann et al., *Lit firecracker thrown into subway train sparks morning commute chaos*, NEW YORK POST (May 31, 2019), https://nypost.com/2019/05/31/lit-firecracker-thrown-into-subway-trainsparks-chaos/. In an even more serious tragedy, just last year, an individual brought guns and smoke bombs onto a subway car in Brooklyn and opened fire, striking ten passengers and resulting in multiple other injuries.[10] Even if only one shot is fired, and even if a firearm is discharged entirely accidentally, the confined space can prevent escape and make it more likely that passengers will suffer injuries. The risk of harm in such a sensitive location is simply too high to permit the unregulated carry of firearms.

### III. Defendants-Appellees Are Correct That the Challenged Laws Are Constitutional

As the Supreme Court expressly declared in *New York State Rifle & Pistol Association, Inc.* v. *Bruen*, 142 S. Ct. 2111 (2022), the Second Amendment does not forbid governments from enacting regulations restricting the possession of firearms in sensitive places. *Id.* at 2133. Accordingly, for the reasons stated in the City's and the Attorney General's briefs, the MTA joins

---

[10] *See Frank James Pleads Guilty to Mass Shooting on New York Subway*, U.S. Dep't. of Just. (Jan. 3, 2023) <justice.gov/opa/pr/frank-james-pleads-guilty-mass-shooting-new-york-subway>.

them in urging this Court to affirm the district court's order, which properly recognized that plaintiff have failed to establish a likelihood of success on the merits of their claim that regulating firearms in sensitive locations like subway cars, commuter trains, and commuter and subway train stations violates the Second Amendment.

The Attorney General and the City are correct to note the wealth of historical support for both the regulation of firearms in sensitive locations analogous to subway cars and trains, and the power of private companies and government entities to restrict firearms on the premises. *See* Br. of Att'y General at 42–50; Br. of City at 38–52. Indeed, as explained below, the MTA *is* a government entity, and the State's and the City's regulation of firearms in the MTA's conveyances and facilities is perfectly consistent with the government's traditional power to regulate its property. The challenged regulations are consistent with the historical regulation of firearms.

### A. The State Should be Able to Regulate Firearm Carry on the MTA Facilities, Which Are Analogous to Government Buildings

As the Attorney General notes in its brief, "[t]he MTA is a public benefit corporation of New York State, which is treated as a state agency for a number of purposes." Br. of N.Y. at 46 n.18 (citation omitted). Accordingly, the State is entitled to regulate firearms in the MTA's subways, trains and stations.

8

The MTA was established as a public benefit corporation in 1965 by the state legislature, for the purpose of overseeing, developing, and improving transportation services within its jurisdiction. *See* N.Y. GEN. CONSTR. L. § 66(4) (2012). Today, the MTA remains chartered by statute at Sections 1263 and 1264 of the Public Authorities Law. Members of its Board of Directors are appointed by the New York Governor, subject to the advice and consent of the State Senate. N.Y PUB. AUTHORITY L. § 1263(1)(a). It is a "state agency." N.Y. Pub. Auth. Law § 1261(16) (defining "State agency" to include "any . . . public benefit corporation . . . or instrumentality of the state.")

Finally, the law expressly recognizes that "the [MTA] shall be regarded as performing an *essential governmental function* in carrying out its purposes and in exercising the powers granted by" the Public Authorities Law. PUB. AUTH. L. § 1264 (emphasis added). The MTA carries out an essential government function sufficient to warrant treating its facilities as government buildings and sensitive locations for the purposes of the Second Amendment.

As the City and Attorney General note, the government has the power to regulate firearms on its property. *See* Br. of City at 37; Br. of Att'y General at 46–47. As the Supreme Court and other courts have recognized, the Second Amendment does not prevent the government from regulating or prohibiting the possession of firearms on government property. *Bruen*, 142 S. Ct. at 2133 (listing government buildings as example of a sensitive place); *see also District*

9

*of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008) (same).  Because the real property on which MTA facilities are located is owned by the City and leased to the MTA, the MTA facilities should be treated analogously to government buildings for purposes of the Second Amendment.

For this reason alone, plaintiffs are unlikely to succeed in showing that the challenged laws violate the Second Amendment as applied to Metro-North or the MTA's subway system.

**B.     Subways and Commuter Trains Did Not Exist in the Eighteenth or early Nineteenth Centuries**

As noted in the City's and Attorney General's briefs, the Supreme Court has already recognized that evidence of post-founding era regulations on firearms is relevant to Second Amendment analysis.  *See* Br. of City at 33–36; Br. of Att'y General at 56.  Moreover, the Court has also noted that, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133; *see also* Br. of Att'y General at 8.  Accordingly, the fact that identical regulations on personal firearms on subways and trains did not exist in the Founding Era or for some time after the constitutional amendments that caused the Second Amendment to apply to the States is neither here nor there.

