# 23-365

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUT

JASON FREY, BRIANNA FREY, JACK CHENG, WILLIAM SAPPE,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK, KEECHANT SEWELL, in her Official Capacity,
STEVEN NIGRELLI, in his Official Capacity,

*Defendants-Appellees,*

KEVIN P. BRUEN, Acting Superintendent of the New York State Police,
in his Official Capacity, DERMOT SHEA, in his Official Capacity as
NYPD Police Commissioner,

*Defendants.*

On Appeal from the United States District Court
for the Southern District of New York

## APPELLANTS' OPPOSITION TO THE
## TIMES SQUARE ALLIANCE MOTION TO
## FILE AN AMICUS CURIAE BRIEF

Amy L. Bellantoni
The Bellantoni Law Firm, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

October 6, 2023

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................... i

Brief Summary of the Appeal ............................................................................. 1

Standard for Considering Leave to File Amicus Brief ............................................ 2

I. 'Public Safety' Was Flatly Rejected By The Supreme Court As A
   Justification For Firearm Regulations ............................................................. 4

II. The Times Square Ban Is Inconsistent With The Plain Text ........................... 10

III. Sacrificing One Constitutional Right To Lawfully Exercise Another Is
    Antithetical to the U.S. Constitution ............................................................. 12

IV. The TSA's Proposed Amicus Brief Is A Redundancy of Appellees' Briefs ... 13

V. Appellees Are Well-Represented and Have No Need for 'Assistance' ........... 16

CONCLUSION .................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. and N.J.*,
    2011 WL 5865296 (S.D.N.Y. Nov. 22, 2011) ......................................... 3

*Barker v. Wingo*,
    407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ............................ 8

*D.C. v. Heller*,
    554 U.S. 570 (2008) ................................................................... Passim

*Hudson v. Michigan*,
    547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ......................... 8

*King v. Amazon.com Servs. LLC*,
    2022 WL 17083273 (E.D.N.Y. Nov. 18, 2022) .................................. 16

*Mapp v. Ohio*,
    367 U.S. 643 ............................................................................................ 8

*Miranda v. Arizona*,
    384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ........................... 8

*N. Sec. Co. v. United States*,
    191 U.S. 555 (1903) ................................................................................ 3

*Nat'l Org. for Women, Inc. v. Scheidler*,
    223 F.3d 615 (7th Cir. 2000) ............................................................ 3, 16

*Ryan v. C.F.T.C.*,
    125 F.3d 1062 (7th Cir. 1997) ................................................................ 2

*Strasser v. Doorley*,
    432 F.2d 567 (1st Cir. 1970) ............................................................... 3, 4

*U.S. v. Microsoft Corp.*,
    2002 WL 319139 (D.D.C. Feb. 28 2002) ............................................... 2

*United States v. Cruikshank*,
  92 U.S. 542, 23 L.Ed. 588 (1876) ......................................................................... 10

*United States v. Gotti*,
  755 F. Supp. 1157 (E.D.N.Y. 1991) ....................................................................... 4

*United States v. Leon*,
  468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ......................................... 8

*United States v. Yaroshenko*,
  86 F. Supp. 3d 289 (S.D.N.Y. 2015) ....................................................................... 3

**Rules**

Federal Rule of Appellate Procedure 29 .................................................................. 2

Plaintiffs-Appellants oppose the motion of The Times Square Alliance ("TSA") requesting leave to file a brief as amicus curiae in support of Defendants-Appellees.

The thrust of the TSA's argument is that public safety justifies banning the peaceable possession of firearms for self-defense in the Times Square location because it a 'unique' location, but 'public safety' justifications have been flatly rejected by the Supreme Court in *Heller, McDonald,* and *Bruen.*

Further, the adequacy of Appellees' representation has not been questioned, the TSA has not claimed to have a "direct interest in another case" the outcome of which could be affected by this appeal, and TSA's proposed amicus brief offers no more than a reiteration of the arguments made by the State and the City. For the reasons below, the TSA's motion should be denied.

### *Brief Summary of the Appeal*

This interlocutory appeal challenges the district court's denial of Appellants' motion to preliminarily enjoin New York State firearm regulations that conflict with the text, history, and tradition of the right to possess and carry weapons for self-defense, as protected by the Second Amendment.

