# 23-365-cv

## United States Court of Appeals
### for the
## Second Circuit

JASON FREY, BRIANNA FREY, JACK CHENG, WLLIAM SAPPE,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK,KEECHANT SEWELL, in her Official Capacity, STEVEN NIGRELLI, in his Official Capacity,

*Defendants - Appellees,*

KEVIN BRUEN, Acting Superintendent of the New York State Police, in his official capacity, DERMOT SHEA, in his Official Capacity as NYPD Police Commissioner,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (White Plains)

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. i

I. THE SUPREME COURT'S INTEREST IN MID-TO LATE 19th CENTURY EVIDENCE WAS MERELY CONFIRMATORY OF THE ORIGINAL MEANING IN 1791 ............................................................................ 1

    A.  19th Century Evidence Is Only Confirmatory ...................................... 1

    B. As Late As 1857, The Public Was Free To "Carry Arms Wherever They Went" .......................................................................... 2

    C. The Second Amendment Does Not Have One Meaning When Applied To Federal Law And Another Different Meaning When Applied To The States ............................................................................. 2

    D. Open and Concealed Carry Are Both Covered By The Plain Text: *Heller* Defined 'Bear Arms' To Encompass Each Modality ............ 4

II. APPELLANTS' LIKELIHOOD OF SUCCESS REGARDING THE OPEN CARRY BAN IS SUBSTANTIAL ................................................ 5

    A.  William Sappe Is Not Required To Be Arrested And Break The Law To Have Standing; A Credible Threat of Enforcement Is Sufficient ........ 5

    B.  Appellees Failed to Identify A National Tradition of Banning Open Carry .......................................................................... 8

    C.  The State and City Improperly Conflate Peaceable Open Carry With Crimes Like 'Affray' and Brandishing .................................................. 10

    D.  Holstered 'Open Carry' Is Not Menacing, Brandishing, 'Affray' Or Any Other Threatening Behavior ............................................................ 12

E. *Bruen* Found New York's Proffered Antebellum Regulations Were Not 'National Traditions', Were Not An Analogue For The State's 'Proper Cause' Restriction; They Therefore Cannot Constitute A 'National Tradition' Or An Historical Analogue For An Open Carry Ban ................................................................................................ 13

F. No 'National Tradition' Of Banning Any Mode Of Carry In The Antebellum Period; *Bruen* Did Not Find A 'National' Historical Tradition of Banning Open or Concealed Carry................................... 14

III. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS REGARDING INTRASTATE RESTRICTIONS OF §400.00(6) ......................... 15

A. Appellees Identified No Historical Analogue.............................. 15

B. Appellants Were Already Deemed "Law Abiding" By Judicial Licensing Officers Who Issued Their New York State Handgun License ................................................................................................. 16

IV. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS REGARDING §400.00(15) ................................................................................. 16

V. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS REGARDING THE TIMES SQUARE BAN AND THE MTA BAN................... 17

A. Today's Societal Problem -- Public Safety – Existed In The Founding Era, Was Balanced -- And Then Rejected In Favor Of The Plain Text ................................................................................... 17

B. The State's Firearm Regulations Are NOT Presumptively Lawful And Appellants Have No Burden To Rebut Them........................... 19

C. The Retaliatory CCIA Is Inconsistent With The Plain Text ...... 20

D. Sensitive Locations Bans Turn Lawful Citizens Into Felons: The Times Square Ban Is Inconsistent With The Plain Text ......... 21

E. Likewise, The MTA Ban Has No Historical Analogue ............. 23

VI.  THE CITY'S REDRESSABILITY ARGUMENT WAS NOT RAISED
BELOW AND SHOULD BE PRECLUDED ........................................................ 24

VII. NEW YORK IS NOT 'SHALL ISSUE' – IT REMAINS AN
'OUTLIER' MAY-ISSUE LICENSING REGIME ............................................... 25

VIII. APPELLANTS MUST ONLY PROVE THEIR CONDUCT IS
COVERED BY THE PLAIN TEXT ..................................................................... 25

        A.  *Bruen* Already Held That Public Carry Is 'Presumptively
Protected ......................................................................................................... 25

        B.  Because The Plain Text Covers Public Carry, Appellees Alone
Must Justify The Challenged Regulations .................................................. 26

IX.  THE CITY IS WRONG: WILLIAM SAPPE SOUGHT A SPECIAL PERMIT
FROM NYPD, WAS DENIED, AND HAS STANDING TO CHALLENGE
§ 400.00(6). ........................................................................................................ 27

X.  SECOND AMENDMENT VIOLATIONS CONSTITUTE
IRREPARABLE HARM ....................................................................................... 27

XI. *BRUEN* REJECTED BALANCING THE GOVERNMENT'S INTERESTS
AGAINST THE INDIVIDUAL'S IN SECOND AMENDMENT
CHALLENGES ...................................................................................................... 28

CONCLUSION ........................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871) .......................................................................... 11

*Antonyuk v. Bruen*,
  —— F.Supp.3d ——, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) .................. 28

*Atkinson v. Garland*,
  70 F.4th 1018 (7th Cir. 2023) .................................................................. 9

*Baird v. Bonta*,
  2023 WL 5763345 (9th Cir. Sept. 7, 2023) ............................................ 9

