

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

January 9, 2024

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for
 the Second Circuit
40 Foley Square
New York, NY 10007

Re: *Frey v. Bruen*, No. 23-365

Dear Ms. Wolfe:

I represent state defendant-appellee Dominick Chiumento in the above-captioned appeal.[1] I submit this letter brief in response to the Court's December 19, 2023, order (ECF No. 110), directing the parties to submit supplemental letter briefs addressing the effect that this Court's recent opinion in *Antonyuk v. Chiumento*, No. 22-2908(L), ECF No. 413-1 (Dec. 8, 2023), has on this appeal.

---

[1] Chiumento was automatically substituted for Steven Nigrelli as the state defendant-appellee when Chiumento succeeded Nigrelli as Acting Superintendent of the New York State Police on October 5, 2023. *See* Fed. R. App. P. 43(c)(2).

*Antonyuk* supports affirmance of the district court's denial of plaintiffs' motion for a preliminary injunction in this case. First, this Court expressly rejected the contention that only eighteenth-century Founding era, and not nineteenth-century incorporation era, historical sources are relevant to the history and tradition of the Second Amendment right. That ruling squarely forecloses plaintiffs' principal argument on this appeal. Second, this Court found that the *Antonyuk* plaintiffs were unlikely to succeed on the merits of their constitutional challenges to various aspects of New York's laws governing firearms in sensitive places and governing firearm licenses. That ruling controls here given the substantially similar historical record analyzed by the district court below, and the fact that the sensitive-place regulations governing Times Square and public transportation at issue in this case are supported by some of the same historical traditions that *Antonyuk* recognized.

## BACKGROUND

As relevant here, this Court in *Antonyuk* (Jacobs, Lynch, and Lee, JJ.) vacated a preliminary injunction that had enjoined enforcement of provisions of New York's Concealed Carry Improvement Act (CCIA) (1)

2

governing firearms in a number of sensitive places, and (2) establishing requirements for a license to carry a firearm. *See* Op. at 72-118, 132-46, 172-239.[2] The sensitive-place regulations at issue in *Antonyuk* included prohibitions on firearms in parks, zoos, theaters, premises licensed for alcohol consumption, and locations providing behavioral health or chemical dependence care or services. *See id.* at 132-46, 172-233.

*Antonyuk* explained in detail the legal standards governing Second Amendment challenges following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). *See* Op. at 31-57. As the Court explained, *Bruen* established "a two-step framework, with the first step based on text and the second step based on history." *Id.* at 40. A plaintiff bringing a Second Amendment challenge first must show that "the Second Amendment's plain text covers [the plaintiff]'s conduct." *Id.* at 39 (quoting *Bruen*, 597 U.S. at 24). If the plaintiff does so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 39-40 (quoting *Bruen*, 597 U.S. at

---

[2] The Court also affirmed preliminary injunctions as to certain other provisions of the CCIA not at issue on this appeal.

24). This Court also reiterated that "the Second Amendment codifies a *preexisting* right, and therefore can fairly be read to incorporate traditional limitations" on the right, "unless historical context suggests otherwise." *Id.* at 45 (citations and quotation marks omitted).

In considering the scope of the Second Amendment right and its limitations, this Court cautioned against a rigid approach. For instance, "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Id.* at 49. Moreover, "the absence of a distinctly similar historical regulation in the presented record," *id.* at 48, or a "significant number" of such regulations, *id.* at 52, "can only prove so much," *id.* at 48. That is because "[l]egislatures past and present have not generally legislated to their constitutional limits." *Id.* In other words, this Court made clear that "novelty does not mean unconstitutionality," "even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Id.* at 49 (quotation marks omitted). And while the absence of historical analogues for a given regulation may not be especially probative, if historical analogues exist, the absence of disputes

4

regarding the constitutionality of these analogues is highly probative, because it may support an inference that it was settled that similar regulation was consistent with the Second Amendment. *Id.* at 53 (quoting *Bruen*, 597 U.S. at 30).

