

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*

### THE CITY OF NEW YORK
## LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NEW YORK 10007

CLAUDE S. PLATTON
Phone: 212-356-2502
cplatton@law.nyc.gov

January 9, 2024

Hon. Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeals for
 the Second Circuit
40 Foley Square
New York, New York 10007

      Re:   *Frey v. Bruen,* No. 23-365

Dear Ms. Wolfe:

As directed by the Court's December 19, 2023 order, defendants-appellees the City of New York and NYPD Commissioner Edward A. Caban[1] submit this supplemental letter brief addressing the effect of *Antonyuk v. Chiumento*, No. 22-2908(L), ECF No. 413-1, __ F.4th __, 2023 U.S. App. LEXIS 32492 (2d. Cir. Dec. 8, 2023), on this appeal. In *Antonyuk*, this Court decided consolidated appeals from orders enjoining

---

[1] Edward A. Caban was automatically substituted for Keechant Sewell on July 17, 2023, when Caban succeeded Sewell as NYPD Commissioner. Fed. R. App. P. 43(c)(2).

provisions of New York State's Concealed Carry Improvement Act (CCIA), including several provisions pertaining to gun licensure and the designation of "sensitive places" where concealed firearms are prohibited. The Court's decision confirms in multiple respects that the district court here providently denied a preliminary injunction as to the three Second Amendment claims that plaintiff-appellants Jason and Brianna Frey and William Sappe press on appeal.[2]

First, with respect to N.Y. Penal Law § 400.00(6), which requires a New York concealed-carry licensee who resides outside of New York City to obtain a special permit from the City's licensing officer to carry a firearm in the City, *Antonyuk* establishes that (1) the Second Amendment allows a state to require a license in order to ensure that only responsible, law-abiding individuals carry firearms; (2) locality-specific licensing is consistent with the nation's tradition of firearms regulation; and (3) the bounded discretion exercised by the NYPD Commissioner in evaluating special-permit applications is consistent with the Second Amendment.

---

[2] In the opinion and order on appeal, the district court stayed decision on other issues that overlap with issues presented in *Antonyuk* and the other consolidated appeals (A186). After *Antonyuk* was decided, the district court granted the defendants' request to maintain the stay pending the outcome of this appeal (ECF No. 98, SDNY Case No. 21-cv-5334).

Second, *Antonyuk* undermines plaintiffs' challenge to N.Y. Penal Law § 400.00(15), to the extent that the provision bars open carry statewide by concealed-carry licensees. The decision's standing analysis confirms that plaintiffs here failed to establish an injury-in-fact from the prohibition of open carry. Moreover, the decision's teachings regarding the proper way to assess historical evidence in a Second Amendment analysis show that the prohibition of open carry is in line with the historical tradition of manner-of-carry regulation.

Third, *Antonyuk*'s assessment of several sensitive places under the CCIA effectively resolves plaintiffs' challenge to the CCIA's designation of Times Square, N.Y. Penal Law § 265.01-e(2)(t), and public transportation including subways and commuter rails, *id.* § 265.01-e(2)(n), as sensitive places. In particular, *Antonyuk* highlights the nation's longstanding tradition of prohibiting firearms in crowded public spaces, thus leaving no question that the CCIA lawfully prohibits firearms in Times Square and on public transportation.

## A. *Antonyuk* shows that the New York City-specific special-permit requirement is lawful.

*Antonyuk* confirms that the special-permit requirement survives Second Amendment scrutiny. As a threshold matter, the decision adopts

the same two-step analysis for Second Amendment claims that the City articulated in its brief (Brief for City Appellees ("City Br.") 15-17). The decision explains that *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022), set "out a two-step framework, with the first step based on text and the second step based on history." *Antonyuk*, Slip Op. 40. And *Antonyuk*'s application of this framework to reject a facial challenge to the CCIA's "good moral character" requirement provides further reason to conclude that the special-permit requirement is constitutional.

