

January 9, 2024

**BY ECF**

Hon. Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for
the Second Circuit
40 Foley Square
New York, New York 10007

     Re:    *Frey v. Bruen,* No. 23-365

Dear Ms. Wolfe,

This firm represents Plaintiffs-Appellants ("Appellants") in the above-referenced appeal. Please accept the following in accordance with the Court's December 19, 2023 Order granting New York State's motion for leave to permit the parties to submit letter briefs, not to exceed fifteen pages double-spaced, addressing what effect *Antonyuk v. Chiumento*, _____ F.4th ____, 2023 WL 8518003 (2d Cir. December 8, 2023) has on this matter, if any.

***Antonyuk*'s Impact on Appellants' Article III Standing**

*Antonyuk* confirms that the district court erroneously held that Appellants Sappe and Frey lacked Article III standing to challenge (i) New York's open carry ban; (ii) criminal penalties under Penal Law 400.00(15); and (iii) the intrastate restrictions of Penal Law 400.00(6).

Like Appellants, no plaintiff in *Antonyuk* had been arrested or prosecuted under the challenged statutes, but *Antonyuk* reiterated that "an actual arrest, prosecution, or other enforcement action is not a

prerequisite to challenging the law." *Antonyuk*, at *39 quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "Instead, a plaintiff has Article III standing to bring a pre-enforcement challenge to a criminal statute if he or she can demonstrate: (1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that the intended conduct is proscribed by the challenged law; and (3) that there exists a credible threat of prosecution thereunder." *Id.* quoting, *Vitagliano v. County of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (quoting *Driehaus*, 573 U.S. at 159, 134 S.Ct. 2334) (internal quotation marks omitted).

*Antonyuk* confirmed Article III's "low threshold" for standing and reiterated that plaintiffs have no burden to show an intent by the government to enforce the law against them; rather, intent is "presumed in the absence of a disavowal by the government." *Antonyuk*, at *39 (citation omitted); accord *Vitagliano*, 71 F.4th at 138 ("[W]here a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it." (quoting *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019)). Indeed, "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Id.* at 39-40 quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (citation omitted) (rejecting any requirement for Article III standing that a plaintiff must establish that they have been threatened with certain prosecution). "

As in *Antonyuk*, Sappe and Frey have announced their intention to carry a handgun (i) open and holstered, and (ii) open and/or concealed in New York City – and would do so but for the fear of arrest and criminal sanctions by the enforcement of Penal Law 400.00(15), a Class A Misdemeanor) [and the criminal possession of a weapon provisions of Penal Law 265.00, *et seq.*] by NYPD and New York State Police. [Appellants' Br. at 27-33; Appellants' Reply Br. at 5-8].

As in *Antonyuk*, the statements by law enforcement officials cited by Appellants "may not directly threaten the specific Plaintiffs in these cases with arrest, those statements are, in the context of

this case, evidence that Plaintiffs face a realistic threat of arrest and prosecution. Far from disavowing prosecution of Plaintiffs, multiple Defendants have announced their intention to enforce the CCIA, and the Superintendent of State Police has warned that his department will have "zero tolerance" for violations. Although prosecution is not certain, Plaintiffs articulate a plausible chain of events resulting in their arrest and prosecution: the "brazen nature of [their] intended defiance," in the district court's words, makes it likely to be noticed by citizens and then by police…Plaintiffs "are thus not without some reason in fearing prosecution," and their fears are neither "imaginary [n]or wholly speculative."" *Antonyuk*, at *41 quoting, *Babbitt*, 442 U.S. at 302.

As such, the district court's finding that Sappe and Frey lacked Article III standing to challenge (i) New York's open carry ban; (ii) criminal penalties under Penal Law 400.00(15); and (iii) the intrastate restrictions of Penal Law 400.00(6) should be reversed.

***Antonyuk* Has No Application to Appellants' Challenge to New York's Open Carry Ban**

*Antonyuk* has no application to Appellants' challenge to New York State's ban on the open carriage of handguns because the panel specifically limited its decision to "concealed carry."

> Section 400.00 provides for many types of firearm licenses, see generally N.Y. Penal L. § 400.00(2), but this case focuses on "concealed carry licenses," which allow the holder to "have and carry [a pistol or revolver] concealed, without regard to employment or place of possession." *Id.* § 400.00(2)(f).

*Antonyuk*, at *16.

The open carriage of handguns was not addressed or referenced by the *Antonyuk* panel. Thus, whether in the context of Appellants' challenge to New York's ban, the enforcement of criminal penalties under Penal Law 265 or 400.00(15), licensing requirements for open carry, and/or intrastate licensing requirements under 400.00(6), *Antonyuk* has no application to regulations affecting the open carriage of handguns for self-defense.

*Antonyuk Has No Application to Appellants' Challenge to New York's Intrastate Licensing*

The *Antonyuk* panel neither considered nor referenced Penal Law section 400.00(6), which requires individuals who were issued a concealed carry license by a licensing officer outside of New York City to apply for and obtain a separate license from the NYPD License Division to lawfully carry a handgun concealed inside of New York City.

