# 23-365

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUT

_____

JASON FREY, BRIANNA FREY, JACK CHENG, WILLIAM SAPPE,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK, KEECHANT SEWELL, in her Official Capacity,
STEVEN NIGRELLI, in his Official Capacity,

*Defendants-Appellees,*

KEVIN P. BRUEN, Acting Superintendent of the New York State Police,
in his Official Capacity, DERMOT SHEA, in his Official Capacity as
NYPD Police Commissioner,

*Defendants.*

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES

_____

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
jcarter@everytown.org
(646) 324-8174

September 26, 2023

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................2

ARGUMENT ...........................................................................................................3

    I.    The Proper Focus for Analysis of Historical Regulation Is the
Reconstruction Era, Not the Founding Era ................................................3

    II.   The City's and the State's Historical Analogues Are More than Sufficiently
Representative ...........................................................................................16

CONCLUSION.....................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Hochul*,
   639 F. Supp. 3d 232 (N.D.N.Y. 2022), *appeal docketed*, No. 22-2908 (2d Cir. Nov. 9, 2022) ................................................................................20

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018) ................................................................2

*Davenport v. Wash. Educ. Ass'n*,
   551 U.S. 177 (2007) ............................................................................19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ....................................................................passim

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228, 2255 (2022) .............................................................19

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011). ....................................................5, 6, 8

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ............................................................19

*Gould v. Morgan*,
   907 F.3d 659 (1st Cir. 2018) ...............................................................6

*Hardaway v. Nigrelli*,
   639 F. Supp. 3d 422 (W.D.N.Y. 2022), *appeal docketed*, No. 22-2933 (2d Cir. Nov. 15, 2023) ..........................................................................20

*Koons v. Platkin*,
   No. 1:22-cv-07464, 2023 WL 3478604 (D.N.J. May 16, 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023) .................................................20

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
   No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023) .........................................................7

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................................................5, 6, 18

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) .................................................................................6

*Nat'l Ass'n for Gun Rts. v. Lamont*,
    No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3. 2023), *appeal docketed*,
    No. 23-1162 (2d Cir. Aug. 16, 2023) ...................................................................16

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023
    WL 4542153 (July 14, 2023) ............................................................................7, 8

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ...............................................................................passim

*Oregon Firearms Fed'n v. Kotek*,
    No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*,
    Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) .................................3

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019) .........................................................................................2

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022
    WL 2382319 (9th Cir. June 28, 2022) .................................................................2

*Shelby Cnty., Ala. v. Holder*,
    570 U.S. 529 (2013) ..........................................................................................20

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) .................................................................................6

*United States v. Meyer*,
    No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023) ........................11

## ORDINANCES

An Ordinance providing for the government and protection of public parks and squares of the city of Trenton (approved June 26, 1890), § 8, in *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) .........................................................21

An ordinance relating to parks and public squares of the City of Spokane (passed Mar. 11, 1892), § 4, in *Municipal Code of the City of Spokane, Washington* 316 (1896) ...................................................................................................................................21

Parks and Public Grounds § 1724, in *Laws and Ordinances of the City of Peoria, Illinois* 667 (1892) ...............................................................................................................22

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............11, 12

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) .............................................................................13, 17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ...............................................................13, 17, 18

Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022)........................................................................................21

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)......9

James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ...................................................21

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...................................................................9, 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .....11, 12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) .....................................................................................................10

Library of Congress, Municipal Codes: A Beginner's Guide,

https://guides.loc.gov/municipal-codes/older-municipal-codes .......................22

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) .........................................................................9

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ......................................................................9

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ........................................9

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ...............................................................................8

U.S. Bureau of the Census, *Historical Statistics of the United States, Colonial Times to 1970*, ch. A, series A57-72 (1975), https://www.census.gov/history/pdf/histstats-colonial-1970.pdf .....................22

U.S. Bureau of the Census, *Population in the Colonial and Continental Periods* 9, Table 1, *in A Century of Population Growth in the United States: From the First Census of the United States to the Twelfth: 1790-1900* (1909) ..................................................18