For one thing, the emergence of violence as a result of personal firearms was comparatively unheard of in the late eighteenth century, and only became a problem as the nineteenth and twentieth centuries progressed.  *Cf.* Randolph

10

Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, *in* A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment 113, 117 (Jennifer Tucker et al. eds., 2019) (discussing availability of reliable, affordable hand guns as emerging in the early nineteenth century); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 512–13 (2004).").

Moreover, it is no surprise to see the absence of government regulations concerning trains long into the past: the mass use of railroads and subway cars did not commence until the nineteenth and twentieth centuries. Indeed, railroad construction only truly exploded in the 1870s.[11] The first subway in the United States was not built until 1897,[12] and the first New York City subway did not open until 1904,[13] rendering any search for exactly analogous regulations before those times (or even around when those activities were first developing) unhelpful. Even then, the trains may not have been government

---

[11] *See Railroads in the Late 19th Century*, Library of Congress, <loc.gov/classroom-materials/united-states-history-primary-source-timeline/rise-of-industrial-america-1876-1900/railroads-in-late-19th-century/> (last visited Sept. 26, 2023).

[12] Notes from the Archive: Tremont Street Subway, CITY OF BOSTON, (July 25, 2017) <boston.gov/news/notes-archives-tremont-street-subway>.

[13] New York city subway opens, HISTORY CHANNEL <history.com/this-day-in-history/new-york-city-subway-opens> (last visited Sept. 22, 2023).

owned, rendering relevant examples of government regulation scarce.  *See*

Josh Hochman, Note, *The Second Amendment on Board: Public and Private*

*Historical Traditions of Firearm Regulation* 11-20 (2023) (manuscript)

(forthcoming 133 YALE L.J.).  That is why any reasoning by analogy must look

at other locations—such as ballroom, marketplaces, and the like—that shared

some relevant common characteristics with trains and subways, but not car-

riages, which would have been smaller and contained fewer passengers.

Once trains arrived, however, the companies that operated them began

regulating the possession of firearms on trains.  *See* Br. of Att'y General at 43–

45; Br. of City at 48.  Such examples are particularly informative given that,

like the MTA, "[e]arly 'private' train companies were in fact often quasi-public

in that they were chartered and given rulemaking authority by the govern-

ment; had governmentally appointed directors or officers; and/or received at

least some governmental funding."  Br. of Att'y General at 44.  Thus, "it is

unsurprising that the state statute books are bereft of firearm regulations for

railroads during this period," and "regulations are scattered throughout rules

promulgated by railroad companies."  Hochman, *supra*, at 7.

In short, any dearth of examples from the eighteenth and nineteenth

centuries reflects the absence of comparable train activity or analogous prob-

lems with personal firearm violence in the distant past, and the law has long

recognized the government's power to respond to emerging problems.  The

Supreme Court has expressly acknowledged that, although the meaning of the Second Amendment "is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 142 S. Ct. at 2132. Quite simply, the fact that restrictions on the possession of firearms in some sensitive places—and on firearms in general—became more prevalent as the country moved through the nineteenth and into the twentieth centuries illustrates precisely the type of evolution the founders anticipated.

## CONCLUSION

The district court's order denying plaintiff's motion for a preliminary injunction should be affirmed.

Respectfully submitted,

MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

/s/ Allan J. Arffa
ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
*1285 AVENUE OF THE AMERICAS*
*NEW YORK, NY 10019*
*(212) 373-3000*

SEPTEMBER 26, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Allan J. Arffa, counsel for amicus curiae MTA, and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached Brief of Amicus Curiae in Support of Defendants-Appellees is proportionately spaced, has a typeface of 14 points or more, and contains 2,858 words.

/s/ Allan J. Arffa
ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
 *1285 Avenue of the Americas*
 *New York, NY 10019*
 *(212) 373-3000*

SEPTEMBER 26, 2023

## CERTIFICATE OF SERVICE

I, Allan J. Arffa, counsel for amicus curiae MTA, and a member of the Bar of this Court, certify that, on September 26, 2023, a copy of the attached Brief of Amicus Curiae in Support of Defendants-Appellees was filed with the Clerk through the Court's electronic filing system, which sent notice to all counsel of record.

/s/ Allan J. Arffa
ALLAN J. ARFFA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*