Specifically, Appellants challenge provisions of the Concealed Carry Improvement Act (CCIA) that ***ban the right to peaceably carry firearms*** for self-

1

defense in Times Square[1], the Metropolitan Transit Authority subway and train cars[2] (public transportation), in public parks[3], theaters[4], and restaurants with on-premise alcohol consumption[5].

Appellants also challenge New York's **ban on the open carriage of handguns** and the **geographical ban** for individuals with NYS concealed handgun licenses to carry concealed inside of New York City (the "City").[6]

### Standard for Considering Leave to File Amicus Brief

Federal Rule of Appellate Procedure 29 permits the filing of an amicus brief only by leave of court where one or more parties does not consent to its filing.

Appellants do not consent to the filing of the TSA's amicus brief.

"In an era of heavy judicial caseloads and public impatience with the delays and expense of litigation, [ ] judges should be assiduous to bar the gates to amicus curiae briefs that fail to present convincing reasons why the parties' briefs do not give us all the help we need for deciding the appeal." *U.S. v. Microsoft Corp.*, No. 98-1232(CKK), 2002 WL 319139, at *3 (D.D.C. Feb. 28 2002) (quoting *Ryan v. C.F.T.C.*, 125 F.3d 1062, 1064 (7th Cir. 1997)).

---

[1] Penal Law § 265.01-e2(t).
[2] Penal Law § 265.01-e2(n).
[3] Penal Law § 265.01-e2(d).
[4] Penal Law § 265.01-e2(p).
[5] Penal Law § 265.01-e2(o).
[6] Penal Law § 400.00(6).

Although judges have wide discretion to permit a nonparty to submit an amicus brief, see *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000), courts "should go slow in accepting" an amicus brief absent consent from all the parties. *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970); see also *N. Sec. Co. v. United States*, 191 U.S. 555, 556 (1903) (Fuller, C.J., in chambers).

Following the Seventh Circuit, the Southern District of New York has put forth a useful litmus test for when an amicus brief is useful: (i) when they are of aid to the court and offer insights not available from the parties; (ii) when a party is not represented competently or is not represented at all; (iii) when the amicus has an interest in some other case that may be affected by the decision in the present case; or (iv) when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide. *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. and N.J.*, No. 11 Civ. 6746, 2011 WL 5865296, at *1 (S.D.N.Y. Nov. 22, 2011) (cases cited). Otherwise, leave to file an amicus curiae brief should be denied. *Id.*

An amicus curiae proves true to its name as a "friend of the court" when it offers a fresh perspective on an unsettled question of law that the actual parties to the litigation have not fully addressed. *United States v. Yaroshenko*, 86 F. Supp. 3d 289, 290–91 (S.D.N.Y. 2015). The proposed Amicus Brief of the Times Square Alliance meets none of these standards.

3

As Chief Judge Aldrich cautioned in *Strasser v. Doorley*, it "may be thought particularly questionable" for the court to accept an amicus when it appears that the parties are well represented and that their counsel do not need supplemental assistance and where the joint consent of the parties to the submission by the amicus is lacking. That observation is precisely applicable here. *United States v. Gotti*, 755 F. Supp. 1157, 1159 (E.D.N.Y. 1991) quoting, *Strasser v. Doorley*, 432 F.2d 567

## I. 'Public Safety' Was Flatly Rejected By The Supreme Court As A Justification For Firearm Regulations

The Times Square Alliance (TSA) posits that the "busyness and vitality" of Times Square warrants terminating the rights of everyone who travels and/or visits the arbitrarily drawn section of New York City to peaceably possess firearms for self-defense. Put differently, TSA feels that the "popularity" of Times Square would "magnify the danger from, and harm by, firearm violence many fold." [7]

The Times Square ban is slightly over a year old. Prior to its enactment, individuals who were licensed to carry a handgun concealed on their person would travel through and/or remain in Times Square every day, in largely unremarkable fashion. Enacting the Times Square ban did absolutely nothing to reduce "firearm violence" therein. As the inhabitants and visitors of Times Square are now experiencing, criminals continue to possess firearms and commit crime in Times

_____

[7] Proposed Br. at 2.