*Barker v. Wingo*,
  407 U.S. 514 (1972) ............................................................................. 18

*Bliss v. Commonwealth*,
  12 Ky. 90 (1822) .................................................................................. 11

*Calcano v. Swarovski N. Am. Ltd.*,
  36 F.4th 68 (2d Cir. 2022) ..................................................................... 8

*Cath. Diocese of Brooklyn v. Cuomo*,
  —— U.S. ——, 141 S.Ct. 63 (2020) ..................................................... 27

*Cayuga Nation v. Tanner*,
  824 F.3d 321 (2d Cir. 2016) ................................................................... 7

*Christian v. Nigrelli*,
  2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) .................................... 27

*D.C. v. Heller*,
  554 U.S. 570 (2008) ......................................................................... 1, 4

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ........................................................................ 30

i

*Dred Scott v. Sandford*,
  19 How. 393, 15 L.Ed. 691 (1857) ........................................................ 2

*Duncan v. Becerra*,
  265 F. Supp. 3d 1106 (S.D. Cal. 2017)................................................. 28

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................................. 27

*Fla. League of Prof'l Lobbyists, Inc. v. Meggs*,
  87 F.3d 457 (11th Cir.1996)................................................................. 6

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ............................................................................. 29

*Gurary v. Winehouse*,
  190 F.3d 37 (2d Cir.1999)..................................................................... 24

*Hardaway v. Nigrelli*,
  2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) .................................... 7

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013)............................................................ 28

*Hudson v. Michigan*,
  547 U.S. 586 (2006) ............................................................................. 18

*Mapp v. Ohio*,
  367 U.S. 643 (1961) ............................................................................. 18

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ............................................................................. 3

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012)................................................................ 30

*Miranda v. Arizona*,
  384 U.S. 436 (1966) ............................................................................. 18

*Morrissey v. Gen. Motors Corp.*,
 21 F. App'x 70 (2d Cir. 2001) ............................................................... 24

*Nat'l Org. for Marriage, Inc. v. Walsh*,
 714 F.3d 682 (2d Cir. 2013)............................................................. 6, 7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022) ..................................................................Passim

*Nunn v. State*,
 1 Ga. 243 (1846) ........................................................................... 9, 11

*Planned Parenthood Ariz., Inc. v. Humble*,
 753 F.3d 905 (9th Cir. 2014)................................................................ 30

*Range v. Att'y Gen. United States of Am.*,
 69 F.4th 96 (3d Cir. 2023)...................................................................... 9

*Riley's Am. Heritage Farms v. Elsasser*,
 32 F.4th 707 (9th Cir. 2022) ................................................................ 30

*Sprint Communications Co.*,
 554 U.S. 269 (2008) ............................................................................... 1

*State v. Chandler*,
 5 La. 489 (1850)................................................................................... 11

*State v. Reid*,
 1 Ala. 612 (1840) ................................................................................ 11

*United States v. Daniels*,
 77 F.4th 337 (5th Cir. 2023) .................................................................. 9

*United States v. Leon*,
 468 U.S. 897 (1984)............................................................................. 18

iii

The scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.

To the extent later history contradicts what the text says, the text controls.

Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2137-38 (2022) (cleaned up) (emphasis added) (citing cases).

# I. THE SUPREME COURT'S INTEREST IN MID- TO LATE 19th CENTURY EVIDENCE WAS MERELY CONFIRMATORY OF THE ORIGINAL MEANING IN 1791

## A. 19th Century Evidence Is Only Confirmatory

*Heller* and *Bruen* recognized that post-Civil War discussions of the right to keep an bear arms "took place 75 years after the ratification of the Second Amendment" and are not as reliable as earlier sources in determining the original meaning of the Second Amendment. *Bruen*, at 2137 quoting, *D.C. v. Heller,* 554 U.S. 570, 614 (2008); *Sprint Communications Co.*, 554 U.S. at 312, 128 S.Ct. 2531 (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). "*Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence only after surveying what it regarded as

1

a wealth of authority for its reading -- including the text of the Second Amendment and state constitutions. In other words, this 19th-century evidence was treated as mere confirmation of what the Court thought had already been established." *Bruen*, at 2137 (citation omitted).

**B. As Late As 1857, The Public Was Free To "Carry Arms *Wherever They Went*"**

Into the Antebellum Period, and as far as 1857, the public was free to "carry arms *wherever they went*." *Bruen*, at 2150 (emphasis supplied) (discussing Chief Justice Taney's description of the parade of horribles that would result from recognizing that free blacks were citizens in *Dred Scott v. Sandford*, 19 How. 393, 15 L.Ed. 691 (1857) (emphasis supplied).

After the ratification of the Fourteenth Amendment in 1868 came an uptick in gun regulation but, as the Supreme Court "suggested in *Heller*, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, at 2153–54.

**C. The Second Amendment Does Not Have One Meaning When Applied To Federal Law And Another Different Meaning When Applied To The States**

Appellees cite **no** Supreme Court case supporting the patently frivolous idea that the Bill of Rights has one meaning when applied to the federal government (1791) and some watered-down and different meaning when enforced against the

2

states (1868) – particularly considering that the 14th Amendment was passed to *ensure the equality of rights*.[1]

There is no such thing as the State-described "modern right to bear arms" [State Br. at 59]. "The People" adopted the Bill of Rights in 1791; territories that later became states did so with the knowledge of the Constitution and Bill of Rights. The Right *is* what it *was* when ratified.