*Antonyuk* also emphasized that *Bruen* "made clear that 'nothing in [its] analysis should be interpreted to suggest the unconstitutionality of . . . "shall-issue" licensing regimes,'" "which often require applicants to undergo a background check or pass a firearms safety course," and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 42-44 (quoting 597 U.S. at 38 n.9). Accordingly, this Court found that the Second Amendment permits the government to require that a firearm-license applicant demonstrate "suitable character or temperament to handle a weapon," *id.* at 44, and to give licensing officers the circumscribed discretion necessary to assess such criteria, *see id.* at 73-74.

## ARGUMENT

**A.** ***Antonyuk*** **Confirmed That This Court May Consider Incorporation-Era History in Evaluating Second Amendment Challenges.**

5

Directly relevant to this appeal, *Antonyuk* expressly rejected the plaintiffs' principal argument here (*see, e.g.*, Opening Br. at 12-17, 34-38; Reply Br. at 1-4) that courts may look only to the Founding era when interpreting the scope of the Second Amendment under *Bruen*. As *Antonyuk* explained, for state laws like the CCIA, the understanding of the right to bear arms in 1791, when the Second Amendment was originally ratified, *and* in 1868, when the people incorporated the Second Amendment against the States through the Fourteenth Amendment, "are both focal points of our analysis." Op. at 55; *see also id.* at 54-57. And evidence from the nineteenth-century incorporation era "is at least as relevant as evidence from the Founding Era." *Id.* at 87 n.27.

Moreover, "time periods in close proximity to 1791 and 1868 are also relevant." *Id.* at 55. That is because "it is implausible that the public understanding of a fundamental liberty would arise at a historical moment, rather than over the preceding era." *Id.* "And it is implausible that such public understanding would promptly dissipate whenever that era gave way to another." *Id.* Indeed, even twentieth-century evidence is relevant. "The *Bruen* Court's concern was with temporally distant laws *inconsistent* with prior practices." *Id.* at 91 n.32 (citing *Bruen*, 597 U.S.

at 36). "In contrast, when laws which otherwise might be too recent when considered in isolation nonetheless reflect previously settled practices and assumptions, they remain probative as to the existence of an American tradition of regulation." *Id.*

Accordingly, *Antonyuk* confirmed the relevance of all the historical materials cited by defendants in this case and relied upon by the district court to confirm the constitutionality of the laws plaintiffs challenge.

## B. *Antonyuk* Supports the Denial of a Preliminary Injunction Against Enforcement of New York's Restrictions on Firearms in Public Transit and Times Square.

This Court concluded that the *Antonyuk* plaintiffs are unlikely to succeed on the merits of their constitutional challenges to several of the CCIA's sensitive-place restrictions. *Antonyuk*'s analytical approach and holding as to sensitive-place restrictions requires affirming the district court's denial of a preliminary injunction against enforcement of the two CCIA sensitive-place restrictions at issue on this appeal: those governing (1) Metropolitan Transit Authority (MTA) subways and commuter trains, and (2) Times Square.

As explained in defendants' principal briefs (Br. for Appellee Nigrelli at 37-40, 47-48, 50-53; Br. for N.Y.C. Appellees at 39-47), New

7

York's prohibition of firearms on MTA subways and commuter trains and in Times Square is consistent with (1) the historical tradition of restricting arms bearing in unusually crowded public places, like fairs and markets; and (2) the historical tradition of restricting arms in places where vulnerable people like children and seniors or people with impaired faculties are often present. *Antonyuk* recognized each of these historical traditions as sufficient historical support for modern restrictions in analogous sensitive places.