At the first step, *Antonyuk* did not reach, and thus left open for the Court to resolve in this case, the argument made by the State there—and by the City here—that a licensing provision designed to ensure that only law-abiding, responsible persons carry firearms does not implicate conduct falling within the text of the Second Amendment (City Br. 17-19). *See Antonyuk*, Slip Op. 75-77. Nor did *Antonyuk* have occasion to consider, and did not foreclose, the City's further argument here that the Second Amendment's text does not speak to whether a state may impose geographic limits on the effectiveness of a carry license (City Br. 19-20). The Court may reject plaintiffs' challenge on either of these grounds.

At the second step of the analysis, *Antonyuk*'s discussion of the historical tradition supporting the CCIA's character requirement confirms that the special-permit requirement passes constitutional muster. The City has argued that the special-permit requirement is consistent with a longstanding tradition of limiting public carriage of firearms to law-abiding, responsible individuals (City Br. 20-26). And indeed, *Antonyuk* identified just such a tradition, concluding that "restrictions forbidding dangerous individuals from carrying guns comport with 'this Nation's historical tradition of firearm regulation.'" Slip Op. 78 (quoting *Bruen*, 142 S. Ct. at 2126). The Court went on to hold that this historical tradition supported the character requirement and several other challenged licensing provisions. *See id.* at 85-101, 110-18. The decision thus refutes plaintiffs' assertion that there is no historical tradition supporting gun licensure of any sort (Brief for Plaintiffs-Appellants ("App. Br.") 19; Appellants' Reply Brief ("Reply") 15 n.21).

Moreover, *Antonyuk* supports the City's argument that the special-permit requirement fits within a historical tradition of locality-specific permitting (City Br. 23-25). The Court's extensive discussion of historical urban firearms regulations confirms that there is a longstanding

tradition of licensing at the local level and of taking specific urban concerns into account when regulating the carrying of firearms. *See Antonyuk,* Slip Op. 91-101. The decision observed that "[l]icensing was the result of changes in American society in the nineteenth century, including urbanization and concomitant shifts in norms of governance" and that "city people have long had a different relationship with guns than their rural neighbors … generally marked by greater concern about interpersonal violence." *Id.* at 96-97. *Antonyuk* thus establishes that, rather than requiring a uniform statewide licensing scheme as plaintiffs suggest (App. Br. 18; Reply 16), the Second Amendment allows for locality-specific schemes, such as the special-permit requirement, under which local officials get to decide whether individuals seeking to carry firearms within their jurisdiction have satisfied all statutory requirements.

Finally, the *Antonyuk* decision refutes plaintiffs' assertion that the special-permit requirement affords licensing officials an impermissible degree of discretion (Reply 16). In plaintiffs' view, the possibility that an out-of-City licensing official and a New York City licensing official could disagree as to whether an applicant has met the criteria for a carry

license reveals the licensing scheme to be "arbitrary and subjective" (*id*.). But as this Court highlighted, provisions that grant "limited discretion in applying defined criteria are consistent with our tradition of firearms regulation." *Antonyuk*, Slip Op. 86. Indeed, *Antonyuk* explains that many historical laws afforded licensing officials discretion, even without "objective criteria," *id*. at 86-87, and their "widespread adoption by diverse and distant localities under varying circumstances suggests that these policies enjoyed broad popular support and were understood at the time to be consistent with the Second and Fourteenth Amendments," *id*. at 92. The Court summarized the pertinent historical evidence in terms that apply equally to plaintiffs' claims here: "[T]he record thus suggests that the kind of purely 'objective' licensing scheme which the district court deemed *required* by history and tradition is in fact a historical outlier." *Id*. at 91.

The Court's discussion of the CCIA's grant of "statutorily bounded discretion," *id*. at 85, thus shows that a licensing regulation is not constitutionally suspect just because different officials could reach different conclusions in borderline cases about whether an applicant has satisfied the statutory requirements.