*Antonyuk Has No Application to Appellants' Challenge to Penal Law 400.00(15), 265.01(1), 265.01-B, 265.03(2), and/or 265.03(3)*

The *Antonyuk* panel neither considered nor referenced Penal Law section 400.00(15), 265.01(1), 265.01-B, 265.03(2), and/or 265.03(3), which subject licensed individuals criminal penalties if they (i) carry a licensed handgun concealed outside of their license restriction, (ii) carry a licensed handgun inside of New York City, and/or (iii) open carry a handgun (whether inside or outside of New York City).

*Antonyuk Has No Application to Appellants' Challenge to Penal Law 265.01-e(2)(n) and (t)[1]*

*Antonyuk* neither discussed nor adjudicated the constitutionality of the "sensitive areas" ban enforced under Penal Law 265.01-e(2)(n) [public transportation] and 265.01-e(2)(t) [Times Square].

In its entire history as a state, New York has never before banned the carriage of handguns for self-defense in Times Square or on public transportation. These "modern day" regulations conflict with the plain text of the Second Amendment.

In *Bruen*, the Supreme Court affirmatively rejected New York's view that "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively

---

[1] The district court properly found that Appellants have standing to challenge the enforcement of Penal Law §§ 265.01-e(2)(n) [subway and Metro North train cars]; and e(2)(t) [Times Square]. [A159-60].

- 4 -

available" – and then New York went on to ban the Second Amendment in virtually all public places. But "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' *far too broadly*. [New York State's] argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below… Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Bruen*, at 2133–34.

Supreme Court precedent, not *Antonyuk*, controls this panel's determination of whether banning the Second Amendment in an area arbitrarily defined as "Times Square" [265.01-e(2)(t)] and/or in every mode of public transportation [265.01-e(2)(n)] violates the Second Amendment.

Rejecting the idea that the Second Amendment held any less force and effect in "crowded" areas and cities, the Supreme Court declared "there is no historical basis" for such a regulation. *Bruen*, at 2134. But that's what the CCIA did – and it targeted *licensed individuals* – people who have already jumped through the State's regulatory hoops.[2] The Times Square and public transportation bans not only prevent people from exercising the right to be armed for self-defense *in that location*, the regulations prevent people from being armed for self—defense from their front door to the sensitive location -- and everywhere they go afterward until returning home. For commuters, like Appellant William Sappe who travels to work in the City from Orange County, New York through the Times Square area, that means every day, all day long he is forced to remain unarmed everywhere he goes until he returns home at night – and likewise for all other similarly situated people.

In *Bruen*, the Supreme Court denounced laws that "eviscerate the general right to publicly carry arms for self-defense" [*Bruen*, at 2134] which is the effect – and intention – of the CCIA. As the Supreme Court stated in *Heller,* and repeated in *McDonald,* and *Bruen,* "individual self-defense is 'the

---

[2] Penal Law 265.00, *et seq.* already punished the unlicensed possession of firearms. The only motivation for enacting sensitive areas bans was to prevent licensed individuals from exercising their Second Amendment rights, as they have no exemption from criminal penalties. See, e.g., Penal Law 265.20.

central component' of the Second Amendment right." *Bruen*, at 2133 quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (plurality opinion) (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); see also *Heller*, at 628 ("the inherent right of self-defense has been central to the Second Amendment right").

New York's modern-day regulations impose a burden on the right of armed self-defense that eviscerates the Second Amendment right to "bear arms" in public. And as the Supreme Court "recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, at 2137, citing, *Heller*, 554 U.S. at 614; cf. *Sprint Communications Co.*, 554 U.S. at 312 (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). And we made clear in *Gamble* that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." *Gamble*, 587 U.S., at ——, 139 S.Ct., at 1975–1976 (majority opinion). In other words, this 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established.'" *Bruen*, at 2137.

*Bruen* cautioned that the inferior courts "must also guard against giving postenactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation." *Bruen*, at 2136–37 quoting *Heller,* 554 U.S. at 605. *Bruen* clarified that, while the *Heller* court "examined a variety of legal and other sources to determine the public understanding of [the Second Amendment] after its ... ratification" and, in other contexts, has acknowledged that "a regular course of practice can liquidate & settle the meaning

of disputed or indeterminate terms & phrases in the Constitution… to the extent later history contradicts what the text says, the text controls.

Consistent with constitutional precedent, *Bruen* held that the plain text of the Second Amendment "controls" because the "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (cleaned up). The scope of the rights protected by the Second Amendment "is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*." *Bruen*, at 2137 (emphasis added). It is under this constitutional precedent and analysis that Penal Law 265.01-e(2)(n) and (t) are to be analyzed by this Court.

Thank you for the Court's consideration.

Very truly yours,

*Amy L. Bellantoni*
Amy L. Bellantoni