U.S. Census Bureau, *2020 Census Urban Areas Facts* (last updated June 29, 2023), https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2020-ua-facts.html..............................................................22

U.S. Census Bureau, *Urban and Rural Areas—History*, https://www.census.gov/history/www/programs/geography/urban_and_rural_areas.html .......................................................................................22

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 90 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See, e.g., Ass'n of N.J. Rifle &*

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

*Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92 & n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11 nn.4 & 7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The challenged provisions of New York's firearms laws—which (i) require a separate license to carry firearms in New York City, (ii) prohibit the open carry of firearms, and (iii) prohibit firearms on subways and commuter trains and in Times Square—are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons the City and State Defendants set out in their briefs. *See* Dkts. 61 ("City Br.") & 62 ("State Br."). Everytown submits this amicus brief to expand on two points. *First*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Second*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, and it does not require a government to

prove that the laws it presents meet some arbitrary threshold of population coverage.

## ARGUMENT

### I. The Proper Focus for Analysis of Historical Regulation Is the Reconstruction Era, Not the Founding Era

After *Bruen*, this Court must first decide "whether the plain text of the Second Amendment protects" a person's "proposed course of conduct." *Bruen*, 142 S. Ct. at 2134.[2] If so, the burden shifts to the government to show its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

If the Court proceeds to the second, historical inquiry, the most relevant time period for that inquiry centers on the Reconstruction Era—the years

---

[2] Plaintiffs have the burden on this first question. *See, e.g.*, *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 n.4 (D. Or. July 14, 2023) (concluding that "the burden is on the plaintiff … to show that the challenged law implicates conduct covered by the plain text of the Second Amendment," in light of *Bruen*'s language and "first principles of constitutional adjudication" (quotation marks omitted)), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.). And, as the City discusses (*see* City Br. 17-18, 30), and Everytown explained below, Plaintiffs have not carried this burden here: they broadly assert a desire to carry handguns "everywhere [they] go[]," without "hav[ing] to seek permission from anyone." Pls.' Second Amended Complaint, *Frey v. Nigrelli*, No. 7:21-cv-05334, Dkt. 47, ¶¶ 29, 31, 40, 51, 53, 61, 73, 76, 81, 91, 93, 142. But it is well established that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2128 (quoting *Heller*). Plaintiffs' challenge therefore fails at *Bruen*'s first step and this Court need not proceed to the historical analysis. *See* Everytown Amicus Br., *Frey v. Nigrelli*, No. 7:21-cv-05334, Dkt. 72, at 2-4.

surrounding 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states—not the founding era. As the City and State have shown, the challenged restrictions are entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. Accordingly, like the Supreme Court in *Bruen*, this Court need not resolve the issue of the correct time period in this case. *See Bruen*, 142 S. Ct. at 2138 (explaining that, with respect to carrying handguns in public without special need, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same"). Nevertheless, if this Court wishes to resolve the issue to guide district courts in future cases, it should hold that the inquiry centers on 1868.

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era

4

understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Several other circuits reached the same conclusion in analyzing the tradition

of firearm regulation at the first, historical step of the then-applicable Second

Amendment framework.[3] *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir.

2012) (following *Ezell*); *Gould*, 907 F.3d at 669 ("Because the challenge here is

directed at a state law, the pertinent point in time would be 1868 (when the

Fourteenth Amendment was ratified).").[4] *Bruen* does not alter that conclusion; the

step-one analyses in these cases remain, as a general matter, good law. *See* 142 S.

Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus);

---

[3] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

[4] As *Ezell* explained, "*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified." 651 F.3d at 702. An unpublished article (not included in the record below, *see* State Br. 59 n.22) that Plaintiffs submitted with their appendix, *see infra* p. 14, argues that *Ezell* "simply made a mistake" in this analysis, and that the Seventh Circuit quickly "changed course" in *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). *See* A109-10. But *Ezell*'s analysis is sound, and *Moore* did not even mention this portion of *Ezell*, let alone disagree with it or purport to correct it. *Moore* referred to 1791, but it did not hold that 1791 is the only relevant time period for historical inquiry. Nor did it consider the implications for originalism of the fact that the Second Amendment did not apply against the states until 1868. Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138.