4

Square. Just yesterday, a man was "robbed at gunpoint" in Times Square's "gun free zone.[8]  The only people affected by the Times Square ban are lawful gun owners seeking to peaceably carry a firearm for self-defense – against *criminals*.[9]



---

[8] https://www.msn.com/en-us/news/crime/man-45-robbed-at-gunpoint-off-times-square-trio-flees-in-getaway-jeep/ar-AA1hKuHf

[9] At n. 2 of TSA's proposed brief, they cites a N.Y. Times article about the first shooting in Times Square after the passage of the CCIA; the article quotes Tom Harris – a retired New York Police Inspector and *the president of the Times Square Alliance* – who admits that "A gun-free zone is

5

The Times Square ban clearly does not prevent criminals from victimizing now-unarmed citizens.[10] The TSA failed to provide any example of how peaceably carrying a firearm for self-defense caused anyone harm before the Times Square ban went into effect, and offers only speculation that restoring the right to lawful firearm owners is likely to cause unknown chaos and disaster.[11]

The issue argued by TSA -- public safety -- is not a 'new societal concern' and it was flatly rejected by the Supreme Court as a justification for firearm regulations. This Court will find no benefit from supplemental briefing on that issue – the *Bruen* test forecloses such 'interest balancing.' Modern societal concerns about public safety are the same concerns that the drafters encountered when ratifying the Second Amendment in 1791.[12]

---

not going to stop a criminal from carrying a gun." Harris went on to say that, in the last three months of 2022, the police were reporting one felony every three days, compared with every two days in 2021.

[10] TSA's description of Times Square as a "quintessential soft target" actually cuts against TSA's cry to disarm all lawful gun owners. [Proposed Br. at 6].

[11] The TSA prefers innocent New Yorkers remain unarmed and vulnerable to violent predators in a city with increasingly unfettered violence, to be raped, stabbed, and shot at will in TSA's "safe space." As the above example illustrates, "gun free zone" is a dog whistle for criminals who know that the innocent people therein have no means of armed resistance.

[12] "Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit. That argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it proceeds to do just that. *Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun….Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment guarantees their right to do so." *Bruen*, at 2160–61 (Alito, J. concurring).

6

*Bruen* instructs that the historical inquiry is fairly straightforward when a challenged regulation addresses a general societal problem that has persisted since the **18th century**. The lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is *inconsistent* with the Second Amendment. *Bruen*, at 2131 (emphasis added).

The societal concern here -- public safety -- was balanced and rejected in favor of codifying the individual right to possess and carry Arms in the Second Amendment, which further declared that the right "shall not be infringed."

> The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense.
>
> It is this balance—struck by the traditions of the American people— that demands our *unqualified deference*.

*Bruen*, at 2131 quoting, *D.C. v. Heller*, 554 U.S. 570, 635 (2008) (cleaned up) (emphasis added).

*Heller* rejected the view that 'guns are bad so state and local jurisdictions should be free to restrict them essentially as they see fit.' *Bruen*, at 2160–61 (Alito, J. concurring) (cleaned up).

As Justice Alito observed in *Bruen*,

> "*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun….

7

Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And **today, no less than in 1791, the Second Amendment guarantees their right to do so**." *Id.* (emphasis added).

In *McDonald*, the Supreme Court recognized that the right to keep and bear arms is "not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, at 783 citing:

> *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona*, 384 U.S. 436, 517, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting); *id.*, at 542, 86 S.Ct. 1602 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases ... will return a killer, a rapist or other criminal to the streets ... to repeat his crime"); *Mapp v. Ohio*, 367 U.S. 643, 649.[13]

The TSA cites no case in which the Supreme Court has "refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications." *Ibid.*

---

[13] The significant, and oft ignored difference, is that the Second Amendment protects the *lawful right* to self-defense, but the exclusionary rule protects the *criminals*.

The Times Square ban does not eliminate crime nor does it prevent criminals from entering Times Square while armed with firearms – or other weapons. It is already illegal in New York State (and City) to possess a handgun without a license.[14] An unlicensed person carrying a handgun *anywhere* in New York State – is guilty of a felony. And criminals do not apply for licenses to lawfully carry a handgun.