The Fourteenth Amendment was also passed by Congress [2] and bestowed *every right* protected by the Constitution upon freed blacks – all "privileges and immunities [enjoyed by all other] citizens, including the right to keep and carry arms *wherever they went*." *Bruen*, at 2150-51 (emphasis supplied).

Appellees' theory conflicts with *Bruen* and *McDonald*. *McDonald* "abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court." *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010). And *Bruen* confirmed that "post-ratification

---

[1] The State recites various Supreme Court cases that look to a wide range of historical evidence, as did *Heller, McDonald,* and *Bruen* [State p. 60] but not one case looks to 1868 as the *primary source* of interpreting the Amendment, nor do they support the State's two-tiered theory.
[2] https://origins.osu.edu/milestones/july-2018-150-years-fourteenth-amendment?language_content_entity=en

adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137.

An intellectually honest reading of *Bruen* shuts the door on Appellees' theories. "The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of the Constitution in 1787." *Bruen*, at 2137 (citation omitted) (cleaned up). *Bruen* acknowledged the existence of a 'scholarly debate' – then disregarded it.[3]

### D. Open and Concealed Carry Are Both Covered By The Plain Text: *Heller* Defined 'Bear Arms' To Encompass Each Modality

The *Heller* Court held that the plain text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, at 592.

*Heller* defined 'bear Arms' as the right to 'wear, bear, or carry upon the person or in the clothing or in a pocket' for the 'purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.' *Bruen*, at 2134 quoting, *Heller,* at 584.[4]

*Heller*'s articulated scope of the term 'bear' encompasses both open carry ('carry upon the person') and concealed carry ('in the clothing or in a pocket'). *Id.*

---

[3] "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, at 2138.

[4] The City's claim that "the Supreme Court has never suggested that bearing arms means carrying firearms in any manner one wishes" is belied by the definition of 'bear.' [City Br. at 30].

4

Thus, open carry and concealed carry are ***both*** protected modalities of exercising the preexisting and presumptively protected right to 'bear Arms' codified in the plain text of the Second Amendment. This overarching protection is further evidenced by the fact that *Bruen* - a concealed carry case – did not distinguish between the two when announcing the Court had "little difficulty concluding" that the plaintiffs' conduct – public carry – was protected by the plain text of the Second Amendment. *Bruen*, at 2134.

Concealed carry remains a mere privilege under New York's may-issue licensing scheme, and the arbitrary delineation of the mode of carry violates the plain text of the Second Amendment. [5] 'Shall not be infringed' leaves no room for the government to dictate how an individual chooses to peaceably carry their Arms for self-protection.

## II. APPELLANTS' LIKELIHOOD OF SUCCESS REGARDING THE OPEN CARRY BAN IS SUBSTANTIAL

### A. William Sappe Is Not Required To Be Arrested And Break The Law To Have Standing; A Credible Threat of Enforcement Is Sufficient

Plaintiffs contesting statutes or regulations on Second Amendment grounds "face an unattractive set of options if they are barred from bringing a facial

---

[5] One problem with criminalizing mode of carry is that the difference between being law abiding and criminal behavior comes down to which way the wind blows, reaching for an object on the top shelf, removing one's jacket on a hot day, or opening one's fanny pack. For many women, effectively concealing a firearm on their person can be a difficult task, as they wear a wide variety of clothing styles from form-fitting stretch pants to loose tunics or dresses.

challenge: refraining from activity they believe the Second Amendment protects, or risk civil or criminal penalties for violating the challenged law. *C.f., Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (First Amendment) quoting, *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir.1996).[6]

The NYPD and NYSP unequivocally announced their intention to arrest anyone who violates New York's firearms laws. NYPD will arrest any upstate licensee who possesses a handgun in the City because an upstate license "is invalid to cross the county" line. [A22 at ¶28]. NYPD officers are trained, "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise; [o]fficers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm [ ] and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous." [A137-141; Sappe ¶14]. According to the NYPD policy, exercising one's Second Amendment rights *de facto* waives one's Fourth Amendment rights. Exercising constitutionally protected conduct now gives the NYPD reasonable suspicion to believe an individual is 'dangerous.' [A137-141; Sappe ¶ 15].

---

[6] "Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." *Nat'l Org. for Marriage*, at 688.

On August 31, 2022, Appellee Nigrelli publicly declared that the NYSP has "zero tolerance" for violations of the state's firearm laws, anyone who violates the firearm laws will be arrested, and NYS "troopers are standing ready to do so." [A26; https://www.youtube.com/watch?v=gC1L2rrztQs].

William Sappe has a stake in the outcome of this litigation sufficient to confer Article III standing. He sufficiently alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *4 (W.D.N.Y. Nov. 3, 2022) citing, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). Sappe open carries a holstered handgun when he is working in California and other jurisdictions where he can legally open carry – he prefers open carry, and would carry in New York State and the City tomorrow if § 400.00(6) and (15) were enjoined. [A27-28].