*First*, *Antonyuk* recognized America's "well-established, representative, and longstanding tradition," Op. at 192, "enduring from medieval England to Reconstruction America and beyond," "of regulating firearms in quintessentially crowded areas and public forums," *id.* at 183. The Court relied on this tradition to reverse a preliminary injunction against enforcement of a broad range of the CCIA's sensitive-place restrictions for crowded places, including parks, zoos, theaters, and bars and restaurants licensed for alcohol consumption. *See id.* at 181-94, 199-202, 206-14, 228-33. In doing so, the Court cited many of the same historical laws and cases upholding this tradition on which the defendants and the district court have relied in this case. *See, e.g., id.* at

8

183-88. And the Court specifically emphasized the significance to historical regulations of features typified by Times Square—such as people "assembled for amusement," *id.* at 229-30 (quotation marks omitted)—or both Times Square and public transit—such as "a high population density in discrete, confined spaces," *id.* at 201.

*Second*, *Antonyuk* recognized America's settled "tradition[s] of firearm regulation in locations where vulnerable populations are present," *id.* at 140, and where "people with impaired self-control or judgment," such as intoxicated people, are present, *id.* at 208. The Court again relied on these traditions to reverse a preliminary injunction against enforcement of several of the CCIA's varied sensitive-place restrictions, including those governing zoos (where vulnerable children are often present), premises licensed for alcohol consumption (where intoxicated people are often present), and locations providing behavioral health or chemical dependence care or services (where people with disabilities are often present). *See id.* at 138-44, 200, 206-14. The Court also again cited many of the same historical laws and cases upholding these traditions on which the defendants and the district court have relied here in support of the sensitive-place restrictions governing

9

subways, commuter trains, and Times Square—where all these vulnerable and impaired people are often present. *See, e.g., id.* at 139-44, 206-10.

*Third*, in assessing historical traditions, *Antonyuk* recognized the significance of private or localized rules restricting firearms. For instance, *Antonyuk* relied on historical rules prohibiting firearms in asylums for the mentally ill as evidence of a historical tradition of prohibiting firearms in locations where vulnerable people are present. *See* Op. at 142 n.60. And the Court emphasized that, where there were such private or localized restrictions on firearms, there may have been "no need" to enact public laws restricting firearms in those locations. *See id.* at 49. Likewise, here, defendants and the district court were correct to rely on private or localized rules restricting firearms as evidence of a historical tradition of firearm regulation. In this case, the relevant rules were early railroads' firearm restrictions. Those rules support a historical tradition of firearm restrictions on trains, and thus provide additional support for the constitutionality of New York's modern firearm restrictions on subways and commuter trains. See, e.g., Br. for Appellee

Nigrelli at 43-45; Br. for N.Y.C. Appellees at 48-50; Appendix (A.) 181-182.

*Finally*, *Antonyuk* held that a single historical tradition supporting a modern firearm regulation is sufficient. *See, e.g.*, Op. at 194 n.84 (where regulation is supported by one historical tradition, court "need not rely" on another historical tradition); *id.* at 211 n.94 (similar). Accordingly, because the CCIA's firearm restrictions governing subways, commuter trains, and Times Square are supported by multiple historical traditions recognized in *Antonyuk* (and others not addressed in *Antonyuk*, such as the tradition of permitting the government to restrict firearms on its own property, see, e.g., Br. for Appellee Nigrelli at 46-47; Br. for N.Y.C. Appellees at 47-48), affirmance of the district court's denial of a preliminary injunction is justified on multiple independent grounds.

**C.  *Antonyuk* Supports the Denial of a Preliminary Injunction Against Enforcement of Local Licensing Requirements and the State's Prohibition on Open Carry.**

**1. New York City license requirement**

In this case, plaintiffs challenge the constitutionality of the requirement that individuals obtain a license or permit for carrying firearms in New York City even if they have a license issued elsewhere

11

in the State. However, *Antonyuk* recognized that cities having more stringent firearm regulations than rural areas is a core part of the nation's history and tradition of firearm regulation.