7

### B. *Antonyuk* confirms that the prohibition on open carry is lawful.

*Antonyuk*'s reasoning also undermines plaintiffs' challenge to the State's prohibition of open carry. *See* Penal Law § 400.00(15). To start, the decision's discussion of the requirements to mount a pre-enforcement challenge support the City's contention that plaintiffs lack standing to challenge this restriction (City Br. 26-28). *See Antonyuk*, Slip Op. 124-31. The Court explained that to lodge such a challenge to a sensitive-place designation, the plaintiff had to articulate both a concrete intention to visit that place and a credible threat of enforcement. *Id.* at 124. The Court held that a plaintiff had standing to challenge the prohibition on carrying firearms in zoos because he averred that he and his wife "frequently visit" a zoo "at least once or twice every fall." *Id.* at 172 (quotation marks omitted).

Here, plaintiffs provided nothing comparable. As the district court correctly concluded, they never clearly articulated a concrete and specific intention to carry firearms openly (A163-64). Instead, they offered just vague and internally inconsistent statements about carrying openly at some unspecified point in the future. Thus, they did not establish standing, and this Court should not reach the merits of this claim.

On the merits, if the Court addresses them, *Antonyuk* provides support for the City's showing that a prohibition of open carry is consistent with a historical tradition of gun regulation. As the City has explained, *Bruen* itself identifies a historical tradition of regulating the manner of public carry that supports New York's open-carry restriction (City Br. 30-32). The City and State have also pointed to additional historical regulations of the manner of carrying firearms (*see* City Br. 30-31; Br. for State Appellees 31). *Antonyuk* undermines plaintiffs' objections to the sufficiency of this evidence.

First, *Antonyuk* refutes plaintiffs' assertion the historical manner-of-carry regulations are not probative to the extent that they prohibited concealed rather than open carry (App. Br. 31). The decision confirms that, as the Supreme Court emphasized in *Bruen*, the government need not identify a historical twin for a modern-day gun regulation, and courts should engage in flexible, analogical reasoning when comparing a regulation to its historical antecedents. *See Antonyuk*, Slip Op. 45-57. The Court explained that, while a clear historical analogue is compelling evidence of the original public understanding of the right, *id.* at 48, the absence of "comparable historical regulations" can prove only so much,

9

*id.* at 52. When considering historical evidence, "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Id.* at 49. The Court therefore embraced a "nuanced approach" that looks at history through a broad lens. *Id.* at 50. Particularly when viewed through that lens, the historical manner-of-carry regulations are probative even if they happened to authorize a different manner of carry than New York does.

Second, plaintiffs' contention that the manner-of-carry regulations do not establish a historical tradition because they were found in only "a handful of Antebellum statutes" (Reply 14) is untenable after *Antonyuk*. The Court's decision makes clear that a historical tradition need not have been "a uniform practice" across all jurisdictions. *Antonyuk*, Slip Op. 93. A court's task is "to determine whether a given modern law is *part* of the nation's tradition of firearm regulation, not the sum of it." *Id*. As *Antonyuk* explains, *Bruen*'s dismissal of outlier territorial laws that contradicted the overwhelming weight of contemporaneous laws does not suggest that historical laws must always have existed in "significant numbers" to indicate a tradition. *Id*. at 52-53. Rather, "[i]n less

10

exceptional contexts lacking such [overwhelming] countervailing historical evidence," the fact that legislation was not adopted more broadly "does not command the inference that legislators there deemed such a regulation inconsistent with the right to bear arms." *Id*. at 53.

Third, *Antonyuk* dooms plaintiffs' attempt to distinguish the manner-of-carry regulations on the basis that some of them post-dated the Founding era (App. Br. 17-18). On plaintiffs' reading, *Bruen* requires the government to identify historical evidence from 1791, when the Bill of Rights was ratified, to support a contemporary gun regulation (Reply 2-3, 15-16). But *Antonyuk* explained that courts may consider evidence from well before the Founding through Reconstruction, and even later, as relevant evidence of a historical tradition. *Antonyuk*, Slip Op. 55-57. The decision explains that while 1791 and 1868 are "key dates" for discerning the original meaning of the constitutional text, it is "implausible that the public understanding of a fundamental liberty would arise at a historical moment, rather than over the preceding era," or "that such public understanding would promptly dissipate whenever that era gave way to another." *Id*. at 55. So, contrary to plaintiffs' arguments, historical laws from before, during, and after the Founding

11

and Reconstruction eras can all be probative evidence that a contemporary law is within the nation's tradition of gun regulation.