*id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi* (*NRA v. Bondi*), 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains sound and consistent with originalist principles. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." … The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations in original) (citations omitted); *see also Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from the time period of the

7

ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023).

That the 1868 understanding of the Second Amendment right should apply in a case against a state is far from a radical position. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position leading scholars of originalist theory have taken. "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *NRA v. Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also*

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); State Br. 58 (citing Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 (2008), and Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022)). Others who have endorsed this view include Michael Rappaport[5] and Stephen Siegel.[6] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.[7]

---

[5] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008).

[6] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

[7] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a

A question raised by that conclusion (though one not directly presented in this case) is what the temporal focus should be in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted that prior decisions had "assumed" that the scope for both state and federal

---

state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 10-13.

governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform

their meaning not only against the states, but also as to the federal government.[8]
More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people
adopted the Fourteenth Amendment into existence, they readopted the original Bill
of Rights, and did so in a manner that invested those original 1791 texts with new
1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view,
too, 1868 meanings bind both the states and the federal government.

    The 1868 view is also consistent with the passage in *Bruen* instructing the
lower courts on historical methodology through the example of sensitive-places
restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained
adequate restrictions on the possession of guns in legislative assemblies, polling
places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133
(emphasis added)—an incomprehensible statement if the Court believed that the
18th century was the only relevant period. Notably, in the pages of the article and
brief the Court cited for that proposition, *see id.*, all of the 19th-century laws
restricting guns in any of the three locations the Court listed were from the *late* 19th

---

    [8] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle
in the Bill of Rights may change its shape in the process of absorption into the
Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into
the Fourteenth Amendment, various rights and freedoms of the original Bill may
be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth
Amendment has a doctrinal 'feedback effect' against the federal government"); *see
also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh
after 1866.").

century.[9]

Moreover, 1868 is neither a starting-line nor a cutoff; *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to

---

[9] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

"settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority) settle the meaning of the Second Amendment right and demonstrate that the challenged laws are constitutional.

Here, state and local laws from the period beginning around Reconstruction and continuing into the 20th century—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the challenged regulations. *See, e.g.*, State Br. 23-28, 31-35, 37-40; City Br. 21-26, 30-32, 39-42, 43-50. And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like New York's.

Plaintiffs' arguments to the contrary, which rely heavily on an unpublished article submitted with their appendix, do nothing to undermine this analysis. *See* Pls. Br. 12-16, 34-38; *see also* State Br. 59-61 (discussing why this article is "unpersuasive"). Plaintiffs fail to address the central originalist issue—the fact that,

in a case against a state, applying the 1868 understanding is the only way to satisfy the Supreme Court's mandate that constitutional rights "are enshrined with the scope they were understood to have *when the people adopted them*." *See supra* p. 5 (quoting *Bruen* quoting *Heller*). Whereas *Bruen* marked the path for originalists to apply the 1868 understanding in federal cases too—by citing leading scholars who explain that the Fourteenth Amendment *updated* the meaning of the Second Amendment for the federal government as well as the states—Plaintiffs have no account to justify forcing on the states a 1791 understanding of the right to keep and bear arms that the 1868 generation did not share when they bound the states to respect that right.

Plaintiffs also fail to account for *Bruen*'s reliance, in discussing sensitive places, on "18th- *and 19th*-century" laws. *See supra* p. 12. They simply ignore *Bruen*'s recognition that later practice can "liquidate" indeterminate or unsettled meaning. *See supra* pp. 18-19. And they fail to recognize that the Court rejected reliance on certain late 19th- and early 20th-century laws in *Bruen* only because that evidence "*contradicted*" what the Court understood to be affirmative earlier evidence of a right to bear arms in public for self-defense without showing special need. *See infra* note 12; *see also, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *31 n.51 (D. Conn. Aug. 3. 2023) (noting that "[n]owhere does *Bruen* forbid consideration of any regulations or history after the end of the 19th

15

century," and that the Supreme Court "chose not to address the 20th century evidence submitted because it 'contradicts earlier evidence,' not because 20th century evidence is *per se* irrelevant"), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023). Here, Plaintiffs point to no affirmative evidence that the founding generation (or any other generation) would have considered the sensitive-place and licensing restrictions at issue here to be unconstitutional.