The only people negatively affected by the firearm ban are licensed gun owners. And Gov. Hochul passed the CCIA to specifically target licensed gun owners; the unlicensed and those disqualified from firearm possession were *already* banned from possessing firearms. Gov. Hochul emphasized implementing

> a public education campaign "so that people who do now ***legally possess*** (handguns) now under the Supreme Court ruling will understand that there are rules of the road that you must follow and law enforcement will be making sure that you do follow these [rules]. That is what we're doing."[15]

Put differently, the licensed individuals who legally carried a handgun for self-protection in Times Square on a daily basis prior to the enactment of the CCIA are now ***felons*** under the State's retaliatory 'rules of the road' if they engage in the same peaceable carriage of a firearm for self-defense.

---

[14] Penal Law § 265.03 (Class C Felony).
[15] https://www.youtube.com/watch?v=gC1L2rrztQs (13:38).

The TSA's public safety based arguments are improperly made and, therefore, of no value to this Court's consideration of this appeal.[16]

## II. The Times Square Ban Is Inconsistent With The Plain Text

As we saw in *Heller,* bans on the right to keep and/or bear Arms are unconstitutional *per se* because the plain text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *D.C. v. Heller* 554 U.S. 570, 592 (2008).

> This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed."

> As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ...."

*Heller*, at 592 (emphasis supplied).

The *Bruen* Court rejected New York State's defense of the now-stricken "proper cause" requirement as a "sensitive places" restriction where the government may lawfully disarm law-abiding citizens including all "places where people typically congregate and where law-enforcement and other public-safety

---

[16] The TSA's inability to distinguish between criminal acts and individuals who are peaceably armed for self-defense renders its perspective questionable and unhelpful to this Court.

professionals are presumptively available." *Bruen*, at 2133 quoting New York State's Brief at 34.

The Court noted that while people sometimes congregate in "sensitive places" where law enforcement professionals are usually presumptively available, expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.

> Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below.
>
> Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen*, at 2133–34 (cleaned up).

The Court rejected the idea that the Second Amendment held any less force and effect in "crowded" areas and cities and declared that "there is no historical basis" for such a regulation.

The Times Square ban not only prevents people from exercising the right to be armed for self-defense in case of violent confrontation [*Heller*, at 592] it bans them from being armed from their front door to Times Square and everywhere they go afterward until returning back home (assuming the TSA does not have a firearm storage area available for the public to store their arms while visiting). For

11

commuters, like Appellant William Sappe who travels to work in the City from Orange County, New York through the Times Square area, that means *every day, all day long* he is forced to remain unarmed *everywhere* he goes until he returns home at night – and likewise for similarly situated people.

The TSA offers no new or insightful information for this Court; the Supreme Court has already denounced laws that "eviscerate the general right to publicly carry arms for self-defense[17]," which is the effect – and intent – of the CCIA.

## III. Sacrificing One Constitutional Right To Lawfully Exercise Another Is Antithetical to the U.S. Constitution

TSA attempts to rebrand its public safety argument by speculating that First Amendment freedoms will suffer if the Second Amendment is allowed to exist in Times Square.[18]

Of course, TSA cites no Supreme Court precedent – or any other court – that has required an individual to choose between two constitutional rights. TSA does cite its co-amicus Everytown's 'research'[19] – but the Supreme Court has repeatedly rejected any "interest balancing" approach to the Second Amendment.

---

[17] *Bruen*, at 2134.

[18] Proposed Br. at 9-13. Ironically, TSA fears that Appellants' exercise of the Second Amendment would "Severely Undermine First Amendment Values" - oblivious to the fact that TSA's exercise of its First Amendment right supports banning (not simply "undermining") New Yorkers' Second Amendment rights. TSA also mentions the 2020 BLM protests where a car drove through a group of protestors, but falls short of calling for a car ban. Perhaps because TSA supports car ownership, which has no constitutional protections.

[19] Proposed Br. at 12.

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach.
>
> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon.

*Heller*, at 634.

The *Heller* majority rejected Justice Breyer's dissenting view – apparently held by the Times Square Alliance - that "Because handgun violence is a problem, because the law is limited to an urban area, and because there were somewhat similar restrictions in the founding period (a false proposition that we have already discussed), the interest-balancing inquiry results in the constitutionality of the handgun ban. QED." *Heller*, at 634.