This circuit cannot reasonably find that the plaintiffs in *Nat'l Org. for Marriage*[7] whose alleged "harm" was "the threat of being labeled a 'political committee'" where the Board of Elections had not even threatened to enforce the challenged election law statutes had Article III standing - - and then *not* find standing for Mr. Sappe where all relevant law enforcement agencies have openly declared

---

[7] "Despite the language of *Lujan* and similar cases, however, we assess pre-enforcement First Amendment claims, such as the ones NOM brings, under somewhat relaxed standing and ripeness rules." *Nat'l Org. for Marriage*, at 689. They should be 'relaxed' here as well.

war on Second Amendment-protected activity, announcing they will violate other constitutional rights by stopping and frisking any individual engaging in Second Amendment-protected conduct, which NYPD deems *presumptively criminal*. [A137].

There is no requirement that Mr. Sappe, "a large and imposing black man" who "stand[s] out in a crowd" and is "regularly scrutinized by police officers" [A27] must openly carry a handgun in New York City, which will immediately subject him to arrest and place his personal safety in danger *because of the NYPD and NYSP's enforcement of the existing open carry ban*, for the Court to find that he has standing to challenge the open carry ban. Even the case cited by the State, *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) recognized that "a plaintiff need not attempt to overcome an obvious barrier to allege an injury in fact, which in some cases could result in physical harm."

Considering the details alleged by Mr. Sappe, it was error for the district court to find that lacked standing to challenge the open carry ban, particularly where it found that he had the requisite standing to challenge the geographical restrictions of § 400.00(6) to carry concealed in New York City. [A172; A25-26].

## B. Appellees Failed to Identify A National Tradition of Banning Open Carry

As numerous courts have correctly observed in applying *Bruen*, the government must identify a historical analogue that curtails the right to peaceably

carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a comparable blanket enforcement to New York's open-carry ban. *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *8 (9th Cir. Sept. 7, 2023), citing, *Atkinson v. Garland*, 70 F.4th 1018, 1021-22 (7th Cir. 2023); *United States v. Daniels*, 77 F.4th 337, 347-48 (5th Cir. 2023); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023).

While New York does not need to identify a "dead ringer" for its open-carry ban, it cannot satisfy the requirement for a closely analogous historical regulation by reference to any general firearm regulation it might unearth. Because states in 1791 and 1868 also grappled with general gun violence, New York must provide analogues that are "distinctly similar" to New York's general open-carry ban in "how" and "why" they curtailed individuals' right to openly carry firearms. *Baird*, at *8.

The only attempt to ban open carry identified by Appellees -- *Nunn v. State*, 1 Ga. 243 (1846) -- was overturned by the Georgia Supreme Court. Appellees identify no other open carry ban[8] in any other jurisdiction – and none from the Founding Era.

---

[8] City Br. at 31.

It was only after the ratification of the Second Amendment in 1791 that public-carry restrictions proliferated.[9] Even then, it was *concealed* carry, not open carry, that was restricted. And to the extent that post-ratification bans of concealed carry existed in a few states, they never swelled into a 'National tradition' of banning open carry.[10]

Turning history on its head, the City claims that because the government permissively *allows* some people to carry handguns concealed, banning open carry is constitutional. But there was no National historical tradition of criminalizing *open carry* – nor have Appellees identified one.

### C.  The State and City Improperly Conflate Peaceable Open Carry With Crimes Like 'Affray' and Brandishing

Peaceable carry for self-defense is presumptively protected by the plain text of the Second Amendment.[11] The historical 'traditions' of regulating the *manner* of carrying weapons involve banning carrying weapons in a threatening manner – akin to 'affray', disorderly conduct, brandishing, and other threatening conduct – like the

---

[9] *Bruen*, at 2145.
[10] The State cites only Antebellum regulations and old English "affray" prohibitions – citing nothing from the Founding Era to justify its open carry ban. [State Br. at 33].
[11] The State's claim that Appellants seek to carry in a "dangerous manner" has no basis in fact. [State Br. at 3].

Statute of Northampton.[12] But *Bruen* confirmed that the Statute of Northampton has nothing to do with the peaceable carriage of firearms for self-defense.[13]

> "…the common law did not punish the carrying of deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people…those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."

*Bruen*, at 2146 (citation omitted).

And the few states during the Antebellum period that favored open carry over concealed carry still did not constitute a "Nationwide tradition."[14] Alabama and Louisiana banned concealed carry in favor of open carry[15]. Georgia as well (see, *Nunn v. State*, 1 Ga. 243 (1846)).[16] And the Kentucky court invalidated a *concealed* carry prohibition. *Bliss v. Commonwealth*, 12 Ky. 90 (1822).

Because the term "bear" as defined in *Heller* covers both concealed carry and open carry, banning either mode of carry violates the plain text of the Second

---

[12] City Br. at 21, 39, 40; State Br. at 31, 34, 37.

[13] "Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Bruen,* at 2139.

[14] *Bruen*, at 2119 (the Court doubts that just three colonial regulations could suffice to show a tradition of public-carry regulation).

[15] *State v. Reid*, 1 Ala. 612, 616, 619 (1840) (the "[l]egislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence"); *State v. Chandler*, 5 La. 489, 490 (1850) (carrying 'in full open view' places men upon an equality"); *Andrews v. State*, 50 Tenn. 165, 187 (1871) (banning open carry would be unconstitutional).