Specifically, this Court explained that "city people have long had a different relationship with guns than their rural neighbors, a relationship generally marked by greater concern about interpersonal violence," and thus often more stringent firearm laws. *See* Op. at 97 (citing Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 98-103, 112-21 (2013)). As the Court observed, New York City's nineteenth-century firearm licensing law "made explicit the connection between the new urban environment and the bearing of arms as a potential problem," by emphasizing the need for the licensing requirement to promote public order and safety in the city. *See id.* at 97-98. *Antonyuk* further recognized a long line of similar municipal licensing laws, including "from the years immediately following ratification of the Fourteenth Amendment." Op. at 86-87; *see also id.* at 88-92 (citing many such laws, also relied on by defendants in this case). And, "[s]trikingly," these municipal licensing laws "did not merely exist—they appear to have existed without constitutional qualms or challenges." *Id.* at 92.

New York City's modern municipal firearm licensing law—ensuring that those carrying in the City satisfy the requirements the City has determined are necessary to protect public safety there—is therefore wholly consistent with America's history and tradition of firearm regulation. See Br. for Appellee Nigrelli at 23-28; Br. for N.Y.C. Appellees at 20-26.

### 2. Open-carry prohibition

*Antonyuk* likewise supports affirmance of the district court's denial of a preliminary injunction against enforcement of New York's prohibition on open carry of firearms. For instance, this Court emphasized the longstanding historical tradition, dating back to the medieval Statute of Northampton, of laws prohibiting carrying firearms in a manner likely to inspire terror—as carrying openly is likely to do today. *See* Op. at 184-85. See also Br. for Appellee Nigrelli at 31-32; Br. for N.Y.C. Appellees at 30-31.[3]

---

[3] *Antonyuk* cited an example of such a law that was not previously cited in this case: an 1816 District of Columbia law that prohibited going armed "in terror of the county." Op. at 184 n.73 (quoting An Act for Punishment of Crimes and Offences, within the District of Columbia, § 40 (1816), *available at* https://rb.gy/7q0cv). Relying on similar evidence and the opinions of several expert historians, a California federal district

13

*Antonyuk* also supports the district court's conclusion that plaintiffs here lack standing to challenge the open-carry prohibition in the first instance. (A. 163-164.) This Court made clear in *Antonyuk* that plaintiffs bringing a pre-enforcement challenge must show a concrete and imminent intent to engage in the proscribed behavior (*see, e.g.*, Op. at 124), and emphasized that courts should be particularly "reluctant" to assume standing based on "tenuous inferences from sparse declarations" where a plaintiff seeks "to invalidate the action of a co-ordinate branch or of a state" (*id.* at 219-20). As explained in defendants' principal briefs (see Br. for Appellee Nigrelli at 29-30; Br. for N.Y.C. Appellees at 27-28), plaintiffs' vague and contradictory declarations provide no basis for standing here.[4]

---

court judge recently determined in a thoroughly reasoned opinion that an open-carry prohibition is consistent with the history and tradition of the Second Amendment. *See Baird v. Bonta,* No. 2:19-cv-617, ECF No. 111, at 47-70 (E.D. Cal. Dec. 29, 2023).

[4] Plaintiffs misrepresent plaintiff Sappe's intent in their reply brief (at 7): although the reply brief suggests that Sappe "prefers open carry," and would open carry "tomorrow" if plaintiffs' requested injunction were granted, the pages of Sappe's declaration that plaintiffs cite (A. 27-28) say no such thing. On the contrary, Sappe declares that he "intend[s] to begin" open carrying only when he is not carrying concealed (A. 27)—and that he intends to carry concealed "on a daily basis" (A. 25).

## CONCLUSION

For all these reasons and those stated in the appellees' original briefs, the Court should affirm the district court's order on appeal.

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellee Chiumento

BARBARA D. UNDERWOOD                By:  */s/ Philip J. Levitz*
  *Solicitor General*                    PHILIP J. LEVITZ
ESTER MURDUKHAYEVA                       *Senior Assistant Solicitor General*
  *Deputy Solicitor General*

15