### C. *Antonyuk* confirms that the State has lawfully designated Times Square and public transportation as sensitive places.

Finally, *Antonyuk*'s analysis of several of the CCIA's designated sensitive locations is dispositive of plaintiffs' challenge to the designation of Times Square and public transportation as sensitive locations.

From a methodological standpoint, the *Antonyuk* Court endorsed the analytical approach that the City advocated for in its brief, under which the government can defend a firearm restriction by identifying multiple historical traditions that collectively support a modern restriction (City Br. 43). The Court's analysis shows that the government need not identify a single lineal ancestor of a modern regulation; a confluence of historical traditions may also together demonstrate that a modern regulation is constitutional. Thus, the Court determined that the historical tradition of prohibiting firearms in crowded places, coupled with historical prohibitions on firearms in places where children gather and places of educational and scientific opportunity, supported the CCIA's designation of zoos as sensitive locations. *Antonyuk,* Slip Op. 200-

202. Likewise, the Court held that historical laws barring guns in crowded places, together with a tradition of barring intoxicated persons from carrying or purchasing guns, supported the CCIA's restriction of guns in establishments that serve alcohol. *Id.* at 213.

*Antonyuk*'s application of this approach, when resolving challenges regarding urban parks and theaters, refutes plaintiffs' challenge here. The Court upheld the designation of urban parks as sensitive locations because there is a historical tradition of prohibiting firearms "in quintessentially crowded areas and public forums." *Antonyuk*, Slip Op. 183. Similarly, the Court upheld the designation of theaters as sensitive places as part of a tradition of barring firearms in "discrete, densely crowded physical spaces wherein people assemble for amusement, educational, or literary purposes." *Id.* at 230. To reach its conclusion that firearms can be banned in such acutely crowded spaces, *Antonyuk* surveyed laws "beginning from medieval England and extending beyond Reconstruction," *id.* at 186, that restricted firearms in "often-crowded" and "densely trafficked public forums," *id.* at 200; *see generally id.* at 184-199, 228-32.

13

As the City argued (Br. 43-47), the same confluence of historical traditions that *Antonyuk* identified as supporting the CCIA's prohibition of firearms in urban parks and theaters supports the CCIA's designation of Times Square, subways, and commuter rails—densely packed spaces where strangers of all ages and from all walks of life are often found shoulder-to-shoulder—as sensitive locations. These locations are modern equivalents of the "crowded 'public squares' such as fairs, markets, and 19th century urban parks," where firearms traditionally were prohibited. *Antonyuk*, Slip Op. 201. And they feature the "high population density in discrete, confined spaces … [that] has historically justified firearms restrictions." *Id.* Moreover, the historical laws burdened the Second Amendment right "in a distinctly similar way (*i.e.*, by prohibiting carriage)" as the prohibition on firearms in Times Square and on public transportation and "for a distinctly similar reason (*i.e.*, maintaining order in often-crowded public squares)." *Id.* at 193-94.

*Antonyuk* also supports the City's contention that any assessment of regulations of public transportation must account for the significant technological and societal changes in transportation since the Founding (City Br. 50-51). The decision emphasized that differences between the

concerns of past eras and those of the present mean that "the lack of a distinctly similar historical regulation … may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Antonyuk*, Slip Op. 49-50. So too, the decision cautioned that the absence of closely analogous regulations may show "lack of political demand rather than constitutional limitation." *Id.* at 49 (quotation marks omitted). These points are directly relevant here, given both the dramatic expansion of mass transit in the nineteenth century and the private regulation of trains in that era that made governmental regulation unnecessary (*see* City Br. 48, 50-51).

In all of these ways, *Antonyuk* offers further support for the district court's denial of a preliminary injunction. This Court should affirm.

Respectfully submitted,

SYLVIA O. HINDS-RADIX
  *Corporation Counsel*
  *of the City of New York*
Attorney for Appellees the City of New York and Commissioner Caban

By: /s/ Claude S. Platton
CLAUDE S. PLATTON
DEPUTY CHIEF, APPEALS

15