Finally, *even if* the meaning of the Second Amendment right is keyed to the public understanding in 1791, the actions of state legislatures in the decades around Reconstruction—starting *within the lifetimes* of some who were alive at the founding—are robust evidence of how the public understood the right to keep and bear arms at the founding. For Plaintiffs to suggest that they have better insight into the founding-era understanding of the Second Amendment right in 2023, 232 years distant from its ratification, than the Reconstruction generation had when 77 years distant, is nothing short of hubris.

## II.    The City's and the State's Historical Analogues Are More than Sufficiently Representative

Challengers in other recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*. *See, e.g.*, Pls.' Br. at 2, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Mar. 2, 2023), Dkt. 136. No such argument is remotely tenable in this case, given the City's and State's

16

robust and extensive record of historical laws. But to the extent this Court chooses to address the issue here, it should observe, in light of *Bruen*'s discussion of the historical laws justifying sensitive places, that a small number of laws can establish a tradition and that small-population jurisdictions matter.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Indep. Inst. *Bruen* Br. 11-12.[10] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were enacted three years apart, in 1647 and 1650, in a single colony, Maryland, that made up an estimated 8.7 percent of the total population in 1650.[11] *See id.*; Kopel &

---

[10] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

[11] *See* U.S. Bureau of the Census, *Population in the Colonial and Continental Periods* 9, Table 1, *in A Century of Population Growth in the United States: From the First Census of the United States to the Twelfth: 1790-1900* (1909), *available at* https://www2.census.gov/library/publications/1909/decennial/century-

Greenlee, 13 Charleston L. Rev. at 235. This analysis demonstrates that a small number of laws covering a small proportion of the nation's population can suffice to establish a tradition of regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[12]

Concluding that a small number of laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct,

---

populaton-growth-part02.pdf.

[12] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative comment should not be given undue weight given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is no such "overwhelming" evidence of a right to carry openly, without a license, or in any of the locations that New York's challenged laws regulate. And—to be clear—even if there were evidence of a traditional *practice* of such carrying, that would not be enough. *Compare* Kopel & Greenlee, 13 Charleston L. Rev. at 235 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressmen to be armed"), *with Bruen*, 142 S. Ct. at 2133 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies).

18

not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[13]

---

[13] Indeed, any such inference would be untenable in light of the Court's statement, in a case decided the day after *Bruen*, that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

19

Nor should courts reject historical laws merely because they covered a small percentage of the nation's population, as some district courts have done,[14] for at least three further reasons. *First*, dismissing the laws of states with smaller populations is in tension with what the Supreme Court has deemed a "historic tradition" and "fundamental principle" of our constitutional bargain: "that all the States enjoy equal sovereignty." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 540, 544 (2013) (citations omitted). If the people of a small state responded to local needs by enacting certain policies, the fact that their neighbors in a larger state chose a different path does not nullify the constitutional agency of the smaller state. *Second*,

---

[14] The opinion in *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022), *appeal docketed*, No. 22-2908 (2d Cir. Nov. 9, 2022), seems to have encouraged other district courts to analyze historical laws according to their population base. *See id.* at 300, 301, 317-18, 320, 324, 325-26, 334, 336, 342-43 (deeming laws that governed less than 15 percent of the nation's population insufficiently representative to form a historical tradition under *Bruen*); *Koons v. Platkin*, No. 1:22-cv-07464, 2023 WL 3478604, at *78 (D.N.J. May 16, 2023) (citing *Antonyuk* for same proposition), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023); *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 442 (W.D.N.Y. 2022) (rejecting laws "governing a small minority of population"), *appeal docketed*, No. 22-2933 (2d Cir. Nov. 15, 2023); *cf.* A175 (noting that laws governing 28.6 percent of the national population were sufficiently representative). The court in *Antonyuk* believed this statistical approach to be dictated by *Bruen*'s brief reference to laws covering "miniscule territorial populations" that totaled less than one percent of the nation. 639 F. Supp. 3d at 256 (quoting 142 S. Ct. at 2154). But the Supreme Court there was merely explaining why a handful of territorial carry restrictions did not counteract the "overwhelming evidence" it had already found in favor of "an otherwise enduring American tradition permitting public carry," *Bruen*, 142 S. Ct. at 2154. Accordingly, absent "overwhelming" evidence of a widespread contrary tradition, a jurisdiction's relatively small population size is no reason to deny it a role in the nation's historical tradition.