**IV. The TSA's Proposed Amicus Brief Is A Redundancy of Appellees' Briefs**

To the extent that the TSA mentions history at all, it either cites to Appellees' Briefs directly or echoes their arguments.[20]

TSA spends two pages rehashing the 1328 Statute of Northampton[21], which has been rejected by the Supreme Court as both outside of the relevant time period and simply irrelevant to the *peaceful* carriage of weapons for self-defense (as

---

[20] Proposed Br. at 13-20.
[21] Proposed Br. at 14-15.

13

opposed to going armed to terrorize people – "affray").[22] The Virginia, North Carolina, Maine, and Tennessee statutes incorporating Northampton also forbade "terrorizing" and "brandishing" – not peaceable carriage for self-defense.[23][24]

Such laws are no analogue for banning lawful gun owners from peacefully carrying a handgun for self-defense. And leaning on "policy goals" to justify firearm regulations highlights TSA's unfamiliarity with the *Bruen* test [25] and Second Amendment jurisprudence.

The TSA swiftly moves on to search the Reconstruction Period – having failed to identify any Founding Era historical traditions analogous to the Times Square ban, as there are none.[26]

Firearm regulations from the late-1800 and early 1900s were likely created *because of* the Fourteenth Amendment's ratification in 1868. Notably – no carry restrictions existed in the Founding Era[27], the *Dred Scott* decision where Chief Justice Taney openly feared that, if blacks were citizens, they would be entitled to

---

[22] "Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Bruen,* at 2139.

[23] Proposed Br. at 15.

[24] See also, Proposed Br. at 19 referencing "the ability of all citizens to live free of terror and intimidation" neither of which are caused by holstered carriage for self-defense. TSA ignores that lawful gun owners would also like to live free of terror and crime – the very reason they carry.

[25] Proposed Br. at 16.

[26] Proposed Br. at 16.

[27] "Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate." *Bruen*, at 2145.

the privileges and immunities of citizens, including the right "to keep and carry arms *wherever they went*,"[28] and then the ratification of the Fourteenth Amendment in 1868.

Justice Thomas explained, however, "as we suggested in *Heller*, however, late-19th-century evidence[29] cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, at 2153–54.

And to the extent later history contradicts what the text says, the text controls. *Bruen*, at 2137. Liquidating indeterminacies in written laws is far removed from expanding or altering them. Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources. *Bruen*, at 2137 (cleaned up) (citations omitted).

The TSA essentially echoes Appellees' briefs, offering no new or independent historical analysis relevant or helpful to this Court's determination of text, history, and tradition, warranting denial of the TSA's motion.

---

[28] Even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America. *Bruen*, at 2150-51.

[29] TSA relies on laws from 1870 through 1903. Proposed Br. at 17.

## V. Appellees Are Well-Represented and Have No Need for 'Assistance'

The adequacy of Appellees' representation has not been questioned, nor can it be. New York City and New York State are powerhouse governments with more than sufficient representation by the New York City Law Department and the New York State Attorney General's Office to adequately address the burden of justifying the challenged regulations.

The TSA has not claimed to have a "direct interest in another case" the outcome of which could be affected by this appeal. *Scheidler*, 223 F.3d at 617.

And the TSA's proposed amicus brief repeats the arguments made by Appellees.[30] These factors also warrant denial of TSA's motion.

---

[30] See, e.g., *King v. Amazon.com Servs. LLC*, No. 22CV01479DGSJB, 2022 WL 17083273, at *5 (E.D.N.Y. Nov. 18, 2022) (denying leave to file amicus brief where each of the parties was represented by able counsel and the court concluded that the proposed amicus curiae briefs did not assist the court).

16

## CONCLUSION

The motion of The Times Square Alliance for leave to file an amicus brief

should, most respectfully, be denied.

Dated: October 6, 2023
      Scarsdale, New York

                        The Bellantoni Law Firm, PLLC
                        *Attorneys for Appellants*

By:    *Amy L. Bellantoni*
                      Amy L. Bellantoni
                      2 Overhill Road, Suite 400
                      Scarsdale, New York 10583
                      abell@bellantoni-law.com

17

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word 2016 and, according to that software, it contains 3792 words, not including the cover, Table of Authorities, Table of Contents, or this Certificate of Compliance.

Dated: October 6, 2023

*Amy L. Bellantoni*

Amy L. Bellantoni