[16] The City concedes concealed carry was banned because concealing one's weapon was considered "suspicious" [City Br. at 35]. Open carry is gentlemanly, allowing the public to see and know when one's adversary (or potential victim) was armed.

Amendment: And "to the extent later history contradicts what the text says, the text controls" because 19th-century evidence is treated as mere confirmation of what the Court thought had already been established. *Bruen*, at 2137.[17]

### D.  Holstered 'Open Carry' Is Not Menacing, Brandishing, 'Affray' Or Any Other Threatening Behavior

The State inaccurately claims that carrying a handgun open and holstered for self-defense is "likely to terrorize others." [State Br. at 32].

But *Bruen*'s historical analysis revealed that states acknowledged "that the carrying of a gun" for a lawful purpose "*per se* constitutes no offence." Only carrying for a "wicked purpose" with a "mischievous result ... constitute[d a] crime." The common law did not punish the carrying of deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people." Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so. *Bruen,* at 2145–46 (citations omitted).

The State failed to identify ***any*** historical analogue to support their view that merely carrying a holstered handgun open and exposed constituted a 'terrorizing'

---

[17] The State's 'chicken little' hysterics concerning 'exposing twenty million New Yorkers to a heightened risk of gunfire' lacks any factual basis and are an improper attempt to sway this Court into rendering an emotional decision. 'Public safety' interest balancing is forbidden under *Bruen*. *Bruen*, at 2160 (rejecting "means-end analysis employed …by the Second Circuit [because it] places no firm limits on the ability of judges to sustain any law restricting the possession or use of a gun").

act – nor will it. As Appellees are forced to concede, *concealed* carry was viewed as a surreptitious mode of carrying a weapon, preferred by criminals; open carry was historically viewed as gentlemanly, honest, and socially acceptable.

Plain clothes police officers, security officers, and investigators carry holstered and open (despite a statutory exemption), yet Appellees provide no examples of the public "running scared" from fear at the site.

And as of mid-2023, it is legal to open carry in 45 of the 50 United States[18] - New York is -- again -- an 'outlier jurisdictions' when it comes to the Second Amendment. *Bruen*, at 2161. Individuals have freedom to choose how best to carry their weapon for their own means of personal self-defense and deployment.[19]

**E. *Bruen* Found New York's Proffered Antebellum Regulations Were Not 'National Traditions', Were Not An Analogue For The State's 'Proper Cause' Restriction; They Therefore Cannot Constitute A 'National Tradition' Or An Historical Analogue For An Open Carry Ban**

*Bruen* analyzed firearm regulations in the Antebellum period and concluded that neither common-law offenses, statutory prohibitions, nor "surety" statutes constituted an historical analogue for New York's restrictive licensing regime. *Bruen*, at 2145. And, "as with the earlier periods, there is no evidence indicating that

---

[18] https://worldpopulationreview.com/state-rankings/open-carry-states.
[19] As of mid-2023, 27 states were "constitutional carry," meaning that no permit is required. https://worldpopulationreview.com/state-rankings/constitutional-carry-states

these common-law limitations impaired the right of the general population to peaceable public carry." *Ibid.*

### F. *No* 'National Tradition' Of Banning Any Mode Of Carry In The Antebellum Period; *Bruen* Did Not Find A 'National' Historical Tradition of Banning Open or Concealed Carry

Appellees misread *Bruen* to stand for the premise that open carry can be banned, so long as concealed carry is available.

But that is not what *Bruen* said.

An analysis of Antebellum regulations revealed that a few states held that *concealed carry* could be eliminated if open carry was an option.

> "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."

*Bruen*, at 2150.

*Bruen* did ***not*** state "one form of carry can be eliminated so long as the other was still an option." If a ban was imposed during the Antebellum Period, it was *concealed carry*, and not open carry, on the chopping block.

Even so, a handful of Antebellum statutes does not establish a 'National tradition' of regulating public carry in the first instance. And because there was no 'National' tradition of regulating public carry, there could be no 'National' tradition of banning *either* concealed *or* open carry.[20]

---

[20] Historical evidence from antebellum America demonstrates that the manner of public carry was subject to reasonable regulation – prohibiting carry in a manner to terrorize others. *Bruen*, at 2150.

14

If statutes from the Antebellum Period serve as an historical analogue of any kind, they would be analogous to a jurisdiction in which unlicensed open carry is freely exercised and concealed carry is banned.

## III. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS REGARDING INTRASTATE RESTRICTIONS OF §400.00(6)[21]

### A. Appellees Identified No Historical Analogue

Appellees proffer only "late-nineteenth-century" regulations to justify §400.00(6)'s restriction on upstate licenses. The State concedes that local intrastate firearm restrictions "became common only in the nineteenth century…" [State Br. at 27].

But the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. *Bruen*, at 2137. For local municipalities to 'define' the scope of the Right to "impose different and sometimes more stringent, firearm restrictions" [*Id.* at 25] is inconsistent with the plain text.

"Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that

---

[21] Even though Appellants hold valid New York State handgun licenses, licensing requirements did not exist until the early 1900s. Appellants do not concede that *any* government permission is consistent with exercising the preexisting right to possess and carry weapons for self-defense.

text." *Bruen*, at 2137. Intrastate permission is inconsistent with the plain text of the Second Amendment.