as multiple historians have commented, the process of unearthing and understanding historical laws demands patience and openness to constant reevaluation.[15] Where a state—particularly at the preliminary-injunction stage—has produced historical laws covering only a small percentage of the nation's population, newly-discoverable historical sources may later yield more examples and increase that percentage. To discard a state's proffered laws for failing to meet some unstated population threshold is to fundamentally misunderstand the gradual and cumulative nature of historical research. And *third*, a population-based approach is structurally unsuited to cases, like this one, that implicate what were, historically, quintessentially local and municipal concerns. For one thing, many historical regulations of public space in cities and towns are likely to be found in local ordinances. *See, e.g.*, City Br. 23-24.[16] But the decentralization of

---

[15] *See* Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) (explaining historical research process); James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ("History is a continuing dialogue between the present and the past. Interpretations of the past are subject to change in response to new evidence, new questions asked of the evidence, new perspectives gained by the passage of time.").

[16] For examples of local ordinances restricting firearms in public squares, *see, e.g.*, An Ordinance providing for the government and protection of public parks and squares of the city of Trenton (approved June 26, 1890), § 8, *in City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) ("No person shall carry firearms … in said park or squares, or within fifty yards thereof[.]"); An ordinance relating to parks and public squares of the City of Spokane (passed Mar. 11, 1892), § 4, *in Municipal Code of the City of Spokane, Washington* 316 (1896) ("All persons are forbidden

municipalities, the inconsistent preservation of local records, and the loss of

primary sources over time all present significant challenges for the historical

research process just mentioned. *See generally* Library of Congress, Municipal Codes:

A Beginner's Guide, https://guides.loc.gov/municipal-codes/older-municipal-

codes (last visited Sept. 26, 2023). Additionally, even in the absence of these serious

research constraints, if judged only against the total population of the United

States, local historical regulation of urban public space would not present a clear

picture of the acceptance of such regulation—because the proportion of the nation

living in cities was substantially smaller during the founding and Reconstruction

eras as compared to today.[17]

---

to carry firearms … within any one of the public parks or other public grounds of the city[.]"); Parks and Public Grounds § 1724, *in Laws and Ordinances of the City of Peoria, Illinois* 667 (1892) ("All persons are forbidden to carry fire arms ... within any of the public parks, public squares, or public grounds, within said city.").

[17] According to the U.S. Census Bureau, the percent of the population that lived in urban areas was 5.1 percent in 1790, 25.7 percent in 1870, and 80 percent in 2020—although the population thresholds used to define urban areas have changed over time. *See* U.S. Bureau of the Census, *Historical Statistics of the United States, Colonial Times to 1970*, ch. A, series A57-72 (1975), https://www.census.gov/history/pdf/histstats-colonial-1970.pdf; U.S. Census Bureau, *2020 Census Urban Areas Facts* (last updated June 29, 2023), https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2020-ua-facts.html; U.S. Census Bureau, *Urban and Rural Areas—History*, https://www.census.gov/history/www/programs/geography/ urban_and_rural_areas.html (last visited Sept. 21, 2023).

## CONCLUSION

This Court should affirm the judgment of the district court.

September 26, 2023                    Respectfully submitted,

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

*Counsel for amicus curiae*
*Everytown for Gun Safety*

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 6,216 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

September 26, 2023                    /s/ Janet Carter

                                     *Counsel for amicus curiae*
                                     *Everytown for Gun Safety*

24