**B. Appellants Were Already Deemed "Law Abiding" By Judicial Licensing Officers Who Issued Their New York State Handgun License**

Lack of historical analogue aside, Appellants were already deemed 'law abiding' by a judicial licensing officer and found to have the requisite 'moral character.' [State Br. at 22, 28]. The fact that the City claims that it, too, should be able to weigh in on the issue underscores the arbitrary and subjective nature of New York's licensing scheme, including §400.00(6).

Appellees failed to identify a National tradition of requiring permission from various local municipalities to carry a handgun for self-defense within one's own state; Appellants' likelihood of success on their §400.00(6) challenge is substantial

**IV. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS REGARDING §400.00(15)**

Appellees failed to identify a National tradition of punishing the peaceable open carriage of a handgun as a crime. Appellants' likelihood of success on the merits of their challenge to §400.00(15) is substantial.

16

## V. APPELLANTS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS REGARDING THE TIMES SQUARE BAN AND THE MTA BAN

### A.  Today's Societal Problem -- Public Safety – Existed In The Founding Era, Was Balanced -- And Then Rejected In Favor Of The Plain Text

*Bruen* instructs that the historical inquiry is fairly straightforward when a challenged regulation addresses a general societal problem that has persisted since the 18th century. The lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. *Bruen*, at 2131 (emphasis added).

The societal concern here -- public safety -- was balanced and rejected in favor of codifying the individual right to possess and carry weapons:

> The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense.
>
> It is this balance—struck by the traditions of the American people— that demands our unqualified deference.

*Bruen*, at 2131 quoting, *Heller*, at 635 (cleaned up).

*Heller* rejected the view that 'guns are bad so state and local jurisdictions should be free to restrict them essentially as they see fit.' *Bruen*, at 2160–61 (Alito, J. concurring) (cleaned up).

17

As Justice Alito observed in *Bruen*,

> "*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun….
>
> Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment guarantees their right to do so."

*Bruen*, at 2161.

In *McDonald*, the Supreme Court recognized that the right to keep and bear arms is "not the only constitutional right that has controversial public safety implications. All the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category."

*McDonald*, at 783 citing:

> *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona*, 384 U.S. 436, 517, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting); id., at 542, 86 S.Ct. 1602 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases ... will return a killer, a rapist or other criminal to the streets ... to repeat his crime"); *Mapp v. Ohio*, 367 U.S. 643, 649.

Neither the City nor the State cite any case in which the Supreme Court has "refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications." *Ibid.*

Appellees begin in 1328 then jump to the late 1800s – skipping the Founding Era – mixing in laws punishing carrying firearms while intoxicated' (no analogue) and resting on modern laws from the late 1800s that ban firearms everywhere the public congregates because of some unarticulated 'danger.' [State Br. at 37-41].

But banning firearms in places the public generally congregates is inconsistent with the plain text and is, therefore, not an historical analogue.

### B. The State's Firearm Regulations Are NOT Presumptively Lawful And Appellants Have No Burden To Rebut Them

*Ipsi dixit,* the State manifests the untethered idea that its firearm regulations are presumptively lawful. [State Br. at 36]. The State's "location bans" are not presumptively lawful and can only be justified if the State proves that they are "consistent with this Nation's historical tradition of firearm regulation." ***Only if*** the firearm regulation is consistent with this Nation's historical traditions may a court conclude that Appellants' conduct falls outside the Second Amendment's "unqualified command." *Bruen*, at 2126, 2129-30.[22]

---

[22] The government has the burden to justify its regulations – not Appellants. The State believes (incorrectly) that by unilaterally calling any location a 'sensitive places' law it enjoys some level of protection. Not so. Every regulation must be justified under the *Bruen* test.

### C.  The Retaliatory CCIA Is Inconsistent With The Plain Text

As we saw in *Heller*, bans on the right to keep and/or bear Arms are unconstitutional *per se* because the plain text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, at 592.

*Bruen* rejected New York State's defense of the now-stricken "proper cause" requirement as a "sensitive places" restriction where the government may lawfully disarm law-abiding citizens including all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*, at 2133 quoting New York State's Brief at 34.

The Supreme Court noted that while people sometimes congregate in "sensitive places" where law enforcement professionals are usually presumptively available, expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.

> Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below.
>
> Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen*, at 2133–34 (cleaned up).

20

Rejecting the idea that the Second Amendment held any less force and effect in "crowded" areas and cities, the Supreme Court declared "there is no historical basis" for such a regulation. *Bruen*, at 2134.

But that's what the CCIA did. The Times Square/MTA bans not only prevent people from exercising the right to be armed for self-defense in that location they prevent people from being armed for self—defense from their front door to the sensitive location -- and everywhere they go afterward until returning home. For commuters, like Appellant William Sappe who travels to work in the City from Orange County, New York through the Times Square area, that means every day, all day long he is forced to remain unarmed everywhere he goes until he returns home at night – and likewise for similarly situated people.

The Supreme Court has denounced laws that "eviscerate the general right to publicly carry arms for self-defense ," which is the effect – and intent – of the CCIA [*Bruen*, at 2134] and so should this Court.

### D. Sensitive Locations Bans Turn Lawful Citizens Into Felons: The Times Square Ban Is Inconsistent With The Plain Text

The Times Square ban is slightly over a year old. Prior to its enactment, individuals who were licensed to carry a handgun concealed on their person would travel through and/or remain in Times Square every day, in largely unremarkable fashion.

21

The Times Square ban does not eliminate crime nor does it prevent criminals from entering Times Square while armed with firearms – or other weapons. It is already illegal in New York State (and City) to possess a handgun without a license. An unlicensed person carrying a handgun in New York State is guilty of a felony[23] and criminals do not apply for firearm licenses.

Only *licensed firearm owners* are affected by the CCIA location bans. Gov. Hochul passed the CCIA to specifically target licensed gun owners and emphasized implementing

> a public education campaign "so that people who do *now legally possess* (handguns) now under the Supreme Court ruling will understand that there are *rules of the road* that you must follow and *law enforcement will be making sure that you do follow these [rules]*. That is what we're doing." [24] (emphasis added).

The licensed individuals who legally carried a handgun for self-protection in Times Square before the CCIA are now felons for engaging in the same peaceable conduct. The ban does not prevent criminals from carrying firearms in Times Square and terrorizing the very people Appellees are forcing to be unarmed victims. Just days ago, a man was "robbed at gunpoint" in Times Square's "gun free zone.[25] The

---

[23] Penal Law § 265.03 (Class C Felony).

[24] https://www.youtube.com/watch?v=gC1L2rrztQs (13:38).

[25] https://www.msn.com/en-us/news/crime/man-45-robbed-at-gunpoint-off-times-square-trio-flees-in-getaway-jeep/ar-AA1hKuHf

only people affected by the Times Square ban are lawful gun owners seeking to peaceably carry a firearm for self-defense – against *criminals*.

The CCIA also bans lawful gun owners from being armed between their home and Times Square -- and everywhere in between. For Mr. Sappe, who travels to work from Orange County through the Times Square area, *every day, all day long* he is forced to remain unarmed *everywhere* he goes until he returns home at night.

Because Appellees failed to identify any National tradition of banning peaceably carry for self-defense in crowded places, like Times Square, Appellants' likelihood of success on the merits is substantial.

### E.  Likewise, The MTA Ban Has No Historical Analogue

Appellees also failed to identify an historical analogue for the MTA ban. Like the Times Square ban, public safety cannot be used to justify the government's firearm regulations but there is no National historical tradition that curtails the right to publicly carry handguns to a comparable degree, with a comparable severity, and with a comparable blanket enforcement to New York's MTA and Times Square bans. *Baird*, at *8.

Because Appellees' justifications are a combination of the same public safety arguments rejected by *Heller*, *McDonald*, and *Bruen*, comprised of regulations far removed from the Founding Era, and inconsistent with the plain text, this Court

23

cannot conclude that Appellants' conduct "falls outside the Second Amendment's unqualified command." *Bruen*, at 2126.

Under *Bruen*, these modern day bans on the public carriage of arms for self-defense – in areas where the public congregates – are inconsistent with the original meaning of the constitutional text and obviously cannot overcome or alter that text. *Bruen*, at 2137.

## VI. THE CITY'S REDRESSABILITY ARGUMENT WAS NOT RAISED BELOW AND SHOULD BE PRECLUDED

A party may not raise an issue for the first time on appeal. *Morrissey v. Gen. Motors Corp.*, 21 F. App'x 70, 73 (2d Cir. 2001) citing, *Gurary v. Winehouse*, 190 F.3d 37, 44 (2d Cir.1999).

The City's redressability argument, made for the first time on appeal [City Br. at 28-29], should be rejected.

If considered, however, Appellees have consistently argued that there is no violation of Penal Law 265 for a licensee to open carry because they are licensed to carry their respectively registered handguns; rather, they argue, openly carrying would violate § 400.00(15).[26] Since open carry would be considered "carrying outside of the of their concealed carry handgun licenses," and a violation of the

---

[26] ECF Doc. 32 at 13 of 19 ("Plaintiffs lack standing to challenge Penal Laws §§ 265.01(1), 265.01-B, 265.03(2), and 265.03(3) because they have not and cannot be injured by those statutes" due to their valid handgun licenses").

24

licensing statute, enjoining the penalties for carrying outside of one's restriction -- §400.00(15) -- would provide Appellants the relief they seek.

## VII. NEW YORK IS NOT 'SHALL ISSUE'[27] – IT REMAINS AN 'OUTLIER' MAY-ISSUE LICENSING REGIME

New York remains a may issue regime and the State has taken no steps to remove the "broad discretion" its vests in the state licensing officers. The CCIA did not create a shall-issue licensing scheme. [State Br. at 35-36, n. 12]. The State fails to quote § 400.00(1) under which "***no license shall be issued*** or renewed except for an applicant" that the government decides has (b) good moral character, which shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." (emphasis added). Not only does the scheme remain subjective, it prohibits issuing a license for self-defense, which, by its definition, endangers others.

## VIII. APPELLANTS MUST ONLY PROVE THEIR CONDUCT IS COVERED BY THE PLAIN TEXT

### A. *Bruen* Already Held That Public Carry Is 'Presumptively Protected'

The City pushes public safety, balancing tests, law-abiding tests, and a whole host of other burdens upon Appellants -- but Appellants *have no such burdens*.

---

[27] City Br. at 1.

The *Bruen* test is remarkably favorable to plaintiffs; when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, at 2126. And *Bruen* had "little difficulty" concluding that public carry is protected by the plain text of the Second Amendment. *Bruen*, at 2134.

Appellants need not show *anything else*. The entire burden shifts onto the government's shoulders to justify its regulations. And the test is a rather unforgiving one for the government.

## B.  Because The Plain Text Covers Public Carry, Appellees *Alone* Must Justify The Challenged Regulations

Appellees must prove that the challenged regulations are consistent with the text, history, and tradition of firearm regulation in this Nation. *Bruen*, at 2126, 2129-30. The City and the State alone have the burden to justify their firearms regulations – Appellants have no burden, including proving they are 'burdened'[28] or that the City's 'special permit' requirement 'deprives ordinary people of their right to public carry'[29], or that the state's permit scheme is being 'impermissibly applied.'[30]

---

[28] City Br. at 18.
[29] City Br. at 19.
[30] City Br. at 20.

26

## IX.  THE CITY IS WRONG: WILLIAM SAPPE SOUGHT A SPECIAL PERMIT FROM NYPD, WAS DENIED, AND HAS STANDING TO CHALLENGE § 400.00(6).

The City incorrectly represents that no Appellant has applied for a Special Permit under § 400.00(6).[31] Mr. Sappe applied for a concealed carry special permit under § 400.00(6) and was denied by the NYPD.  [A25, ¶9].

## X.  SECOND AMENDMENT VIOLATIONS CONSTITUTE IRREPARABLE HARM

The Supreme Court has held that the loss of "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, —— U.S. ——, 141 S.Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, at 2156 quoting, *McDonald*, at 780.

It is no justification to suggest that because Appellants can exercise *some* of their rights *some* of the time in *some* places, that their individual right to carry weapons in public to protect themselves has not been violated.[32]

---

[31] City Br. at 36.

[32] See, e.g., *Heller*, at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed").

27

Absent a preliminary injunction, Appellants' constitutional rights will continue to be violated and they will continue to suffer irreparable harm. Because of the challenged regulations they are "forced to give up their rights to armed self-defense outside their homes, being left to the mercy of opportunistic, lawless individuals who might prey on them"[33] whether they are unarmed in the City, on public transportation, and/or in Times Square. And criminalizing the open carriage of a handgun under § 400.00(15), which is the historically accepted mode of carrying weapons, constitutes irreparable harm as well.

## XI. *BRUEN* REJECTED BALANCING THE GOVERNMENT'S INTERESTS AGAINST THE INDIVIDUAL'S IN SECOND AMENDMENT CHALLENGES

*Bruen* rejected any 'balancing' of the government's interest over that of the individual's rights when determining Second Amendment challenges. Appellants have demonstrated a likelihood of success on the merits of their Second Amendment challenges, which means that they are suffering irreparable harm, the public interest always supports enjoining unconstitutional regulations, and the government has no interest in enforcing unconstitutional laws.

It is always in the public interest to prevent the violation of a person's constitutional rights. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145

---

[33] *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *10 (W.D.N.Y. Nov. 22, 2022).

(10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. —— –, 134 S.Ct. 2751.

A preliminary injunction in this case would serve the public interest of fostering self-defense across the state. The public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Christian*, at *11 citing, *Antonyuk v. Bruen*, No. 22-CV-0734, —— F.Supp.3d ——, ——, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022); see also, *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1136 (S.D. Cal. 2017), aff'd, 742 F. App'x 218 (9th Cir. 2018) (the public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens.).

As for balancing the hardships, the Supreme Court has declared multiple times that the Second Amendment is not subject to government interest-balancing or public safety excuses. All Appellees argue is that allowing individuals to exercise their civil rights 'poses a substantial safety risk' with "widespread chaos' [State Br. at 63] – patently improper arguments, and also speculative and unsupported by any evidence.

Each Appellant is *already licensed* – and every other New Yorker covered by this Court's injunction would be licensed as well.

29

Appellees present no evidence of "hardship" below independent of their "public safety" claims. The government cannot use the balance of hardships prong to backdoor public safety arguments that are barred from an analysis of the merits of Appellants' Second Amendment challenges. See, *Baird, supra.*

And because the "burdens at the preliminary injunction stage track the burdens at trial [*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)] public safety concerns are not properly part of the equation.

As the Ninth Circuit recently observed, it is well-established that the first *Winters* factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation. *Baird*, at *3 (9th Cir. Sept. 7, 2023) citing, *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014), abrogated on other grounds by *Dobbs v. Jackson Women's Health Org.*, —— U.S. ——, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022).

And his likelihood of succeeding on the merits also tips the public interest sharply in his favor because it is "always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, at *3 citing, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

30

## CONCLUSION

The district court decision should be reversed and, in the interest of judicial economy, the challenged statutes should be permanently enjoined.

Dated: October 10, 2023
      Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: _Amy L. Bellantoni_____
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

31

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)**

1.      This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). It contains 6,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: October 10, 2023

_Amy L. Bellantoni_
Amy L. Bellantoni